IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
PARIS DIVISION

LINDA FREW, ET AL.,              §
    Plaintiffs,              §
                                  §
v.                                §      Civil Action No. 3:93CA65
                                  §
DON GILBERT, ET. AL.,            §
    Defendants                    §

## MEMORANDUM OPINION

### Table of Contents

PART ONE: FINDINGS OF FACT REGARDING VIOLATIONS OF CONSENT DECREE
    Background and Procedural History
    Issue I: Outreach
        A. Overview
        B. Findings of Fact: Outreach
            1. Knowledge and Understanding
            2. Transportation
            3. Receipt of Services after Oral Outreach
            4. Low Participation Rates
            5. Insufficient Staffing
        C. Violations of Decree: Outreach
        D. Providers' Requests for Outreach: Findings of Fact Regarding Violations of Decree
        E. Outreach Reports: Findings of Fact Regarding Violations of Decree
    Issue II: Medical and Dental Checkups
        A. Overview
        B. Findings of Fact: Checkups
            1. Medical Checkups
            2. Dental Checkups
                a. Services
                b. Provider Recruitment
            3. Teens
            4. Abused and Neglected Class Members
        C. Violations of Decree: Checkups
            1. Principles of Statutory Interpretation
                a. Structure and Context
                b. Legislative Intent
            2. Waiver
            3. The Cases
        D. Checkups Reports: Findings of Fact Regarding Violations of Decree
    Issue III: Corrective Action Plans
        A. Corrective Action Plans for Lagging Counties: Findings of Fact Regarding Violations of
            Decree
            1. What is "Lagging"?
            2. Counties with Few Class Members
            3. Managed Care Counties
            4. Checkups Versus Treatments
            5. Professionally Acceptable Data Analyses

1

*B. Corrective Action Plans for Transportation System*
    *1. Overview*
    *2. Role and Importance of Defendants' Transportation System*
    *3. Findings of Fact Regarding Violations of Decree*
**Issue IV: Managed Care**
    *A. Defendants' Managed Care Programs*
    *B. Findings of Fact: Receipt of Services by Class Members Enrolled in Managed Care*
        *1. Overview*
        *2. Inaccurate and Inflated Data*
        *3. THQA Focus Studies*
        *4. Comparing Managed Care and Fee-for-service Systems*
        *5. Incomplete Checkups*
        *6. Problems with the Medical Home and Primary Care Provider Models*
            *a. The PCP*
            *b. Crowded Clinics and Emergency Rooms*
        *7. Access to Specialists*
        *8. Access to Pediatric Care and Mental Health Services*
        *9. THQA Provider and Consumer Studies*
        *10. Self-Reporting by Class Members*
            *a. B.M. and Samantha*
            *b. C.H. and Sons*
            *c. C.O.*
    *C. Violations of Decree: Receipt of Services by Class Members Enrolled in Managed Care*
    *D. Children of Migrant Farmworker Families*
        *1. The Problem*
        *2. Findings of Fact Regarding Violations of Decree*
    *E. Training of Health Care Providers in the Managed Care System: Findings of Fact Regarding Violations of Decree*
    *F. Data Collection in the Managed Care System: Findings of Fact Regarding Violations of Decree*
**Issue V: Toll-Free Numbers**
    *A. Overview*
    *B. Findings of Fact: Prompt Answering of All Calls*
    *C. Violations of Decree: Prompt Answering of All Calls*
        *1. Abandonment Rates*
        *2. Waits in Queue*
        *3. Unit of Measurement*
    *D. Knowledgeable, Helpful, and Polite: Findings of Fact Regarding Violations of Decree*
**Issue VI: Case Management**
    *A. Role and Importance of Case Management*
    *B. Findings of Fact*
        *1. The Need*
        *2. Utilization*
        *3. Sufficient Staffing*
        *4. The Safety Net*
        *5. Recruitment*
    *C. Violations of Decree*
**Issue VII: Outcome Measures**
    *A. Overview*
    *B. Findings of Fact Regarding Violations of Decree*
        *1. Joint Notice Measures*
        *2. Unilateral Substitution of Measures*

*3. Corrective Action Plans*

*4. Timing*

**Issue VIII: Training for Health Care Professionals**

*A. Findings of Fact*

*B. Violations of Decree*

**PART TWO: DEFENDANTS' OBJECTIONS TO ENFORCEMENT OF CONSENT DECREE**

**Issue I: Enforcement of the Medicaid Statute**

*A. Law of the Case*

*B. Supreme Court Jurisprudence on Enforceable Rights*

*C. The EPSDT Provisions of the Medicaid Act*

**Issue II: Eleventh Amendment Objection**

*A. Defendants' Objection*

*B. Lelsz v. Kavanagh*

*1. Overview*

*2. The Holding: A Closer Look*

*3. The Narrowing of Lelsz*

*4. An Untenable Distinction?*

*C. Application*

*1. Enforcement of Provisions Guaranteeing Services*

*a. Outreach*

*b. Services*

*c. Managed Care*

*2. Enforcement of Provisions Requiring Reporting of Data and Information*

*a. Reporting*

*b. Outcome Measures and Corrective Action Plans*

*3. Enforcement of Training and Toll-Free Line Provisions*

**CONCLUSION**

3

# PART ONE: FINDINGS OF FACT REGARDING VIOLATIONS OF DECREE

*Background and Procedural History*

This civil action, filed on September 1, 1993, concerns the alleged failure of the State of Texas

to implement a Medicaid program that assures that indigent children and youth receive timely,

comprehensive health care.  The case was brought by a class of more than one and one-half

million indigent children in Texas who are entitled to health benefits through the Early Periodic

Screening, Diagnosis and Treatment program ("EPSDT").  *See* 42 U.S.C. §§ 1396a(a)(43)[1];

1396d(r).[2]  In Texas, the program is referred to as the "Texas Health Steps" program, which is

---

[1]Title 42 U.S.C. § 1396a(a) provides:
A State plan for medical assistance must--

. . .

(43) provide for--
> (A) informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance including services described in section 1396d(a)(4)(B) of this title, of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title and the need for age-appropriate immunizations against vaccine-preventable diseases,
> (B) providing or arranging for the provision of such screening services in all cases where they are requested,
> (C) arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services, and
> (D) reporting to the Secretary (in a uniform form and manner established by the Secretary, by age group and by basis of eligibility for medical assistance, and by not later than April 1 after the end of each fiscal year, beginning with fiscal year 1990) the following information relating to early and periodic screening, diagnostic, and treatment services provided under the plan during each fiscal year . . .

[2]This provision of federal law sets forth the minimum services which the state must provide under the EPSDT program, including: 1) screening services, including comprehensive health and developmental histories, comprehensive unclothed physical exams, appropriate

administered jointly by the federal government and the Texas Health and Human Services Commission.   EPSDT is intended to be "the nation's largest preventive health program for children." H.R. 3299, 101st Cong. § 4213 (1989). It is "among the most important programs that the Texas Department of Health runs." *Order Concerning Fairness of Consent Decree* at 8 (filed January 25, 1996)(hereinafter "*Fairness Order*")(internal quotes omitted).

The purpose of the EPSDT program is to ensure that poor children receive comprehensive health care at an early age, so that they will develop fewer health problems as they grow older. EPSDT is designed to provide health education, preventive care, and effective follow-up care for conditions identified during check-ups.  Preventive health care identifies health problems that may respond to early treatment but, if left untreated, may instead lead to serious health conditions.  For example, a heart murmur detected during an EPSDT screening, if untreated, could lead to heart failure.  Severe anemia, if untreated, could result in behavioral problems and reduced mental capacity.  Other important components of the EPSDT program include immunizations, parental education, assistance with scheduling appointments and transportation assistance, and coordination of EPSDT and other programs serving Medicaid-eligible children.

After two years of extensive negotiation following the filing of this case, the parties proposed a partial consent decree to this court in July of 1995.  During a fairness hearing held in

---

immunizations, laboratory tests (including appropriate lead blood level assessments), and health education;  (2) vision services, including diagnosis and treatment for vision defects;  (3) dental services, including "relief of pain and infections, restoration of teeth, and maintenance of dental health";  (4) hearing services, including diagnosis and treatment for defects in hearing;  and (5) "such other necessary health care ... to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered by the State plan."

December of that year, the parties urged the court to approve the proposed decree.  The court

approved the decree as fair, reasonable, and adequate on February 16, 1996.  Per the agreement

of both parties, the decree expressly retains the court's jurisdiction to rectify violations of its

terms, and provides a mechanism to invoke this jurisdiction.  Consent Decree, ¶ 303.[3]

*The Plaintiffs' Claims*

Currently pending before the court is plaintiffs' motion to enforce multiple provisions of

the consent decree with which defendants allegedly have not complied.  Specifically, plaintiffs

allege that defendants have failed to: 1) implement properly the outreach program and deliver

required outreach reports; 2) assure that all class members receive medical and dental checkups;

3) develop and implement annual corrective action plans both for counties that lag behind the

statewide average for checkups and for the state's medical transportation system; 4) operate the

state's managed care system consistently with the mandates of the decree; 5) operate toll-free

numbers so as to ensure that all calls are answered promptly by a knowledgeable and helpful staff

member; 6) provide case management to all class members who need it, statewide; 7) develop

methods to study each agreed health outcome measure; and 8) provide EPSDT training for health

care providers.

---

[3]Paragraph 303 provides in full:

303.  This Decree contemplates that the parties will reach agreement in the future about several issues.  It further
contemplates that Defendants' future activities will comport with the terms and intent of this Decree.  If this proves
to be incorrect, the parties may request relief from this Court.  Absent emergency, no party may request relief from
the Court without first providing the opposing party with one month's written notice.

*The Defendants' Responses*

Defendants deny that plaintiffs are entitled to any relief sought, and maintain that they are in full compliance with the decree. In addition, they argue that in interpreting the consent decree to require certain specific actions by defendants, plaintiffs seek to modify the decree, and not merely to enforce it. In the alternative, defendants argue that a federal court's jurisdiction over a state official is limited by the Eleventh Amendment to requiring compliance with federal law. Therefore, defendants argue that the decree itself may not be enforced against them to the extent that it goes beyond the scope of simple compliance with federal law.

*The Hearing and Memorandum Opinion*

A hearing was held from March 13 - March17, 2000, on plaintiffs' motion to enforce the decree, and evidence was heard on each of the above-listed issues. Following the hearing, the court invited the parties to submit briefs on several of the legal issues involved in this case. Additionally, plaintiffs submitted proposed orders of enforcement, to which defendants responded. The following is a memorandum opinion that grants plaintiffs' motion to enforce the decree in part. Part One of the opinion details the court's findings of fact regarding defendants' specific violations of the consent decree, as interpreted by the court. Part Two addresses defendants' objections to the enforcement of various provisions of the decree. The court's Order of Enforcement accompanies these findings of fact and conclusions of law as a separately issued order.

## I. Issue One: Outreach

### A. Overview

The decree elaborates in detail the defendants' obligations to conduct outreach efforts aimed at increasing participation and the receipt of needed services. For example, it requires defendants to inform all class members about checkups and other services, and to assist them in arranging for checkups and needed care. ¶¶ 10-74. These decree paragraphs stem from the federal requirement that a state plan for medical assistance that details the state's obligations pursuant to their participation in the federal Medicaid program must "provide for" the "informing" of all eligible recipients of EPSDT services of the availability of those services. 42 U.S.C. §1396a(a)(43)(A). The decree also requires defendants to provide outreach to "encourage EPSDT recipients to fully use services" and "assist recipients to overcome common barriers that prevent them from using EPSDT services." ¶ 50.[4] These barriers include the "lack of a health care provider," "communication problems," "transportation problems," and "lack of knowledge" about the program. ¶ 51. As was explained to the court:

> [I]f poor parents understood the concept of prevention and understood the value of having their child seen early and on a regular basis and they understood the outcome they could expect, which is a child with no decay and pretty white teeth and a pretty smile, of course they would [seek services].

TR 252, line 23 to 253, line 14; *see also* TR 308, lines 13-15. (Testimony of Nancy Seale, D.D.S., M.S.D.[5]).

---

[4] The defendants may provide outreach by use of their own staff or by contract. ¶ 26.

[5] With no objection from defendants, the court qualified Dr. Seale as an expert in "pediatric dentistry, oral health conditions, and problems of children, including members of the class and barriers that prevent class members from seeking dental care." TR 250, lines 11-8. Dr. Seale has taught dentistry, and the specialty of pediatric dentistry, since 1972. She has taught primarily at Baylor College of Dentistry in Dallas, where she is now the chairwoman of the

## B. Findings of Fact: Outreach

At issue is defendants' compliance with decree provisions requiring that they maintain sufficient staffing and other resources to conduct outreach "effectively" (¶ 32) and that they "effectively inform" class members about EPSDT services to which they are entitled (¶¶ 11, 52).[6]

Abundant evidence that defendants have violated the decree's outreach provisions was presented to the court. The evidence may be sorted into five categories: 1) evidence of class members' lack of knowledge of defendants' services, 2) evidence related to defendants' transportation system, 3) evidence that plaintiffs do not often obtain services after having received outreach contacts, 4) evidence of plaintiffs' low participation in defendants' programs, and 5) evidence of defendants' insufficient staffing of their outreach programs.[7]

### *Knowledge and Understanding*

Overwhelming evidence was presented – both statistical and anecdotal – demonstrating that large numbers of class members do not know about Texas Health Steps, or do not understand the breadth of services to which they are entitled.

---

pediatric dental program. In addition, Dr. Seale has many years of personal experience with the provision of dental care to class members. TR 248, lines 10-22; TR 328, line 24 to 329, line 3. Dr. Seale is responsible for two hospital-based dental programs for children in Dallas. Also, Dr. Seale is involved at both the state and national level in organized dentistry, and has published extensively in the field of pediatric dentistry. She is a member of the editorial board for *Pediatric Dentistry*. P.Ex. W-6. Dr. Seale was not paid for her testimony. TR 250, lines 9-10.

[6]These obligations are discussed in more detail in Section I(C), following the court's findings of fact in this area.

[7]Because they implicate different paragraphs of the decree, plaintiffs' related complaints concerning defendants' failure to respond effectively to provider requests for outreach and defendants' failure to report outreach efforts as required by the decree will be treated separately, in Sections I(D) and I(E), respectively.

Numerous witnesses testified to the lack of understanding about defendants' services among class members. For instance, one witness testified about parents who are "overwhelmed with [] confusion" about the program. TR 163, lines 8-13. (Testimony of Carolynn Singleton, M.P.H., R.N.[8]). She explained that class members view Medicaid as a program to use only if they become sick. She stated that class members are not aware of the preventive dental services to which they have access, and the transportation services they could use to gain access to such care. TR 162, lines 1-15.

Another witness testified that most class members "do not seem to be familiar with all the services Medicaid provides," noting that class members often do not know how many prescriptions they may receive, have not heard of the medical transportation program, and do not know about eyeglass coverage or dental coverage. TR 19, line 22 to 20, line 8. (Testimony of Jane McHan, M.S.W.[9]). A third witness also testified that a common problem for class members

---

[8]The court qualified Ms. Singleton as an expert "in the field of preventive and primary care for children who have Medicaid, including barriers to their receipt of health care." She is a registered nurse, and has a master's degree in public health from Tulane University. P.Ex. W-7. Ms. Singleton estimates that she has conducted about 20,000 Texas Health Steps medical checkups over the course of her career. In addition, Ms. Singleton is an owner of Agapé Clinics of Texas, which opened in 1991. Agapé operates four clinics in the Dallas-Fort Worth area. The Arlington clinic alone sees more than 4,000 class members every year. P.Ex. A-8 at 4. Agapé employs three physicians, an optometrist, four nurse practitioners, twelve registered nurses trained to perform Texas Health Steps medical checkups, medical assistants and support staff. TR 183, lines 2-18. Agapé also provides Texas Health Steps checkups for Head Start students in many Texas counties, as well as checkups and primary care for many class members. TR 217, line 5 to 218, line 9.

[9]The court qualified plaintiffs' witness Jane McHan as an expert in "the field of social work and case management as it applies to class members, including barriers to class members' receipt of health care." TR 18, line 16 to 19, line 3. She has worked with low-income families for over twenty years. TR 41, lines 13-18. Ms. McHan has been the director of the Parent Case Management Program in Abilene for three years, where she supervises eight case managers. TR 13, line 24 to 14, line 7; TR 17, lines 1-5. She has a master's degree in social work. She TR 16,

is that they do not understand their benefits under Medicaid. TR 760, line 20. (Testimony of Carol

Tillman[10]). *See also* P.Ex. M-17.

> Echoing the testimony of these experts, a fourth witness explained that

> [t]he families are under-informed about the Medicaid program. They do not understand all the concepts about preventive care. Most of the families do not know what coverage their children have and do not have through Medicaid. . . . Most of them do not understand what a checkup is; they think this means any contact with a medical provider's office.

P.Ex. A-8 at 5 (Deposition of Deborah Skaggs[11]). Furthermore, it was demonstrated that class

members do not understand preventive dental care or Medicaid dental benefits:

> [T]he families of the poor children work under the assumption [that] you go to the dentist when you have a toothache, and you go to the dentist when you have a problem, otherwise you don't go. And I think they need to be taught. . . . [T]he ones who haven't been taught don't know what they can expect. They simply don't know, and I think a large percent of [class members'] parents don't know. . . . [O]ne of the single greatest reasons that they don't seek [dental care] is they simply don't know.

---

lines 19-25. She also has taught social work at Hardin Simmons University for over ten years. TR 17, lines 7-11; *see also* P.Ex. W-1. Ms. McHan was not paid for her testimony.

[10]The court qualified Ms. Tillman as an expert in "managed care especially as [it applies] to class members, including barriers to class members' receipt of health care." TR 68, lines 5-15. She has fifteen years of experience in the managed care field, including experience in senior management positions with several managed care companies. TR 65, line 10 to 66, line 17. From 1995 to 1997, she served as the vice president and chief operating officer for Community First Health Plans, an HMO that is owned by the Bexar County Hospital District in San Antonio. TR 66, line 18 to 67, line 1. Most of Community First's membership has Medicaid. TR 67, lines 16-21; *see also* P.Ex. W-11. As vice president and chief operating officer, Ms. Tillman oversaw the day to day operation of the HMO and was responsible for probably every department except for medical management and claims. TR 67, lines 6-11. She was responsible for provider relations and member services. TR 67, lines 12-5. Ms. Tillman was not paid for her testimony.

[11]Deborah Skaggs works at Agapé Clinics with Ms. Singleton. She helps class members to resolve problems with gaining access to Medicaid managed care programs. She has worked at Agapé for about six years. P.Ex. A-8 at 4.

TR 253, line 19 to 254, line 11. (Testimony of Dr. Seale).

Furthermore, defendants' August, 1998 Outreach and Marketing Report notes that class members "were consistently surprised to learn that Texas Health Steps offers dental and vision care, free transportation and eligibility until age 21." P.Ex. O-1, at 2. This report also indicates that 60% of participating EPSDT clients knew "very little" (12%) or "nothing at all" (48%) about the program. *Id.* at 8. Potential clients knew even less: 70% of those eligible but not enrolled reported knowing very little or nothing at all about Texas Health Steps. *Id.* at 7. The study also revealed that parental confusion about which services they have or have not obtained for their children may operate as a barrier to plaintiffs' receipt of care. For example, class members' families often confuse EPSDT services with other services they may have received, such as services from the Women's Infants' and Children's program (WIC). *Id.* at 8.

Moreover, class members' parents sometimes do not understand what a dental visit is or think their child has had a dental visit when in fact the child has not. TR 274, lines 23-25. (Testimony of Dr. Seale). Parents frequently believe that class members are up to date on checkups and immunizations, when in fact they are not. TR 165, line 10 to 166, line 25. (Testimony of Ms. Singleton). As Dr. Seale noted, when "a parent thinks a child has already had a visit, . . . [but the child is actually overdue for a checkup] . . . they may not follow through . . . because they think the child has already had one." TR 275, lines 10-18.[12]

---

[12]Defendants' reliance on plaintiffs' loosely conducted survey of class members concerning their knowledge of the scope of EPSDT services is misplaced. D.Ex. 95. That is, the court is persuaded that although class members may think they know the full array of services to which they are entitled, they may not actually have been informed fully or correctly. The study also lacks indicia of scientific validity. For these reasons, defendants' 1998 Outreach and Marketing report is found to be a more reliable gauge of class members' knowledge and understanding of the Texas Health Steps Program.

### *Transportation*

The class members' lack of knowledge of the free medical transportation system is perhaps the clearest example of a failed outreach program.  Many of plaintiffs' expert witnesses quoted in the above section testified to this lack of knowledge.  The Texas Legislature's Sunset Advisory Commission Health and Human Services Staff Report for 1998 states that "the lack of information about available client transportation services . . . [is] . . . a major barrier to accessing needed transportation."  P.Ex. —3 at 115.  Furthermore, according to a Texas A&M University study of defendants' transportation program, "[o]n average, recipients who do not use MTP report fewer medical and dental appointments than MTP users."  P.Ex. T-43 at 54.  However, despite the importance of the transportation program, it is severely underutilized.[13]  This underutilization, stems from the failure of the defendants' outreach program to make class members aware that MTP exists:

> Recipients who did not use MTP simply did not know about the program or the services it provided. . . . [S]lightly more than a third of non-users reported any knowledge of MTP.  Of those who had heard of the program, only a small fraction had actually heard of any of the specific MTP funded services.

P.Ex. T-43 at 55.[14]

---

[13]MTP services are used by only a small fraction of those who qualify for the service.  For example, 98% of those eligible for transportation assistance had not used MTP in the year prior to the survey.  P.Ex. T-43 at 54.

[14]Defendants report that 63% of the medical transportation program participants were very satisfied with the program.  TR 887, lines 2-5.  However, this statistic reflects only the degree of satisfaction among the program's users, not the problems relating to the lack of knowledge among the class as a whole as to the program's existence.

### *Receipt of Services after Oral Outreach*

The effectiveness of defendants' outreach program may also be measured by the number of class members who opt to receive services after having been contacted by defendants. Because written information and contacts with eligibility workers are not, by themselves, likely to inform all class members about EPSDT services, the decree provides for the creation of "oral outreach units" designed to provide outreach services to those recipients who request additional information, those who miss check ups, and those whose health care provider requests outreach. ¶ 33.

The evidence produced at the hearing suggests that defendants' outreach efforts do not generate particularly high levels of participation among eligible EPSDT recipients. Approximately 25% of class members actually receive medical checkups after having received oral outreach services.[15] P.Ex. O-3; *see also* TR 943, lines 19-25. From the start of fiscal year 1999 through June of 1999, the percentage of newly-certified and re-certified class members who received checkups after receiving oral outreach services ranged from about 26% to 38%. The percentage of class members who were overdue for checkups and who received checkups after oral outreach ranged from about 12% to 38%. P.Ex. O-4.

### *Low Participation Rates*

The low participation rates among class members, discussed in Section II(B) of this opinion, also demonstrate that defendants' outreach efforts are ineffective. The fact that

---

[15]Defendants do not record data aimed at measuring the success of dental outreach.

participation rates have declined is stark evidence of the ineffectiveness of defendants' outreach program.[16]

### Insufficient Staffing

Finally, the evidence demonstrates that defendants' failure to conduct appropriate outreach, at least in part, may be attributed to inadequate outreach staffing. Although defendants' outreach obligations to the large number of plaintiffs who had missed appointments should have increased steadily every year from fiscal year 1997 through 1999, there was no concomitant increase in defendants' staffing. P.Ex. O-5. In 1996, one outreach unit staff member served 3,500 class members. P.Ex. O-8.

### C. Violations of Decree: Outreach

The evidence weighing against a finding that defendants are in violation of the outreach provisions consists primarily of improvements made after the entry of the decree.[17] The drop in the number of class members overdue for checkups, from 690,868 in 1998 to 629,600 in 1999, could be interpreted as evidence of an effective outreach program. D.Ex. D-101. However, the

---

[16]Defendants point to declining numbers of clients contacted by outreach staff because they had missed their checkups as evidence of fewer checkups missed by class members. Given the low participation rates cited by plaintiffs in dental checkups and in other medical services, *see* Section II(B), *supra*, defendants' logic is seriously flawed. The decline in contacts for missed checkups might also indicate, as plaintiffs urge, that defendants have failed in their duty to contact plaintiffs after missed checkups, or have failed accurately to compute how many plaintiffs were due checkups.

[17]For example, there were 435,818 outreach efforts made in 1999 – a significant increase from the 152,557 efforts made in 1995. TR 880, lines 12-23; D.Ex. 102. Defendants also rely heavily on D.Ex. D-119, the "Texas Health Steps Outreach Efficacy Study." However, that particular study is found to be wholly unreliable for the reasons cited in plaintiffs' written objections to the report, and will therefore not be considered as evidence contradicting earlier outreach reports prepared by defendants and relied upon by plaintiffs.

large number of class members overdue for checkups is more appropriately viewed as evidence of an ineffective outreach program, especially considering that over one million class members did not receive any dental checkups in fiscal year 1998. P.Ex. D-3 at 5. The decline thus says very little, if anything, about the overall effectiveness of the outreach program.

The evidence also reveals that the number of outreach contacts increased from 2.3 per class member in fiscal year 1997 to 2.5 per class member in fiscal year 1998, and that the number of outreach contacts has increased each year from fiscal year 1997 to 1999. D.Ex. D-100, D-102. However, roughly two-thirds of these reported contacts were written, not oral, contacts. Despite the effectiveness of home visits,[18] defendants rarely conduct them. P.Ex. O-3. Although the decree does not mandate that a certain proportion of defendants' outreach contacts be home visits, it is found that defendants are not adequately availing themselves of the opportunity to use one of the most effective means of outreach. For example, defendants conducted only 53 home visits in the entire state for the month of March 1999. More importantly, given the strikingly large number of missed checkups – especially dental checkups – defendants' reported increase in the number of contacts would be expected due to the requirement in paragraph 33 that those who miss checkups subsequently receive outreach. In sum, it is found that much of the evidence of improvement is severely undermined by the low levels of success that have characterized defendants' outreach program.[19]

---

[18]Ms. Singleton testified that, in her experience as a provider through Agapé Clinics, home visits or oral outreach "is the best way to educate . . . and get access." TR 244, lines 2-5.

[19]For example, defendants report that the receipt of medical checkups by class members has increased every year since the decree was entered. D.Ex. D-96, D-97, D-98, D-99. Defendants also stress that they have recently contracted with Maximus to provide Texas Health Steps outreach and informing. Defendant's $7.6 million contract with Maximus is the largest

Furthermore, it is by no means clear that defendants' progress is at issue, as the decree does not require progress in these areas. In enforcing the consent decree, the court is bound solely by its language. As the Supreme Court emphasized in *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971), "the scope of a consent decree must be discerned within its four corners," not by reference to what either party hoped to achieve by the decree, or to what they might have achieved through the litigation of their claims. Under the logic of *Armour*, as derived from the law of contracts, an interpretation of the decree must be based strictly on the language of the decree, and not on the legal requirements of the Medicaid Act, except to the extent that those requirements are clearly imported by the language of the decree.

There are two major exceptions to the general rule in *Armour*. First, extrinsic evidence may be consulted in interpreting the language of a consent decree:

> Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the "four corners" rule of *Armour*.

*United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238 (1975) (footnote omitted).

Relying upon general contract principles, courts have interpreted this to mean that "[e]xtrinsic evidence ... may generally be considered only if the terms of the judgment, or of documents

---

EPSDT contract for outreach services in the United States, and represents a serious commitment by the state to conduct effective outreach in the future. TR 882, lines 2-4. Defendants will make their outreach efforts more effective by contracting with up to fifty community-based organizations through Maximus. The court is impressed with this massive undertaking. However, while all parties are hopeful that the contract will result in great improvements in defendants' outreach program, this potentiality is not relevant to the court's inquiry into defendants' past and current compliance with the decree.

17

incorporated in it, are ambiguous." *See, e.g., SEC v. Levine*, 881 F.2d 1165, 1179 (2nd Cir.1989). A contract is ambiguous "when it is reasonably susceptible to more than one meaning, in light of surrounding circumstances and established rules of construction." *Northshore Laboratories Corp. v. Cohen*, 721 F.2d 514, 519 (5th Cir. 1983). Whether a contract is ambiguous is a question of law. *Paragon Resources, Inc. v. National Fuel Gas Distribution Corp.*, 695 F.2d 991, 995 (5th Cir. 1983). Once a court determines that a contract is ambiguous, it may look to extrinsic evidence to support its terms. *Eaton v. Courtaulds of North America, Inc.*, 578 F.2d 87, 91 (5th Cir. 1978). Although the determination of a contract's ambiguity is a question of law, determination of the party's intent through extrinsic evidence is a question of fact. *Paragon Resources*, 695 F.2d at 995.

Second, if a statement of purpose is contained in the decree itself, as the product of arm's-length negotiations, and that purpose may be discerned without reference to the extrinsic aims of the parties, *Armour* should not be read to prohibit consideration of that purpose. *See United States v. Local 1804-1*, 44 F.3d 1091, 1098 (2nd Cir. 1995). In the instant case, the various introductory paragraphs interspersed throughout the decree form the relevant backdrop for its interpretation. For example, the overall purpose of the decree is recited in paragraph 6.[20]

Thus, the decree will be interpreted within its "four corners," and its interpretation will be supplemented by extrinsic evidence where ambiguities so require. Consideration will also be

---

[20] This paragraph states:

6. To address the parties' concerns, to enhance recipients' access to health care, and to foster the improved use of health care services by Texas EPSDT recipients, the parties agree and the Court orders Defendants to implement the following changes and procedures for the Texas EPSDT program[.]

given to the purposes incorporated into the decree itself. Therefore, attention must first be given

to the language of the decree's outreach provisions put in question by plaintiffs' evidence:

> 11. The parties agree to and the Court orders the following changes to the Texas EPSDT
> program, policies and procedures to effectively inform recipients about the EPSDT program:
> . . .
> 32. All outreach units will have sufficient staff and other reasonably necessary resources to
> handle their workload promptly and effectively.
> . . .
> 52. Oral outreach efforts will effectively inform recipients about EPSDT, including the schedule
> for medical and dental checkups as well as the full range of covered services. Oral outreach will
> also effectively inform recipients about the benefits of preventive health care, that services are
> free of charge, how to locate a provider who is willing to provide services to EPSDT recipients,
> how to schedule appointments and how to schedule transportation assistance.

The court must determine which of these provisions create binding obligations on the state

that, based on the evidence presented, have not been met. Paragraph 11 highlights the fact that

the parties bound themselves to the outreach provisions that follow. Paragraph 32 states that all

outreach units "will have sufficient staff. . . to handle their workload promptly and effectively."

This language is unequivocally mandatory and clearly binds defendants. The only question is,

what level of staffing is "sufficient," and what level of resources "reasonably necessary"? While

these terms may at first seem vague and difficult to enforce, their meaning is clarified in part by

the remainder of paragraph 32. "Sufficient" staffing and "reasonably necessary" resources are

those inputs that will permit the "prompt" and "effective" handling of the workload. Paragraph

52, which states that oral outreach efforts will "effectively inform" recipients about EPSDT,

echoes this emphasis on effectiveness. *See also* ¶ 11 ("effectively inform"); ¶ 30 ("Outreach units

will work cooperatively with others who serve EPSDT recipients to serve recipients effectively

and efficiently"). Thus, paragraphs 32 and 52 state explicitly what the State must do: it must hire

enough staff members to permit the effective handling of the workload, and it must effectively inform class members about the program through oral outreach.[21]

What, then, amounts to "effective" informing or serving, or the "effective" handling of a workload? Under *Armour* and its importation of contract law into the interpretation of consent decrees, extrinsic evidence of the parties' intent is to be considered by a court in giving meaning to ambiguous phrases. Defendants appear to suggest that the use of the phrase "effectively inform" in 42 C.F.R. § 441.56(a) should inform the court as to the parties' intended meaning of the phrase in the decree.[22] Specifically, defendants appear to argue that the phrase "designed to," significantly limits their more general duty to "effectively inform." However, defendants' proposed interpretation of this phrase must be rejected as inconsistent with the parties' use of "effective" in the decree. In particular, paragraph 52 does *not* include the phrase "designed to," and instead states unequivocally that defendants' outreach efforts "*will* effectively inform" (emphasis added). The omission of the phrase "designed to" suggests, if anything, that the parties intended to require the defendants to do more than merely plan or design to inform effectively. Therefore, defendants' proposed extrinsic evidence is found to have little bearing on the meaning of "effective" as used in these paragraphs.[23]

_____

[21]Paragraphs 32 and 52 relate to the defendants' duty to effectively inform specifically through the oral outreach units required by the decree. However, because it precedes the entire outreach section of the decree – which extends through paragraph 74 and touches on all aspects of oral and written outreach – paragraph 11 makes clear that the duty to "effectively inform" extends to all class members, including those not entitled to oral outreach under paragraph 33.

[22]This regulation requires state agencies to provide for a combination of written and oral methods designed to inform effectively. *See* Part Two, Section II(C)(1)(a).

[23]It is further noted that, even had the parties provided the court with relevant extrinsic evidence, it would be very difficult, if not impossible, to arrive at the intended meaning of

The meaning of "effective" can be more clearly discerned by looking at the entire context of the decree, thereby locating and examining possible goals or criteria under which "informing" or the "handling" of a workload might be deemed "effective." *See Alliance to End Repression v. City of Chicago*, 119 F.3d 472, 475 (7th Cir. 1997)(noting that "four corners" inquiry requires a focus on the entire decree, not just a single provision).  For example, under one reading of the decree, one might consider informing to be "effective" if it is simply well-communicated to those plaintiffs who are contacted.  This reading would place defendants under an obligation, in the course of their outreach, to be "effective" in instilling understanding or knowledge among those contacted.  *See, e.g.*, ¶ 14 ("Information about EPSDT must be relevant to recipients' needs. Information must also be reasonably interesting and presented in a manner that is sensitive to EPSDT recipients' many different cultural backgrounds. . . . Finally, information must be presented in a manner that is convenient to recipients."); ¶ 17 ("Defendants will use letters that are effective and appropriate.  They will be printed in English and Spanish."); ¶ 51 ("Common barriers may include[:] . . . misunderstandings/lack of knowledge about Medicaid and/or EPSDT."); ¶ 52 ("Oral outreach efforts will effectively inform recipients about EPSDT, including the schedule for medical and dental check ups as well as the full range of covered services.  Oral outreach will also effectively inform recipients about the benefits of preventive health care, that services are free of charge, how to located a provider who is willing to provide services to

---

"effectively inform" at the time of the signing.  It is more likely that such an endeavor would permit the court to discern only the outer boundaries of a range of behavior intended by the parties to be required of defendants.  It is improbable, for example, that the defendants would have bound themselves to effectuate the goal of furnishing all class members with perfect information about EPSDT all of the time.  Likely, too, would the plaintiffs have intended the term to mean more than marginal improvements in the status quo at the time of the signing.

EPSDT recipients, how to schedule appointments and how to schedule transportation assistance."); ¶ 54 ("Oral outreach will use examples that are tailored to the recipient's age and needs so that information is relevant and interesting to the recipient.  When a household includes several recipients of different ages, outreach will provide age appropriate information about each recipient when possible."); ¶ 56 ("Oral outreach will be provided in a manner that is sensitive to recipients' ability to understand and process information.  Appropriate language will be used. Sessions will be long enough to meet recipients' needs for information but not so long that they are overwhelming or confusing.  The length of sessions will necessarily vary from recipient to recipient.")

Alternatively, other decree provisions suggest that outreach that succeeds in reaching the maximum possible number of people could be termed "effective." *See, e.g.,* ¶ 20 ("Eligibility workers will now be required to discuss EPSDT with applicants who apply for benefits on behalf of an EPSDT eligible person."); ¶ 25 ("But, information about EPSDT provided by TDHS eligibility workers will not be effective for all EPSDT recipients.  Oral outreach units will provide outreach services when required."); ¶ 31 ("Defendants will provide outreach services in all areas of the state."); ¶ 49 ("Outreach units will keep current so that they can [] provide prompt outreach upon receipt of new Outreach Lists. . ."); ¶ 50 ("The purpose of oral outreach is to encourage EPSDT recipients to fully use EPSDT services; and [to] assist recipients to overcome common barriers that prevent them from using EPSDT services."); ¶ 59 ("Over time, the groups of recipients who require oral outreach should change. . . . The groups of recipients who require oral outreach will increasingly be [] newly eligible recipients who have never received oral outreach. . ."); ¶ 73 ("Defendants will arrange for and implement a marketing plan that

22

encourages providers and recipients to participate in the EPSDT program."); *see also* ¶¶ 175-213

(regarding "special groups [that] require special attention so that they can receive the full benefits

of the Texas EPSDT program."); ¶ 264 ("The [case management] plan will make sufficient case

management available in every county or cluster of counties where few recipients reside."); ¶ 271

("Medicaid services, including EPSDT services, must be available 'in every political subdivision of

the state.' 42 U.S.C. § 1396a(a)(1)."); ¶ 273 ("The parties agree to implement a process to meet

the statewideness requirement.").

Still another alternative would be to measure the effectiveness of outreach by its success in

persuading listeners to gain access to services.[24] *See, e.g.,* ¶ 10 ("Information about the EPSDT

program is important so that recipients can fully utilize EPSDT services, including medical and

dental checkups."); ¶ 14 (informing efforts must encourage "recipients to understand and use

services fully"); ¶ 17 (written materials must be provided "to explain the EPSDT program and to

encourage its use. . . . The reason to include age appropriate information is to provide information

that is relevant and interesting to encourage the recipient to fully use EPSDT services."); ¶ 50

("The purpose of oral outreach is to encourage EPSDT recipients to fully use EPSDT services

and assist recipients to overcome common barriers that prevent them from using EPSDT

services."); ¶ 64 (defendants may conduct other outreach efforts to "encourage recipients to use

EPSDT services"); ¶ 66 (other agencies can help class members to use services); ¶ 73 (media

marketing plan must "encourage . . . recipients to participate in the EPSDT program"); *see also* ¶

178 ("The purpose of outreach to recipients who are children of migrant farmworkers will be to

---

[24]The court notes, with disapproval, that defendants do not keep records of those class
members who have declined services. P.Ex. CH-23.

help them to receive as many needed EPSDT services as possible. . . ."); ¶ 183 (Outreach

information will encourage [migrant farmworker] recipients to receive as many needed services as

possible. . . ."); ¶ 193 (managed care companies must "cooperate with outreach units so that

recipients who miss medical and/or dental checkups receive prompt services"); ¶ 265 (defendants

must "encourage the acceptance of case management by recipients.")

Thus, whether "informing" has been done "effectively," or an outreach workload handled

"effectively," wholly depends on the goals one hopes to effect. All three of the above-listed

outreach goals – facilitating clear knowledge or understanding, reaching the maximum number of

eligible class members, and persuading or encouraging class members to obtain care – are present

to a large extent in the decree, and were at the heart of the parties' agreement. These are the

purposes that appear repeatedly within the "four corners" of the nearly one hundred pages of the

decree.

The testimony of several witnesses supports this view of what constitutes "effective"

outreach. While these witnesses' individual definitions of "effective" cannot be used as evidence

of the parties' intended meaning of the term, they do paint a picture of a commonsense

understanding of what it means to conduct outreach effectively that bolsters the court's above

analysis and parsing of the decree. For example, one witness testified that defendants' outreach

efforts are not effective, based on "the *numbers* of clients that we see in our program that still

have *very little, if any knowledge* about Medicaid services and how to access them." TR 25, lines

17-24 (Testimony of Ms. McHan) (emphasis added). Another witness agreed, noting that while

"[t]he efforts have been put into place," that she did not "see that they have been *effective*," since

a "*large number* of [class members] still don't *understand* . . . the need for repeated [] visits." TR

24

174, lines 18-24; 235, lines 10-19 (Testimony of Ms. Singleton)(emphasis added). A third

witness testified that the defendants' outreach program

> is not accomplishing everything that it's intended to. . . . [I]f it were accomplishing
> what it was intended to do, it would be educating the parents about the value of
> early checkups, about the value of *keeping appointments* on a regular basis and
> *getting care* for their children when there was not a problem.

TR 329, lines 8-25 (Testimony of Dr. Seale)(emphasis added). Again, while these comments are

not evidence in themselves of what the parties meant by "effective," the witnesses' collective

emphasis on the numbers of class members with little knowledge, on the superficiality of their

understanding, and on the failure of outreach to result in a significant number of requests for

treatment lends further support to the court's assessment of the meaning of the term "effective."

With these background provisions in mind, the precise meaning of "effective" need not be

determined. Whether the parties intended it to mean that outreach effectuate the goals of

understanding, of reaching maximum numbers of eligibles, or of persuading them to use services,

the evidence clearly demonstrates defendants' ineffectiveness in all three senses of the word.

First, if the defendants' duty to effectively inform and serve were interpreted to require defendants

to effectuate understanding in the minds of those class members subjected to outreach,

defendants' August, 1998, "Outreach and Marketing Report" clearly demonstrates their

widespread failure to bring about understanding of the program, or even awareness of its

existence, among the plaintiff class. P.Ex. O-1, *see also* Section II(B)(1).[25] If, instead,

"effectiveness" is measured by defendant's success in reaching large numbers of the plaintiff class

---

[25]In addition to these cited exhibits, plaintiffs presented credible witnesses who testified to
the lack of knowledge among class members of the various services offered by Texas Health
Steps. For example, Ms. Singleton testified to class members' lack of knowledge based on her
extensive experience in serving class members as a provider.

entitled to various forms of outreach, the Outreach and Marketing Report, P.Ex. O-1, is similarly damning.[26] That report clearly demonstrates that defendants have been ineffective in contacting large numbers of class members entitled to oral outreach in an overall effort to inform the population of the program's existence. Specifically, 60% of respondents reported knowing only "very little" or "nothing at all" about the program.

Were the term "effective" read to require some measure of success in encouraging or facilitating recipient participation, defendants' failure would be most dramatic. As noted above, only about 25% of class members who are informed of the program by defendants actually receive medical checkups after having received outreach. These figures are a far cry from "effective informing" if the goal to be "effected" is the actual receipt of care. So, too, are the startlingly low participation rates among class members in key health components in Texas Health Steps, related in Section II(B) of this memorandum opinion.[27]

---

[26] Equally telling is the evidence that the staff-to-member ratios are such that one could not possibly infer that large numbers of class members are being informed, particularly in light of the special barriers to outreach posed by characteristics of the plaintiff class. These barriers are enumerated in the decree itself and were described by plaintiffs' expert witness, Ms. Singleton. *See* Section I(B).

[27] Whether the goal to be "effected" is to achieve clear understanding among some members of the class, to effect widespread dissemination among the class, to persuade class members to accept medical services, or some combination of these goals which form the textual fabric of the decree, the court adopts a commonsense notion of what *degree* of success in these areas is necessary for defendant's performance to be deemed "effective" under paragraphs 32 and 52 of the decree. Due to the particularly dismal performance rates of defendants under all three interpretations of "effective," the court need not inquire as to whether the state need score an "A+" or merely a "C" to be deemed an "effective" informer. *Cf. King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1059 (2nd Cir. 1995) ("Whatever constitutes 'immediate,' it is certainly less than three weeks.")

In conclusion, plaintiffs' evidence aptly demonstrates that defendants have failed to maintain sufficient staff and other reasonably necessary resources to handle their workload promptly and "effectively," and to "effectively" inform recipients about Texas Health Steps. Therefore, it is found that defendants are in violation of paragraphs 32 and 52 of the decree.

**D. Providers' Requests for Outreach: Findings of Fact Regarding Violations of Decree**

Plaintiffs' concerns about defendants' outreach program include a complaint that defendants have not provided adequate outreach for the recipients whose health care providers request outreach, as mandated by paragraphs 33 and 96 of the decree. They note that under paragraphs 32 and 52, discussed at length above, this outreach must be "effective." However, plaintiffs rely solely on the experience of Ms. Singleton, who requested outreach assistance on behalf of five patients. Defendants responded by sending letters, and then closed the cases. TR 172, line 23 to 173, line 24. While the court finds Ms. Singleton to be a credible witness, her lone account of her experience involving the defendants' arguably inadequate outreach does not establish by a preponderance that defendants have failed to effectively inform this particular subcategory of class members entitled to oral outreach under paragraph 33. Plaintiffs also rely on the fact that in August of 1999, defendants' outreach units answered only 243 providers' requests for outreach. P.Ex. O-3. In certain regions of the state, defendants responded to no requests at all during that time. *Id.* However, the court has not been provided with any benchmark for the number of provider requests to which defendants should have responded. The evidence also revealed that provider requests decreased from well over 2,000 per month during 1998 and 1999 to under 700 in December of 1999. Defendants proffer this decline as evidence that their

outreach to providers has had educative effects, while plaintiffs argue that providers are unaware of their ability to request aid and information. D.Ex. 94.

Based on the above evidence, it is found that plaintiffs have not met their burden with respect to this particular group, and did not, therefore, establish a violation above and beyond the violation detailed above, in Section I(C). It is noted that this finding does not in any way affect the above finding that defendants are in violation of paragraphs 32 and 52 with respect to the larger group entitled to oral outreach under paragraph 33.

## E. Outreach Reports: Findings of Fact Regarding Violations of Decree

Finally, plaintiffs seek to enforce the outreach reporting requirements at paragraphs 60 and 61 of the decree. Specifically, plaintiffs complain that defendants fail to report separately on outreach efforts made to distinct groups of class members. The court is unaware of any decree provision requiring defendants to deliver the data required under paragraph 60 in a format that distinguishes among subgroups in the plaintiff class. Therefore plaintiffs' invitation to impose the structure of paragraph 33 onto paragraph 60, which sets forth clear and unambiguous reporting requirements, will be declined.

Plaintiffs also maintain that they are entitled to reports about the receipt of checkups after oral outreach that separate medical from dental checkups. Paragraph 61[28] does not, on its face, require defendants to distinguish those class members who receive dental checkups from those who receive medical checkups following outreach, although this would appear to make sense in light of both parties' desire to monitor effectively the outreach program and target specific areas

---

[28]Paragraph 61 provides that defendants "will develop and implement a method that reports the number and percent of recipients who receive medical and/or dental checkups after receipt of oral outreach."

for improvement.  Despite the sound logic behind plaintiffs' request, under *Armour*, the court

cannot go beyond the language of the decree.  Hence, defendants will not be held to have violated

paragraph 61.

## Issue II: Medical and Dental Checkups

### A. Overview

Plaintiffs claim, next, that defendants have not complied with paragraphs 2, 35, 37, and

143 of the consent decree, which outline plaintiffs' entitlements to medical and dental checkups

under 42 U.S.C. §§ 1396a(a)(43).[29]  These paragraphs provide that class members "are entitled to

both medical and dental checkups on a regular schedule," ¶ 2, and "to all needed follow up health

care services that are permitted by federal Medicaid law." ¶ 3.  Paragraph 143 states that

"[d]efendants must provide periodic dental checkups and needed dental services to relieve pain,

restore teeth and maintain dental health for EPSDT recipients. . . ."  Paragraph 35 describes the

schedule for medical checkups as required by the decree;[30] the schedule for dental checkups is

---

[29]As noted above, this statute, which details the state's obligations pursuant to their participation in the federal Medicaid program, mandates that the state's plan must "provide for" the "informing" of eligible recipients of EPSDT services of the availability of those services, 42 U.S.C. 1396a(a)(43)(A); must "provide for" the "providing and arranging for the provision of such screening services in all cases where they are requested;" 42 U.S.C. 1396a(a)(43)(B); and must "provide for" the "arranging for" corrective or follow-up treatment where the need for such care is disclosed by such screening.

[30]Through 1999, the schedule for medical checkups entitled class members to medical checkups at birth, 1-2 weeks, 2 months, 4 months, 6 months, 9 months, 15 months, 18 months, 24 months, 3 years, 4 years, 5 years, 6 years, 8 years, 10 years, 12 years, 14 years, 16 years, 18 years, and 20 years of age.  This court's February 28, 2000 order modified paragraph 35 to provide complete medical checkups for teenage class members every year instead of every other year.

governed by paragraph 37. Defendants are required by federal law to set these schedules. 42

U.S.C. §§ 1396d(r).[31] Paragraphs 35 and 37 incorporate by reference these "periodicity

schedules" created by the state and impose an additional obligation upon defendants to provide

oral outreach to recipients who miss a medical or dental checkup "due" or required under such a

periodicity schedule. Based on these paragraphs, plaintiffs claim that defendants have failed to

provide plaintiffs with needed medical and dental checkups. Plaintiffs claim, additionally, that

defendants have failed to provide plaintiffs with adequate reports on the checkups performed on

all class members.

The evidence relating to whether defendants have violated these decree provisions is

presented below. First, findings of fact relating to the provision of medical checkups are recited.

Second, findings of fact relating to the provision of dental services, including those concerning

defendants' recruitment of dental providers, are made. Third, defendants' provision of medical

and dental checkups to teens is reviewed. Fourth, defendants' provision of checkups to abused

and neglected class members is examined. These sections report the court's findings of fact.

Section II(C) sets out defendants' violations of the decree in relation to all of these matters.

Section II(D) deals with defendants' reporting of data relating to the provision of checkups to

class members.

---

[31]Title 42 U.S.C. §1396d(r) defines "early periodic screening, diagnostic, and treatment
services" to include "screening services . . . which are provided . . . at intervals which meet
reasonable standards of medical and dental practice, as determined by the State after consultation
with recognized medical and dental organizations involved in child health care. . ." 42 U.S.C. §§
1396d(r)(1)(A)(i).

**B. Findings of Fact: Checkups**

*Medical Checkups*

The evidence at the hearing clearly demonstrated defendants' noncompliance with decree provisions requiring the provision of medical checkups to the plaintiff class. As evidence that class members are not receiving checkups,[32] plaintiffs first point to the defendants' reported medical checkup "participation ratio" for fiscal year 1998, which was .66. D.Ex. D-97. The participation ratio is a "ratio derived by looking at the number of [class members] who have received at least one [checkup] over the expected number of [class members] that should receive a [checkup] during that year." TR 446, lines 6-11. (Testimony of Rick Allgeyer, Ph.D.[33]). The number of class members who should have received a checkup during the year is adjusted to account for the average period of Medicaid eligibility (about .7 years, or slightly more than eight months) during the year and for the schedule for medical checkups. TR 450, line 18 to 451, line 22. Defendants report this figure annually to the Health Care Finance Administration (HCFA), the

---

[32]Plaintiffs presented considerable evidence about the importance of checkups, and the dire consequences to children's health that can result when checkups are missed. This evidence, while compelling, does not bear on the issue of whether or not defendants are in violation of the decree. Additionally, plaintiffs presented evidence of particular children who missed checkups to their detriment. For example, plaintiffs presented the story of a deaf class member who reached the age of seven without having had a hearing evaluation, a mandatory component of a Texas Health Steps medical checkup. They also presented evidence about young class members who had not been tested for lead poisoning, another mandatory component of checkups. P.Ex. M-4 at 2-5, 2-11, 2-12, 2-21. This evidence will be considered as demonstrative of the fact that some class members do not receive the required checkups; however, the court relies more heavily on the statistical evidence discussed in the text above to reach a conclusion about defendants' compliance with the state-wide decree in this action.

[33]Dr. Allgeyer, the Director of Statistical Services of TDH, and Program Manager of the Department's Research and Public Health Assessment Division, was certified by the court as defendants' expert in statistical reporting, data collection, and in the analysis and dissemination of federal and state program information.

31

federal agency responsible for oversight of the Medicaid program, in a "HCFA 416" report detailing participation in the program.  P.Ex. M-39.

Not surprisingly, defendants maintain that actual participation by the plaintiff class in the dental and medical checkup program is higher than the reported statistic.  D.Ex. D-96.  Plaintiffs maintain that actual participation is lower than reported.  More specifically, plaintiffs contend that the participation ratio, computed by defendants in accordance with instructions from HCFA, represents an inflated measure of the actual receipt of services because it is adjusted for the average length of time that class members receive Medicaid during the reporting period.[34]  After reviewing the evidence presented, the court is in agreement with plaintiffs that the reported participation ratios are inflated indicators of the actual participation rates among the plaintiff class.[35]

---

[34]For example, according to a hypothetical presented by plaintiffs, if ten four-year-olds receive Medicaid for only six months (half a year), the participation ratio method mandated by HCFA would reduce the number of ten class members by one-half, to five.  Thus, if the ten class members received five medical checkups, the participation ratio would be 1.0, or 100%, despite the fact that only one-half of the ten children eligible for the checkup had received the service. Defendants base their methodology on the assumption that not all of the ten children would be "due" for a checkup during the period of their eligibility, as a four-year-old who had recently received a checkup just before being placed on the Medicaid program would not be "due." Plaintiffs acknowledge this possibility, but argue that the vast majority of newly-eligible class members have not recently seen a doctor; hence, they argue, a more acceptable empirical assumption would be that all ten, or at least some high fraction of the ten, are in fact "due" upon enrollment.  It is noted that only a well-supported estimate of the likelihood of a newly-enrolled participant's having recently received a checkup just prior to enrollment will enable the parties to resolve their current disputes concerning the accuracy of the participation ratio as an indicator of actual receipt of services.

[35]Defendants also rely on a survey of class members conducted by plaintiffs which showed that in 1998, 91% of class member respondents reported that families in their area were not having problems getting medical or dental care.  D.Ex. 95.  However, this loosely-conducted survey is found to be highly unreliable.  The court finds that the optimistic answers given by class members are most likely to be non-representative of the true state of affairs, given the pitfalls of

# In addition, plaintiffs note that defendants report a shortage of health care providers

enrolled in the Texas Health Steps Program.  Specifically, in sixty-five of Texas' 254 counties,

class members' need for doctors "dramatically exceeds provider to client ratios," while in nineteen

additional counties, defendants report "limited provider support for the existing client

population." P.Ex. D-13.

## Dental Checkups

### Services

Abundant evidence was presented that clearly demonstrated that class members do not

receive adequate dental care.  They crowd emergency rooms in hospitals, suffering from acute

forms of dental disease that, while easily preventable, often lead to such health complications as

serious oral infections, dehydration, fever, and malnourishment stemming from the inability to

eat.[36]  In 1998, only 19% of class members received at least one dental checkup. P.Ex. D-3 at 5.

This figure declined from 21% in 1997, and rose again to 21% in 1999. P.Ex. D-14.[37]  Even fewer

class members receive all of the checkups required by defendants' dental periodicity schedule,

which entitles class members over age one to a dental checkup every six months. ¶ 37.  Although

---

self-reporting.  Nonetheless, despite the irrefutable reality that not all class members receive all, or
even any, of the services to which they are entitled, participation rates in the state have steadily
increased since the consent decree was approved.  For example, in 1993, the (inflated) medical
checkup participation ratio was .29. TR 344, lines 14-16.  Since that time, the rate has roughly
doubled.  However, as noted above, defendants' progress per se is not at issue, as it does not fall
within the four corners of the decree.

[36]Testimony of Dr. Seale,  TR 260, line 19 - TR 261, line 7.

[37]The situation in certain regions of the state is even more dire.  For example, in fiscal year
1999, only 11.5% of class members in Region 9 over the age of one year received one dental
checkup.  That same year, in Region 1, only 14.1% of class members eligible for dental checkups
received one. P.Ex. D-14.

the average period of Medicaid eligibility for class members was slightly more than eight months in 1998, only 3.7% of class members received the required two dental checkups in 1999.[38]  P.Ex. D-14.  Particularly disturbing is the statistic reported in defendants' 1998 "State-Wideness Report" that roughly one million Texas Health Steps eligibles had received no dental services for that year.  P.Ex. D-3.  Furthermore, the number of class members overdue for dental checkups has steadily increased every year between fiscal years 1997 and 1999.  P.Ex. O-5.

In 1998, 38% of the class received some form of dental treatment.[39]  P.Ex. D-3 at 5. However, the fact that 38% of Texas Health Steps eligibles received at least one dental "service," as opposed to a checkup, is consistent with the program enrollees' tendency to seek dental services only in emergencies.  TR 263, line 23 to TR 265, line 7 (Testimony of Dr. Seale). Viewed in conjunction with the insufficient number of children receiving full checkups, the "services" statistic indicates that while class members may be receiving some form of "dental service," they are most likely receiving such services in emergency settings, and are not receiving the preventive services to which they are specifically entitled under the EPSDT program.  *Id.*

Defendants emphasize that in 1998, approximately 20% of children enrolled nationally in EPSDT utilized dental services, as compared with 32% of enrolled children who utilized the dental services provided in Texas, a figure which steadily increased during the years 1996 through

---

[38]  Dr. Seale testified that this number was "extremely low." TR 256, lines 6-10.

[39]  It is noted that the parties disagree about the best way to measure the availability of dental services to class members. Defendants believe that dental utilization is best measured by looking at the utilization of all dental services, while plaintiffs appear to focus on the dental checkup as the most important indicia of utilization. It is concluded that the relevant indicator for purposes of plaintiffs' motion to enforce paragraphs 37 and 143 of the decree is the dental checkup, as those paragraphs unambiguously refer to dental checkups.

1998. D.Ex. D-81. Defendants cite the fact that Texas Health Steps has produced better results than the national average as evidence that defendants have complied with the decree by exceeding any minimum goals contemplated by the parties when they entered into it. However, because Texas provides dental services beginning at age one, whereas many other states begin providing dental services at age three, Texas' higher utilization rates may simply reflect a larger number of eligibles instead of a higher participation rate among eligibles relative to other states.[40] TR 271, lines 1-11; TR 313, line 18 (Testimony of Dr. Seale).

*Provider Recruitment*

Both parties presented statistics relating to the availability of dentists accepting Texas Health Steps enrollees. Defendants emphasized that while the ratio of dentists to the general population in the state of Texas in 1999 was roughly 1 : 2,600, the ratio of participating dentists to the Medicaid population was 1 : 584. D.Ex. D-104. However, plaintiffs introduced evidence that of the Medicaid providers identified by defendants, only one-third were "high volume" providers, or providers likely to be able to accept a new enrollee in need of a checkup. TR 268, line 21-25 (Testimony of Dr. Seale); P.Ex. D-12. Defendants' Director of Oral Health, Jerry

---

[40]Dr. Seale's testimony also effectively demonstrated that defendants' other main source of dental statistics, the "Make Your Smile Count" study is highly unreliable, as it is inconsistent with the defendants' own "State-Wideness Report," P.Ex. D-3, relies on information reported by parents who are often confused about their children's actual receipt of services and may have psychological incentives to over-report their utilization, and presents shockingly high participation rates that Dr. Seale labeled as unrealistic. TR 323, lines 9-10; D.Ex. D-3, D-107. She concluded that "the statewideness report is probably more realistic." TR 285, lines 19-23. The court, after reviewing the various sources of data, is inclined to agree.

Felkner, D.D.A., M.P.H.,[41] agreed with this assessment, noting that an enrolled dentist "could see one [class member] a year and still be classified as an active dentist." TR 809, lines 16-25.

In addition, multiple witnesses testified concerning the severe shortage of dentists in various regions of the state. For example, the director of a case management program for children with special health care needs in a large area surrounding Abiliene, Texas, testified that many families are having difficulty finding a dentist who will accept Medicaid. TR at 20, lines 7-9. (Testimony of Ms. McHan). A witness from the Texas Migrant Council in Lubbock related that "[a] lot of towns [in the Panhandle] don't have Medicaid providers, either medical or dental. A lot of the time, we . . . have to bus these young children an hour to the dentist." P.Ex. A-4 at 12-13 (Deposition of Nancy Lloyd). The shortage of dentists in the Arlington-Dallas area was also detailed, including the fact that "the dentists are so limited that the referrals that we make need to be for kids that got [sic] abscesses and rotten teeth. . .those are the ones that generally get in." TR 205, lines 4-18 (Testimony of Ms. Singleton).

This shortage of dentists who are willing to see class members is statewide.[42] TR 24, lines 10-12 (Testimony of Ms. Singleton). Defendants themselves agreed in October of 1999 that there were at that time 136 counties in which "the needs of a client population . . . dramatically exceed[ed] provider to client ratios."[43] P.Ex. D-13. Statewide, although about 2,900 dentists are

---

[41]The court qualified Dr. Felkner as an expert in "the dental services provided by the Texas Health Steps program" without objection from plaintiffs. TR 795, lines 7-10.

[42]Ms. Singleton is familiar with class members' problems with gaining access to dental care by virtue of her work with Head Start centers throughout the state. TR 241, lines 4-9; *see also* TR 217, line 5 to 218, line 5.

[43]These counties have severe shortages of doctors, dentists, or both. TR 833, lines 16-18. Of these counties, 71 show severe shortages of dentists or of both dentists and doctors. P.Ex. D-

enrolled, only roughly 1,700 actively serve class members.  TR 825, lines 4-19.  If all class members over the age of one year were to receive the dental care to which they are entitled, it would be necessary that these active dentists each care for 876 class members.  This load is not currently being borne by the active dentists.  TR 826, line 23 to 827, line 6 (Testimony of Dr. Felkner).[44]

Worse, the number of dentists enrolled in the program is currently decreasing in Texas due to low reimbursement rates and frustration with the defendants' failure to change those rates.  TR 330, lines 11-21. (Testimony of Dr. Seale).  Low reimbursement rates for dental services from the state makes the recruitment of additional dentists extremely challenging.[45]  TR 824, lines 5-12 TR 823, line 24 to 824, line 4 (Testimony of Dr. Felkner); P.Ex. D-12.  Even though defendants admit a severe shortage of dentists exists in 136 counties, defendants propose to recruit only seventy-five additional Texas Health Steps providers (doctors and dentists) during the year 2000.  TR 833, line 24 to 834, line 2 (Testimony of Dr. Felkner);  P.Ex. D-13 at 1.

---

13.

[44]Plaintiffs calculate that about two-thirds of active Texas Health Steps dentists each cared for fewer than 100 class members over a three-month period.  P.Ex. D-12.

[45]According to Dr. Felkner, despite the defendants' efforts to recruit dentists into the Medicaid program, the number of enrolled dentists has been "very flat" for four years.  Dr. Felkner testified that "[a]s a rule of thumb, overhead expenses run about 65 percent for the average dental practice," although defendants currently reimburse dentists at a rate which is "definitely less than 65 percent." TR 836, lines 2-13.  He added that, during the most recent session of the Texas legislature, defendants requested funds to increase dental reimbursement rates by at least 19%.  TR 835, lines 5-18.  They succeeded in obtaining an increase of about 3.5%.  TR 837, lines 9-10.

*Teens*

Defendants' failure to provide checkups has a particularly severe impact on teenage class members, for whom the 1998 participation ratio for medical checkups or special adolescent visits was .64. D.Ex. D-9 (11- to 18-year-olds.) Again, such ratios are inflationary because they rest on the assumption that class members receive checkups randomly throughout the year, and do not, therefore, account for the reality that many class members need checkups immediately upon enrollment because they are "overdue."[46] Specifically, in fiscal year 1999, only 24% of six- to fourteen-year-old class members received a checkup or adolescent preventive checkup, while only 12.4% of those aged fifteen to twenty years received such a checkup. P.Ex. CH-26. Additionally, because of the expected growth in the number of fifteen- to eighteen-year-old enrollees resulting from the implementation of the new State Children's Health Insurance Program (SCHIP), defendants' failure to provide services to the teenage population is a particularly grave aspect of defendant's extensive failure to serve the class.[47] P.Ex. CH-25.

### *Abused and Neglected Class Members*

Substantial evidence was introduced that demonstrated defendants' failure to address the needs of the roughly 13,200 abused and neglected class members supervised by the Texas

---

[46]Plaintiffs note, too, that defendants' exclusion of nineteen- and twenty-year-olds raises the reported participation rate for teens, as these older teens receive fewer services than their younger counterparts.

[47]For example, in fiscal year 1999, less than 19% of the newly enrolled fifteen- to eighteen-year old class members received at least one medical checkup. P.Ex. CH-25. Defendants respond that the participation rate for teens eligible for the Texas Health Steps program has risen from .37 in fiscal year 1996 to its current level. D.Ex. 98. However, as noted previously, it is unclear why defendants progress since 1996 is put at issue by the decree provisions sought to be enforced by plaintiffs.

Department of Protective and Regulatory Services.  The receipt of checkups by this particular population is governed not only by paragraphs 2, 3, 35, and 37, but also by paragraph 212.  This paragraph required the parties to submit a Memorandum of Understanding to the Court which would, among other things, "assure that all EPSDT recipients under the supervision of TDPRS receive all medical and dental checkups when due."  ¶ 212.  The defendants' reports on various subgroups within the larger class of abused and neglected children[48] reveal that this at-risk group does not receive all medical and dental checkups when due.[49]  P.Ex. R-11, R-14.

## C. Violations of Decree: Checkups

With the above evidence in mind, the court now considers plaintiffs' claims that defendants have violated specific decree provisions.  Plaintiffs' primary argument appears to be that, since participation rates in the dental and medical checkup programs are extremely low, defendants have failed to provide the services to which plaintiffs are entitled, and have therefore violated the decree.  As noted above, in enforcing the consent decree, the court is bound solely by its language.  With this in mind, the court turns to the decree.  The paragraphs sought to be enforced by plaintiffs in relation to medical and dental checkups are:

> 2.  EPSDT is intended to provide comprehensive, timely and cost effective health services to indigent children and teenagers who qualify for Medicaid benefits.  Checkups are the cornerstone of the program.  They assess recipients' health, provide preventive care and counseling (anticipatory guidance) and make referrals for other needed diagnosis and treatment. 42 U.S.C.

---

[48]These reports provide information about the children in adoptive placements for the months of October and November of 1999, those in relative placements during the months of August through November of 1999, and those in foster care for the months of July through November of 1999.

[49]February of 2000 is the most recent month for which defendants have reported data for this subgroup.  For that month, the percentage of class members supervised by TDPRS who missed medical checkups ranged from 27 to 38 %, depending on the category of the child's placement.  The percent who missed dental checkups ranged from 40 to 60 %.  P.Ex. R-14.

§§ 1396a(a)(43); 1396d(r).  Recipients are entitled to both medical and dental checkups on a regular schedule.  About 48% of recipients received at least one medical checkup in fiscal year 1994 (FY94), according to reports Defendants filed with the United States Department of Health and Human Services.
3. Recipients are also entitled to all needed follow up health care services that are permitted by federal Medicaid law. 42 U.S.C. § 1396d(r).
. . .
35.  Beginning on September 1, 1995, outreach units will provide oral outreach to all recipients who miss a medical checkup that is due on or after July 1, 1995.  "Due" means a medical checkup that is due according to the current Texas EPSDT periodicity schedule, i.e., newborn, 1-2 weeks, 2 months, 4 months, 6 months, 9 months, 12 months, 15 months, 18 months, 24 months, 3 years, 4 years, 5 years, 6 years, 8 years, 10 years, and annually thereafter through and including 20 years of age.[50]
. . .
37.  Beginning no later than June, 1997, outreach units will provide oral outreach to all recipients who miss a dental checkup that is due on or after April 1, 1997.  "Due" means a dental checkup that is due according to the Texas EPSDT periodicity schedule, i.e., starting at 1 year and continuing every 6 months.
. . .
143.  Defendants must provide periodic dental checkups and needed dental services to relieve pain, restore teeth and maintain dental health for EPSDT recipients.  42 U.S.C. § 1396d(r)(3). . .
."
. . .
212. TDH and TDPRS will present a Memorandum of Understanding [that] will . . . assure that all EPSDT recipients under the supervision of TDPRS receive all medical and dental checkups when due.

What obligations do these six paragraphs impose upon defendants?  First, it is noted as a

preliminary matter that paragraphs 35 and 37 are unavailing for the plaintiffs. While these

paragraphs do make reference to the state's schedules for medical and dental checkups, they do

so solely for the purpose of establishing when the outreach duties are to be triggered, and do not

support plaintiffs' claims for timely medical and dental checkups.

Next, paragraph 2 emphasizes the importance of checkups to the overall success of the

EPSDT program.  The only obligatory language in this paragraph, however, appears in its fourth

sentence, where it is stated that "[r]ecipients are entitled to both medical and dental checkups on a

_____

[50]This schedule reflects a change from the schedule in use when the court originally entered this decree in 1996.  At that time, the schedule included biannual medical checkups for teenagers and more limited adolescent preventive visits in the alternate years.

regular schedule." Similarly, paragraph 3 states that "recipients are also entitled to all needed follow up health care services that are permitted by federal Medicaid law. 42 U.S.C. § 1396d(r)." The argument between the parties stems from a dispute over the meaning of the word "entitled" as used in these sentences.

Defendants' understanding is that class members are "entitled" to services, but that they must first ask for them. Under this common-sense understanding of the term, argue defendants, plaintiffs must have requested services and have been denied them for defendants to be out of compliance with paragraphs 2 and 3. Plaintiffs presented no evidence of having requested and having been denied services, nor did they argue that the participation data is evidence that some requested services were actually refused by defendants.[51] Under this understanding of the word "entitled," then, plaintiffs have not met their burden in showing a violation by defendants.

Defendants maintain that this "request defense" is strongly buttressed by the language of the EPSDT statute itself, which requires that state Medicaid plans provide for the delivery of services "in all cases where they are requested." 42 U.S.C. § 1396a(a)(43)(B). It is noted that the requirements of federal law would be irrelevant to this court's construal of the decree under *Armour* but for the fact that the parties elected to incorporate by reference these statutes in the many paragraphs that detail defendants' obligations to plaintiffs, including paragraphs 2 and 3. Therefore, federal law must inform the court's interpretation of these provisions.

### *Principles of Statutory Interpretation*

42 U.S.C. § 1396a(a) provides, in pertinent part:

---

[51]Several witnesses testified that defendants are not aware of a single class member who has requested services and not subsequently received those services. TR 348, lines 22-25; 842, line 22; 437, lines 4-7; 373, lines 1-15; D.Ex. 14.

A State plan for medical assistance must --

. . .

(43) provide for –

(A) informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance including services described in section 1396(a)(4)(B) of this title, of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) or this title and the need for age-appropriate immunizations against vaccine-preventable diseases,

(B) providing or arranging for the provision of such screening services in all cases where they are requested,

(C) arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services, and

(D) reporting to the Secretary . . . the following information relating to early and periodic screening, diagnostic, and treatment services provided under the plan during each fiscal year . . .

Congress has enacted a statute that requires, first, the informing of all people eligible for EPSDT of the benefits to which they are entitled, § 1396a(a)(43)(A); second, the provision of those services wherever requested, § 1396a(a)(43)(B); third, the subsequent provision of follow-up or corrective treatment for health problems identified, § 1396a(a)(43)(C); and, fourth, the reporting of data relating to the provision of those services and treatments, § 1396a(a)(43)(D). Plaintiffs' response to defendant's reliance on the "request" language of part B of § 1396a(a)(43) may be summarized as follows: Why should defendants be released from the duty to provide services simply because they have not been formally "requested," when they have violated part (A) by failing to inform members that such services exist?

*Structure and Context*

The court declines defendants' invitation to read part B of § 1396a(a)(43) in isolation from the rest of paragraph 43 is rejected in favor of the approach dictated by the "Whole Act Rule." Under this rule, a legislature passes judgment upon an act or amendment as an "entity, not giving one portion of the act any greater authority than another. Thus any attempt to segregate any portion or exclude any other portion from consideration is almost certain to distort the

legislative intent." N. Singer, *Sutherland on Statutes and Statutory Construction*, § 47.02, p. 139, *quoted in* William N. Eskridge, Jr. & Philip P. Frickey, *Legislation: Statutes and the Creation of Public Policy* (2d ed. 1995) 643.  The Supreme Court has expressed agreement with this canon of interpretation: "When 'interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute . . . and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature.'" *Kokoszka v. Belford*, 417 U.S. 642, 650 (1974) (citation omitted).

In light of this principle, interpreting the directive to screen upon request in isolation of the context of the entire paragraph would likely result in the significant distortion or misinterpretation of part B.  Therefore, the entire paragraph and its structure will be considered.  As noted above, the "request" language appears in a four-part directive to the states, which might be rephrased in the following manner: you must inform, you must screen, you must treat, and you must report. This directive is, notably, chronological: it sets out a series of steps in which the population is first told about the program, then screened for health problems, and then given follow-up treatment. As a final step, data is sent back to Washington about the states' performance.   In light of this chronological structure, it is presumed that Congress intended for eligible participants in the program to be informed of it before requesting services.  That is, although eligible participants' rights to screenings were limited by Congress by the phrase, "in all cases where they are requested," that phrase was intended to refer to those cases where, having first been informed, eligible participants requested services.  The meaning and scope of the limiting language are cabined by its location in the structure of the paragraph's chronology.

A parallel phrase appears in part C, which deals with corrective treatment. In that part, states are directed to provide corrective or follow-up treatment, "the need for which is disclosed" in the screenings performed pursuant to part B. This choice of language leads to two conclusions. First, it adds support to the structural interpretation given above, wherein eligible participants are first informed, are given services in all cases where requests are made after having been informed, and are given corrective treatment in all cases where the need is disclosed after they have been screened. It supports the structure of "A, then B (for which A is a condition precedent), then C (for which B is a condition precedent)." Put simply, the informing was to lead to requests based on information, just as the screenings were to result in treatments based on screenings. Parts B and C are read in this parallel fashion because of their similar grammatical structure and use of sequencing.

A second conclusion may be drawn from the fact that Congress did not choose to limit the provision of corrective treatment in part C by the "request" defense, but instead chose to make corrective treatment available wherever the need was demonstrated through screening. If the "request" language had been genuinely designed to limit defendants' duty to provide screenings even in cases where states had failed to inform eligible participants of the services, why then did Congress choose not to include such a limit on the provision of follow-up services? Why, if the request language was truly meant to limit the states' provision of checkups even where eligible participants had no knowledge of their right to receive regular checkups, did not Congress similarly limit the states' duty to provide follow-ups? Under the statutory principle of "expressio unius," which holds that words omitted, or the decision to omit language, may be just as significant as the decision to use particular words, the omission of the "request" defense in part C

44

should inform the court's understanding of the "request" language in part B. Rather, its

disappearance in part C suggests that the phrase was not meant to limit the states' duty to provide

screenings in cases where requests were not made due to the states' failure to inform; otherwise,

one would expect a similar limitation on follow-up services. This adds further support for the

above-explained structure of "A, then B (for which A is a condition precedent), then C (for which

B is a condition precedent)."

*Legislative Intent*

A brief history of the program will aid the court's interpretation of this section. In 1967,

Congress amended the Medicaid Act to provide for the mandatory provision of EPSDT services

to needy children under the age of 21. § 1396d(a)(4)(B).[52] The "request" language was first

injected into the statute in 1972, when Congress, as part of the Social Security Amendments of

1972, enacted a penalty provision to punish participating states for failing to provide child health

screening services under Medicaid.[53] In 1981, this penalty was repealed, and the language

requiring the informing, provision of screening services, and provision of follow-up treatment was

---

[52]This amendment to the Medicaid statute required participating states to furnish "such early and periodic screening and diagnosis of individuals who are eligible under the plan and are under the age of 21 to ascertain their physical or mental defects, and such health care, treatment, and other measures to correct or ameliorate defects and chronic conditions discovered thereby, as may be provided in regulations of the Secretary."

[53] 42 U.S.C. § 603(g) (effective October 20, 1972) (now repealed) provided:
Notwithstanding any other provision of this section, the amount payable to any State under this part for quarters in a fiscal year shall with respect to quarters in fiscal years beginning after June 30, 1974, be reduced by 1 per centum . . . of such amount if such State fails to–
(1) inform all families in the State receiving aid to families with dependent children under the plan of the State approved under this part of the availability of child health screening services under the plan of such State approved under subchapter XIX of this chapter,
(2) provide or arrange for the provision of such screening services in all cases where they are requested, or
(3) arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services.

incorporated into a new paragraph, §1396a(a)(44), which in 1984 became §1396a(a)(43). The legislative history of the EPSDT program, while scant, clearly indicates that the 1967 amendment was the result of a growing need for health care among poor children. *See* Comment, *Child Health Care: Unresolved Dilemma of Section 1905(a)(4)(B) of the 1967 Social Security Act Amendments*, 59 Geo.L.J. 965 (1971). Early in 1967, in response to this growing need, President Johnson recommended that Congress pass a comprehensive program providing early diagnosis and treatment of poor children with special health care needs. President Johnson, Welfare of Children, H.R.Doc.No.54 (1967).

Whatever might be discerned about the goals of the founders of EPSDT, one may fairly assume that they did not intend to create a means by which states that fail to inform poor and unhealthy children about the program might turn around and use this as a defense to their failure to provide services. To the contrary, the "request" limitation was introduced as part of the penalty scheme injected in 1972, which was aimed at penalizing states whose efforts at compliance were less than commendable. More importantly, the "request" language was introduced in conjunction with the duty to inform – a point which concerns the structure of the 1972 and 1981 amendments, discussed above.

It is a fundamental principle of statutory interpretation that a court cannot allow a literal reading of a statute to produce a result "demonstrably at odds with the intentions of its drafters." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982). Therefore, it is held that the "request" language may not be read to contravene the congressional intent, in 1967, to enact a program that would serve needy children, or Congress' subsequent intent to strengthen enforcement mechanisms against states that fail to provide those services. Defendants' reading of

46

the "request" language – that the phrase permits them to avoid the duty to provide services where no services have been requested, even in cases where plaintiffs have not been informed so as to be able to make such requests – is in clear conflict with the legislative intent behind the EPSDT statute.

### Waiver

The doctrine of waiver undergirds the court's reasoning on this issue. Waiver is an intentional relinquishment or abandonment of a known right or privilege. *Johnson v. Zerbst*, 304 U.S. 458 (1938). In the context of criminal law, waiver of the right to counsel and of the right to remain silent must be voluntary and made knowingly and intelligently. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The principles of waiver extend beyond the criminal context, into the civil context, where waiver is closely linked to the notion of due process. *See Bueno v. City of Donna*, 714 F.2d 484 (5th Cir. 1983)(plaintiffs did not knowingly relinquish their right to a hearing when they were never aware of that right); *Clark v. Schweiker*, 652 F.2d 399 (5th Cir. 1981)(no waiver of statutory right to counsel in hearing before Social Security Administration where Secretary of Health and Human Services failed to notify claimant of right to representation). Whether a particular right is waivable, whether the defendant must participate personally in the waiver, whether certain procedures are required for waiver, and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake. *See, e.g.*, 2 W. LaFave & J. Israel, *Criminal Procedure* § 11.6 (1984).

The doctrine of waiver is not, strictly speaking, applicable in the context of plaintiffs' motion to enforce the instant decree; however, its principles form the basis of a useful analogy. In this case, the court is presented with a statutory right to health services, along with a statutory

47

right to be informed of the right to health services.  Thus, the right to periodic screenings upon request is unlike most statutory rights, in that Congress has specifically provided a concomitant right to be informed of the right to the services.  Thus, this unique statutory right to "services upon request" must be viewed in light of the right to be informed.  Because Congress has created the right to know of the right to services, the right to services upon request is, in this sense, akin to the right to remain silent and the right to counsel.  Defendants in effect argue that plaintiffs have waived their right to services by failing to request them.  However, under the logic of waiver, which looks to the parameters of the right at stake, the related statutory right to be informed would require defendants to inform plaintiffs of their rights to services before such "waiver," or failure to request, could be considered meaningful.

### The Cases

The court's exercise in statutory interpretation supports the commonsense notion that a poor and often isolated population should not be robbed of their rights to services upon request when they have not been informed of those rights.  This commonsense notion was first applied to EPSDT in a case in which the defendant State of Indiana defended a remarkably poor record of performance with the contention that "[a]ny of the eligible children in this state can secure all of the requested services merely by requesting them from their local health provider." *Stanton v. Bond*, 504 F.2d 1246, 1250-51 (7th Cir. 1974).  Though the Seventh Circuit did not specifically address the "request" language, which was at that time located in a different penalty section of the

Social Security Act and therefore did not explicitly limit plaintiffs' rights to services under 42

U.S.C. § 1396d(a)(4)(B),[54] the court made short shrift of defendant's argument:

> It is utterly beyond belief to expect that children of needy parents will volunteer
> themselves or that their parents will voluntarily deliever them to the providers of
> health services for early medical screening and diagnosis. By the time an Indiana
> child is brought for treatment it may too often be on a stretcher. This is hardly the
> goal of "early and periodic screening and diagnosis." EPSDT programs must be
> brought to the recipients; the recipients will not ordinarily go to the programs until
> it is too late to accomplish the congressional purpose.

*Stanton v. Bond*, 504 F.2d at 1251.

Relying on *Stanton*, the U.S. District Court for the District of Columbia has implicitly held

that defendants who fail to inform the EPSDT population may also be held to violate

§1396a(a)(43)(B) where services have not been provided, even in the absence of

requests. *Salazar v. District of Columbia*, 954 F.Supp. 278 (D. D.C.1996). In *Salazar*, Medicaid

applicants and recipients claimed that the District had both failed to inform them of EPSDT

services and to provide them with the services. Though it did not specifically address the

"request" language in §1396a(a)(43)(B), which was the same at the time *Salazar* was decided as

it is today, the court held that defendants had violated both §1396a(a)(43)(A) and

§1396a(a)(43)(B). *Id.* at 328-331. Of particular interest is the *Salazar* court's holding that

defendants had failed to provide the lead blood toxicity testing of ESPDT children. *Id.* at 330.

The court recited, as has this court, numerous statistics in support of the finding that the lead

poisoning screenings had not been provided. The *Salazar* court also noted that only one plaintiff

with a particularly compelling story had "actually requested" lead blood tests repeatedly and had

---

[54]*See* above discussion of the enactment of the EPSDT statute and subsequent
amendments.

been denied. *Id.* at 306. Because this isolated tale of request and denial appears among a sea of statistics supporting the court's legal conclusion that defendants had failed to provide the services, it may be reasonably inferred that the *Salazar* court relied primarily on the failure to provide services, regardless of whether or not they had been requested by plaintiffs. It appears unlikely that the court based its finding of a violation on one plaintiff's story of a denied request, without explicitly saying so. It is more probable that the court's finding that defendant's outreach had been inadequate led the court to find the defendants in violation of §1396a(a)(43)(B) without consideration of the "request" issue, based on the commonsense principles discussed above.

The defendants' logic having been rejected by the court, it is hereby found, based on the evidence recited in Section II(B)(1) above, that plaintiffs have met their burden in establishing that defendants have violated paragraphs 2 and 3 of the decree.[55] Similarly, it is found, based on the evidence relayed in Section II(B)(2) regarding defendants' provision of dental checkups to the plaintiff class, that defendants have violated paragraph 143. It is further found, based on the evidence in Section II(B)(4), that defendants have violated paragraph 212[56] in failing to provide the required checkups to children in the custody of TDPRS.

---

[55]The evidence related in Section II(B) of this opinion was primarily focused on the provision of checkups, rather than follow-up treatment. However, a finding that defendants have not provided checkups, in violation of paragraph 2, necessitates a finding that follow-up treatments subsequent to those checkups were also not provided. ¶ 3.

[56]The court interprets the language in paragraph 212 cited in Section II(B) to be reiteration or stressing, with respect to a subgroup demonstrated to be at risk of not receiving care, of the defendants' general obligation under federal law to provide checkups to all class members.

**D. Checkup Reports: Findings of Fact Regarding Violations of Decree**

Plaintiffs also complain of defendants' failure to report checkup data regularly and accurately. Plaintiffs' argument is three-fold. First, plaintiffs maintain that defendants are in violation of paragraph 284, which requires that defendants report annually the "number and percent of recipients" who receive all of their scheduled medical checkups. Defendants report only "participation ratios" – the figures required by HCFA – instead of actual percentages.[57] Defendants respond that the participation ratios are "professional, statistically valid, and [in conformity] with reporting requirements established by the Health Care Financing Administration (HCFA)." Defendants' Response to Plaintiffs' Second Amended Motion to Enforce the Consent Decree at 11.

The relevant language of the decree is as follows:

> 283. METHOD TO REPORT CHECKUPS  First, Defendants report EPSDT participation statistics to the federal government every year on the HCFA Form 416. The HCFA Form 416 uses calculations to approximate the number of recipients who receive EPSDT medical checkups.
> 284. Every year from 1996 through 1999, Defendants will also report to Plaintiffs the number and percent of recipients who receive all of their scheduled medical checkups. They will further report the number and percent of recipients who receive all of their scheduled dental checkups. Defendants will provide these reports to Plaintiffs no later than December 31 of each year.
> 285. For these reports, Defendants will develop a method that records all recipients who receive the full number of scheduled checkups within a year. . . . The complexities associated with collecting utilization data require the parties' continued collaboration in the design and implementation of this system.

When read in conjunction with paragraph 283, which mentions defendants' pre-existing duty to report participation ratios to HCFA, paragraph 284 requires defendants to provide plaintiffs with more information; namely, "the number and percent of recipients who receive all of their scheduled dental checkups." Defendants' argument that HCFA Form 416 data fulfills their

---

[57]The difference between these two measures and plaintiffs' concerns about the use of participation ratio are discussed in detail above in Section II(B).

obligations under paragraph 284 is therefore rejected. Paragraph 284 makes clear that plaintiffs bargained for a very specific type of data in addition to the "calculations" or "approxim[ations]" already required by HCFA. The word "also," in addition to the use of "number and percent" in place of "calculations" makes this plain.

Defendants maintain that plaintiffs have been inflexible in their demands and that the percentages required by paragraph 284 are impossible to obtain. It is true that "[t]he complexities associated with collecting utilization data require the parties' continued collaboration in the design and implementation of this system." ¶ 285. Plaintiffs must therefore collaborate with defendants in their pursuit of the required "number and percent." However, the above-quoted paragraphs make it apparent that plaintiffs bargained for the "number and percent," and not the Form 416 data referenced in paragraph 283. Because they have not furnished plaintiffs with this data, defendants are held to be in violation of paragraph 284.

Second, plaintiffs complain that defendants report information about class members who have received one medical or dental checkup per year, instead of all medical or dental checkups that are due. P.Ex. MC-20. The text of paragraph 284 makes clear that plaintiffs' position is correct. It is found that defendants are in violation for their failure to provide the data specifically described in paragraph 284.

Third, plaintiffs argue that defendants have violated paragraph 212[58] by failing to provide complete reports on the receipt of checkups by abused and neglected children in the custody of

---

[58]Paragraph 212 requires the parties to create a Memorandum of Understanding that establishes a method to report the number and percent of EPSDT recipients under TDPRS supervision who have received all of their medical and dental checkups, and "assure[s] that all EPSDT recipients under the supervision of TDPRS receive all medical and dental checkups when due."

the Texas Department of Protective and Regulatory Services (TDPRS).  Specifically, defendants'

May 28, 1998 report was incomplete, and no complete report was provided until the fall of 1999.

P.Ex. R-2.  Plaintiffs correctly note that paragraph 212 mandates the reporting of the number and

percent of EPSDT recipients "under the supervision of TDPRS" who receive services.

Defendants respond that providing this data has been extremely difficult due to unforeseen

difficulties.  Defendants' Response to Plaintiffs' Second Amended Motion to Enforce Consent

Decree at 10.  However, this does not excuse defendants' failure to provide the data mandated by

the decree.  Defendants have failed to cite any decree language that would permit them to exclude

certain subsets of those class members "under the supervision of TDPRS."  Therefore, it is found

that defendants are not in compliance with paragraph 212.  Their partial compliance will,

however, inform the court in its formulation of appropriate orders of enforcement.


## III. Issue Three: Corrective Action Plans

### A. Corrective Action Plans for Lagging Counties: Findings of Fact Regarding Violations of Decree

As is stated in paragraph 271 of the decree, "Medicaid services, including EPSDT

services, must be available in every political subdivision of the state." *See* 42 U.S.C. §

1396a(a)(1).  To prevent regions of the state from lagging behind others in performance, and to

ensure that class members throughout Texas receive the checkups to which they are entitled, the

parties created the "State-Wideness" section of the decree. ¶¶271-81.  The decree specifies that

by March 30th of each year, defendants must report the number of class members who have

received medical checkups and dental checkups, by county or cluster of counties. ¶¶ 277, 280.

They must then identify any counties that "lag behind" the rest of the state in the delivery of services to the plaintiff class.  ¶ 278.  Finally, defendants must develop corrective action plans for any so-called "lagging" counties in an effort to improve participation in those counties. ¶ 281.

Plaintiffs allege that defendants have not properly developed annual corrective action plans.  Defendants respond that all required corrective action plans for the poorly-performing counties have been completed, and that the issues raised by plaintiffs concerning the particular methodology used by defendants are not governed by the consent decree.  Alternatively, defendants assert that their methodology for creating and implementing the plans completely satisfies the standards set out in the decree, were the court to find that such standards exist.

### What is "Lagging?"

Plaintiffs are primarily concerned with the methodology used by defendants to identify the so-called "lagging" counties.  Plaintiffs contend, first, that defendants label as "lagging" only those counties whose participation rates fall behind the average county participation rate, instead of those counties whose rates fall behind the "state average," as is required by the decree in paragraph 280.[59]  As a result, plaintiffs assert, fewer counties are targeted for corrective action than are required to be targeted by the decree.  It appears that plaintiffs understand the term "state average" to mean the participation rate for the state of Texas.  Defendants respond that "state average" was used in paragraph 280 as shorthand for the average of the participation rates of each of the counties in the state.  It is clear from the text of paragraph 280 that defendants' reading is

---

[59]Paragraph 280 provides in full:

280. Defendants will complete a statewideness analysis every year by March 30.  Defendants will identify the counties or county clusters that lag behind the state average for medical checkups beginning in 1996 and for medical and/or dental checkups beginning in 1997 and continuing annually thereafter for the duration of his agreement.

correct.  The words "state average" unambiguously refer to an average; therefore, the only

question is: the average of what?  The only logical answer is the one proposed by the defendants:

the average of the county participation rates.  Plaintiffs suggest no other average, but insist,

erroneously, that the term "state average" should be read as synonymous with the participation

rate for the entire state of Texas.  This is simply not an average.  Ideally, it would certainly be

preferable to target for corrective action all counties with participation rates below that of the

state; however, the court cannot look beyond the clear language of the decree.[60]

### Counties with Few Class Members

Plaintiffs next complain of defendants' decision to omit from the analysis all counties

where fewer than 100 class members reside.  P.Ex. CH-6 at 5, P.Ex. D-3 at 4.  Defendants assert

that these counties  were excluded from the calculus because their sample sizes were too small.

However, the parties obviously anticipated this problem, as the decree specifically provides that

"counties where few recipients live may be clustered so that statistically valid results can be

achieved."  ¶ 276.  Nonetheless, defendants insist that "clustering non-adjacent counties" is an

"invalid method for developing corrective action plans."  Defendants' Response to Plaintiffs'

Second Amended Motion to Enforce Consent Decree, at 13.  It is unclear why clustering, or

grouping the counties with low enrollee counts with adjacent counties with higher counts, would

constitute an "invalid" method.  Defendants have provided no expert testimony to that effect.

Nor is it clear from the court's reading of the decree that the clustering of non-adjacent counties

---

[60]This particular phrasing of the decree has significant consequences for plaintiffs.  For
example, only ten out of Texas' 254 counties were identified by defendants as requiring corrective
action in 1998, whereas only 110 of the 254 counties "equaled or exceeded the statewide
participation rate."  P.Ex. CH-6.

would be required.  Regardless, the fact remains that the defendants agreed to the terms of

paragraph 276.  There is no provision in the decree for the omission of any county from the

calculus.  On the contrary, the entire "state-wideness" section is geared toward the inclusion of

neglected areas of the state and achieving consistency across the state's vast territory and

numerous counties. ¶¶ 271-274.  Even had defendants been able to produce expert testimony that

clustering is not "statistically valid," within the meaning of that phrase as it appears in paragraph

278,[61] they would likely be bound by their own prior sanctioning of clustering in paragraph 276.

Therefore, it is found that defendants are in violation of the corrective action provisions of the

decree due to their failure to include counties with few class members. ¶¶273-81.

### Managed Care Counties

Plaintiffs also complain of defendants' decision to omit all counties (hereafter referred to

as the "managed-care counties") in which defendants require class members to receive services

from managed care organizations (hereafter referred to as "MCOs").  P.Ex. CH-6 at 5.  Again, as

noted above, no provision of the decree permits the omission of certain classes of counties from

the analysis.  The omission of managed care counties is particularly disquieting, because those

counties report lower checkup participation rates than counties in which managed care has not

been implemented. *See* Section IV(B)(4).  Defendants concede that they are unable to obtain the

reliable data that they need in order to include the managed care counties in the lagging county

---

[61]Paragraph 278 reads in pertinent part:

278. . . . Defendants will develop a statistically valid method to determine which counties or county clusters lag
behind . . . The method is subject to Plaintiffs' approval.  Plaintiffs' approval is limited to whether the proposed
method is professionally acceptable and valid. . . . Plaintiffs will not unreasonably withhold approval. . . .

analysis,[62] citing differences in the reporting mechanisms used by fee-for-service entities and managed care organizations as the source of their difficulties.[63]  Perhaps anticipating this response, plaintiffs included in the decree a clear mandate that "TDH will assure by various means that the number and percent of EPSDT patients in each managed care organization who receive all medical and dental checkups when due and information for outcomes research as needed is accurately collected." ¶ 191[64].  Notably, Dr. Allgeyre, defendants' Director of Statistics, testified that he was unaware of this provision.

Defendants are under a clear obligation to secure reliable data for the managed care counties and to include them in the lagging county analysis.  The decree provides no legal basis for defendants' excuses, which revolve around the alleged difficulty in obtaining data that they explicitly agreed to furnish to plaintiffs.[65]  The decree plainly requires the collection of the data at

---

[62]For example, defendants admit that the data in their "Annual EPSDT Participation Reports" is incomplete for the years 1997 and 1998 because managed care data was not obtained. P.Ex. M-32, M-39.  It is further noted that the Texas Health Quality Alliance, the agency with which defendants have contracted to obtain independent studies of their managed care initiatives, has reported that the managed care companies serving class members through contracts with the state do not maintain accurate, valid data about the receipt of services, including checkups. D.Ex. D-48.

[63]Defendants cite in particular the fact that "reports generated from encounter data are not representative of true utilization due to the movement from a claim basis ([fee-for-service] claim forms submitted for payments) to an encounter data basis (information submitted on capitated services)." Defendants' Response to Plaintiffs' Second Amended Motion to Enforce the Consent Decree, at 28. *See also* TR 460, line 20 to 461, line 5.

[64]Defendants' violation of this paragraph is discussed in more detail below, in Section IV(F).

[65]Defendants' apparent position that the data collection techniques of the managed care entities are beyond their full understanding or control is further evidence of their recalcitrance, as it is difficult to imagine that any one of the MCOs currently serving the State of Texas would leave behind a lucrative contract were the state to demand the data which plaintiffs seek – data to

issue and does not provide for the exclusion of managed care counties. Defendants can cite no

language in the decree in support of their failure to collect the data, or of their exclusion of said

counties. Rather, as was mentioned in the above discussion concerning the counties with low

numbers of eligible participants, the state-wideness section must be construed with an eye toward

achieving the express goals of inclusion and statewide consistency.[66] Therefore, it is found that

defendants are in violation of the corrective action provisions of the decree due to their failure to

include counties in which class members are enrolled in managed care. ¶¶273-81.

### *Checkups vs. Treatments*

Plaintiffs assert that defendants fail to report by county the number of class members who

receive one or two dental checkups per year. Defendants have instead reported the number of

class members who receive "at least one dental treatment." P.Ex. D-3 at 6. Plaintiffs suggest that

because the percentage of class members who received dental checkups in 1998 (19%) is

significantly smaller than the percentage of members who received any form of dental service

(38%),[67] defendants' dental services data do not paint an accurate picture of how many class

members are receiving the required checkups by county. Paragraph 277 clearly mandates the

---

which plaintiffs are unambiguously entitled to under the decree. And, as the decree makes clear,
even though defendants contract with managed care companies to provide services to many class
members, defendants "remain ultimately responsible for the administration of the EPSDT program
in Texas and compliance with federal EPSDT law." ¶ 300.

[66]The portions of the decree dealing specifically with managed care as it affects the
plaintiff class provide further support for the court's interpretation that the decree requires the
inclusion of the managed care counties in defendants' analysis. *See* Section IV.

[67]P.Ex. D-3 at 5. A similar gap appears in the 1997 data. *Id.*

reporting of the receipt of dental checkups, not "services."[68]  It is therefore found that defendants

are in violation of paragraph 277 of the consent decree.

### *Professionally Acceptable Data Analyses*

Finally, plaintiffs assert that the data in defendants' reports is not "professionally

acceptable and valid," as required by paragraph 281 of the decree.  The sole evidence for this

assertion consists of correspondence authored by plaintiffs' counsel.  Because these documents

are hearsay, they cannot be considered for the truth of what they assert − that defendants'

statistics are unacceptable or invalid.  Even were the inconsistencies in defendants' data to be

considered by the court, it is found that plaintiffs have not proven by a preponderance of the

evidence that defendants have not met the decree's "professionally acceptable and valid" standard.

Plaintiffs have provided no guidance for the court to ascertain where the boundary between

unacceptable and acceptable might lie.  Drawing such a line would likely be an onerous task.

Such fine-tuning will not be necessary, however, as it is hereby found that the very small

discrepancies in defendants' data of which this court may take note do not amount to a violation

of the standard set out in paragraph 281.

### B. Corrective Action Plans for Transportation System

### *Overview*

Plaintiffs allege that defendants have not completed the "Medical Transportation Studies"

and transportation corrective action plans required by the decree.  The aim of defendants'

---

[68]Paragraph 277 provides in full:
Beginning in 1996, Defendants will measure the percent of EPSDT recipients who receive medical checkups.
Beginning in 1997, Defendants will conduct 2 analyses.  They will measure the percent of EPSDT recipients who
receive medical checkups and 2 dental checkups/year in each county or county cluster.

transportation program is to assist class members, many of whom have no form of transportation, in coordinating transportation to their appointments.[69]  To improve the transportation program, defendants must assess the program by March of each year.  ¶¶ 223-29.  The aim of these annual evaluations is to assess class members' unmet transportation needs and their satisfaction with the program.  In addition, paragraph 228 requires defendants to "take corrective action wherever the assessment indicates that transportation services are inadequate.  'Inadequate' means problem(s) exist that Defendants can reasonably be expected to correct."  The decree also orders the parties to determine how to decide where corrective action is needed, how quickly it is needed, and what actions to take.  ¶ 229.

### Role and Importance of Defendants' Transportation System

The Texas Legislature's Sunset Advisory Commission issued the following statement in a 1998 report:

> Transportation is among the most frequently cited barriers to service delivery for health and human services clients in Texas.  Without transportation, clients are unable to access services for which they are eligible.  Transportation is a problem primarily for those who do not own a personal automobile, or are unable to drive for other reasons, and thus considered "transportation disadvantaged."  This can include people with a mental or physical disability . . . and low-income individuals.

P.Ex. M-3 (Staff Report, Health and Human Services Commission, 1998) at 115.  More than one of defendants' witnesses testified that transportation problems are one of the most common

---

[69]Defendants offer a variety of transportation services through their contractors.  The options include transportation by car, mass transit, bus service between cities, van, taxi, or airline. MTP will arrange transportation to Texas Health Steps checkups, immunizations, dental services and medical treatment for class members.  P.Ex. T-6 at 3.  Defendants also provide mileage reimbursement at a rate of 28 cents per mile.  ¶ 232.

reasons that class members miss health care appointments.[70] Plaintiffs' witnesses agreed.[71] A study prepared by Texas A&M University reports that 35% of class members who miss health care appointments give transportation-related problems as the reason for their not having arrived at the scheduled time. P.Ex. T-43 at 27 (Table 5.3).

### Findings of Fact Regarding Violations of Decree

Abundant evidence demonstrated the various problems with defendants' transportation program, including evidence that class members often cannot gain access to the transportation vouchers to which they are entitled, are not reimbursed until months after transportation expenditures have been made, and often spend whole working days arranging and waiting for transportation to and from brief appointments. Some class members, for example, are forced to take one to two days off from work to accompany their children to medical appointments, because the defendants' transportation schedules may require an overnight stay. The burden this creates on poor class members can be overwhelming.[72]

---

[70] TR 380, lines 7-15 (Testimony of Margaret Bruch). The court qualified Ms. Bruch, a program consultant for Texas Health Steps case management as an expert in "medical case management in the Texas Health Steps program and other programs administered by the Department of Health." There was no objection. TR 356, lines 11-6. *See also* TR 975, lines 19-23 (Testimony of Billy Millwee). Mr. Millwee is defendants' division director for the Texas Health Steps and Medical Transportation Programs. TR 872, lines 16-8. The court qualified him as an expert in "the field of health care and . . . the administration of the Texas Health Steps Program." There was no objection. TR 876, lines 7-11.

[71] TR 70, lines 13-7 (Testimony of Ms. Tillman); TR 254, line 17 (Testimony of Dr. Seale).

[72] One of many of plaintiffs' examples concerned J.F., who, as the result of having suffered a closed-head injury, has left side neglect, disruptive behaviors, perseveration, leaning disabilities, vision problems, problems walking, problems swallowing, and problems with internal control and memory. P.Ex. A-7; TR 34, line 15 to 38, line 19. J.F. had received treatment at the Brown School in Austin, but in December of 1998, he returned home and needed daily therapy sessions at the West Texas Rehabilitation Center in Abilene. He lives about fifteen miles from Abilene, in

Under paragraph 223, the first annual assessment of defendants' MTP was due in March of 1996. However, it was not completed by defendants until January of 2000. Because it appears that defendants have not provided plaintiffs with the required annual assessments for the years 1996 through 1999, the court finds that defendants were in violation of paragraphs 223 through 229 of the decree during that entire three-year period. Because defendants completed their first assessment in January of this year, and their first formal transportation corrective action plan on February 25, 2000, it is found that defendants have come into partial compliance with these paragraphs as of the year 2000. However, it is noted that plaintiffs' counsel have not received a copy of the plan or had the opportunity to give their input, as required by the decree. ¶ 229.

## IV. Issue Four: Managed Care

The vast majority of the testimony produced at the hearing on plaintiffs' motion to enforce concerned defendants' increased implementation of managed care across the state. A short explanation of what is meant by "managed care" will aid this discussion.

---

Merkel. By March, W.P., his mother, still had not received reimbursement for trips made in December. After Ms. McHan's extensive intervention, W.P. finally received reimbursement in April for travel in December. In the meantime, his mother had to borrow money from multiple sources and quit her job to stay home to take care of her son's extreme needs. TR 38, lines 4-11 W.P. relayed that "[b]ecause of . . . delays, I maxed out my gas credit card. I had to borrow money from all of my friends to pay for trips to rehabilitation five days per week." P.Ex. A-7 at 7. In January of 2000, after a six-month delay, W.P. finally received reimbursement for travel in June of 1999. TR 38, lines 13-19.

Additional evidence of the transportation difficulties faced by plaintiffs will not be recited, as such evidence is irrelevant to the question of whether or not defendants have complied with those decree provisions governing the creation of corrective action plans. As plaintiffs themselves concede, the decree does not set out standards for the transportation program itself, but merely sets out a process by which the parties, through the development of corrective action plans, must identify and implement improvements to be made to the program.

## A. Defendants' Managed Care Programs[73]

To implement managed care, defendants have used three main managed care "models":

capitated managed care, partially capitated managed care, and primary care case management.  In

capitated fee models, managed care organizations ("MCOs") are paid flat fees by Medicaid to

provide services for their patients.  TR 99, lines 18-22.  The MCO assumes the risk of providing

services that are medically necessary.  P.Ex. M-2 at 95.  The model is based on the theory that

when organizations are paid a flat fee to serve their patients, they will provide cost-effective

preventive care in an effort to avoid the costs of expensive treatment of acute conditions.  P.Ex.

—2 at 94.  Partial capitation refers to the use of caps for some kinds of services within a single

health plan.  In primary care case management models, individual health care providers are paid a

small monthly fee to arrange referrals and other needed services for patients, but providers are still

paid a fee for the services that they provide.  Other combinations of these three approaches have

been used in some counties.  Members of the plaintiff class are enrolled in each of these managed

care models.

---

[73]Defendants' most common managed care program is the "STAR" program.  There are STAR managed care programs in the Travis, Southeast, Bexar, Tarrant, Lubbock, Dallas, Harris and El Paso regions. P.Ex. MC-57.  The STAR program began in 1993 with two pilot projects, one in Travis County and the other in the Gulf Coast area in and around Galveston.  In 1995, the Gulf Coast area expanded to include a few new counties.   In 1996, Defendants added several counties to the Travis managed care project and started their managed care programs in the Bexar, Lubbock and Tarrant regions.  The Harris region project began in 1997.  P.Ex. M-2 at 93.  Finally, Defendants began their Dallas and El Paso regional projects in 1999. P.Ex. MC-57.  By December 1, 1999, Defendants had enrolled 346,388 Texas Medicaid recipients in managed care. D.Ex. D-62.  Most managed care enrollees are class members.  For example, in fiscal year 1997, 83% of Texas Medicaid recipients in managed care were under the age of 20 years.  P.Ex. M-2 at 104.  In 1999, the Texas legislature declared a moratorium on the further expansion of managed care for class members and other Texas Medicaid recipients.  Tex. Gov't Code, § 533.012; P.Ex. MC-57.  However, a future continuation of the "roll-out" of managed care is considered likely by all parties.

Each of the three types of managed care programs share several characteristics.  First, each class member either chooses or is assigned to a primary care provider (PCP).  The primary function of the PCP is to provide each class member with a "'medical home,' including comprehensive preventive and primary care on a 24 hour/7 day a week basis."  P.Ex. —2 at 95. PCPs are also charged with approving other forms of care that class members may need.  For example, without PCP approval, class members may not receive most forms of specialty care. P.Ex. —2 at 94, 97.  In other words, PCPs are supposed to assist class members and coordinate their care, and also to function as gatekeepers who may limit the care that class members receive. TR 556, line 20 to 566, line 17.  Second, managed care involves circumscribed networks of providers and therefore limits clients' choices of providers (with some exceptions) to those under contract with the managed care organization ("MCO") network.  P.Ex. M-2 at 95.  Third, managed care programs institute utilization review and management programs to monitor network providers.  P.Ex. M-2 at 95.

Plaintiffs' complaints regarding defendants' managed care system may be grouped into four areas: 1) the receipt of services by class members enrolled in managed care, 2) the treatment of the children of migrant workers enrolled in managed care, 3) the training of health care providers employed by the managed care system, and 4) the defendants' failure to obtain required data from managed care organizations.

## B. Findings of Fact: The Receipt of Services by Class Members Enrolled in Managed Care

### *Overview*

Plaintiffs seek to enforce the following decree provisions to ensure the receipt of services by class members enrolled in managed care programs:

189. Regardless of their disagreements about the merits of managed care, the parties agree that managed care must be implemented in a manner that benefits EPSDT recipients and does not harm them. For this reason, the parties agree and the Court orders that:

190. EPSDT recipients served by managed care organizations are entitled to timely receipt of the full range of EPSDT services, including but not limited to medical and dental checkups.

192. TDH will assure by various means that managed care organizations provide medical and dental checkups to newly enrolled recipients no later than 90 days after enrollment except when recipients knowingly and voluntarily decline or refuse services. Managed care organizations will also have the capacity to accelerate services to the children of migrant farmworkers to accommodate their special circumstances. TDH will also assure medical and dental checkups in a timely manner to all recipients.

As a preliminary matter, it is noted that paragraph 189, in which the parties agree "that managed care must be implemented in a manner that benefits EPSDT recipients and does not harm them," does not create any binding obligation on defendants. None of the federal law cited by the parties indicates that the parties meant to refer to a statutory obligation of defendants to the plaintiff class. Rather, paragraph 189 serves as an introduction to the set of obligations that appear in the sentences that follow.

Nonetheless, much of the evidence produced at the hearing focused on the benefits and disadvantages of the managed care approach to healthcare, in Texas and nationally. Defendants emphasized that the principal objectives of managed care are to improve access to health care for Medicaid clients, to enhance the quality of services, to provide a continuum of care and a medical home, to reduce inappropriate utilization, and to enhance long-term cost effectiveness. D.Ex. D-33, D-45, D-46. Plaintiffs countered with familiar arguments about the effects of cost-saving incentives on the quality of and access to healthcare, emphasizing the harm resulting from class members' inability to understand and navigate defendants' complex managed care system.[74]

---

[74]For example, Ms. Tillman testified that it is very difficult for class members to get services since "[t]hey don't understand the managed Medicaid process." TR 70, line 23 to 71, line 2; TR 109, line 22 to 110, line 10; TR 111, lines 9-16; TR 116, line 7-11. Ms. Singleton also testified that the advent of managed care has made things worse by exacerbating class members' confusion and frustration in attempting to gain access to healthcare. TR 191, line 20 to 192, line

Plaintiffs also emphasized the lack of "fit" between the realities faced by the EPSDT population and the theory behind the managed care model. The population's poverty makes it likely that they will need many visits, making capitated fee arrangements unprofitable for providers. Also, their relatively short enrollment period removes providers' incentives to provide effective preventive care to keep their patients healthy in the long run. *See, e.g.*, Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 130-33.

Both parties have provided numerous studies depicting varying degrees of satisfaction among providers and consumers in managed care. The breadth and difficulty of the public policy questions they have raised is apparent. While it forms the subject of much debate and discussion in the realm of public policy, the viability of managed care is not, and should not be, on trial in this proceeding. Whether or not to continue the rapid expansion of managed care is an issue for the legislature alone.

Relevant to plaintiffs' motion to enforce are the provisions that create binding obligations on defendants. The evidence at the hearing that demonstrated that class members enrolled in managed care do not receive the checkups to which they are entitled under the decree is presented below.

### Inaccurate and Inflated Data

First, plaintiffs' evidence demonstrates that defendants' data about checkups in the managed care system is inflated and inaccurate. Specifically, plaintiffs argue that defendants' managed care data, reported in defendants' "Annual EPSDT Participation Report" for fiscal year

---

2.

1998,[75] are inflated because they include "well child" visits that are not true Texas Health Steps

medical checkups. The so-called "well child" visit is considerably less comprehensive than the

Texas Health Steps checkup. "The Texas Health Steps checkup is much broader and more

involved . . .[than] . . . a well-child exam." TR 175, lines 6-11. (Testimony of Ms. Singleton).[76]

In reporting their managed care data, defendants used data that the Texas Health Quality Alliance

("THQA")[77] had obtained from defendants' contractor managed care companies. TR 648, line 20

to 649, line 25. Per defendants' instructions, TR 650, lines 1-8, THQA included in the data two

forms of checkups received by class members in managed care: Texas Health Steps checkups and

"well child" checkups.

Defendants have not made clear to the court how many of the checkups counted in their

Annual EPSDT Participation Report were well child visits, as opposed to Texas Health Steps

medical checkups. However, in a "Medicaid Managed Care Report" written for the Texas

---

[75]D.Ex. D-42, D-43.

[76]Ms. Singleton has personally conducted about 20,000 Texas Health Steps checkups over the course of her career. TR 175, lines 4-5.

[77]Defendants contract with the Texas Health Quality Alliance for independent reviews of the managed care companies' performance. Federal law requires external review. 42 U.S.C. § 1396u-2(c)(2); TR 591, lines 14-23; *see also* Decree ¶ 199; TR 541, lines 13-23. THQA uses several methods to evaluate Defendants' managed care programs. Their on-site review determines what structure and process is in place to meet the requirements of their contract. TR 594, lines 15-23. This study is an attempt to address all of the requirements of the contract by examining their written policy and procedures. TR 595, lines 3-8. THQA also surveys consumers and healthcare providers in defendants' managed care programs. TR 596, lines 16-23. Further, THQA tries to validate data reported by the managed care programs. TR 596. Although THQA had hoped to validate the programs' data by comparing them to actual medical records, often they have not been able to do so. TR 597, line 19 to 598, line 3. In those instances, THQA's validation efforts were limited to attempts to replicate the HMOs' reports using the HMOs' data. TR 596, line 24 to 598, line 3. Finally, THQA conducts focus studies, in which medical records are reviewed. TR 598, lines 7-17.

Legislature for fiscal year 1998, defendants provide participation rate data for their Medicaid managed care plans that includes only Texas Health Steps checkups, and does not include well child visits. P.Ex. MC-5 at 35. These checkup participation rates varied from .24 in Harris County to .39 in the Lubbock managed care region. The participation rates under the primary care case management pilots were somewhat higher, but none exceeded .60. P.Ex. MC-5 at 35. These low rates demonstrate the substantial inflationary effect caused by the inclusion of well child visits in defendants' revised 1998 Annual EPSDT Participation Report, which reports participation ratios in managed care ranged from .77 for children of ages 6-14 years, to .46 for those aged fifteen to twenty years. D.Ex. D-42.

### THQA Focus Studies

THQA studies reveal that class members have received a startlingly lower number of checkups under managed care than defendants have reported. In addition, THQA Focus Studies[78] find many fewer checkups in managed care than defendants report.[79] Defendants' schedule

---

[78]In particular, plaintiffs rely on a 1999 THQA study which asked whether children, regardless of health status, were receiving periodic screenings and checkups according to a periodicity schedule, whether they were receiving immunizations consistent with standards, and whether they were receiving blood lead screenings periodically. TR 652, lines 20-5. THQA did separate studies of well child care in defendants' Texas Health Network (the model of primary care case management) and defendants' contractor HMOs. The study sampled medical records about class members in each group to determine the rate of checkups, immunizations and blood tests for lead poisoning. The sample was limited to class members up to the age of 28 months who had been enrolled in Medicaid continuously for at least six months. P.Ex. MC-7 at 7; P.Ex. MC-8 at 55.

[79]It is noted that the data reported in the "Annual EPSDT Participation Report" is not directly comparable to the THQA data, because the THQA data is limited to class members who had been enrolled for at least 6 months. Also, the medical records used to compile the data included all records that the primary care provider had compiled in the class member's file. It is hoped and expected under common medical practice that the PCPs maintain complete records about the class members assigned to their care. However, the focus study reports that some PCPs

entitles class members to nine Texas Health Steps medical checkups before they reach two years

of age.  P.Ex. M-4 at 2-5.  However, fewer than 43% of the class members included in THQA's

sample of the Texas Health Network data received one or two documented preventive visits in the

first two years of life, even if data for Texas Health Steps checkups and "well child" visits are

combined.  Only about 1% received three or four documented visits.  P.Ex. MC-7 at 12.  In stark

contrast, defendants' "Annual EPSDT Participation Report" states that the participation rate for

infants was .82 in fiscal year 1998.  D.Ex. D-42.  This participation rate purportedly measures the

number of infants who received at least one medical checkup for the year.  TR 446, lines 4-11.

Obviously, the THQA report and defendants' data differ considerably.[80]  Reviewing both sets of

data and the evidence presented at the hearing related to the accuracy of both sets, it is found that

plaintiffs' reliance on the THQA studies is not misplaced.  It is also found that plaintiffs'

explanations for these disparities – the inflationary effect of the assumptions used in calculating

---

may not have done so.  P.Ex. MC-7 at 12-3; P.Ex. MC-8 at 66-7.  The court takes these
shortcomings in the comparability of these data sets into account, and concludes that this
comparison is just one of many bits of evidence that demonstrate, by a preponderance of the
evidence, that class members in managed care do not receive the timely checkups to which they
are entitled.

[80]Plaintiffs presented other dismal THQA findings, including the fact that no
documentation of any checkups for over one-half of the class members in the Texas Health
Network could be located.  "[O]ver 50% of received records per [region] had no documentation
of either Texas Health Steps/well child checkups, immunizations or lead screening."  P.Ex. MC-7
at 12.  This data is very troublesome because defendants' most recent report to the Texas
Legislature notes that there has been an increase in the number of "complex" newborns within
almost all of their managed care plans.  The percent of complex newborns is higher among the
population enrolled in defendants' managed care programs than in the fee-for-service population.
P.Ex. MC-5 at  25, 32-3.

the participation ratio and of the arbitrary inclusion of well child data in defendants' reports, along

with the MCOs' inaccuracies in data collection and reporting -- are highly persuasive.[81]

### Comparing Managed Care and Fee-for-service Systems

Third, plaintiffs have shown that class members enrolled in managed care receive fewer

checkups than those enrolled in the traditional fee-for-service plans.

Plaintiffs argue that, by design, many managed care healthcare systems include incentives

that motivate providers to limit healthcare visits. The results of this alleged incentive structure,

they claim, may be seen in a comparison of managed care data with fee-for-service data.  For

example, in fiscal year 1997, defendants reported lower participation ratios for class members in

managed care than for those in fee-for-service Medicaid, with the exception of infants.[82]

Similarly, defendants' most recent data about medical checkup participation rates – the revised

"Annual Participation Report" for fiscal year 1998 that includes data from their managed care

contractors – shows that with the exception of infants, class members in managed care have lower

participation ratios than class members in fee-for-service plans.[83]  D.Ex. D-42.  A recent internal

---

[81]Plaintiffs note, in addition, that had THQA been permitted to review medical records instead of administrative data to validate the medical checkups, the disparities between THQA's findings and the data reported by defendants would likely have been even greater.

[82] In some regions, the screening ratios for infants were better in managed care than in fee-for-service, although this was only marginally true for all managed care regions combined.  P.Ex. MC-22.

[83]This data shows that managed care enrollees receive fewer services even with the inflationary factors discussed at length above.  Defendants stress the fact that the disparity among the fee-for-service and managed care participation ratios is not extreme; however, due to the problems with defendant's managed care data set, the court finds this argument unconvincing.  A more accurate set of data would likely reveal greater disparities between the two subgroups. Defendants also compare the screening ratios for class members enrolled in managed care and those enrolled in fee-for-service plans.  D.Ex. D-43.  This exhibit shows screening ratios that are

memorandum authored by defendants reports that "[t]he most recent FY'99 percentages for Texas Health Steps medical exams in the nine pilot Medicaid Managed Care counties of Region 1 remain significantly lower than percentages in these same counties prior to implementation of the pilot." P.Ex. M-20 ("Region 1 Highlights").

### Incomplete Checkups

Fourth, the "checkups" received by managed care plaintiffs are grossly inadequate and incomplete. As discussed above, the parties agree that some class members receive "well child" visits instead of checkups. These visits are less comprehensive than Texas Health Steps checkups, and do not substitute for the full checkups required by federal law, by decree paragraphs 190 and 192, and by defendants' own policies.

It takes about one hour to complete an initial Texas Health Steps checkup and about forty-five minutes to complete subsequent checkups. TR 188, line 23 to 189, line 8 (Testimony of Ms. Singleton). It takes about twelve to twenty minutes to perform Texas Health Steps checkups for infants, while "older children [take] longer." TR 759, lines 17-20 (Testimony of Dr. Beverly Koops[84]). The evidence also revealed that twelve minutes would be "pretty quick" and that it

---

the same or higher for class members in managed care, when compared with class members in fee-for-service. However, it was found above that this data is plagued by various inaccuracies likely to lead to inflationary biases. Therefore, the court is not convinced that class members in managed care are receiving the same number of screens and other services as those in fee-for-service plans. For example, defendants report that the screening ratio for infants in fee-for-service is .83 and for infants in managed care is .82. But, based on the studies conducted by THQA described above, it is found that defendants' .82 figure is inaccurate and highly unreliable.

[84]Dr. Koops is defendants' medical director for Healthcare Financing. TR 743, lines 14-5. She is a neonatologist. TR 745, lines 3-4.

would be difficult to complete five Texas Health Steps checkups in under one hour.[85]  TR 930,

line 20 to 931, line 6 (Testimony of Mr. Millwee).  However, Medicaid patients in managed care

receive only "nine to ten minutes with a primary care provider actually seeing the patient."  TR

114, lines 20-4 (Testimony of Ms. Tillman); see also P.Ex. MC-42, complaint of class member

B.C. (dated August 25, 1999, documenting receipt of a ten-minute appointment), complaint of

class member D.R (dated November 11, 1999, complaining of a one- to two-hour wait "every

time" and of a five- to ten-minute doctor visit), complaint of class member J.S. (dated November

30, 1999, complaining of a two-hour wait, and only "about 2 minutes" with doctor).

Finally, THQA's studies demonstrate that class members in managed care receive less

immunization and lead testing[86] than they should.[87]  Specifically, THQA found that less than 17%

of class members in the Texas Health Network were documented as having been fully immunized

by the age of two.  P.Ex. MC-7 at 12.  The HMOs report that less than 50% of enrolled two-

---

[85]  Also, Ms. Tillman testified that it takes an additional 30 to 45 minutes to explain managed care to class members.  TR 116, lines 12 to 117, line 1.

[86] Defendants agree that class members' healthcare visits only "count" as Texas Health Steps checkups if all elements of the checkup are completed.  P.Ex. —5 at 39-3.  In addition, Congress has recognized the importance of immunizations and blood tests for lead poisoning by requiring that they be mandatory checkup elements. 42 U.S.C §§1396d(r)(1)(B)(iii) (immunizations); 1396d(r)(1)(B)(iv)(blood tests for lead poisoning).

[87] Plaintiffs also introduced evidence of other elements that checkups within the managed care system may be lacking.  P.Ex. CH-24, complaint of class member L.G. (dated July 29, 1998, Texas Health Steps checkup not done adequately, shots not given), complaint of class member L.S. (dated July 31, 1998, doctor refused to do thorough checkup, burden on mother to find specialty care, child later diagnosed with cystic fibrosis), complaint of class member J.H. (dated August 12, 1998, doctor refused to give immunizations, saying he would not get paid), complaint of class member A.M. (dated August 12, 1998, child's head not examined during checkup, later diagnosed with brain tumor).

year-olds are fully immunized. P.Ex. MC-8 at 65.[88] The THQA study also showed that class

members, who are entitled to blood tests for lead poisoning at twelve months and again at twenty-

four months, were in large part not receiving this vital service. P.Ex. M-4 at 2-5, 2-21.[89] Only

15.5% of the sampled medical records of the class members enrolled in the Texas Health Network

confirmed the receipt of even one blood test for lead poisoning during the first twenty-eight

months of life. P.Ex. MC-7 at 12. Less than 2% of class members had medical records that

showed two or more tests, as is required for children aged two years. P.Ex. MC-7 at 12. The

lead test reports are also unfavorable for those class members enrolled in HMOs. Less than 30%

of enrolled class members received a blood test for lead poisoning by the age of two, and only

about 9% had received two or more tests. P.Ex. MC-8 at 65.[90]

### Problems with the Medical Home and Primary Care Provider Models

Fifth, class members' timely receipt of full EPSDT services is impeded by the failure of the

"medical home model," in which a single primary care provider (PCP) acts as gatekeeper.

Defendants claim that their managed care programs improve healthcare for class members through

---

[88]Furthermore, in 1998, defendants reported to the Texas Legislature that only 22% of 24-month-old class members in managed care were fully immunized. P.Ex. MC-23 at 11-25.

[89]Defendants admit that "childhood lead poisoning is one of the most common and preventable pediatric health problems in the United States today," P.Ex. OM-9, "Texas Health Steps Program Outcome Measures, Percent of Children with Blood Lead Levels Greater Than or Equal to 15 ug/dL by Race/Ethnicity." Moreover, poverty is associated with an increased risk of lead poisoning. P.Ex. CH-1 at 2.

[90]Other evidence indicates that defendants include checkups that are incomplete with regard to lead screening in their managed care data. Dr. Ron Jemelka, THQA's research director, testified that in their 1997 report, THQA reviewed a small sample of managed care medical records. TR 605, line 1 to 606, line 20; P.Ex. MC - 1, "Focus Studies State Summary" at 19. THQA found that the managed care companies had reported more lead screening questionnaires than the medical records reflected. Id.

the application of the dual concepts of the "medical home" and the "primary care provider," or

"PCP."[91]  Plaintiffs counter that these concepts fail plaintiffs in their application, and prevent the

timely receipt of EPSDT services by class members enrolled in managed care plans.[92]  Plaintiffs'

criticisms of the PCP/medical home model are two-fold: first, that class members often have

neither a medical home nor any knowledge of their PCP, and second, that PCPs often refuse to

treat class members, forcing them to seek care in local emergency rooms.

*The PCP*

When some class members arrive at various healthcare clinics, they do not know the name

of their PCPs.  TR 193, line 23 to 194, line 2 (Testimony of Ms. Singleton).  The confusion

caused by the difficulty in identifying class members' PCPs leads to delays in the receipt of needed

care.[93]  One witness relayed that

---

[91]For example, Dr. Koops testified that PCPs are a strength of defendants' managed care system.  She stated that class members in managed care enjoy having their own personal physician, which they had not had before managed care came into being for the Medicaid population.  TR 755, line 11 to 756, line 3; *see also* TR 709, lines 10-2.

[92]For example, Ms. Singleton testified about class members whose care was delayed because of the structure of managed care. According to her testimony, defendants' implementation of managed care programs has worsened class members' access to care.  TR 191, lines 20-23. Ms. Singleton and her staff have communicated the perceived problems with managed care to defendants "on a regular basis."  They have talked with defendants' local staff, defendants' staff in Austin and staff of the HMOs.  They have even "brought it to the governor's office attention that children were not getting the care that they needed."  TR 203, lines 14-22.  But, according to Ms. Singleton, "[t]here has not been a lot of progress made" toward the resolution of the problems she has observed.  TR 203, lines 23-25.

[93]*See* P.Ex. MC-42, complaint of class member M.R. (dated February 2, 1999, claiming that although PCP had been changed two months earlier, doctor still refused to see child until Medicaid ID form had been corrected), complaint of class member R.L. (dated March 30, 1999, claiming that due to PCP change, mother could not find out from managed care plan where she could take her child for a Texas Health Steps checkup), complaint of class member V.H. (dated July 7, 1999, stating that members of doctor's staff called NHIC at time of child's appointment,

many families have trouble getting primary care for their children who have Medicaid. Lots of families find out their children's Primary Care Provider has been changed without their knowledge or permission. Then, sometimes they can't get care from the Primary Care Provider assigned to them. Sometimes, their children get assigned to providers who don't see patients their age at all; these providers just refuse to see them or they send them to us even though we're not the Primary Care Provider. Both Maximus and the HMOs told us these problems would get better after managed care had been here for a while, but they have not gotten better.

P.Ex. A-8 at 7 (Deposition of Ms. Skaggs).

Based on this evidence, it is found that the PCP model is currently functioning as a barrier to the timely receipt of care for many class members. The following section demonstrates that the problem is not merely administrative.

*Crowded Clinics and Emergency Rooms*

One clinical provider testified that class members visit clinics even though their PCPs practice elsewhere. According to her testimony, "[W]hen they come to us, . . . they have called their primary care provider and they can't get in to see them for an extended period of time." TR 195, lines 3-5 (Testimony of Ms. Singleton).[94] Clinics are not the only places where class

--------

and were told that another doctor was child's PCP), complaint of class member C.R. (dated July 7, 1999, reporting that defendants' representative incorrectly told doctor that he was not PCP when child arrived for appointment).

[94]*See also* P.Ex. MC-42, complaint of class member M.O. (dated April 23, 1999, claiming that PCP refused to see member because member was under the age of 12), complaint of class member J.A. (dated June 29, 1999, in which PCP refused to see child because of outstanding bills for others in the family), complaint of class member R.V. (dated July 12, 1999, stating that doctor covering for PCP while PCP was out of town refused to see child), complaint of class member K.W. (dated August 24, 1999, stating that despite child's being sick for a week, PCP would not schedule appointment), complaint of class member E.M. (dated September 3, 1999, alleging that PCP refused to see "very sick" child because mother did not speak English), complaint of class member C.R. (dated October 13, 1999, stating that PCP refused to see child with "bad eye infection" and "bleeding eyes" because of "lack of ID card.")

members seek care when the doors to their "medical homes" are locked.  It was hoped that

managed care would force class members to receive services outside of emergency rooms.  TR

752, line 2-6; TR 755, lines 9-19.  However, class members enrolled in managed care often seek

care in the ER.  The Tarrant Regional Advisory Committee on Managed Care has reported

ongoing problems with class members who arrive in the emergency room without ever having

seen their PCPs.  P.Ex. MC-48.  Also reported were problems with PCPs who, "despite having

received monthly cap payments, do not feel that they should be required to see that client on an

urgent care basis." *Id.*[95]

In October of 1999, the Tarrant committee discussed the problems that occur  when the

"PCP incorrectly perceives [the] ER as a quicker way to obtain specialist evaluation for stable

children."  P.Ex. MC-49.  They noted the following:

> What many PCPs do not realize, however, is that this does not result in a quicker
> appointment with [a] specialist unless the child is acute when he appears in the ER.
> . . . [T]hese referrals are partly a result of the cumbersome referral process under
> Managed Care. . . . [T]he PCP sends the client to the ER out of frustration with
> the system.

P.Ex. MC-50.  The committee discussed problems that arise when the "PCP perceives the ER as a

place to send children who are sick when his own office is overloaded – a result of a lack of

Medicaid providers."  P.Ex. MC-49.  The committee also noted the shortage of specialists in the

Tarrant region.  "There is a lack of access to outpatient mental healthcare.  There are not enough

---

[95]*See also* P.Ex. MC-50; P.Ex. MC-42, complaint of class member K.C. (dated January
22, 1999, reporting that a "child having seizures" was refused by provider unless health plan
immediately changed), complaint of class member M.R.G. (dated February 4, 1999, complaint
that, for the second time, PCP refused to see "very sick" child), complaint of class member C.G.
(dated November 11, 1999, complaint that PCP not available to see child who was vomiting and
having problems breathing).

providers for behavioral health and mental health, and the impact is that the members go to the emergency room."[96]  P.Ex. MC-51 at 2-3.

### *Access to Specialists*

Sixth, defendants' managed care programs impede class members' access to specialists. HMO provider referral handbooks are often inaccurate, since many specialists listed in the HMOs' referral books are not taking Medicaid patients.[97]  Class members face remarkable difficulties in finding specialists who will accept EPSDT enrollees in managed care plans.  For example, Agapé Clinics has reported "major problems" finding specialists to take care of class members.[98]

Part of the problem appears to lie with the HMOs' internal approval processes.  For example, Ms. Singleton described a 17-month-old who was assigned Agapé Clinics as his newly-designated PCP.  He had recurrent ear infections.  "[B]etween the time . . . he was three weeks old, which is real early to start ear infections, and when he came in to see us, he had been on regimes of antibiotics . . . 17 [times] before we saw him."  TR 202, lines 1-6.  After Agapé staff treated the boy three more times without success, they asked the HMO for approval to send him to an ear, nose and throat specialist.  The boy was not referred because he had not met the

---

[96]The impact of managed care on plaintiffs' access to mental healthcare services is discussed in more detail below.

[97]TR 203, lines 8-10 (Testimony of Ms. Singleton). Ms. Singleton testified that "[v]ery, very many of [the listed HMOs] are not [taking new Medicaid patients]. They are not participating in the program."  TR 200, lines 7-14.

[98]Ms. Singleton told the story of one patient who broke his arm at school.  According to Ms. Singleton, "it took us just under eight weeks to get him into an orthopedist specialist for treatment. . . . [T]here was difficulty in getting an appropriate referral through the managed care system to get him in for treatment."  TR 199, lines 7-13. During the 8 weeks while he was waiting for treatment, the class member was in a sling and on restricted activity.  TR 199, lines 10-11. When he eventually received orthopedic care, he needed a pin and surgery.  TR 199, lines 14-16.

requirements of the HMO that Agapé, as the primary care provider, must have treated him six

times within six months.[99]  TR 202, lines 7-12.[100]

### Access to Pediatric Care and Mental Health Services

Seventh, defendants' managed care system impedes class members' receipt of pediatric

care and mental health services.

The Dallas regional advisory committee on managed care noted in May of 1999, that there

were only fifty-three pediatric providers in the entire Dallas managed care area.  It also reported a

"pediatrician shortage" in which "[t]here are 6 counties which have either 1 or 0 pediatricians."

MC-52 at 5-6.  This shortage was reported to have persisted as late as October of 1999.  P.Ex.

MC-53 at 9.  Some pediatricians do not enroll in defendants' managed care programs because the

"rates are too low, the hassle factor is high, and they are afraid the dam would open up," and they

would be swamped with Medicaid patients.  *Id.*

--------

[99]*See also* P.Ex. MC-42, complaint of class member V.H. (dated December 1, 1998,
claiming that despite growing "knot" on child's neck discovered during September Texas Health
Steps checkup, child was still waiting for promised referral to specialist), complaint of class
member K.C. (dated December 7, 1998, claiming that emergency room merely splinted child's
arm due to lack of pediatric orthopedist in network), complaint of class member S.N. (dated
January 15, 1999, claiming that HMO denied referrals for child with rare disease because relevant
needed specialist "does not accept PCA."), complaint of class member P.H. (dated March 10,
1999, reporting experience of family trying for three weeks to get a referral to a neurologist),
complaint of class member B.B.S. (dated June 29, 1999, reporting that although doctor's office
reported baby's need for cardiologist, HMO refused out of network request and had "no pediatric
cardiologists in network").  The Harris regional advisory committee on managed care has also
expressed concerns with the authorization process for follow up appointments with specialists,
noting that since the referral process differs among the HMOs, it can lead to confusion.  P.Ex.
MC-46

[100]The recurring themes of Ms. Singleton's testimony were confirmed by Ms. Skaggs, who
spoke also of an additional problem: the billing of class members for services that EPSDT should
have covered.  P.Ex. A-8 (Deposition of Deborah Skaggs).  *See also* P.Ex. MC-42.

Defendants' system of managed care is also impeding class members' access to mental healthcare.  One physician and member of the Tarrant regional advisory committee on managed care commented:

> [T]hey are losing services that were available three years ago; there are fewer hospital beds for children and adolescents. . . . [M]ental health is the least served area.  If there is high demand, then the providers can select their patients.  They're going to select patients where they will get reimbursed appropriately.  Taking a system that is weak to start with in its reimbursement and making it more difficult to administer, places further demands on those providers.  They are going to drop out of the system.

P.Ex. MC-51 at 6; *see also* P.Ex. MC-53 at 10.[101]

### THQA Provider and Consumer Surveys

Eighth, plaintiffs present THQA studies that purport to demonstrate that providers themselves view defendants' implementation of managed care as having a detrimental effect on plaintiffs' receipt of timely care.  THQA surveys reveal that more healthcare providers are dissatisfied than satisfied with the impact of defendants' managed care program on class members' access to care and continuity of care.  P.Ex. MC-11 at 7.   Surveys do show that physicians' satisfaction with Medicaid managed care increases the longer they are in the program.[102] However, this increase could be the product of many other variables besides physicians' increased satisfaction with class members' access to care.  The survey results could indicate that physicians who are dissatisfied with defendants' managed care program simply drop out.  The most that can

---

[101]The Dallas committee also discussed problems with access to mental healthcare for class members, noting concerns about "the adequacy of the mental health network for children, especially children with complex needs. . . ."  P.Ex. MC-54 at 12.

[102]TR 723, lines 1-4. (Testimony of Susan Milam, Chief of the Bureau of Managed Care).

be said, given the data presented, is that the majority of providers currently believe that defendants' implementation of managed care has had an adverse impact on class members' access to services.

Plaintiffs also rely on THQA's 1999 survey of consumers, which shows that many class members experience difficulty receiving necessary healthcare from defendants' managed care programs. For example, 32% of respondents said that they had problems "getting the care" they needed from defendants' STAR HMOs. Similarly, 27% of those enrolled in the Texas Health Network said that they had problems. Of those enrolled in STAR HMOs, 18% said they had "big problems" getting care; in the Texas Health Network, 16% reported "big problems." P.Ex. MC-9 at 11. However, it is not entirely clear what conclusions may be drawn from this particular study. A simple rephrasing of its findings reveals that 85% of Medicaid patients in managed care have no problems or only "small problems" getting care that they need from the managed care companies. TR 543, lines 19-21; TR 706, lines 1-13; D.Ex. 35.

THQA also asked consumers how often they received care without long waits. More than 50% of STAR HMO respondents reported long waits before they could receive care. Fully 26% responded that they "sometimes or never" got care without long waits. In the Texas Health Network, 49% reported waits for care; 24% reported that they "sometimes or never" received care without long waits.[103] P.Ex. MC-9 at 12. Once again, rephrasing the findings, the study

---

[103]Plaintiffs argue that defendants' managed care contractors themselves contribute to these delays. For example, THQA's 1999 study found that managed care companies' staff are improperly educated about which services they are required to cover for class members. THQA found that managed care member services staff gave incorrect answers when THQA surrogate callers asked for information about how to receive services that they needed. *See, e.g.*, P.Ex. MC-14 at 50, 57; TR 601, lines 8-10. When managed care member services staff give out incorrect information, argue plaintiffs, they function as a barrier that impedes class members' access to the

demonstrates that 71% of respondents received care without long waits.  One witness opined that these results are "excellent."  TR 707, lines 13-23; D.Ex. D-40 (Testimony of Ms. Milam).  Thus, neither the THQA provider surveys nor the survey of consumers are particularly helpful with regard to the issue of whether managed care class members receive timely checkups without problems.  It is found that the data is susceptible to varying interpretations.

### Self-Reporting by Class Members

Ninth, the accounts of three individual class members who were directly, adversely impacted by the structure of managed care poignantly illustrate the predicament of class members who are denied the timely receipt of services to which they are entitled under the decree.  These accounts form the final category of evidence on which the court bases its finding that defendants have failed to provide class members enrolled in managed care with the checkups and other services to which they are entitled.

### B.M. and Samantha

Class member Samantha has "developmental delays, cerebral palsy which manifests itself in gross and fine motor skills problems and speech problems, learning disabilities (predominantly non-verbal), severe Attention Deficit Hyperactivity Disorder, asthma and airborne allergies, chronic ear infections, and pituitary dwarfism."  P.Ex. A-5 at 5.  B.M., her mother, explained that she has had problems obtaining all of the care that Samantha needs:

---

full range of services that federal Medicaid law guarantees to them.  The same is true for managed care members services staff's responses to THQA surrogate callers' calls about medical emergencies.  For example, staff at one HMO told a caller conducting an emergency scenario that the mother would need to call back with an ID number and details of symptoms.  Defendants' obligations to provide training to managed care providers are discussed below, in Section VI(E).

> Now Samantha is in a Medicaid HMO.  It is hard to get medical appointments for
> her in a timely way.  Sometimes when she is sick, the doctor's office tells me that
> all the appointments are full and she can't get one for approximately two weeks.
> When this happens, we can't go to another doctor.  Also, the HMO representative
> told me that if I take Samantha to the emergency room, it had better be a true life-
> threatening emergency.  She said if it's not, I have to pay the bill.  That is very
> scary.  I don't know when her problems can wait and when they can't, especially
> when it takes so long to get an appointment.

P.Ex. A-5 at 7.  B.M. also has trouble obtaining specialty care for Samantha.  Her HMO only

contracts with one orthopedist who is qualified to handle Samantha's problems.  However, B.M.

sought the help of a second doctor.  She "looked and looked but there was no one else.  The

HMO people would not even answer my questions about trying to find another orthopedist."

P.Ex. A-5 at 7.  Furthermore, problems with prior approval of Samantha's physical and speech

therapy have "caused delays in Samantha getting the therapy she needs," P.Ex. A-5 at 7, and

there is a shortage of physical therapists in Samantha's HMO.  Her mother reported, "I called and

called and called before I could find a physical therapy agency signed up with my HMO.  Most

physical therapy agencies told me Medicaid paid too little to be worth it." P.Ex. A-5 at 7-8.

*C.H. and Sons*

C.H. characterizes her experiences with Americaid, one of defendant's managed care

contractors, as a "nightmare." P.Ex. A-1 at 6 (supplemental deposition).  C.H. is the mother of

three young class members: Jonathon, who has manic depression, oppositional defiant disorder

and attention deficit disorder; James, who has mild mental retardation, asthma, oppositional

defiant disorder and affective disorder, and is sometimes violent; and Jacob, who suffers from

serious kidney disease and asthma.

C.H. has encountered significant difficulty in obtaining healthcare for James and Jacob.

First, the psychiatrist who had been treating James "dropped all his Medicaid patients." P.Ex. A-1

at 6 (supplemental deposition).   Americaid initially told C.H. that she did not need a referral code

to take James to a new psychiatrist.  Americaid later refused to pay for his care because C.H. "did

not follow procedure about getting a referral code."  P.Ex. A-1 at 6 (supplemental deposition).

On one occasion, C.H. took James and Jacob in for emergency care because they both

were suffering from fevers and diarrhea.  "They kept vomiting and they were both getting

dehydrated.  I was very scared because they are so young and Jacob just had no weight to lose –

he has so many other health problems."  P.Ex. A-1 at 6.  The hospital refused to see the boys

without a referral code from their HMO or payment from C.H.  P.Ex. A-1 at 6-7.[104]  "We then

went . . . to another emergency room where I was scolded for not getting the children to medical

attention sooner.  They said each of the children had lost several pounds, and it was dangerous to

let this happen.  They had to give Jacob intravenous fluids."  P.Ex. A-1 at 7.

Shortly before C.H. gave her deposition in March of 2000, James suffered a serious and

prolonged asthma attack.   C.H. called the doctor's office repeatedly from about 2:00 p.m.

Saturday until 3:00 a.m. Sunday morning, finally reaching a nurse who instructed her to take him

to the nearest emergency room.   There, it was determined that James' situation was critical.  Says

C.H.:

> I feel terrified and helpless when my child is in such bad shape and I have no way
> to do anything about it.  I absolutely couldn't go to another doctor when that one
> didn't call me back, because we are in a Medicaid HMO.  I was in fear of being
> turned away if I took him to the emergency room without a referral code. . . .   The
> worst thing is I expect it to happen again; my children are still in a Medicaid HMO
> and they still have chronic illnesses.

---

[104]According to one emergency room doctor addressing the Tarrant regional advisory
committee, "managed care recommends" that ER staff "refuse to see" some Medicaid patients
who seek care there.  P.Ex. MC-50.

P.Ex. A-1 at 7.

C.H. has also experienced difficulty obtaining a psychological evaluation for Jacob.  "[W]e are trying to get some help but it is really hard to find someone to do it because he is in a Medicaid HMO."  P.Ex. A-1 at 8.  By the time that C.H. had found someone to perform Jacob's psychological evaluation, she had changed the boys' PCP.  To C.H.'s surprise, she learned that James and Jacob's HMOs had also been changed, and that their former doctors would no longer accept them as patients.  P.Ex. A-1 at 8.  C.H. expects further delays because of the amount of time it takes to change Medicaid managed care plans.  P.Ex. A-1 at 8. *See also* TR 192, lines 18-25.

*C.O.*

Plaintiffs also report a serious problem with delays in providing necessary medical equipment in their managed care programs in Harris County.  Class member C.O. is a junior high school student with serious disabilities because of cerebral palsy.  He was enrolled with HMO Blue in Defendants' STAR Plus managed care program for people with disabilities.  P.Ex. C-21. When C.O. outgrew his wheelchair, he encountered difficulty in trying to get HMO Blue to replace it.  According to C.O.'s school therapist,

> the chair is desperately needed to promote independence of C.O. and to help him get from classroom to classroom.  This is his last year in Junior High, and the High School is much more difficult to maneuver.  This is also a safety issue. [C.O.] has no trunk control and he doesn't have protective responses, so if he falls he has no way of breaking the fall or protecting himself. . . .  At the present time parents are propping chair up with wooden blocks - which is also not safe - he recently fell from his chair at home due to imbalance of chair and the physical reasons stated above.  His current chair is three years old - his knees protrude and he has to have extra seat belts.  This is particularly difficult for transport.  The school bus driver has to double strap him to chair, and has difficulty moving him on and off the school bus.

84

P.Ex. C-21.

It took more than a year for C.O. to get a replacement wheelchair. P.Ex. C-21 (internal

TDH e-mail dated January 13, 1999). Among the causes of C.O.'s untimely receipt of care listed

by defendants in the internal memo were the fact that C.O.'s mother did not speak English and the

fact that HMO Blue's policies concerning wheelchairs were stricter than other Medicaid HMOs.

*Id.* Under 42 U.S.C. §1396(d)(r)(5), however, C.O. was entitled to receive the full range of

services that he needed, including a wheelchair.

Unfortunately, C.O.'s troubles are not unusual. THQA's 1999 STAR Plus consumer

satisfaction survey shows that, on average, 43% of respondents report problems obtaining special

medical equipment, and 27% of respondents report having had "a big problem" in obtaining

special medical equipment. HMO Blue had the worst record of defendants' contractors, with

one-half of respondent enrollees reporting problems and one-third reporting "big" problems

receiving medical equipment. P.Ex. MC-9 at 35.

## C. Violations of Decree: Receipt of Services by Class Members Enrolled in Managed Care

In light of the data presented to this court and set out in Section IV(B), it is found that

defendants have violated paragraphs 190 and 192 by failing to provide timely checkups to class

members enrolled in managed care.[105] While the court applauds defendants' efforts to encourage

---

[105]More specifically, the court finds that defendants have are in violation of paragraph 190
for the failure to provide the "timely receipt of the full range of EPSDT services, including but not
limited to medical and dental check ups," and of paragraph 192 for failing to "assure medical and
dental checkups in a timely manner to all [managed care] recipients." Because no evidence was
presented indicating that defendants are in violation of the requirement that they ensure the
provision of checkups to new managed care enrollees within 90 days after enrollment, the court
makes no finding with regard to that portion of paragraph 192.

the managed care organizations to take steps toward reaching the goals of the decree,[106] and while it is hoped that such new initiatives will be met with success, these efforts do not excuse defendants' current noncompliance.

## D.  Children of Migrant Farmworker Families

### *The Problem*

In drafting the decree, the parties took special care to identify certain subsets of the class that have historically been denied adequate healthcare.  Paragraph 192, which states that "[m]anaged care organizations will also have the capacity to accelerate services to the children of migrant farmworkers," is an example of the parties' early identification of a group that might be adversely affected by the installment of a managed care system.  All parties agree that the acceleration, or speedy delivery, of services to this group of class members is crucial to their receiving adequate care, given their frequent migration and high rates of illness.[107]

---

[106]Defendants point to a provision in the "1999 Contract for Services between TDH and HMO," D.Ex. D-45, as evidence of their good-faith efforts to comply with paragraphs 190 and 192 of the decree. However, paragraphs 190 and 192 unequivocally mandate that class members enrolled in managed care receive the full range of EPSDT services to which they are entitled, and paragraph 300 makes clear that the ultimate responsibility for fulfilling the duties under paragraphs 190 and 192 lies with defendants:

300.  Defendants may contract with individuals and entities to provide EPSDT services.  But, Defendants remain ultimately responsible for the administration of the EPSDT program in Texas and compliance with federal EPSDT law.

It is noted that a 1998 THQA report found that one-half of defendants' managed care contractors did not substantially meet the requirement that they have systems in place to ensure the delivery of THSteps services.  TR 611, lines 8-14; P.Ex. MC-2, MCO On-Site Survey, State Summary at 6.  In addition, evidence was presented that indicated that defendants had found one MCO, Community Health Choice, in violation of the contract in the year 1997; sanctions, however, were delayed until the year 2000.  P.Ex. MC-43.

[107]Migrant farmworker families are typically found in four of TDH's regions: Regions 1, (Panhandle), 8 (San Antonio and Wintergarden areas), 9/10 (El Paso) and 11 (South Texas). Class members are enrolled in managed care programs in three of these areas: Regions 1, 8 and

Class members whose parents are migrant farmworkers face many health problems, including serious dental problems and lack of dental care, lice, lack of immunizations, dehydration, pesticide exposure, agricultural accident-related injury, nutritional problems such as anemia and lead poisoning, and health problems commonly associated with severely substandard housing. P.Ex. A-4 (Testimony of Nancy Lloyd).[108]

It can be very difficult for class members whose parents are migrant farmworkers to receive the healthcare that they need, since farmworkers' children often need to be transported to doctors or dentists whose offices are an hour or more away. There are hosts of local doctors and dentists in close proximity who do not accept Medicaid clients. P.Ex. A-4. Educating parents about their children's' needs is also crucial. For example, Ms. Lloyd arranged appropriate physical and occupational therapy for a two-year-old class member who had cerebral palsy. Prior

---

9/10.  TR 955, line 13 to 956, line 24.

[108]Ms. Lloyd is the health specialist for the Texas Migrant Council (TMC) of the Panhandle region. TMC's Head Start programs provide educational and health services to students, including daily breakfast, lunch and snacks. TMC serves a large area in the Texas Panhandle. Its Head Start centers are located in Lubbock, Hale, Pecos, Deaf Smith, Reeves, Floyd and Bailey Counties. P.Ex. A-4 at 5-6. During the summer season, the centers serve about 450 children. P.Ex. A-4 at 7. The students are children up to five years of age whose families are mobile migrants who have moved interstate or intrastate within the last year to engage in agricultural employment. P.Ex. A-4 at 5. About 80% of TMC's students are on Medicaid. Most of their older siblings are also on Medicaid. P.Ex. A-4 at 7. As the health specialist, Ms. Lloyd is responsible for helping TMC's students to receive medical and dental checkups and needed treatment.

At the December 1995 hearing in this case, then-EPSDT Program director Ernie Schmid testified that migrant farmworkers are "perhaps the most underserved population in the world." P.Ex. M-1 at 136. According to then-Defendant Commissioner of Health David Smith, M.D., problems that characterize the children of migrant farmworkers include acute respiratory disease, parasites and intestinal diseases, skin problems, and malnutrition. P.Ex. B-15 at 156-60. Gloriana Lopez, D.D.S., defendants' then-Dental Director stated that "the migrant population seems to have a higher degree of dental disease . . . the amount of decay is more and the amount of untreated decay is more. . . ." P.Ex. B-11 at 49.

to this arrangement, the child had been receiving only two sessions per month even though he

needed three sessions per week.  Before Ms. Lloyd's intervention, the child

> was losing muscle mass . . . . he couldn't even hold his head up but after two
> weeks of therapy he could.  Also, you're fighting a time clock here.  If children
> don't learn to walk by the time they're three years old, they probably never will. . .
> . If someone had been following this child, this never would have happened.  He
> had been getting two visits per month for a year before he came to our center.  He
> had Medicaid during this whole time.  I want to know why no one helped him to
> get the full therapy that he needed.

P.Ex. A-4 at 13-14.  He also did not have a standing frame so that he could strengthen his

muscles to learn to walk.  "The mother wanted help but she didn't know what options were

available or what her child needed.  This was one of the saddest cases I've seen." *Id.*

Ms. Lloyd testified that this subgroup's pattern of migration made obtaining care through

EPSDT managed care extremely difficult:

> The HMOs would tell the parents that they would register the children with the
> [primary care providers], but they never would do it.  So, the children would never
> get a local PCP while they were in our area.  They'd be stuck with their PCP from
> wherever they were before, which would do them no good while they were here,
> or else they wouldn't have one at all.  Without a PCP, they were locked out of the
> system, because the PCPs have to provide or approve all of the care.  A lot of
> times, the HMOs would register the children with a PCP just as the family was
> moving on to a new job out of our area, or after the family had left. . . .  This
> happened a lot.

P.Ex. A-4 at 19.[109]  Defendants' Chief of the Bureau of Managed Care, Susan Milam, agreed that

it is important to accelerate services for class members whose parents are migrant farmworkers:

---

[109]Ms. Lloyd illustrated this phenomenon with the example of a young migrant farmworker
class member in Dallas in need of plastic surgery because her outer ear was deformed and she had
no ear canal.  "We could never get this organized before they left.  There was no one to help us to
make the complex arrangements, including the managed care organizations, [who] were no help
at all."  P.Ex. A-4 at 13.

> [T]hey oftentimes will not reside in a particular area for a long period of time, if
> you are concerned about a child getting the necessary immunizations or series of
> checkups that they need, that by the time they become eligible, get enrolled, et
> cetera, that they may only have a chance to have maybe one or two services
> rendered to them before they move to another location. . . .

TR 732, lines 12-21.

### *Findings of Fact Regarding Violations of Decree*

Despite the increased health risks faced by class members whose parents are migrant

farmworkers, much evidence suggests that defendants have not adequately ensured that their

managed care contractors make efforts to accommodate them.  The managed care companies in

the counties of Lubbock, Crosby, Floyd, Hale, Lamb and Lynn counties lack the capacity to

accelerate services for migrant farmworker class members.  P.Ex. A-4 at 15-16.   According to

Ms. Lloyd, the managed care companies "don't do anything to accelerate services for our

children.... [or] ... for other children of migrant farmworkers . . . who have Medicaid."  P.Ex. A-4

at 16.  Ms. Lloyd reported that she has tried several times with no success to help the managed

care companies accelerate services to TMC students and their siblings.  She first asked the

managed care companies to be part of TMC's Health Services Advisory Committee.  "They said

they would but then they never showed up for any meetings."  P.Ex. A-4 at 16.  She then asked

them to make presentations to TMC parent groups to "give the families a chance to learn about

what the managed care programs do and how they work," but they have not yet agreed to do so.

P.Ex. A-4 at 16.

In short, there seems to be no evidence that defendants' Panhandle area managed care

companies make any efforts to accelerate services to class members whose parents are migrant

farmworkers:

> If they do, they have never explained them to me or my staff. If they truly wanted
> to speed things up for migrant farmworkers' children, you'd think they'd want us
> to understand how their programs work, and you'd think they'd want to cooperate
> with us. We're one of the largest programs for the children of migrant
> farmworkers in this area, and almost all of our students have Medicaid.

P.Ex. A-4 at 16. (Testimony of Ms. Lloyd).

The problem is statewide. In 1998, ten of the thirteen managed care plans were not in

substantial compliance with the requirements relating to the acceleration of services to migrant

populations. P.Ex. MC-2, 1998 THQA "MCO On-Site Survey," at 3. Most plans had difficulty

identifying migrants since they were not identified on the plans' enrollment tapes. *Id.* Apparently,

only three of the thirteen managed care companies with whom the state contracts use assessment

tools that specifically identify migrant farmworkers. P.Ex. MC-41. These findings in the THQA

report were corroborated by comments made by several of defendants' managed care contractors

about their abilities to accelerate services for children of migrant farmworkers.[110] TR 607, line 21

---

[110]These contractors commented:

- "We really need TDH or DHS to assist the MCO's identifying migrant workers...." (CHC)
- "With regards to the screening of migrant workers on the HMO Blue Medicaid health plan, we currently do not do anything extraordinary that we would [not] do for any other member." (HMO Blue)
- "The difficulty in assuring acceleration of services results from inability to identify these Members upon enrollment." (MethodistCare)
- "... this information is not asked at the time the client qualifying for Medicaid eligibility w/DHS." (MSCH ACCESS)
- "We will cooperate, and coordinate with TDH to develop strategies and perform outreach to secure prompt delivery of service to the migrant population as soon as they are identified." (Parkland)
- "... it was the understanding ... that [food stamps] was the only state program that maintained this information." (PCA)
- "At this time, Seton Health Plan does not have a policy & procedure addressing identification of migrant farm workers specifically." (Seton)
- "The state does not give migrant populations a separate membership risk group nor are they identified in any way on the enrollment file." (AmeriHealth)
- "The MCOs are unable to identify these members without assistance from the enrollment

to 608, line 21.  Defense witness Ms. Milam testified that the managed care companies have a

great deal of trouble identifying class members whose parents are migrant farmworkers.[111]  TR

734, lines 12-15.

Defendants point out that the Medicaid managed care plans do have the "capacity" to

accelerate services to class members "when these members are identified."[112]  However, the

evidence clearly demonstrates that the process of identification is severely flawed, if not

completely nonfunctional.  Paragraph 192 states unequivocally that the managed care

organizations "will . . . have the capacity to accelerate services to the children of migrant

farmworkers."  It is held that a managed care organization that fails to identify class members

whose parents are migrant workers does not have the "capacity" or working ability to accelerate

services to them, and that defendants are, therefore, out of compliance with paragraph 192.[113]

---

broker or the state."  (FirstCare)
P.Ex. MC-41 at 3-4.

[111] Ms. Milam also testified that defendants have not yet been able to determine if the
Texas Department of Human Services identifies migrant farmworkers during its interview
process.  TR 734, line 21 to 735, line 1.  Thus, defendants themselves do not currently know how
many class member children of migrant farmworkers are assigned to each of their managed care
contractors.  P.Ex. A-10.

[112] Defendants' Chief of the Bureau of Managed Care, Susan Milam, TR 696, lines 6-14,
testified that the managed care companies have the capacity to accelerate services to class
members whose parents are migrant farmworkers, even though the companies cannot identify the
children.  She explained that "capacity" means "that if an individual is identified . . . as being in a
certain category, . . . the plan has the internal structure or infrastructure in place that they can
respond quickly."  TR 718, lines 3-6.

[113] Defendants report that the children of migrant families are particularly hard to identify
due to many factors, including the population's own unwillingness to self-identify.  Dr. Koops
testified that it can be difficult to identify migrant farmworker families because it would be
improper to pry into this issue.  TR 775, line 4 - 776, line 11.  This reluctance has proven to be a
large obstacle to defendants' progress in fulfilling their duty under paragraph 192.  However,

91

The court is aware of defendants' good-faith efforts, and will consider them in its

formulation of enforcement orders.  Nevertheless, the court may not stray from the task of

enforcing the language of the decree.  A "capacity" to serve this subset of the class, which the

court has found to be all but wholly lacking, must be in place.[114]

### E. Training of Healthcare Providers in the Managed Care System: Findings of Fact

### Regarding Violations of Decree[115]

In drafting the decree, the parties were particularly concerned about training providers

within the managed care system:

> 194.  TDH will assure by various means that managed care organizations arrange appropriate
> training for all healthcare providers and their staff who serve EPSDT recipients . . . All will be
> trained about program requirements relevant to their responsibilities, including the relevant
> terms of this settlement.

The rationale behind provider training is that providers are often the people best situated

to explain which services are available to their patients.  For example, if providers are unaware of

class members' entitlement to free transportation through the Medical Transportation Program,

they will not be able to direct their patients to the program when they coordinate appointments

and follow-up visits.  Or, if providers are not familiar with all elements of the EPSDT checkup,

---

whether migrant farmworkers are willing to be identified or not depends, at least in part, on
whether the agency itself is threatening or welcoming.  P.Ex. A-4 at 20.  Ms. Lloyd's experience
at TMC shows that the task of identification can and should be accomplished.

[114]It is noted that a system that effectively identified and offered the acceleration of
services to migrants who then refused to take advantage of such acceleration would satisfy
defendants' paragraph 192 obligation.  However, until proper identification and education of this
subgroup has been conducted by the MCOs, it is held that the requisite "capacity" has not been
developed.

[115]Training for healthcare providers, which is to be provided by defendants and is not
limited to providers within managed care organizations, will be discussed in Section VIII.

class members will not receive the full preventive care to which they are entitled.  In short, "[p]rofessionals cannot provide full services that class members need absent understanding of how EPSDT is supposed to function." *Fairness Order* at 31.

Plaintiffs presented evidence suggesting that defendants have failed to assure that the MCOs deliver appropriate training to all healthcare providers serving class members.[116]  A survey of providers conducted by the Texas Health Quality Alliance indicates that roughly half of the respondents were dissatisfied with "training for providers and office staff." P.Ex. MC-11 at 5. However, defendants have noted that provider surveys do not provide the most accurate data by which to gauge the "appropriateness" of training, as many providers may be dissatisfied with managed care generally.  Defendants also note correctly that it is unclear from the survey which aspect of provider training produced the high level of dissatisfaction, because training on EPSDT is not evaluated separately by the survey respondents.  Finally, defendants point out that provider satisfaction with managed care generally increases as providers continue to participate in the program.  Therefore, the court finds that, on balance, this evidence is only marginally helpful in evaluating the appropriateness of defendants' training programs.

---

[116]Plaintiffs rely primarily on the testimony of Ms. Tillman, who testified about efforts to train healthcare providers and their staff when she was the vice president and chief operating officer for Community First, a managed care contractors in the Bexar region.  She described her inability to educate properly healthcare providers and their staff about their contractual responsibilities toward class members, reporting that managed care providers and their staffs are often more concerned with billing than with the entitlements of class members under EPSDT. TR 112, line 20 to 113, line 10.  She also testified that her time spent educating busy physicians had been very limited and focused on profit-oriented concerns.  TR 113, lines 12-21.  While Ms. Tillman's descriptions of the motives and pre-occupations of physicians and their staffs may be accurate, they do not inform the court as to whether the training provided by defendants is appropriate under the decree.

The 1999 THQA "MCO On-Site Review" reveals more about the adequacy of defendants' training programs.  D.Ex. D-64.  It shows, for example, that "[t]hree MCOs have not offered formal training to their physical health specialists."  D.Ex. D-64 at 6.  The report also indicates that "[p]rovider training beyond the initial orientation is limited unless requested by the provider or their office staff."  D.Ex. D-64 at 6.  Other evidence has shown that HMO staff themselves are not properly advised about the scope of healthcare services that they must provide to class members.  P.Ex. MC-14 at 50, 57; TR 601, lines 8-10.  The MCO On-Site Review confirms this impression, reporting that when THQA called the HMOs' member services hotlines, plan representatives from each managed care organization provided inaccurate information.  Topics most often misrepresented were home modification, self-referral for behavioral health services, comprehensive care, and medical transportation.  D.Ex. D-64 at 13.  The evidence also revealed that some HMO staff apparently do not answer callers' questions, but instead refer callers to their PCP handbooks.  P.Ex. MC-12 at 35, 45.

Also relevant in determining whether training is "appropriate" is the evidence proffered at the hearing of the different kinds of training and education currently implemented by the MCOs, which are under explicit contractual obligations to train their providers about EPSDT.  D.Ex. D-56 at 44.[117]  That evidence suggests that defendants and the MCOs offer an array of training

---

[117]Section 6.8.3 of the "1999 Contract for Services" between defendants and the MCOs provides that each MCO "must provide appropriate training to all network providers and provider staff in the providers' area of practice regarding the scope of benefits available and the THSteps program.  Training must include THSteps benefits, the periodicity schedule for THSteps checkups and immunizations, and Comprehensive Care Program (CCP) services available under the THSteps program to Members under age 21 years.  Providers must also be educated and trained regarding the requirements imposed upon the department and contracting HMOs under the Consent Decree entered in [the instant case].  Providers should be educated and trained to treat each THSteps visit as an opportunity for a comprehensive assessment of the Member."

services and pursue education through many avenues of contact with providers.  D.Ex. D-41;

Defendants' Response to Plaintiffs' Second Amended Motion to Enforce Consent Decree at 34-

36.

"Appropriate," like "effective," is a term difficult to define.  The court therefore looks to

other relevant provisions in the decree for interpretive guidance.  Notably, paragraph 104

expresses the parties' agreed-upon goal in provider education: "To adequately serve recipients,

providers must understand how EPSDT works.  They must also understand EPSDT recipients'

needs." ¶ 104.  This paragraph's emphasis on the providers' actual understanding, and its lack of

focus on the programs offered, leads the court to adopt plaintiffs' interpretation of "appropriate."

The evidence that MCOs do not understand which services class members may receive and how,

and the evidence that providers' staff relay inaccurate information, strongly suggest that

defendants have failed to assure that providers receive appropriate training.  The court relies on

this evidence in conjunction with the 1999 THQA MCO On-Site Review to arrive at the

conclusion that, despite evidence of defendants' having made some efforts to provide education,

defendants have not "assured" the provision of "appropriate" training.  Therefore, it is found that

plaintiffs have established by a preponderance of the evidence that defendants are in violation of

paragraph 194.

## F. Data Collection in the Managed Care System: Findings of Fact Regarding Violations of Decree

As the United States General Accounting Office has stated,

[t]he continuing trend toward expansion of mandatory, capitated Medicaid
managed care programs requires that states have the ability to adequately oversee
their contracts with health plans and ensure that states get what they are paying
for.  However, developing systems to hold plans accountable for ensuring that

Medicaid beneficiaries receive the care that they need has been a challenge for states. . . . [T]o . . . [assure] that managed care can effectively and efficiently meet the healthcare needs of Medicaid beneficiaries, more effort is needed.

P.Ex. MC-18 at 24.[118]  As noted in Section III(A), the parties, recognizing the potential problems in data collection in a managed care system, included paragraph 191:

191. TDH will assure by various means that the number and percent of EPSDT patients in each managed care organization who receive all medical and dental checkups when due and information for outcomes research as needed is accurately collected.

The evidence has shown that defendants have violated paragraph 191 in several ways.

First, defendants' federal reports to HCFA about checkups are not accurate or complete.

Defendants appear to concede that their reports to HCFA in 1997 and 1998 were incomplete because of their lack of data on class members enrolled in managed care.[119]  P.Ex. —32, M-39.

Studies conducted by the Texas Quality Health Alliance (THQA) corroborate the conclusion that defendants' managed care reports about checkups are seriously flawed.  One of the primary tasks of the THQA is to evaluate managed care "encounter" data to determine its validity.  TR 561, lines 4-22.  Encounter data is similar to what is called "claims data" in the fee-for-service healthcare environment.  In fee-for-service, "claims data" includes information about claims that healthcare providers submit for payment for services rendered to patients.  Because

---

[118]Similarly, the Health Care Finance Administration has characterized the collection of EPSDT data as "problematic," noting in particular problems in the "reporting of services provided in capitated settings."  P.Ex. MC-21 at 6.

[119] Defendants provided a revised report for 1998 as Exhibit D-115, *see also* D.Ex. D-96, D-97.  During the hearing, defendants provided a second revised report, which reduced the participation rate to reflect further revision of the managed care checkup data.  Specifically, in the second revision, defendants revised their participation rate for class members of all ages downward from .72 to .66.  TR 465, line 9 to 466, line 11.  While the court appreciates defendants' recent efforts to provide correct data, their last-minute revisions to the report do not inspire confidence in the accuracy of the managed care data.

managed care frequently does not pay healthcare providers on a per-service basis, claims data is not available. Instead, managed care organizations record "encounters." TR 561, lines 13-22.

In general, THQA has been unable to validate data provided by defendants' managed care contractors, as is revealed by the most recent THQA study of managed care encounter data. P.Ex. MC-6 ("Validation Study, 2000"). The Validation Study found significant inaccuracies in the managed care data. THQA was unable to verify the MCOs' reports of the number of Texas Health Steps medical checkups conducted on managed care enrollees. P.Ex. MC-6 at 37; TR 620, lines 4-11. In other words, THQA could not confirm that the MCOs had correctly calculated the number of checkups provided to class members. P.Ex. MC-6 at 37. In the words of THQA's research director, the MCOs' utilization management data "need[s] to be interpreted with considerable caution. . . . Overall, I would be cautious in using it." TR 620, lines 12 - 25 (Testimony of Dr. Jemelka).

There also seems to be a considerable lack of accord between the managed care administrative data sets and class members' medical records. TR 632, lines 9-11. Moreover, THQA never checked to see if the 1998 managed care administrative databases over-represented checkup encounters found in medical records. This shortcoming in the study is of great consequence because the assumption in the medical community that if an event is not recorded in a patient's medical record, it did not happen. TR 630, lines 3-19. Furthermore, in a 1997 study, THQA found that about one-quarter of the data reported in the MCOs' administrative databases was not reflected in any medical records. TR 622, lines 11-16. This suggests that the MCOs' administrative data reports checkups that have not occurred, or that have not been documented.

Finally, defendants fail to ensure that accurate outcome measures[120] data is collected on class members in managed care. Jimmy Blanton, M.P.A., "principal staff person"[121] for the outcome measures research required by the decree explained that such outcome measures would help to assess whether Texas Health Steps clients' care is improving, and would be instrumental in correcting problems with the system and improving class members' care. TR 513, lines 13-21.

However, defendants have not obtained all of the data that they need in order to include managed care enrollees in outreach studies required by the decree. For example, although defendants have agreed to study class members' length of hospitalization for asthma, they "will not be able to provide [data for] managed care" enrollees regarding this factor. TR 519, lines 13-20. At the time of the hearing, defendants had established managed care programs in all major urban areas in Texas. P.Ex. MC-57. By excluding class members in managed care, Defendants exclude a very large and important group of class members from their database.

To conclude, defendants do not accurately report the number and percentage of class members in each managed care organization who receive medical checkups when due. Their data is neither complete nor accurate,[122] and they are therefore in violation of paragraph 191.

---

[120]Defendants' obligations under the outcome measurement provisions of the decree are discussed in more detail below, in Section VII.

[121]TR 501, lines 13-15.

[122] A similar conclusion has been reached in the legislative arena. The Texas Legislature's Sunset Advisory Commission's 1998 staff report concluded that "[t]o date, the State has been unable to obtain much useful information from existing Medicaid managed care data." P.Ex. M-3 at 91.

## V. Issue Five: Toll-Free Numbers

### A. Overview

To help class members acquire knowledge about Texas Health Steps, locate providers, set appointments, and arrange transportation to and from appointments, defendants maintain a statewide toll-free telephone number and two toll-free telephone numbers in each geographical region. The purpose of the statewide hotline is to respond to questions about Medicaid.[123] The Regional Texas Health Steps toll-free numbers were instituted to answer questions about EPSDT and to help class members find healthcare providers to serve them. Regional Medical

---

[123] Defendants argue that this statewide toll-free number is not covered by the decree. They argue, first, that paragraphs 239- 245 describe the purposes of toll-free numbers, which are to help class members schedule appointments and to arrange transportation. Defendants urge that the statewide toll-free hotline does not serve these functions, so it is not covered by the decree. D.Ex. D-92. Second, defendants assert that there are few Texas Health Steps-related calls to the statewide toll-free number. A "Texas Health Steps-related ... [call is when] ... a client called and asked a question about Texas Health Steps." TR 958, lines 20-23. In 1999, the total number of Texas Health Steps-related calls to the statewide toll-free number was 7,677, or 3.25% of total calls received. D-91. However, it is noted that defendants' definition of "Texas Health Steps-related calls" is so limited that it overlooks many calls about or from class members, particularly given the broad scope of their entitlement to services from defendants. 42 U.S.C. § 1396d(r)(5).

Plaintiffs urge that the statewide toll-free number is covered by the decree. First, the heading to paragraph 247 refers to "Standards for Toll-free Help Lines (Transportation, Scheduling Assistance *and Other*)(emphasis added). The heading alludes to more than just scheduling and transportation assistance, and by its own terms purports to cover more than just the lines that deal directly with scheduling and transportation assistance. The court is in agreement with plaintiffs that the plain language of paragraph 247, which sets out standards for "Toll-free Help Lines (Transportation, Scheduling Assistance and Other)," covers the statewide Medicaid hotline. Although it is noted that class members are not the only group of people who use the hotline, nor the largest, the hotline must be considered a "toll-free number[] for EPSDT recipients" within the meaning of paragraph 247 because it is set up to answer the questions of all Medicaid recipients, whether they are EPSDT clients or other Medicaid recipients.

Transportation Program toll-free numbers help class members arrange for transportation to appointments.[124]

Before this court's entry of the decree, class members "had serious trouble even getting through to [defendants'] staff by phone to ask for help." *Fairness Order* at 15. After long waits at pay phones, class members with no phones at home were asked to leave home phone numbers for return calls. *Id.* Also, "[g]etting transportation assistance from toll-free telephone numbers often required long waits." *Id.* at 16.

Many class members do not have phones.[125] The lack of a phone makes it difficult, if not impossible, for class members and their families to make repeated calls to defendants' toll-free numbers, or to wait for defendants to answer their phones. TR 30, lines 8-20; *see also* P.Ex. A-2 at 12. According to Terry Hicks, the Director of Medical Transportation for East Texas Support

---

[124]One of the most common reasons that Texas Medicaid recipients miss healthcare appointments is that they have no form of transportation.  P.Ex. T-43, "1999 Report on the Medical Transportation Program: A Survey of THSteps Recipients and Providers," at 37.

[125] According to Ms. McHan, many class members' families do not "have a phone or . . . have a phone part of the time but then have it disconnected [or] have difficulties maintaining a phone on a regular basis."  TR 24, lines 2-8.  Ms. Singleton also testified that class members and their families have trouble maintaining telephones.  "[T]he phones go on and off almost like lights."  TR 167, line 22; TR 244, lines 16-20.  In addition to lacking a phone at home,  many class members' parents lack access to phones while they are at work.  They are only allowed to use the phone for emergencies or during short breaks during their shifts.  TR 24, lines 9-24.

The Federal Communications Commission's "Telephone Penetration by Income by State" (January 1998) confirms this testimony.  In Texas and throughout the United States, poverty is associated with having no phone at home.  P.Ex. T-4 at 5.  For example, although more than 90% of all Texas households had telephones in March 1997, less than 80% of Texas households with incomes under $10,000 had phones.  P.Ex. T-4 at 5.

Services in Jasper, Newton County, the problems with phone-call coordination deprive class

members of services:[126]

> If Medicaid recipients call and call and can't get through to the Medical
> Transportation system, eventually they give up and stop trying. If they can't find
> another way to get to their healthcare appointment, they miss the appointment.
> Some ETSS clients have missed appointments because they couldn't get
> transportation help through the Texas Dept of Health's Medical Transportation
> Program toll-free numbers.

P.Ex. A-3 at 7. As a result, many EPSDT recipients have not received the Medicaid services they

need. P.Ex. A-3 at 10.[127] Many class members report that they have not used defendants'

transportation program because they were unable to gain access to the program by phone. P.Ex.

T-43 at 42-43, Table 7.1. Seventeen percent of class members report that they could not use

Defendants' Medical Transportation Program assistance because the toll-free number was busy.

TR 976, lines 21-24. Callers also complain of having missed scheduled healthcare appointments

because they cannot get through to defendants' toll-free numbers. TR 974, lines 8-12.[128]

In response to these problems, the parties agreed to the following decree provision:

---

[126]Ms. Hicks bases her statement on many years of experience working with class members
who need transportation assistance to be able to use Medicaid services. P.Ex. A-3 at 3. For
thirteen years, she has been responsible for arranging all rides provided by ETSS for Medicaid
recipients who live in fourteen East Texas counties. P.Ex. A-3 at 4. ETSS provides about 2,500
rides per month; about 45% of the rides are for class members. P.Ex. A-3 at 5.

[127] Defendants' witness Mr. Millwee agrees that if callers cannot get through to
defendants' toll-free numbers, they face barriers obtaining transportation assistance. TR 973, line
25 to 974, line 12.

[128] For example, M.G.G. complained that she was unable to reach Defendants' South
Texas Medical Transportation Program, and consequently her "very ill" son missed his
appointment. Similarly, Y.D. complained that her son missed his appointment with his doctor
because of the lack of transportation. Ms. D. waited a long time while the line was busy, and
when she finally did get through, the system disconnected her. P. Ex. T-40.

247. <u>Standards for Toll-free Help Lines (Transportation, Scheduling Assistance and Other)</u> Toll-free numbers for EPSDT recipients will be staffed sufficiently by well trained personnel.  Each recipient will receive prompt service by a person who is knowledgeable, helpful and polite.  All calls will be answered promptly absent equipment failure.  Equipment will be adequate so failure results only from circumstances beyond Defendants' control, such as bad weather.  TDH will make reasonable arrangements to meet the needs of recipients who do not speak English.  No calls may be "answered" by a tape recording during working hours except in unusual circumstances.

Plaintiffs complain that class members' calls are not answered "promptly," and that class members often are not serviced by a "person who is knowledgeable, helpful and polite."

## B. Findings of Fact: Prompt Answering of All Calls

Abundant evidence suggests that defendants have been less than prompt in answering class members' calls.  Data for the period of September through November of 1999 indicates that the average waits in queue on the Texas Health Steps Toll-free Lines for Regions 4/5 and 9/10 ranged from 94 to 121 seconds, and 142 to 161 seconds, respectively.  P.Ex. T-22.  The average waits in queue on the Medical Transportation Program Toll-free Line during those months ranged from 124 to 190 seconds in Region 6, and from 46 to 56 seconds in Region 7.  D.Ex. D-109.  And on the Statewide Toll-free Line, the average wait ranged from 163 to 229 seconds on the English line, and from 96 to 237 seconds on the Spanish line.  P.Ex. T-17, T-18.

However, these averages mask the extremely long delays sometimes faced by class members.  For example, in December of 1999, the Region 2 (Abilene) Medical Transportation Program toll-free number had an average speed in answering of 30 seconds.  However, the longest wait before a call was answered was 13 minutes and 2 seconds.  P.Ex. T-25; *see also* TR 961, line 25 to 963, line 20.  Similarly, in December of 1999, the Tyler Medical Transportation Program had an average speed in answering of just 11 seconds.  Even so, the longest wait before a call was answered was 9 minutes and 46 seconds.  P.Ex. T-26.

Likewise, in November of 1999, the average wait in queue for the South Texas Medical Transportation Program was 16 seconds, D. Ex. D-109, while the longest wait in queue in the Corpus Christi call center was 12 minutes and 13 seconds. P.Ex. T-29. In 1999, the longest wait for calls to be answered by the South Texas number was 17 minutes and 18 seconds. P.Ex. T-29; see also TR 964, lines 5-21; *see also* TR 967, line 16 to 969, line 10. 540. In Region 6, as recently as the week of November 8, 1999, the maximum delay before a call was answered was 23 minutes and 20 seconds. During the week of August 23, 1999, the longest delay was nearly 29 minutes.

As for the statewide Medicaid hotline, the English-language line had maximum waits of over 22 minutes in each month of 1999, and the longest maximum wait for a call to be answered was 49 minutes and 16 seconds. P.Ex. T-16; see also TR 970, lines 2-5. For the Spanish-language statewide line, the longest maximum wait was 59 minutes and 20 seconds, in June of 1999. P.Ex. T-16; see also TR 970, lines 8-13.

High call "abandonment rates" – percentages of callers who hang up, presumably in frustration – provide additional evidence that calls are not being answered promptly.[129] For the Texas Health Steps Toll-free Lines, the abandonment rate ranged from 12 to 20% from September through November of 1999 in Region 5. P.Ex. T-22. For the Medical Transportation Program Toll-free Line, three regions had abandonment rates of over 10 percent from June through August of 1999. (Region 6, the worst of the lot, had a rate that ranged, approximately,

---

[129]Defendants appear to argue that abandonment rate evidence is irrelevant, as the decree is silent regarding the abandonment of calls. Defendants' Response to Plaintiffs' Second Amended Motion to Enforce the Consent Decree, at 38. However, it is found that these rates are one of several indicators of the promptness with which calls are answered by defendants and are therefore relevant to the issue of whether defendants are in compliance with paragraph 247.

from 20 to 28 percent.)  D.Ex. D-109.  For the Statewide Toll-free Line, the abandonment rate

for February of 1998 to February of 1999 ranged from 17 to 48%.  P.Ex. T-16.[130]

Evidence that calls are not answered promptly is not limited to statistics.  Several mothers

and grandmothers of class members from different parts of the state testified about these delays.

One mother of three seriously ill children testified that she called defendants' statewide Medicaid

hotline several times and was put on hold for 15 to 30 minutes.[131]  She testified further that she

had been on occasion "placed on hold for more than an hour. . . Only twice or perhaps three times

was I ever able to talk with a live person, even after a long wait."  P.Ex. A-1 at 4-5.

Another mother noted:

> Most of the time it's really hard to get the Houston Medical Transportation office
> on the phone.  Their phone is busy, busy, busy. . . .  Sometimes I finally get
> through and sometimes I don't.  When I don't get a busy signal, sometimes the
> phone rings 20 times or even more before anybody answers.  Then, I get put on
> hold. . . . [J]ust last month . . . [s]omeone answered pretty quickly, but they just
> said 'hold' and then put me on hold again.  They didn't even let me say anything.
> After that it was about 15 minutes before they got back on the line.

P.Ex. A-5 at 9.[132]

---

[130]  The average and maximum delays before callers abandon their efforts to reach
defendants' Medical Transportation Program toll-free numbers are also relevant to this discussion.
In Region 6, the average delay before abandonment can be quite long.  For example, during the
week of September 6, 1999, the average delay before abandonment was more than 5 minutes.
P.Ex. T-28.  From May 31 to December 13, 1999, the shortest weekly average delay before
abandonment in Region 6 was 63 seconds during the week of December 13.  During that same
week, the maximum delay before abandonment was almost 15 minutes.  P.Ex. T-28.

[131]C.H. is a Tarrant County mother of three young class members, Jonathan, James and
Jacob, each of whom has ongoing, serious health problems.  See P.Ex. A-1 at 3-4.

[132]B.M. is the mother of class member Samantha, who suffers from various chronic health
problems.  See P.Ex. A-5 at 5.  B.M. herself is disabled.  P.Ex. A-5 at 4.  She cannot drive
because her sight and brain were damaged in an accident.  P.Ex. A-5 at 8.  Her testimony
concerned defendants' Medical Transportation Program toll-free number in Houston.

Class members were not the only people who testified about calls not answered promptly. Ms. McHan testified that her staff often must help class members make arrangements with defendants' Medical Transportation Program when family members have difficulty contacting the program. TR 28, lines 6-12. Numerous incidents, as recent as December of 1999, reported by defendants' own toll-free number staff reveal many problems and delays inconsistent with any commonsense notion of "promptness."[133]

---

[133] Some of the incidents are recounted, below:

- In Region 1, callers hear a message to "choose 1 or 2. When you choose either one of these options, the computer voice comes on saying 'the person at extension 780 is on the phone, please leave a message at the tone or press 0 for assistance. . . . If you press 0, it loops back to the computer voice. . ." December 3, 1999 memo from Susie Arellano, TDH Region 1. P.Ex. T-40.
- Region 4 "[c]lients say our number rings and goes dead. I tested it and it rang several times and went dead. I tried again and got our second recording. Something is not right." December 14, 1999 memo from Jess Reeves, TDH Region 4. The problems were still not fixed two weeks later. *See* December 15, 1999, December 16, 1999 and December 28, 1999 memos from Jess Reeves, TDH Region 4. P.Ex. T-40.
- In Region 10, "we've had a lot of calls from clients saying that they are calling our office and no one is answering the phone. The phone reports are showing an elevated increase in abandoned calls, actually, we've never experienced them to be this high since the problem we had last time where equipment needed to be replaced." December 9, 1999 memo from M. L. Duran, TDH, Region 10.
- "[W]e continue to receive calls from upset clients saying we are not answering the phones. A contractor called and said she tried for 15 minutes calling the 1-800 # and the line was repeatedly busy. I tried it and verified that it rings busy." December 13, 1999 memo from Mary Lou Duran, P.Ex. T-40.
- In Region 11, "[j]ust tried from my phone, I reached the recorded message, then it is ringing and ringing." December 28, 1999 memo from R.M. Garza, TDH Region 11. P. Ex. T-40.
- In late December of 1999, "Javier noticed an unusual amount of abandoned phone calls. Today, workers are receiving calls, answering them and there is no one on the line, phone simply hangs up." December 28, 1999 memo from Gloria Macias, TDH. P.Ex. T-40.

## C. Violations of Decree: Prompt Answering of All Calls

Defendants respond with three arguments.  First, they claim that the phrases "prompt service" and "answered promptly" are too vague to create binding obligations.  Second, defendants assert that the court should adopt a five-minute standard for promptness in interpreting the decree, and that they have met that standard.  Third, defendants argue that the statewide average of the regional average waits in queue and abandonment rates, not the regional figures themselves, should form the basis of this court's judgment regarding their compliance with the decree.

The first of these arguments is rejected.  Defendants promised plaintiffs that they would provide "prompt service" and answer calls "promptly" – a promise that may be enforced within the meaning of these phrases as interpreted within the "four corners" of the decree.  The court agrees with defendants that these terms are ambiguous, but that does not end the inquiry.  A finding that language in a consent decree is ambiguous merely permits the court to consider extrinsic evidence of the parties' intent in drafting the language.  *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238 (1975).  Our task is to understand more fully what the parties meant by the use of the word "prompt."

### *Abandonment Rates*

Plaintiffs urge the court to consider evidence of an alleged industry-wide standard for the prompt answering of calls, based on average waits in queue and abandonment rates targeted by various corporations in their operation of toll-free telephone lines.  However, evidence of performance by corporations such as General Electric, Land's End, and American Express is simply too far removed from the state's operation of toll-free numbers for the benefit of its

Medicaid population to be considered relevant to the parties' understanding of the word "prompt." These pie-in-the-sky targets, characterized within a Kaiser Associates report prepared for defendants as the "rapid, timely" responses of "best-in-class companies" reveal little about the parties' intent when they agreed to the "prompt" answering of calls. P.Ex. T-11. Nor does the isolated performance of Community First, one of defendants' managed care contractors in the Bexar region, paint a clear picture of any industry-wide standard. P.Ex. T-14.[134]

However, several documents in evidence have proved useful in arriving at a working definition of "prompt." First, a final draft of the "Medicaid Managed Care Enrollment Standards and Guidelines," issued by the U.S. Department of Health and Human Services Healthcare Financing Administration (HCFA) includes a section entitled "Abandoned Calls/Call Waiting Times." P.Ex. T-10. In that section, HCFA lists a set of "generally acceptable standards" which "states should require" those who conduct enrollment and information service functions in Medicaid managed care to meet. Among the enumerated standards are an average queue wait time of less than 45 seconds, and an abandonment rate of five to ten percent. *Id.* Although these standards were promulgated after the signing of the decree, and are non-binding, the frequent citations to and recitations of the federal ESPDT statute throughout the decree suggest that the parties intended to draft a document that would be rooted in the requirements of federal law. It is

---

[134]Plaintiffs also draw the court's attention to the performance standards of Maximus, with whom defendants have recently contracted to conduct Texas Health Steps outreach in 195 Texas counties. TR 857, lines 1-13; D.Ex. D-108. As part of their Texas Health Steps outreach efforts, Maximus takes calls from the same callers (class members and their families) who also call the defendants' toll-free numbers, TR 971, lines 12-8, but Maximus maintains a much better average speed to answer of 20 seconds. TR 863, lines 4-5. This performance rate, which should provide hope for the future of defendants' outreach program, is best categorized as another example of top performance to which plaintiffs may not hold defendants without having included clear standards in the decree.

reasonable to surmise that in agreeing to the word "prompt," the parties were agreeing to a term that could only derive its meaning from some outside source, or some unmentioned standard of performance.  Because the decree draws so heavily on federal law, it is reasonable to examine federal guidelines in construing those provisions the court finds ambiguous.

The court is mindful of the Supreme Court's mandate in *Armour* to interpret decrees without reference to the purposes of federal law.  *See* Section I(C).  It is the incorporation of the language of the federal EPSDT statute throughout the decree by the parties themselves, however, that suggests that the ambiguity raised by "prompt" may in part be resolved by consulting the standards of the federal agency charged with the administration of EPSDT.  By expressly incorporating the language of federal law throughout the decree, the parties created the backdrop against which an ambiguous phrase like "promptly answered" must be considered.

Nevertheless, because of the above-noted risks of interpretation, other extrinsic evidence will be considered to determine the meaning of "prompt," in accordance with the Supreme Court's decision in *ITT Continental Baking Co.*  An excerpt from defendants' contract with its MCOs proves helpful in this task.  P.Ex. —34.  One purpose of the contract is to ensure that defendants, by requiring various activities by the MCOs, comply with the mandates of the consent decree.  *See* Section IV(C), ¶¶ 190, 192.  Section 8.5 of the contract requires the contracting MCO to maintain a toll-free hotline, and to demonstrate "telephone availability" through an "abandonment rate of less than 10%."  P.Ex. M-34 at 84.  Obviously, the defendants' having required the MCOs to maintain an abandonment rate of less than ten percent does not lead directly to the conclusion that the defendants bound themselves to a similar standard in their contract with plaintiffs.  However, the fact that many provisions of the MCO contract seek to

108

ensure defendants' compliance with the decree suggests that the rate may be one component of

MCO performance that defendants thought necessary to the adequate servicing of the plaintiff

class. While the decree does not specifically state that defendants must assure the "prompt"

answering of calls by MCOs, it is logical to conclude that defendants regarded the maintenance of

a ten percent or lower abandonment rate as necessary for the facilitation of plaintiffs' "timely

receipt" of services from MCOs. ¶ 190. Therefore, even if paragraph 247 were read to require

only minimally adequate "promptness," defendants' MCO contract, which sets out standards that

MCOs must meet for defendants to meet other decree provisions, suggests that an abandonment

rate of ten percent or lower is required by paragraph 247.

Even if a different standard of promptness governs the behavior of MCOs than the

standard to which this court may hold defendants under paragraph 247, defendants' internal

documents lend further support to a ten percent rule. Plaintiffs' Exhibit T-13 includes an excerpt

from a document entitled "Monitoring and Coaching for Peak Performance," which was studied

by defendants' toll-free number staff at a training session provided by Jane Finn and the Quality

Alert Institute. The document coaches defendants' employees operating toll-free lines to aim for

the "Industry Standard" of five percent or lower abandonment rate. P. Ex. T-13 at 12; TR 971,

line 23 - 972, line 8. This document – again, because of the defendants' likely aim of compliance

with the decree – is suggestive of how defendants interpret the word "prompt." The document is

therefore instructive on what the defendants intended when they agreed to answer calls

"promptly."

Perhaps most important, defendants have set their own standards for their Regional Texas

Health Steps and MTP lines: on average, they must answer calls within 90 seconds and they must

abandon no more than ten percent of calls. TR 891, lines 4-6 (Testimony of Billy Millwee). It is acknowledged that defendants' behavior after the signing of the decree does not necessarily reveal their understanding of the requirements of paragraph 247.[135] However, the congruence of each of the pieces of evidence discussed above, and the persistent appearance of the five to ten percent abandonment rate in particular, leads this court to conclude that paragraph 247 requires a degree of promptness associated with an abandonment rate approximating ten percent.

### Queue Waits

Had defendants produced evidence of short average waits in queue, the abandonment rate would have less weight as a indicator of actual promptness. But the evidence presented suggests that the average waits in queue are sometimes quite lengthy. See Section V(B). Defendants' goal is for their Texas Health Steps and Medical Transportation Program toll-free numbers to answer calls on average within ninety seconds. TR 892, lines 14-8. (Testimony of Mr. Millwee). Not all regions meet this standard. See Section V(B). Defendants urge the court to accept a "five-minute-standard" for queue waits as characteristic of "prompt answering" as defined by the decree. However, defendants' reliance on other toll-free number services is rather unhelpful. D.Ex. D-93, D.Ex. D-112; Plaintiffs Proposed Findings of Fact and Conclusions of Law. No order of the court requires that these toll-free numbers be answered promptly. Moreover, several of these toll-free number services are run by defendants or their contractors. D.Ex. D-93. It would be letting the fox watch the chicken coop to allow defendants to use their own

---

[135]Nonetheless, defendants note in their post-hearing brief that "[t]he toll-free telephone standards embraced by the Department of Health when the Consent Decree was entered in 1996 were no more than ten percent call abandoned . . . " Defendants' Post-Trial Brief at 47.

performance (or that of their contractors) to help define the standard of promptness required by the decree.

For these reasons, it is found that not enough evidence has been provided for the court to determine what average wait in queue may be deemed "prompt" under paragraph 247.  However, evidence about lengthy delays experienced by individual class members is useful here.  *See* Section V(B).  This evidence aptly demonstrates that class members' waits in queue do not comport with a common understanding of what it means to have one's call answered "promptly."

### *Unit of Measurement*

Defendants' primary attempt to rebut plaintiffs' evidence of noncompliance in this area involves a dispute about the proper unit of measurement.  Specifically, they object to the selectively pulling of data from specific regions or clusters of counties in which defendants' record is particularly abysmal.  Defendants assert that the statewide average wait in queue and statewide abandonment rate are more reliable indicators of promptness.  Defendants' Response to Plaintiffs' Second Amended Motion to Enforce Consent Decree, at 38-39.  They argue that, on average, regional average waits in queue are not excessive.  D.Ex. D-84, D-85, D-89, D-90.  Specifically, defendants note that, as of the first quarter of fiscal year 2000, the average wait in queue for the regional Texas Health Steps lines was 43 seconds; for the Medical Transportation Program it was 47 seconds.  Defendants also note that statewide average abandonment rates for the Texas Health Steps toll-free lines ranged from 4.6% to 5.7%, and that statewide average abandonment rates for the transportation program line ranged from 9% to 11%.  However, one witness admitted that charts about statewide performance do not reveal  whether defendants answer "all calls" promptly.  TR 961, lines 4-24 (Testimony of Mr. Millwee).

111

The phrases "each recipient" and "all calls" in paragraph 247 suggest that the paragraph should be read to require promptness for all class members, in all regions of the state.  It is true that averages must be used to gauge the "promptness" which defendants afford class members.  However, given the paragraph's inclusive language, and its emphasis on the experience of individual class members, it is concluded that class members, no matter where they live, are entitled to prompt service.  The regional averages are thus a superior measure of defendants' success in ensuring promptness than are statewide averages, which mask defendants' failures in some regions to ensure promptness.  The court's decision to rely on regional data is also compelled by the parties' emphasis on "statewideness" throughout the decree.  ¶¶ 271-281.  It is therefore found that defendants were out of compliance with paragraph 247 during the periods of time in which calls were not answered promptly in certain regions of the state.[136]

## D. Knowledgeable, Helpful, and Polite: Findings of Fact Regarding Violations of Decree

The decree also entitles class members to "prompt service by a person who is knowledgeable, helpful and polite." ¶ 247.  However, the evidence presented at the hearing demonstrated that defendants' staff members are often unhelpful or lack knowledge.[137]

---

[136]Defendants point to recent efforts made to improve their toll-free line services, including the transition of several regional lines to a contractor, Maximus, Inc., which has resulted in dramatic improvements.  Defendants' Response to Plaintiffs' Second Amended Motion to Enforce the Consent Decree, at 39.  These efforts are applauded and the results striking.  This record will inform the court in its formulation of orders of enforcement.

[137]Also, sometimes toll-free number staff are unable to assist class members because the caller speaks only Spanish and the staff do not speak Spanish, even in the South Texas office.  *See, e.g.,* complaints from  M.R. from McAllen, M.O. from Donna, F.N. from Austin. P.Ex. T-40.

The mother of one class member testified that "[o]n the two or three occasions that I was able to talk with a live person, the person was not polite or helpful.  They told me that they could not answer my questions and that I needed to call somewhere else."  P.Ex. A-1 at 5.

Another mother of a class member said that one "problem with the Houston Medical Transportation Program office is that sometimes the person who answers the phone doesn't know what they should do."  P.Ex. A-5 at 9.  Although she herself is disabled by cerebral palsy,  the Medical Transportation Program office staff member told her that she and her daughter "had to take the bus to [the class member's] medical appointments. . . . [the staff member] just kept saying that if we couldn't take the bus they couldn't help us."  P.Ex. A-5 at 5-9.  The staff person was unaware of other transportation options, such as cabs or Metrolift.[138]  Although she promised to research the issue and call back, she never did.  P.Ex. A-5 at 9.  The problem remained unresolved until counsel intervened.

A third parent stated that the Medical Transportation Program staff need to be better trained.  P.Ex. A-7 at 7.  Even though her son had had the same schedule for his rehabilitation appointments for months at a time, the Transportation Program staff still made scheduling errors despite repeated calls.  P.Ex. A-7 at 7.  She also described how difficult it was to arrange her son's transportation to rehabilitation after her truck broke down.  She requested that a van be sent to pick him up at school and take him to rehabilitation.  The staff person at the Transportation office told her that it was impossible because her son was a minor.  The problem was rectified only weeks later, after the mother discussed the matter with a supervisor at MTP.  P.Ex. A-7 at 8.

---

[138]  Decree paragraphs 214-16 describes the scope of defendants' transportation services. *See also* ¶¶ 231-2, Order (filed May 19, 1997).

Moreover, in order to receive mileage reimbursement to which she was entitled, she found it necessary to consult with counsel.  P.Ex. A-7 at 8.

Finally, Ms. McHan testified that "some of the staff need to be a little better trained in sensitivity toward the clients they are working with."  Both she and her clients, who are parents of class members, have experienced the staff members' rudeness over the phone. TR 39, lines 11-6, *see also* P.Ex. A-2 at 19.  She also noted that Medical Transportation Program toll-free number staff are sometimes less than helpful because they lose information that has previously been supplied.  Ms. McHan stated that workers sometimes deny that the information has been given to them on prior occasions.  TR 40, lines 5-12.[139]

Based on the evidence presented above, the court finds by a preponderance of the evidence that defendants have violated paragraph 247.  Plaintiffs have succeeded in demonstrating that class members' calls are frequently not answered by knowledgeable and helpful staff members.

---

[139]She also explained how staff members' rudeness and unhelpfulness can be a barrier to receipt of services that class members need.  It can be

> devastating. . . . Your child is already sick.. . . . You need to go out of town, spend the night [to address your child's health problems].  How are you going to make arrangements for your other children.  You are already stressed out, and then there is somebody who has no empathy for you on the phone.  Families feel really badly about that sort of thing. . . .  I've had parents say to me, "I don't want to feel like I'm a drain on the system or that I am scum because I have to ask for this help. . . ." And that does affect families quite deeply. . . . I have had family members cry in my office because of something somebody said to them.

TR 40, line 22 - 41, line 12.  When class members feel frustrated or demeaned in the process of asking for help, she explained, they often fail to get healthcare that they need, because they decide not to call back, and not to attempt to gain access to the system in the future.  TR 56, line 24 to 57, line 4.

# VI. Issue Six: Case Management

## A. Role and Importance of Case Management

"Case management" refers to the service provided by "case managers," or employees of the state who help families to navigate the often confusing healthcare system. Case management helps indigent families to develop coherent plans to take care of their children's healthcare and related needs. Case managers also work to help empower families to request healthcare services on their own. Their support can often be crucial for class members and their families, who are largely uneducated and unfamiliar with the state's healthcare system in general, and with Texas Health Steps in particular. Thus, case management plays a vital role in facilitating recipients' access to needed medical, social, and educational services.

Before this lawsuit was filed, defendants "only provided case management on a limited basis to several categories of class members." *Fairness Order* at 33. In response to the decree, defendants developed a new case management program called Texas Health Steps Medical Case Management ("case management"). The program is aimed at a broad group of class members who have a health condition or risk, have special healthcare needs, or whose physical conditions are medically complex or medically fragile. P.Ex. C-1 at 14. The purpose of providing case management to class members who are at risk of health problems is "preventive." TR 141, lines 6-18.[140]

Class members face numerous barriers in gaining access to healthcare, including language barriers, lack of transportation, unemployment, substandard housing, and lack of food, shelter,

---

[140] The components of Texas Health Steps case management are intake, family needs assessment, service plan development, and follow-up. TR 366, lines 6-16, *see also* P.Ex. C-1 at § 33.503.

and clothing. TR 15, lines 5-15. The evidence demonstrated that Texas Health Steps medical case management is needed to overcome barriers to care. TR 380, line 15 to 381, line 6; TR 405, line 22 to 406, line 3 (Testimony of Margaret Bruch).[141] Case managers often find adequate food and shelter for class members and their families. Without case management, it is extremely difficult for some class members to receive services that they need through defendants' managed care programs. TR 70, line 23 to 71, line 8 (Testimony of Ms. Tillman).[142] Children who are homeless or who live in shelters are also particularly difficult to serve without case managers. TR 71, lines 17-22. And in situations in which a child's health problem stems from the poor health of the child's parents, case managers play a vital role.[143] In each of these situations, case management provides a comprehensive approach that helps overcome families' multiple obstacles to safe and healthy living.[144]

---

[141] The court qualified Ms. Bruch, a program consultant for Texas Health Steps case management, as an expert in "medical case management in the Texas Health Steps program and other programs administered by the Department of Health." There was no objection. TR 356, lines 11-6.

[142] Ms. Tillman is one of four owners of Community Outreach, Referral and Evaluation in San Antonio. She testified about the day-to-day provision of Texas Health Steps case management. TR 67, lines 2-3; P.Ex. W-11. Since its beginning in 1998, CORE has helped about 1,000 class members and their families. TR 69, lines 15-17.

[143] For example, Ms. Tillman discussed the plight of a class member who was not eating properly and therefore failing to thrive. Upon a referral from the doctor, CORE discovered that the class member's mother had an eating disorder. TR 72, lines 20-5. She also noted that parents with mental retardation or mental health problems sometimes "don't understand how the system works" and need to be educated by case managers. TR 73, lines 3-15. She spoke about parents who become "overwhelmed" by large numbers of children with serious health problems, and the need to assist them with transportation and other support. TR 74, lines 9-25.

[144] For example, CORE helped a family where the father was a single parent raising five class members. The mother was in jail. CORE initially became involved when the 16-year-old class member's arm was injured in a drive-by shooting. He needed intensive physical therapy on

116

## B. Findings of Fact

Acknowledging the importance of medical case management to the families who need it,

the parties included in the decree the following provisions:

> 248. EPSDT programs must provide case management to each recipient if needed. Since case management is a service that Medicaid programs may cover, 42 U.S.C. §§ 1396d(a)(19); 1396n(g), Medicaid programs must cover it for EPSDT recipients if medically necessary. 42 U.S.C. § 1396d(r). . . .
>
> . . .
>
> 264. By January 31, 1996, the parties will complete a case management plan for the EPSDT program. Case management includes arrangements for the child and the family which are needed to meet the child's healthcare needs. The plan will make sufficient case management available in every county or cluster of counties where few recipients reside. It may provide case management by contract with local agencies or on a fee-for-service basis, whichever is more effective in each county.

### *The Need*

At issue is whether defendants have enacted a plan that makes "sufficient case

management available in every county or cluster of counties where few recipients reside," as

required by paragraph 264. As a threshold matter, the parties dispute how many class members

are in need of the service. Defendants estimate that about 7% of the class (about 90,000 to

107,000) are in need of medical case management. Plaintiffs contend that more than 10% of the

class need case management. Plaintiffs' Second Amended Motion to Enforce the Consent Decree,

at 37.

---

his arm. TR 77, lines 2-3. In addition to helping with the physical therapy problems, CORE helped the father to get into a work program and helped the family to find other housing in a neighborhood without gang violence. CORE also addressed the other class members' health problems. Thus, even though the initial reason for helping the family was medical, CORE tackled each element that put the class members' health at risk. TR 77, lines 15-19, TR 76, line 20 to 78, line 6.

Defendants base their 7% estimate on data from the defendants' High Risk Pregnant Women and Infants case management program ("PWI case management"). TR 397, lines 4 - 12. About 5% of pregnant women and infants with Medicaid use PWI case management. TR 397, line 13 to 398, line 1; P.Ex. C-20. Defendants estimate that the rate of need for Texas Health Steps medical case management (MCM) would exceed this rate by a small percentage, because they expect that more class members will know about MCM. However, reason defendants, the 7% estimate is too high because it does not account for class members' use of other forms of case management. TR 364, line 23 to 365, line 13.[145] For this reason, defendants estimate that only 5 to 6% of class members need Texas Health Steps case management. TR 434, lines 18-21 (Testimony of Ms. Bruch).

The above reasoning is seriously flawed. First, defendants have shown only that 5% of pregnant and infant Medicaid recipients actually use PWI case management, not that only 5% of these Medicaid recipients need case management. Second, defendants' reliance on PWI case management data underestimates the need for Texas Health Steps case management, because the PWI case management offers a narrower set of services, thereby reducing the expected population in need of those services.[146] Also, some class members who need Texas Health Steps case

---

[145] For example, class members may receive case management through the Mental Health/Mental Retardation agency, Early Childhood Intervention (ECI), Texas Commission for the Blind, PWI, Children with Special Healthcare Needs (CSHCN) and the Medically Dependent Children's Program (MDCP). D.Ex. D-6, *see also* D.Ex. D-16. About 60,000 class members received case management through these other programs in fiscal year 1999. P.Ex. C-25.

[146] For example, Ms. Tillman testified that her Texas Health Steps case managers see "lots of children with lots of dental issues." TR 75, line 7. But as Ms. Bruch admitted, PWI data do not include class members in need of case management because of dental problems. TR 401, line 8 to 402, line 15.

management have health problems that are more chronic in nature or are in poorer health than those who need PWI case management. TR 403, line 21 - 404, line 15; *see also* P.Ex. C-21. Therefore, the need for PWI case management, which offers a different array of services addressing the health needs of a different population, is not, perhaps, the best starting point for measuring the need for Texas Health Steps case management.

In addition, the different case management programs are not mutually exclusive. Class members may need and be entitled to Texas Health Steps case management even if they also use other forms of case management.[147] Other forms of case management may not be as comprehensive as Texas Health Steps case management. TR 81, lines 8-21.[148] While defendants' regulations prohibit duplication of case management services, P.Ex. C-1, § 33.504(a), they do not prohibit receipt of more than one form of case management if there is no duplication. This reasoning cuts against defendants' decision to reduce their 7% estimate (already questionable due to their reliance on PWI data) to 5 or 6% based on class members' access to alternative forms of case management.

---

[147]For example, class members younger than three years may qualify for ECI case management and Texas Health Steps case management. TR 381, line 22 to 382, line 1. Class members with mental health or mental retardation diagnoses may seek case management through the Mental Health/Mental Retardation agency, but they may also seek Texas Health Steps case management. TR 383, lines 10-20. Also, some class members with mental health or mental retardation diagnoses may not be able to get assistance from MHMR because of backlogs. TR 383, line 21 to 384, line 1.

[148]For example, class member G.V. receives case management through the Commission on the Blind. The Commission case manager "only addresses the visual need issues, such as bringing G. toys to address her visual impairment, and she does not contact [the] mother on a regular basis." Since G. is a medically complex child, she also needed Texas Health Steps case management. P.Ex. C-21; see also TR 393, line 20 to 394, line 3.

*Utilization*

Even assuming that defendants' reasoning is correct, and that they have properly calculated that only about 90,000 to 107,000 class members need case management, by defendants' own estimates, at least 30,000 class members still have unmet case management needs.[149]  See also TR 406, line 13 to 407, line 5.  Since the means by which defendants arrived at these estimates lacks reliability, the actual need for case management may well exceed these estimates.

There is abundant evidence that members' use of Texas Health Steps case management is startlingly lower than the population's true need.  From the program's start, in January of 1998, through January of 2000, defendants provided fewer than 33,000 Texas Health Steps case management services.[150]  TR 369, lines 7-21; D.Ex. D-9; *see also* D.Ex. D-25.  Only 0.3% of all Texas class members aged 1 to 20 used Texas Health Steps case management in the first four months of state fiscal year 2000.[151]  TR 421, lines 13-9, Case Management Utilization Report, P.Ex. C-20. This is obviously a much smaller group than need case management, even under defendants' conservative estimates.  Furthermore, in more than 120 counties, no class members at all used Texas Health Steps case management in the first four months of fiscal year 2000. P.Ex. C-20.

---

[149]Texas Health Steps case managers assisted only 2,994 class members in fiscal year 1999.  P.Ex. C-25.

[150]A service is a single contact between a case manager and a family, for example, an assessment or a follow-up phone call.

[151]Defendants excluded infants because they are not eligible for Texas Health Steps case management.  TR 417, lines 7-17.

As noted above, statewide, there are 1,306,455 class members over the age of one year statewide. Only 4,353 – roughly 0.3% – of them received Texas Health Steps case management. TR 421, lines 13-19. The regional data tells an even more deplorable story of a service almost completely inaccessible to class members. In Hale County, where there were 3,820 class members over the age of one year, not one received Texas Health Steps case management during the first four months of fiscal year 2000. TR 416, line 13 to 417, line 5. In Dallas County, which has 100,012 class members over the age of one, only forty-eight received Texas Health Steps case management. TR 417, line 21 to 418, line 1.[152] In Region 8, which has the highest percentage of class members who use Texas Health Steps case management, only about 1% of class members use Texas Health Steps case management. TR 419, lines 5 -22; *see also* TR 88, lines 19-21. And in Region 11, the South Texas region, which is very poor, only 0.2% of class members receive Texas Health Steps case management. TR 421, lines 3-12.

Defendants respond that the gap between the estimated population who need case management and those who receive it can be explained by several factors. First, some class members who need the service may choose not to request it. They may not want case management, may have their management needs met by family or friends, or may receive "targeted" case management from another source, such as the Department of Mental Health and Mental Retardation, Commission for the Blind and Visually Impaired, Texas Department of Health, or Early Childhood Intervention Program. D.Ex. D-6. However, several of these forms of case management address distinct kinds of medical needs. Moreover, the receipt of case

---

[152] Ms. Tillman commented that utilization in Dallas County is "considerably low. It's terrible." TR 89, lines 1-9.

management from another source does not preclude class members from being eligible for Texas Health Steps medical case management where medically necessary.

Defendants also emphasize that there is no waiting list for Texas Health Steps Medical Case Management services, and that plaintiffs have identified no class members who, after requesting the service, were not referred to case management providers. Defendants argue that they provide sufficient case management in every county or cluster of counties because there is no waiting list for Texas Health Steps case management assistance. Ms. Bruch stated that "to our knowledge there has not been a child present that has not gotten connected to case management." TR 373, lines 13-5; see also TR 407, lines 10-2, TR 437, lines 2-7, D.Ex. D-14. This argument appears to rely on the "request" language at 42 § 1396a(a)(43)(B). However, the court dispensed with this defense in Section II of this memorandum opinion. That is, under 42 § 1396a(a)(43)(A), defendants are obligated to inform eligible participants about the services to which they are entitled. Class members cannot be expected to make requests for services where defendants have failed to make them aware of such services.[153]

### *Sufficient Staffing*

Plaintiffs argue, next, that defendants have not recruited a sufficient supply of case managers to meet class members' needs, in violation of the requirement that "sufficient case management" be made "available." ¶ 264. Multiple witnesses testified to the shortage of case managers across the state. TR 53, lines 9-12.[154]

---

[153]A discussion of defendants' failure to inform appears in Section I(B).

[154]Ms. Tillman testified that there are few Texas Health Steps case managers in Bexar County, TR 82, lines 23-25, and that of those few, several had recently assumed inactive status and no longer saw clients. TR 87, lines 4-9. In addition, Ms. McHan testified that sufficient case

The statistics presented at the hearing support the opinions of these witnesses.  At the end

of 1999, approved Texas Health Steps case managers could serve 16,707 class members.  But, of

the 162 approved case managers,[155] 41 were inactive.  Thus, at the end of 1999, the actual

capacity of defendants' active, enrolled Texas Health Steps case managers was only 13,809.  TR

408, line 9 to 410, line 4; P.Ex. C-20.  This low capacity is not sufficient to meet even defendants'

estimate of class members' need for this service.

### The Safety Net

No private Texas Health Steps case managers are enrolled in about 130 of Texas' 254

counties.  TR 412, lines 8 - 22; P. Ex. C-20, D.Ex. D-15.  Instead, TDH social workers are

assigned to these counties; in some counties, only one social worker is assigned.  TR 413, lines 5-

10.

Two major problems arise when no privately-enrolled case managers serve an area.  First,

class members have less choice among case managers.  TR 85, lines 9-13.  This is especially true

in the many counties in which only one privately-enrolled Texas Health Steps case manager

---

management is not available for low income families in Abilene, San Angelo, and the surrounding
area. She noted that even though MHMR and ECI case management exists in the area, case
management is not sufficiently available "because those particular case management programs are
only for a certain group of people." TR 63, lines 11-7. Melinda Metterauer testified that the
Texas Health Steps case management provider base is not adequate. TR 869, line 4 to 870, line
3. She based her opinion, in part, on her knowledge of class member D.H.'s experience in
November of 1999, of having not obtained service despite having called five case managers.
P.Ex. C-21. Ms. Mettauer heads Maximus' Texas Health Steps outreach and informing project.
Defendants have contracted with Maximus to provide outreach to class members in several
regions of Texas. TR 857, lines 1-18. Maximus is supposed to make special efforts to inform
class members about Texas Health Steps case management. TR 372, lines 2-8.

[155] As of the week of the hearing, there were 170 approved Texas Health Steps case
managers. TR 370, lines 16-9.

participates in the program.  P.Ex. C-20.  Class members' ability to choose their own case managers, who form intimate relationships with class members and their families, is important to the success of the service. TR 413, line 20 to 414, line 1 (Testimony of Ms. Bruch).  Second, when no privately enrolled case managers serve an area, Texas Department of Health social workers are supposed to assist class members as case managers.[156]  TR 400, lines 7-13.  However, these Texas Health Steps case managers are available only on a limited basis in those counties.[157] TR 125, lines 5-8.

TDH social workers are overwhelmed in their capacities as "safety net" case managers. For example, TDH social workers in Regions 2/3 and 9/10  have caseloads of about 500 to 600 clients.[158]  They work in several different programs.  In contrast, a full-time case manager at the Parent Case Management Program (PCM) handles twenty-five to fifty children.  TR 48, line 23 to 49, line 2. (Testimony of Ms. McHan).

### *Recruitment*

Defendants' low reimbursement rates for Texas Health Steps case management contribute to the shortage of case managers.[159]  According to a 1998 internal TDH memo, the reimbursement

---

[156]  TDH employs about 100 social work staff in the regions.  TR 374, lines 7-10.

[157]Ms. Bruch testified that TDH social workers are assigned to several different programs. Thus, it is not common for a social worker to be assigned only to Texas Health Steps case management.  TR 441, lines 1-10.

[158]Ms. McHan testified that such a load is "definitely . . . too much . . . to handle as a social worker."  TR 51, line 16 to 53, line 8.

[159]Defendants pay Texas Health Steps case managers $54.58 for case management assessments and face-to-face visits.  TR 373, lines 10-3, P.Ex. C-24.  They pay $18.00 for phone contacts. P.Ex. C-24.  Defendants apparently based the reimbursement rates for Texas Health Steps case management on reimbursement for other forms of case management developed many

rates for Texas Health Steps case management are "woefully inadequate in comparison" with

other state agencies' payment rates for their case management services.  P.Ex. C-21.  This

evidence is consistent with the fact that PCM cannot afford to hire staff qualified to provide Texas

Health Steps case management for the reimbursement that defendants pay.  TR 54, line 18 to 55,

line 7. (Testimony of Ms. McHan). The rural nature of PCM's practice – and of many potential

providers of case management – exacerbates the problem, because such providers "may be

sending staff out to drive several hours, meet with a family for several hours, [and] drive back for

several hours, for $54."[160]  TR 55, lines 5-7.

These low reimbursement rates have a tangible effect on enrollment and withdrawal from

the case management program.[161]  In Bexar County, Texas Health Steps case managers are taking

inactive status primarily because they cannot stay in business given the current low rates of

reimbursement.[162]  TR 87, lines 4-17.  Potential case managers do not enroll with Texas Health

---

years prior to the start-up of the Texas Health Steps case management program. TR 425, line 7 to
426, line 4.  In addition, the reimbursement rates have not changed very much over time.  TR 436,
lines 18-20.

[160]According to the June 1999 comments of the Smith County Public Health District's
(East Texas) coordinator of case management, "An agency providing Texas Health Steps Medical
Case Management would have a difficult time maintaining a case manager with the current
reimbursement schedule and pay for the case manager's salary, travel, FICA, health/sick/and
vacation benefits and the cost of office support and supplies." His recommendation was to
increase the reimbursement rates to ensure the viability of the program.  P.Ex. C-21.

[161]Defense witness Ms. Bruch confirmed that defendants' low reimbursement rates
discourage the enrollment of Texas Health Steps case managers.  The low reimbursement rate is
"one of the top deterrents" cited by providers and potential providers.  TR 423, lines 14-21.
Defendants' survey of Texas Health Steps case managers also reports providers' complaints about
low levels of reimbursement.  P.Ex. C-20 at 8.

[162]For example, in October of 1999, provider organization "ASAP" wrote that their
program's Board of Directors were considering phasing out case management because the low

Steps case management because the low rates make it extremely difficult to pay the salaries required to hire needed social workers and nurses with professional experience.  TR 91, line 16 to 92, line 1.[163]

One of the reasons for the failure of reimbursement rates to meet providers' costs appears to be that the cost of conducting home visits is not reimbursed.  Instead, defendants pay Texas Health Steps case managers a flat fee of $54.58 for initial, comprehensive "assessments." TR 424, lines 13-15.  But $54.58 does not begin to cover the cost of a home visit in many parts of the state. P.Ex. C-21; TR 423, line 25 to 424, line 19; TR 430, lines 1-6.  For example, for an assessment to be comprehensive, it must be done in the client's home.  TR 430, lines 7-10.  Home visits are more comfortable for the client and make it easier for the case manager to establish a rapport and to receive an accurate picture of the client's needs. TR 430, lines 11-16.  If the family lives in substandard housing, the case manager can assess the level of risk that the home itself imposes.  TR 430, lines 17-21.  It generally takes about one to three hours to do an initial, comprehensive Texas Health Steps case management assessment. TR 423, line 25 to 424, line 12.

---

rates did not cover their costs. P.Ex. C-21.

[163]   Ms. Singleton, for example, testified that Agapé Clinics would like to become a Texas Health Steps case manager.  TR 216, lines 4-9.  Her reasons for not applying related solely to "[t]he financial aspect of whether or not what is expected can be done for the fees that are established, and not knowing what the time frame on reimbursement would be." TR 210, line 20 to 211, line 7.  Agapé Clinics are located in Dallas and Tarrant Counties, in Region 3.  TR 157, lines 5-11.  In those two counties, there are 155,401 class members over the age of one year.  In the first four months of fiscal year 2000, only 560 (.3%) of them received Texas Health Steps case management.  P.Ex. C-20. Similarly, Page One Healthcare Solutions, Inc., of Dripping Springs wrote in January of 1999 that the company "was quite interested in working with your agency providing case management for the children of Central Texas" but that "the reimbursement rates were such that the equation simply was not balance-able." P.Ex. C-21.

126

Although defendants originally based their Texas Health Steps case management payment rates on other programs' payment structure, Texas Health Steps case managers are not reimbursed for certain services for which case managers in other programs receive reimbursement. For example, unlike PWI case managers, Texas Health Steps case managers are not paid for initial intake sessions.[164]  TR 426, line 25 to 426, line 15; P.Ex. C-23.  This continuing disparity[165] makes it extremely difficult to attract Texas Health Steps case managers. P.Ex. C-21; *see also* TR 428, line 24 to 429, line 16.

In addition to low rates of reimbursement, the cumbersome application process itself appears to inhibit many case managers from participating in Texas Health Steps case management.[166]  For example, in October of 1999, a case management provider applicant still had not received a provider number even though defendants had approved the applicant in December of 1998.  P.Ex. C-21.  Defendants' internal memos demonstrate their knowledge of this paperwork problem.  P.Ex. C-21; *see also* TR 431, lines 15-18.  Payment delays also cause problems.  One witness testified that 10-30% of CORE's claims are not paid,  TR 92, lines 2-7,

---

[164]Case managers and coalitions of case managers from various parts of the state have complained to defendants that the Texas Health Steps case management payment rates are too low.  TR 426, line 7 to 428, line 23.  For example, the Hidalgo-Starr Counties Case Management Coalition and the Cameron-Willacy Counties Case Management Coalition, both from South Texas, have asked defendants to reimburse Texas Health Steps case managers for completing initial intake forms.  P.Ex. C-21.  As stated above, Defendants reimburse PWI case managers for initial intake interviews.  TR 426, line 25 to 427, line 15.

[165] *See* D.Ex. D-14.  Defendants increased the reimbursement for face-to-face follow-up visits from $18.00 to $54.58. *See also* D.Ex. D-14.

[166] At the time of the hearing, defendants were in the process of revising their application form to simplify it.  TR 375, lines 5-13; D.Ex. D-18.

127

which forces her staff to tap into personal funds to meet payroll costs.[167]  TR 93, lines 4-9

(Testimony of Ms. Tillman).  Another testified that payment delays create significant cash flow

problems for Texas Health Steps case managers because many case management organizations

are small businesses.  TR 430, line 22 to 431, line 14 (Testimony of Ms. Bruch).

Finally, Texas Health Steps case management is underutilized because class members do

not know that the service is available.  TR 90, lines 8-10.  Vital referral sources, such as healthcare

providers, school staff, and employees of community agencies, frequently do not know about

Texas Health Steps case management.[168]  TR 90, lines 10-21.  However, Texas Health Steps case

management is very well-received by referral sources once they are informed about the program.

CORE "immediately began getting referrals" once referral sources learned of its services.  TR 90,

line 22 to 91, line 8.

## C. Violations of Decree

Defendants point to the number of medical case management provider recruitment

activities that they have conducted.  TR 357, line 11 to 360, line 4; TR 367, line 12 to 368, line 3;

D.Ex. D-7, D-12, D-13, D-24.  They note the steady progress made recently in recruiting

providers, TR 369, line 23 to 370, line 12; D.Ex. D-10, and point to a recent increase of the

reimbursement rate for face-to-face follow-up activities.  D.Ex. D-10, D-14.  They report that

---

[167]Ms. Tillman also testified that because of the low reimbursement rates, CORE currently cannot afford to pay three of its owners who work full time at CORE, without whom CORE could not function.  TR 93, line 10 to 94, line 17.

[168]Defense witness Margaret Bruch testified that one reason that Texas Health Steps case management utilization is so low is that families do not know about the service.  TR 422, lines 7-9.  Also, she testified that many referral sources such as school nurses, school social workers, doctors, and dentists are still unaware of Texas Health Steps case management.  TR 431, line 19 to 432, line 7, and therefore cannot refer class members to case managers.  TR 432, lines 8-12.

since January of 1998, the number of medical case management services provided has increased every month, rising from 5,000 services to over 30,000 services in January of 2000.  D.Ex. 9. Nevertheless, despite defendants' recruitment efforts, and despite the gradual increase in the number of approved case managers, there is still a serious shortage of Texas Health Steps case managers.[169]

Based on the findings of fact set out above in Section VI(B)(1) through VI(B)(5), defendants are found to be in violation of paragraphs 248 and 264 of the decree.  The dramatic underutilization of the service of case management, coupled with a well-demonstrated need for the service, leads the court to conclude that defendants have failed to provide medical case management services to the plaintiff class.  Plaintiffs have amply demonstrated defendants' failure to make case management available in every county or cluster of counties in the state.

---

[169]Defendants point to a comparative study that allegedly shows that Texas compares favorably to other states in providing case management services.  Defendants surveyed several states about their case management efforts for children who have Medicaid.  D.Ex. D-21, D.Ex. D-32.  They found that fewer than one-half of the states provide four or more targeted case management programs.  They also found that about one-half of the states provide EPSDT case management.  TR 377, line 7 - 378, line 19.  Based on this survey, Ms. Bruch thinks that Texas compares "very favorably to other states."  TR 378, lines 17-9.  However, as noted earlier, the performance of other states, because they are not bound by the decree in this case, is not relevant to defendants' compliance.  In short, the poor performance of other states relative to Texas does not excuse defendants' failure to comply with the decree.  Furthermore, neither the number of case management programs offered by Texas, nor its decision to provide EPSDT case management is at issue in this case.  Having opted to provide these services, defendants are bound by the requirements of federal law on which plaintiffs first based their claims, and in which the decree is grounded.

## VII. Issue Seven: Outcome Measures

### A. Overview

In an effort to "measure whether recipients receive the full range of services that they need and are entitled to receive," ¶ 288, the parties agreed to create "health outcome indicators." ¶¶ 286-297. The decree states that these indicators should be "chosen wisely" by the parties and should be "diverse enough to gauge the health of the entire EPSDT population, not merely factions of the population." ¶ 289. The parties agreed to develop a list of health outcome indicators by September 1, 1995. ¶ 293. On August 30, 1995, the parties submitted a Joint Notice Concerning Outcome Measures to the court ("Joint Notice").

The parties also agreed to create "target goals" for each indicator. ¶ 294. Defendants agreed to report the "best available information on each health indicator annually, beginning on September 1, 1996 and continuing through 1999," through the use of a methodology approved by plaintiffs. ¶ 295. Finally, defendants agreed to develop, by January of each year, corrective action plans to "address all matters within Defendants' control to improve results for each indicator" for which the target goal was not reached. ¶ 296. The plans are to be presented for plaintiffs' suggestions, which may not be unreasonably rejected by defendants. *Id.*

### B. Findings of Fact Regarding Violations of Decree

Plaintiffs allege that defendants have failed to comply with their obligations under these paragraphs by failing to provide plaintiffs with outcome studies that meet the standards in both the decree and the Joint Notice, failing to obtain the consent of plaintiffs' counsel regarding three substitute outcome measures introduced by the defendants, failing to create adequate corrective

action plans, and failing to abide by the deadlines in the decree.  Each contention will be addressed in turn.

### *Joint Notice Measures*

Plaintiffs' complaints about defendants' outcome measures as required by the Joint Notice begin with the first indicator, Joint Notice Measure #1, which measures the rate of immunization among the plaintiff class. P.Ex. OM-9 at 12.  Plaintiffs complain, first, that defendants' data is not compiled annually, but is instead provided biannually.  Defendants respond that immunization surveys take significant time to complete, and that the opportunity to evaluate new intervention strategies designed to improve immunization rates has required at least a two-year cycle. Nevertheless, defendants agreed to the term "annually." Moreover, the immunization indicator appears in the express language of the decree at paragraph 290.  Therefore, when defendants agreed to the annual provision of the best available data on each indicator, they specifically included this indicator.  For these reasons, it is found that defendants' biannual compilation of immunization data violates paragraph 295.

In addition, plaintiffs complain that defendants' 1998 immunization study sample size was too small to yield adequate data about racial and ethnic subgroups, as required by Joint Notice Measure #1.  Defendants have not furnished any reliable evidence that their 1998 data was the "best available," as required by paragraph 295.  They have not explained, to the satisfaction of the court, why they were unable to create the requisite sample sizes that would have yielded the desired racial data.  It is therefore concluded that defendants have not furnished plaintiffs with the

best available data on this indicator for the year 1998.  Thus, in 1998,[170] defendants failed to

comply with paragraph 295.[171]

Plaintiffs also object to the exclusion from study of hundreds of thousands of class

members who are enrolled in managed care. D.Ex. D-62.[172]  To evaluate this objection, the court

must examine paragraph 295, which contemplates an ongoing exchange between the parties

concerning the specific methodology to be used to report on each indicator:

295.  Defendants will report the best available information on each health indicator annually, beginning on
September 1, 1996 and continuing through 1999.  The EPSDT program will arrange for studies to evaluate the
health of the EPSDT population, including each health outcome indicator.  Defendants will present their proposed
methodology for Plaintiffs' approval by April 1, 1996.  Plaintiffs will not unreasonably withhold approval.  If they
approve, Plaintiffs may make suggestions.  Defendants may accept or reject the suggestions.

This language is interpreted to mean that defendants' failure to report on an indicator or

specifically enumerated sub-indicator – such as their failure to provide any data by race as

required by Joint Notice Measures #1 and #4, above – will nearly always[173] constitute a failure to

provide the "best available information."  However, a disagreement over methodology must be

treated differently.  The court must decide whether defendants have provided the "best available

---

[170]Defendants note that immunization data by race and ethnicity for the years 1994 and
1996 were reported.  P.Ex. OM-9 at 12.  In addition, defendants plan to survey and provide
results by race and ethnicity for the years 1999, 2000, and 2002.  D.Ex. D-71, D-72.

[171]Similarly, defendants have not provided plaintiffs with the racial and ethnic data required
by Joint Measure #4 for any year, again in violation of paragraph 295.

[172]  Mr. Blanton admitted that for some studies, defendants do not have data about class
members in managed care.  TR 519, lines 13-17.

[173]In the court's view, it would be difficult for defendants to argue that the failure to
provide *any* data on an indicator or sub-indicator constitutes the provision of the "best available
information," since terms of paragraph 295 dictate that defendants themselves are responsible for
generating the information through studies.  Thus, defendants are under an obligation to conduct
the studies that will give them the "best available information" for each indicator.

information" or whether plaintiffs have withheld their approval of defendants' methodological decisions "unreasonably." The phrase "best available information" is held to be ambiguous. The court must therefore determine, as best it can, what the parties meant by the phrase with regard to each methodological decision challenged by plaintiffs.

Have defendants provided the "best available information" regarding the indicators for which they have excluded managed care data, or have plaintiffs withheld their approval of the exclusion "unreasonably"? Paragraph 191 provides a clear answer: defendants must assure that "information for outcomes research as needed" is collected from "each managed care organization." ¶ 191. In light of paragraph 191, the phrase "best available information" is not ambiguous in relation to managed care data. Therefore, in failing to collect data on managed care enrollees, defendants violated both paragraph 191 and paragraph 295.

Next, with regard to Joint Notice Measure #5, plaintiffs complain that defendants have limited their study of lead poisoning in the class to a study of class members whose blood samples have been submitted to the Texas Department of Health laboratory for testing. Does this limitation render defendants' information less than the "best available"? No other provisions related to lead-poisoning in the decree can guide the court in answering this question. Paragraph 289 at first glance appears promising, with its requirement that indicators be "diverse enough to gauge the health of the entire EPSDT population, not merely factions of the population." ¶ 289. This paragraph speaks directly to the selection of indicators, not to methodologies used in generating the best available information about those indicators, but it could be used by the court to give meaning to the ambiguous phrase "best available." However, paragraph 289 appears to be aimed at the exclusion of particular groups (such as young females or teenage males) from

consideration. There is no evidence that defendants' use of the blood registry data unduly excludes a particular "faction" from study. Thus, while defendants are strongly encouraged to expand their studies to include class members whose blood is not currently reported in the registry, they will not be held in violation of the decree for relying solely upon the blood registry.

Plaintiffs also note that although defendants are obligated under Joint Notice Measure #5 to re-evaluate at the age of 24 months the blood lead levels of EPSDT children who had high lead levels at 12 months, defendants fail to do so because their "registry cannot distinguish a child whose second test was normal from a child who never received a second test." P.Ex. OM-9 at 9; TR 527, line 11 to 528, line 14. The court agrees that, because they have failed to report an enumerated indicator, defendants have failed to provide the "best available" data regarding that indicator. Defendants insist that they cannot provide the re-evaluation data because of the configuration of their registry. Nevertheless, defendants have plainly failed to meet their obligation to "arrange for studies to evaluate the health of the EPSDT population, including each health outcome indicator." ¶ 295.[174]

Plaintiffs' complaints concerning Joint Notice Measures #8 and #9 will be treated similarly. In both instances, plaintiffs regard defendants' decision to restrict data collection to certain subsets of the population as in violation of paragraph 295. However, it is found that defendants' decision to proceed with methodologies based on Women's Infants' and Children's Program ("WIC") data (#8) and on data from the previously mentioned blood registry (#9), do

---

[174]In light of defendant's obligation to provide the re-evaluation data, and their current inability to report on this indicator through the use of registry data, it appears that the registry-based methodology – held to be sufficient for part of Joint Notice Measure #5 – does not currently provide defendants with sufficient data to be in full compliance with the reporting requirements for all sub-parts of the indicator.

not violate paragraph 295, because defendants have demonstrated the data for each indicator to be the best available.  The Joint Notice itself authorizes TDH, not the plaintiffs, to "establish the methodology" for these measures.  *See* Joint Notice at 3.  Plaintiffs have proffered no evidence that defendants' reported data is not the "best available."[175]

Finally, plaintiffs correctly assert that defendants have failed to provide the best available data for Joint Notice Measures 10 and 11.  No data has been provided regarding Measure 10, which deals with the mental health of class members.  Regarding Measure 11, which deals with asthma, the language of the Joint Notice clearly requires the reporting of the rate of hospitalization or the number of hospitalizations by year, not, as defendants maintain, the average length of stay for a patient hospitalized.  It is found that the "best available" data has not been provided for either of these Joint Notice Measures.

### Unilateral Substitution of Measures

The parties agree that three of the originally agreed-upon outcome measures cannot reasonably be studied by defendants.  After discovering this, defendants apparently unilaterally substituted those measures with three new measures, without securing the plaintiffs' agreement as required by paragraphs 289 and 293.  The substitutions, plaintiffs argue, caused defendants' outcome measurements to be unduly focused on the health of infant/toddler and pregnant teenage class members.  They note that there is only one indicator that gauges the health of teenagers who are not pregnant.  Hence, argue plaintiffs, defendants' indicators are not "diverse enough to measure the health of the entire EPSDT population, not merely factions of the population."  ¶ 289.

---

[175]Such evidence might, for example, have taken the form of an illustration of how a broader class member base might have been studied.

The court need not evaluate the "diversity"of the various outcome measures selected by the parties, for the decree mandates that the parties select such indicators "together." ¶ 289. Thus, both parties must "agree" to "change, add, or delete indicators." ¶ 293. It is therefore held that defendants may not fulfill their obligations under the outcome measurements portions of the decree through the study of variables that were not agreed upon by both parties to this action.

### *Corrective Action Plans*

Having received defendants' 1999 target goals and corrective action plans, plaintiffs have formulated their commentary and suggestions pursuant to paragraph 296. P.Ex. OM-19, OM-21. Plaintiffs' primary complaint with many of defendants' proposed plans is that they "do not aim high enough." Plaintiffs' Prehearing Motion to Enforce the Consent Decree. However, the decree gives the court no authority to evaluate the substance of defendants' target goals and corrective action plans. Plaintiffs are correct in noting that under paragraph 294, "target goals" are to be set together by the parties, and may not be set unilaterally by defendants. Moreover, under paragraph 296, defendants may not "unreasonably reject" plaintiffs' suggestions in response to defendants' proposed plans. However, no evidence that defendants have unreasonably rejected plaintiffs' suggestions was presented to the court. Both parties should recognize that the court will not intervene in the ongoing negotiations between the parties. That these processes were built into the mechanisms of the decree reflects the reality that the parties themselves are in the best position to reach an agreement regarding issues of methodology, and to set and revise target goals.

*Timing*

Defendants failed to provide their 1999 corrective action plan in January, as required by paragraph 296. More importantly, defendants have provided only one corrective action plan, although the decree mandates that they were to have been provided annually from 1996 through 1999. Defendants have also fallen significantly behind on their annual reports of the outcome data, also required annually, upon which these corrective action plans are to be based. Defendants' tardiness in preparing their first corrective action plan means that defendants cannot possibly consider plaintiffs' comments and then revise their plan in time to implement it in 1999, as envisioned by the annual corrective action plan process.

As noted above, reports for some agreed-upon indicators have not been completed, while reports for others are late or incomplete.[176]   Therefore, defendants will be held in violation of paragraph 295 for their untimely furnishing of outcome data to plaintiffs, and in violation of paragraph 296 for their failure to complete annual corrective action plans based on the incomplete data that they possessed.  However, it is also noted that defendants have voluntarily taken steps to institutionalize outcomes measurement in the Texas Health Steps Program, and have offered to extend reporting outcome measures beyond the time frames stated in the decree.  TR 506, lines

---

[176] Defendants maintain that these delays were exacerbated by plaintiffs' having limited communication between their epidemiological expert and defendants.  D.Ex. D-71; *see also* TR 506, lines 12-7.  Plaintiffs respond that epidemiologists normally prefer to review written proposals for research studies to evaluate them fully, and that defendants have failed to provide any written proposals for their expert to review despite repeated requests. The court is in agreement with the plaintiffs that it is unreasonable for defendants to demand that plaintiffs commit the time of their expert, Paul Newacheck, without first providing requested written materials.

21-24; D.Ex. 71. These ongoing efforts to accommodate the needs of the plaintiff class will be reflected in the order of enforcement issued pursuant to this memorandum opinion.

## VIII. Issue Eight: Training for Healthcare Providers

### A. Findings of Fact

"To adequately serve recipients, providers must understand how EPSDT works. They must also understand EPSDT recipients' needs." ¶ 104.[177] The decree targets for improvement defendants' "educational programs for professionals, so that healthcare providers [can] understand how Medicaid and EPSDT work." Fairness Order at 31.

The evidence demonstrates that many healthcare providers who serve class members do not understand their cultural and economic situations, and that without this understanding, they cannot properly assist class members.[178] Defendants' expert Mr. Millwee agreed that training

_____

[177]The importance of provider training is discussed in more detail under Section IV(E), which deals with the training of providers within the managed care system.

[178]For example, one witness testified that

[A]s a result of a lack of understanding on the part of the staff and the provider, [there] are very judgmental attitudes about unkept appointments, about not following through on recommendations for brushing or caring for the children. . . . [T]hose sorts of attitudes . . . by the providers act as a barrier to these families because they don't want to be treated that way. They don't want to have their children treated that way. [I]f we could improve the understanding on the part of the providers about the patient population, we could improve the atmosphere in the offices, . . . and make it a more welcome environment and make families more willing to be there to receive care.

TR 297, line 22 to 299, line 8. (Testimony of Dr. Seale). Another witness often hears from physicians and clinics the myth

that Medicaid patients don't care enough to keep their appointments or just blew it

138

about cultural sensitivity is one of the most important components of training for professionals

who work with class members.  TR 937,  line 24 to 938, line 6.  See also P.Ex. —23.  Class

members' parents also testified at length about specific instances in which healthcare providers

had treated them harshly.  In addition, defendants have received complaints about healthcare

providers' improper treatment of class members.  P.Ex. CH-24, CH-2.

The evidence also reveals that it is extremely important for healthcare providers to be

trained to work with class members and to understand how the Medicaid program functions:

> It's very important because they may be the primary contact that the family has. . .
> . [providers and staff] need to know about Medicaid, about the other services that
> Medicaid offers.  Oftentimes from our experience all the physician's office [knows]
> is, is Medicaid going to cover the visit? It would be most helpful if there was staff
> in the office . . . who could advise the family.

TR 43, line 14 to 44, line 2 (Testimony of Ms. McHan).  Class members do not receive services

when providers do not know that they exist, and have difficulty getting to a specialist when

referring physicians do not know that transportation assistance is an option.[179]  TR 45, lines 19-

22.

---

> off. . . . [I]f they had a better understanding of what it's like for families to live
> under those circumstances and what sort of barriers there are that might prevent
> them from coming, number one, their attitude would be different and, number two,
> they would probably have more kept appointments in their office.

TR 44, lines 12-21 (Testimony of Ms. McHan).

[179]Plaintiffs provided other examples of providers' misunderstanding of the scope of Texas
Health Steps Coverage.  One such example arose in Region 1, in the Panhandle.  A pediatric
dentist required a father to pay an emergency fee before treating a class member.  P.Ex. M-20; *see
also* P.Ex. A-8 at 8.  The six-year-old class member had to travel from Amarillo to Lubbock for
corrective treatment because the local dentist did not understand that Medicaid would by law
reimburse him in full.

## B. Findings of Fact Regarding Violations of Decree

The decree orders, in clear and mandatory language, the creation of various types of training by defendants. Nonetheless, defendants have yet to complete even their Requests for Proposals ("RFPs") that would enable them to contract with training groups for training at professional schools, ¶ 107,[180] EPSDT training associated with other "high caliber" training, ¶ 108,[181] training about mental health services, ¶¶ 112-14,[182] training about new issues, ¶ 117,[183] training about cultural sensitivities and the realities of EPSDT recipients' lives, ¶¶ 118-20,[184] and

---

[180]Paragraph 107 provides that "[d]efendants will provide information and facilitate ongoing training about Medicaid and EPSDT at all relevant professional schools in Texas. 'Relevant professional schools' include all schools that train healthcare providers who could serve EPSDT recipients. . . ."

[181]Paragraph 108 provides that "[d]efendants will make staff available to participate in ongoing training in conjunction with appropriate professional training. 'Appropriate professional training' means training about issues that are relevant to the provision of services to EPSDT recipients, such as how to conduct a medical checkup for a teenager. . ."

[182]Paragraph 112 provides that "[d]efendants will facilitate training for professional about the importance of and how to conduct mental health assessments for indigent children and youth. . . ."

[183]Paragraph 117 provides that "[a]s time goes by, new clinical issues will arise that are important to the provision of care to EPSDT recipients. Defendants will facilitate training in those areas."

[184]Paragraph 120 provides that "[d]efendants will develop training modules designed to be included in other training programs about the realities of EPSDT recipients' lives to attempt to improve providers' attitudes toward recipients. These training materials will be provided to professional schools."

ongoing training for pharmacists. ¶¶ 124-130.[185] In other words, defendants are still in the

beginning stages of projects that should have been fully implemented long ago.

Perhaps anticipating this court's finding, defendants developed an RFP for healthcare

provider training in December of 1999, and are awaiting plaintiffs' responses. D.Ex. D-105. The

Director of Texas Health Steps testified that this RFP would be published in the Texas Register

within two months of the hearing, and that a contract would likely be awarded within six months.

TR 923, lines 22-25.[186] While defendants' recent efforts to procure provider training services are

applauded by the court, they do not change this court's finding that because the training has not

been adequately provided, defendants are in violation of the training provisions of the decree.[187]

Therefore, it is found that defendants are in clear violation of the above-cited training provisions

of the decree.

---

[185]Paragraph 129 states that "[b]y January 31, 1996, Defendants will implement an initiative to effectively inform pharmacists about EPSDT, and in particular about EPSDT's coverage of items found in pharmacies. . . ." Paragraph 130 mandates that "[b]y July 31, 1996, Defendants will conduct a professional an valid evaluation of pharmacists' knowledge of EPSDT coverage of items commonly found in pharmacies. They will report the results of the evaluation to Plaintiffs by September 1, 1996. . . ."

[186]Mr. Milwee also testified that some of the provisions in the RFP go beyond the requirements of the decree, including a video program that will be used to recruit and educate providers. TR 923, lines 15-18. Defendants' continuing efforts, in some areas, to go above and beyond the requirements of the decree have not gone unnoticed by the court. It is sincerely hoped that these extra efforts will benefit the children whom Texas Health Steps was designed to serve.

[187]It became apparent at the hearing that defendants have, in fact, provided some degree of training to nurses. TR 183, lines 11-15.

141

# PART TWO:

# DEFENDANTS' OBJECTIONS TO ENFORCEMENT OF DECREE

As is described in Part One, defendants opposed virtually all of plaintiffs' proposed findings of fact. Defendants also argued, in the alternative, that certain provisions of the decree are unenforceable against them, even were the court to find violations of those provisions. Defendants challenge this court's authority to enforce the decree on two bases. First, they argue that some of the rights on which decree paragraphs are based are not enforceable through 42 U.S.C. § 1983.[188] Second, they argue that this court may not enforce certain provisions of the decree consistent with the protection afforded state defendants by the Eleventh Amendment. Each objection will be considered in turn.

## Issue I: Enforcement of the Medicaid Statute

### A. Law of the Case

Before addressing the merits of defendants' first argument, the court pauses to note that this is not the first time that the court has addressed the issue of the enforcement of EPSDT provisions via § 1983 during the course of this litigation. In an order issued by this court on August 10, 1994, defendants' motion to dismiss was denied except as to the state agency defendants. In that order, defendants' arguments that the EPSDT provisions found at 42 U.S.C. §§ 1396a(a)(43) and 1396d(r) could not be enforced by plaintiffs in a § 1983 action were

---

[188]42 U.S.C. § 1983 provides that "[E]very person who, under color of any statute, ordinance, regulation, custom or usage of any state . . . subjects, or causes to be subjected, citizens . . . to the depreivation of any rights, privileges or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law. . . ."

explicitly rejected. Specifically, in that order, this court held those provisions to be clearly and unambiguously enforceable through § 1983 under the Supreme Court's framework first set out in *Wright v. City of Roanoke Redev. & Hous. Auth.*, 479 U.S. 418 (1987), and further developed in *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990), and *Suter v. Artist M.*, 503 U.S. 347 (1992).

Under the "law of the case" doctrine, a court should not reopen issues decided in earlier stages of same litigation. *See, e.g., Agostini v. Felton*, 521 U.S. 203, 236 (1997). However, because defendants re-urge their argument based on Supreme Court case law decided since 1994, the merits of defendant's objection will be considered in brief. The discussion which follows disposes of defendant's more recent challenge while fortifying the court's prior holding that the above-cited provisions may be enforced by plaintiffs via § 1983.

## B. Supreme Court Jurisprudence on Enforceable Rights

The Supreme Court has held that § 1983 safeguards certain rights conferred by federal statutes. *Maine v. Thiboutot*, 448 U.S. 1 (1980). However, in order to seek redress through § 1983, a plaintiff must assert the violation of a federal right, and not merely a violation of federal law. *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 106 (1989). Recently, the Supreme Court reiterated the test to determine when federal statutes confer rights that are actionable through 42 U.S.C. § 1983. *Blessing v Freestone*, 520 U.S. 329 (1997). Under that test, three distinct factors must be examined by a court when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. *Wright*, 479 U.S. at 430. Second, the right must not be so "vague and amorphous" that its enforcement would strain judicial competence. *Id.* at 431-32.

143

Third, the statute must unambiguously impose a binding obligation on the States. *Wilder v.*

*Virginia Hosp. Ass'n*, 496 U.S. 498, 510-11 (1990).[189]

Once a plaintiff demonstrates that a federal statute creates an individual right, there is a

rebuttable presumption that the right is enforceable. However, the right will be unenforceable if

Congress "specifically foreclosed a remedy under § 1983." *Smith v. Robinson*, 468 U.S. 992,

1005, n. 9 (1984). Congress may do so expressly, by forbidding recourse to § 1983 in the statute

itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with

individual enforcement under § 1983. *Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994).[190]

---

[189]The Supreme Court's decision in *Suter v. Artist M.*, 503 U.S. 347 (1992), which
followed *Wilder* but preceded *Blessing*, has produced much confusion and debate. The Fifth
Circuit has refrained from deciding the impact of *Suter* on *Wilder*. *Resident Council of Allen
Parkway Village v. United States Dep't of Hous. & Urban Dev.*, 980 F.2d 1043, 1051 (5th Cir.
1993). In *Travelers Health Network v. Orleans Parish Sch. Bd.*, 842 F.Supp. 236, 240
(E.D.La.1994), the court followed the Seventh Circuit's approach in *Procopio v. Johnson*, 994
F.2d 325, 331, n. 9 (7th Cir.1993), by "proceeding with the two-step *Wilder* analysis and bearing
in mind the additional considerations mandated by *Suter*." 842 F.Supp. at 240. *See also Arkansas
Medical Society, Inc. v. Reynolds*, 6 F.3d 519, 525 (8th Cir.1993) ("synthesizing" *Wilder* and
*Suter* ). This court will take the same course.

[190] As was noted in this court's 1994 order, the Supreme Court analyzed a provision of the
Medicaid Act, the same statute at issue in the instant action, in *Wilder v. Virginia Hosp. Ass'n*,
496 U.S. 498 (1990). In *Wilder*, healthcare providers claimed that they had been deprived of
their right, under 42 U.S.C. § 1396a(a)(13)(A), to Medicaid payment both "reasonable and
adequate to meet the costs incurred by efficiently and economically operated facilities." The
Court held the relevant provision of the Medicaid Act enforceable under § 1983 because: a) the
plaintiff healthcare providers were the intended beneficiaries of the provision at issue; b) the
provision imposed a binding obligation on participating states to adopt reasonable and adequate
rates; c) the statute set out factors which a state must consider in adopting its rates; and d) the
administrative scheme at issue was not sufficiently comprehensive to demonstrate a congressional
intent to preclude § 1983 relief.

## C. The EPSDT Provisions of the Medicaid Act

The starting point for determining whether a statute creates an enforceable private right of action is the statute itself. The Medicaid program is a cooperative program between the federal and state governments, providing medical services to qualified recipients. State participation in the Medicaid program is voluntary. If a state chooses to participate, however, it must comply with the requirements outlined in the Medicaid subchapter of the Social Security Act. *Wilder*, 496 U.S. at 502; 42 U.S.C. § 1396a. A participating state must submit a plan for providing medical services to qualified recipients, which is approved and partially subsidized by the federal government. *See* 42 U.S.C. § 1396. The requirements that the state plan for medical assistance must satisfy are provided in § 1396a(a). In this case, plaintiffs seek to enforce provisions in a decree based on rights set forth in the Early Periodic Screening, Diagnosis and Treatment sections of the federal Medicaid Act; specifically, the provisions that mandate that a state's Medicaid plan must provide for:

- "informing all persons in the State who are under the age of 21 . . . [and qualify for Medicaid] of the availability of early and periodic screening, diagnosis, and treatment services as described in [§ 1396d(r)(5)] and the need for age-appropriate immunizations against vaccine-preventable diseases" 42 U.S.C. § 1396a(a)(43)(A).
- "providing or arranging for the provision of such screening services in all cases where they are requested" 42 U.S.C. § 1396a(a)(43)(B).
- "arranging for (directly or through referral to appropriate agencies, organizations or individuals) corrective treatment the need for which is disclosed by such child health screening services" 42 U.S.C. § 1396a(a)(43)(C).

Plaintiffs also seek to enforce their rights to the following:

- medical check ups according to a properly prescribed schedule and at other intervals when needed, "which shall at a minimum include -
  (i) a comprehensive health and developmental history (including assessment of both physical and mental health development),
  (ii) a comprehensive unclothed physical exam,
  (iii) appropriate immunizations according to age and health history,
  (iv) laboratory tests (including lead blood level assessment appropriate for age and risk factors), and

(v) health education (including anticipatory guidance)" 42 U.S.C. § 1396d(r)(1).

- dental services including check ups according to a properly prescribed schedule and treatment, "which shall at a minimum include relief of pain and infections, restoration of teeth, and maintenance of dental health" 42 U.S.C. § 1396d(r)(3).

- the full range of healthcare services allowed by the federal Medicaid statute, 42 U.S.C. § 1396d(r)(5), including but not limited to case management.  42 U.S.C. §§ 1396(a)(19); 1396n(g)(2).

The *Wilder/Blessing* framework may be easily applied to these provisions.  First, the statutory sections are clearly intended to benefit plaintiffs and the class.  "EPSDT . . . is . . . the nation's largest preventive health program *for children*."  H. R. 3299, 101st Cong. § 4213 (1989) (emphasis added).  Congress also noted that as more children qualified for Medicaid because of federal expansions in the Medicaid program, "the EPSDT benefit will become even more important to the *health status of children* in this country." *Id.* (emphasis added).  Additionally, the plain language of the statute demonstrates that Congress was attempting to increase preventive healthcare services for minor Medicaid recipients.  *See* 42 U.S.C. § 1396a(43).

The second prong of the *Wilder/Blessing* test asks whether the language of the statute is mandatory rather than precatory.  *Wilder*, 496 U.S. at 512.  In this case, the language is clearly mandatory: a state plan *must* provide for informing all eligible minors of the availability of the EPSDT services, provide for the providing or arranging of the services, and provide for the arranging for corrective treatment.[191]  More concisely, state plans "must . . . provide for"

---

[191]*Suter v. Artist M.*, 503 U.S. 347 (1992), contains language which might be interpreted to foreclose the enforceability of any statutory provision in a section of a law specifying the content of a state plan.  On October 20, 1994, Congress attempted to resolve the confusion about the impact of *Suter* by amending the Social Security Act, which includes the Medicaid provisions at issue in this case.  42 U.S.C. § 1320a-2.  The amendment provides that in an action brought to enforce a provision of the Social Security Act, such provision is not to be deemed unenforceable merely because of its inclusion in a section of the Act requiring a state plan or specifying the required contents of a State plan.  Most courts have interpreted the amendment to restore the *Wilder* test pre-*Suter*. *See Visiting Nurse Assoc. of North Shore, Inc. v. Bullen*, 93 F.3d 997, 1003, n. 5 (1st Cir.1996), ( "Congress intended that [the amendment] serve to resurrect the

informing all class members, 42 U.S.C. § 1396a(a)(43)(A); providing or arranging of medical and

dental check ups with appropriate elements for all class members, 42 U.S.C. §§ 1396a(a)(43)(B),

1396d(r)(1)(medical check ups), 1396d(r)(3)(dental check ups); and arranging all required

treatment allowed by the federal Medicaid Act,  42 U.S.C. §§ 1396a(a)(43)(C), 1396d(r)(5),

including case management.  42 U.S.C. §§ 1396(a)(19), 1396n(g)(2).

Third, the statute is clear and concrete enough for judicial interpretation and enforcement.

The EPSDT provisions are not, as defendants argue, vague or amorphous.  Defendants base their

argument on *Blessing*, in which plaintiffs sought to enforce a federal child support enforcement

statute.  520 U.S. at 333-35.  The Court held that relief under § 1983 was not available, first,

because plaintiffs had failed to articulate precisely which rights they sought to enforce: their

efforts to enforce the entire child support scheme painted with "too broad a brush." *Id.* at 342.

Unlike the plaintiffs in *Blessing*, plaintiffs in this case have isolated provisions within the Medicaid

Act which are quite clear and concrete.  Second, the Court in *Blessing* was reluctant to enforce a

statute which required the Secretary of Health and Human Services to "look to the aggregate

---

*Wilder* test, with no *Suter* overlay"); *Stanberry v. Sherman*, 75 F.3d 581, 583-584 (10th
Cir.1996) ("Basically, the Congress disavowed *Suter's* approach. . . .  It also reaffirmed the
approach taken in the Supreme Court decisions prior to *Suter*.").
　　More broadly, the amendment overrules the general theory in *Suter* that the only private
right of action available under a statute requiring a state plan is an action against the state for not
having that plan.  Instead, the *Wilder* test must be applied to the question of whether or not the
particulars of a state plan can be enforced by its intended beneficiaries.  *See, e.g., Doe v. Chiles*,
136 F.3d 709, (11th Cir. 1998).  In *Doe*, the Eleventh Circuit held that 42 U.S.C. § 1396a(a)(8),
which states that "[a] State plan for medical assistance must . . . provide that all individuals
wishing to make application for medical assistance under the plan shall have the opportunity to do
so, and that such assistance shall be furnished with reasonable promptness to all eligible
individuals," confers a right enforceable under § 1983 to Medicaid eligible participants to be
served with "reasonable promptness." 136 F.3d at 719.

services provided by the state, not to whether the needs of any particular person have been satisfied," holding instead that a federal provision requiring that states be in "substantial compliance" with the federal child support law only tangentially benefitted the plaintiffs. 520 U.S. at 343. This case, therefore, may be distinguished from *Blessing* in this key respect. Plaintiffs do not seek to enforce a "yardstick" or provision requiring "substantial compliance." They seek to enforce decree provisions based on rights Congress has guaranteed to each and every Medicaid recipient under the age of 21. 42 U.S.C. § 1396a(a)(43).

As defendants stress, the *Blessing* Court held that a sufficient staffing requirement could not be enforced via § 1983 because it gave no guidance as to what level of staffing would be sufficient. 502 U.S. at 345. However, contrary to defendants' characterization of the EPSDT provisions as "standardless promulgation," the provisions in fact go into great detail regarding the timing of specific services that must be provided. *See* 42 U.S.C. § 1396d(r). The EPSDT portions of the Medicaid Act are, therefore, clearly more specific than those at issue in *Blessing*, and certainly more definite than the "reasonable access" provision of the Medicaid Act held enforceable in *Wilder*.

Moreover, as described below, many courts have already found the statutory provisions at issue in this case to be enforceable via § 1983. In *Bond v. Stanton*, 655 F.2d 766, 767-79 (1981)("*Bond II*"),[192] the State of Indiana did not effectively implement its EPSDT program, failing in particular with regard to its informing and screening components.[193] Section 1983 was

---

[192] *See Stanton v. Bond*, 504 F.2d 1246 (7th Cir. 1974), *cert. denied*, 420 U.S. 984 (1975) (*"Bond I"*) (subsequent history omitted) for a prior decision in *Bond*.

[193] *Bond* addressed the predecessor to the current EPSDT statute. These requirements are currently codified in 42 U.S.C. §§ 1396a(a)(43)(A)(informing); 1396a(a)(43)(B)(checkups);

148

available to enjoin this violation of indigent children's federal rights. *Bond II*, 655 F.2d at 768; *Bond I*, 504 F.2d at 1247, 1251.  In fact, the court in *Bond I* emphasized the mandatory nature of the EPSDT provisions at issue: "The mandatory obligation upon each participating state to aggressively notify, seek out and screen persons under 21 in order to detect health problems . . . is made unambiguously clear" by the EPSDT statute. *Bond I*, 504 F.2d at 1250; *see also Salazar v. District of Columbia*, 954 F.Supp. 278, 303, 311-12 (D.D.C. 1996); *Wellington v. District of Columbia*, 851 F.Supp. 1, 6 (D.D.C. 1994);[194] *Chappell v. Bradley*, 834 F.Supp. 1030, 1035 (N.D. Ill. 1993).

Similarly, the Fifth Circuit in *Mitchell v. Johnston*, 701 F.2d 337, 341-42 (5th Cir. 1983) allowed a § 1983 challenge to the state's reductions in EPSDT preventive and treatment dental services.  Plaintiffs complained because Texas cut several dental services from its Medicaid program for children.  But, since Congress clearly intended to "require participating states to provide eligible children with a comprehensive *preventive* dental program," 701 F.2d at 348 (original emphasis), Texas children who qualified for Medicaid benefits could enforce the EPSDT dental provisions of the federal Medicaid Act through § 1983. *Id.* at 344, 346-51; *see also Chappell*, 834 F.Supp. at 1033-5.

Finally, numerous courts have held that the states' duty to provide a broad scope of treatment services available to EPSDT eligible participants is also an enforceable obligation.  That

---

1396d(r)(1)(A) (medical checkups); 1396d(r)(3)(dental checkups). *Bond* relied on federal regulations and guidelines.  In many regards, the language of the current statute either follows or parallels the language of the regulations in effect when *Bond* was decided. *See* 45 CFR §§ 205.146 and 205.146(c), *quoted in Bond II*, 655 F.2d at 770; 45 CFR § 249.10(a), *quoted in Bond II*, 655 F.2d at 771; *see also Bond I*, 544 F.2d at 1250.

[194] *Salazar* and *Wellington* are different phases of the same case.

is, defendants must provide to class members any healthcare service that is permissible under the federal Medicaid Act, as long as the service is "necessary . . . to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services. . . ." 42 U.S.C. § 1396d(r)(5). For example, *Pittman by Pope v. Secretary, Florida Department of Health and Rehabilitative Services*, 998 F.2d 887, 889, 891-92 (11th Cir. 1993), holds that 42 U.S.C. § 1396d(r)(5) grants enforceable rights to Medicaid recipients under the age of 21 to the full, broad range of healthcare treatment prescribed by the statute. *See also Miller by Miller v. Whitburn*, 10 F.3d 1315 (7th Cir. 1993)(liver-bowel transplant); *Pereira v. Kozlowski*, 996 F.2d 723, 724-6 (4th Cir. 1993)(heart transplant included in state's "obligation to provide to children under the age of twenty-one all necessary services"); *Hunter v. Chiles*, 944 F.Supp. 914 (S.D. Fla. 1996)(augmentative communicative devices and services); *Montoya v. Johnston*, 654 F.Supp. 511 (W.D.Tex. 1987)(Texas Medicaid program's coverage of liver transplants for children and youth).[195]

  To conclude, the above-cited EPSDT sections of Medicaid Act create specific rights – to information, to various detailed screening services, and to follow-up or corrective treatment – which may be enforced by plaintiffs under § 1983. This conclusion was reached in this court's 1994 order but is reiterated today in light of the citation of more recent Supreme Court precedent

---

  [195] This is not a complete list of the many cases that require state Medicaid programs to cover the full range of services required by 42 USC § 1396d(r)(5). In this case, the consent decree requires defendants to provide needed case management to class members. As with organ transplants, case management is a service that is permitted by the federal Medicaid Act. 42 U.S.C. §§ 1396(a)(19); 1396n(g)(2). As a result, Defendants must provide it to class members when needed. As the above-cited cases demonstrate, plaintiffs may enforce their rights to this service and others via § 1983.

and defendants' renewed objections.[196]  These federal enforceable rights form the bases for the

decree provisions which plaintiffs now seek to enforce.

## Issue II: Eleventh Amendment Objections

### A. Defendants' Objection

Defendants present a second challenge to the enforcement of various provisions of the

decree based on this court's subject matter jurisdiction.  In *Local Number 93, International*

*Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 519 (1986) (hereinafter *Firefighters*),

the Supreme Court stated that a consent decree possesses a dual character or "hybrid nature" that

reflects attributes of both a contract and a judicial decree.  Consent decrees parallel contracts

since "their terms are arrived at through mutual agreement of the parties." *Id.* at 519.  The

judicial aspect of a consent decree derives from the imprimatur of the court, which invests the

decree with the integrity of the judiciary and signifies the court's willingness to implement the

solution of the parties.

It is a fundamental concept of federal jurisprudence that the Eleventh Amendment to the

U.S. Constitution is an explicit jurisdictional limitation on the judicial power of the federal courts.

The Supreme Court has interpreted the Eleventh Amendment so as to provide immunity to a state

against suits in federal court by a citizen of that state.  *Pennhurst State Sch. and Hosp. v.*

*Halderman*, 465 U.S. 89 (1984).  Defendants therefore argue that the Eleventh Amendment

prohibits the enforcement against the State of Texas by this federal court of any decree provision

---

[196]Because defendants do not re-urge their argument concerning the foreclosure by
Congress of the use of § 1983 in the pursuit by plaintiffs of their rights under the EPSDT statute,
that issue will not be revisited.

which goes above and beyond what federal EPSDT law requires. This court's holding otherwise, defendants argue, would result in an impermissible infringement on the rights of the State of Texas.[197] *Saahir v. Estelle*, 47 F.3d 758 (5th Cir. 1995) (per curiam); *Lelsz v. Kavanagh*, 807 F.2d 1243, 1252 (5th Cir. 1987), *cert. dismissed*, 483 U.S. 1057 (1987) (the only legitimate basis for federal court intervention consistent with the Eleventh Amendment is the vindication of federal rights).[198]

Notably, defendants do not argue that the decree was invalid as an agreement between the parties or improperly approved by this court. To the contrary, they note, correctly, that to sustain

---

[197]In this case, plaintiffs have availed themselves of the "Ex parte Young" exception. In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court created an exception to states' Eleventh Amendment Immunity in holding that acts performed by state officials in violation of federal law could not have been authorized by the state, and that, therefore, suits seeking to enjoin such acts are not suits against the state. Consequently, federal courts have authority to enjoin prospectively violations of federal law and require state officials to conform their conduct to federal law. *Edelman v. Jordan*, 415 U.S. 651 (1974). As the Supreme Court reiterated last year, because of *Ex Parte Young*, the Eleventh Amendment "does not bar certain actions against state officers for injunctive or declaratory relief." *Alden v. Maine*, 527 U.S. 706 (1999). In this case, plaintiffs seek injunctive relief against several state officials, including the Commissioner of Health and Human Services, the Commissioner of Health and the Texas State Medicaid director, all sued in their official capacities. Therefore, the case falls squarely within the *Ex Parte Young* exception to the Eleventh Amendment.

[198]In their Post-Trial Brief, defendants raised the additional argument that *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), *City of Boerne v. Flores*, 521 U.S. 507 (1997), and *Kimel v. Florida Bd. of Regents*, 120 S.Ct. 631 (2000), limit this court's ability to enforce the decree in this matter. However, these cases address the authority of Congress to pass laws conferring rights upon citizens, and are therefore not relevant to this case. It is well-established that Congress may impose requirements for state Medicaid programs because each state may choose whether to accept federal funds to implement the program. *See, e.g., California v. United States*, 104 F.3d 1086, 1092 (9th Cir. 1997); *Mitchell v. Johnston*, 701 F.2d 337, 340-41 (5th Cir. 1983). Once a state chooses to accept federal Medicaid funds, it must meet all federal requirements that apply. "[S]ince Texas voluntarily and knowingly entered into the cooperative [Medicaid] program, fully aware of its requirements, it must bear the responsibilities and requirements of its participation." *Mitchell*, 701 F.2d at 351.

federal court jurisdiction to approve a consent decree against state officials, the remedies in the

decree must only serve to: 1) resolve a dispute within the court's subject matter jurisdiction, 2)

come within the general scope of the case made by the pleadings, and 3) further the objectives of

the law upon which the complaint was based. *Firefighters* at 525. Notably, a Fifth Circuit panel

in *Lelsz* held that although, under *Firefighters*, a federal court may enter a consent decree

providing broader relief than the court could have awarded after a trial, the same court "must fall

back on its inherent jurisdiction when it issues its own, different order enforcing. . . the decree."

*Lelsz*, 807 F.2d at 1252. Thus, defendants rely heavily on the Fifth Circuit's distinction in *Lelsz*

between that which a federal court may *approve* in a consent decree and that which the same

court may later *enforce*.

Defendants readily admit that some portions of the decree are directly related to the

federal statutory scheme for the EPSDT program and to the rights created by Congress, and are

therefore enforceable by this court. However, they argue that, in many instances, the decree

creates binding obligations that are ungrounded in a federally protected right. For example, while

defendants do not deny that class members have the right to certain health services, they argue

that plaintiffs have not shown the relationship between outcome measure studies and the services

to which plaintiffs are entitled. Defendants' Post-Hearing Brief at 5. Defendants argue that the

court cannot enforce those provisions of the decree unrelated to a federally protected right

because the entry of a consent decree does not expand the court's inherent jurisdiction, which is

cabined by the Eleventh Amendment with respect to state defendants. *Lelsz*, 807 F.2d at 1252.

Plaintiffs respond that each provision of the decree that they seek to enforce meets the

requirements in the Fifth Circuit for enforcement consistent with the Eleventh Amendment; each

such provision, they argue, vindicates actionable federal rights.

## B. *Lelsz v. Kavanagh*

### *Overview*

Since defendants' reading of *Lelsz* threatens to nullify entire sections of the decree to

which they consented, a closer look at this cardinal case is warranted. *Lelsz* began when a class

of mentally retarded patients residing in state institutions filed an action against officials of the

Texas Department of Mental Health and Mental Retardation seeking treatment and rehabilitation

in the "least restrictive" setting. The litigation resulted in a consent decree agreed to by the

parties and approved by the district court. The district court then issued an order enforcing the

consent decree requiring the state to furlough class members from institutional to "community

care" centers. On appeal, a Fifth Circuit panel held that the Eleventh Amendment rendered the

district court without jurisdiction to enforce the consent decree because the only source of the

right to community-based treatment existed in state law, basing its holding on *Pennhurst State

School v. Halderman*, 465 U.S. 89 (1984) ("*Pennhurst II*"). *Lelsz*, 807 F.2d at 1252-53.

### *The Holding: A Closer Look*

The *Lelsz* panel summarized its holding as follows: "Whether the district court's [order

of enforcement] springs from legitimate enforcement of the [consent decree] or as a court-created

remedy for its violation is ultimately of no moment if the relief ordered, in effect, requires state

officials to comply with state law." *Lelsz*, 807 F.2d at 1247. This statement of the holding makes

apparent that the proposition defendants derive from *Lelsz* – that a court may not enforce decree

provisions if those provisions fall outside of the court's "inherent jurisdiction" – must be viewed

in conjunction with the federalism which permeates *Pennhurst II*.  Defendants rely on one sentence in the *Lelsz* decision that draws an apparent distinction between the authority of a court to approve a consent decree and its authority to enforce it.  By isolating this single sentence, defendants obscure the context of the decision, which targets the enforcement of *state* laws against *state* actors in *federal* courts:

> Appellees would draw support from [*Firefighters*] for the proposition that "a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial."  This argument founders on several grounds. First, appellees interpret [*Firefighters*] far too broadly. For one thing, that case emphasizes that "a consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction."  If the court has no jurisdiction, as a result of the application of the Eleventh Amendment through *Pennhurst II*, [*Firefighters*] does not apply.  Additionally, [*Firefighters*] addressed the entry of a consent decree and held that the parties' agreement could result in a decree whose terms would exceed the court's remedial authority under a governing statute.  It does not enlarge the court's latitude to issue its own, different order enforcing or modifying the decree, for in that case we presume the court must fall back on its inherent jurisdiction. The Court in [*Firefighters*] cited *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) with approval of the proposition that in modifying a consent decree, the court may not act inconsistently with the underlying statute.

*Lelsz*, 807 F.2d at 1252 (citations omitted).  The sentence in the above passage on which defendants rely, in which the panel holds that *Firefighters* does not "enlarge the court's latitude to issue its own, different order enforcing or modifying the decree," is sandwiched between two important keys to its interpretation.  First, the *Lelsz* panel began its task of distinguishing *Firefighters* by noting that if a federal court lacks subject matter jurisdiction because of *Pennhurst II*, the *Firefighters* standard for the entry of decrees does not apply.  From this beginning statement, it is apparent that the *Lelsz* panel was primarily concerned with the inability of a federal court to enforce *state* law against *state* defendants.  Next to the panel's strong emphasis on the

155

Eleventh Amendment implications of enforcing provisions built on state law, the panel's

subsequent distinction between the approval of and the enforcement of a decree appears as little

more than an afterthought. The remainder of the decision in *Lelsz,* and its heavy reliance on

*Pennhurst II,* lend further support to the interpretation that the approval/enforcement distinction

is mere dicta – or, at the very least, not at all central to the discussion of the state law issues with

which the panel was confronted.

   The sentence at the close of this passage similarly cabins the meaning of the words on

which defendants rely. The phrase, "in modifying a consent decree, the court may not act

inconsistently with the underlying statute," again suggests that the *Lelsz* panel was primarily

concerned not with the approval/enforcement distinction, but with a district court's ordering a

remedy "inconsistent" with underlying federal law. Like the *Lelsz* panel's emphasis on

*Pennhurst II* and state law, the panel's intent to limit clearly the scope of the power of the district

court is a theme in the opinion which all but eclipses the brief drawing of a distinction between the

approval and enforcement of a consent decree: "If, as appellees argue, a federal court may take

almost any action against a state to enforce a consent decree so long as it is 'consistent with' the

'spirit' of the applicable constitutional law and the decree itself, there is no limitation on the scope

of the court's power. Lack of restraint on an organ of government (even the judiciary) is the

antithesis of law." *Lelsz,* 807 F.2d at 1253. Upon closer examination, however, the *Lelsz* panel's

vision of judicial restraint is nothing more than the rule in *Armour* that a court may not, in an

order enforcing a decree, go further than the "four corners" of the decree; looking to its "spirit" is

impermissible. *Armour,* 402 U.S. at 462. This principle is neither derived from nor furthered by

the panel's distinction between the approval of and the enforcement of a decree. Throughout the

opinion, this theme is intertwined with the court's focus on *Pennhurst II,* without additional

comment on the distinction upon which defendants now base their response.

### The Narrowing of Lelsz

This court is not the first to view *Lelsz* in the shadow and wake of *Pennhurst II.*  The

dissent from the Fifth Circuit's denial of rehearing en banc in *Lelsz* makes clear that the primary

issue in the case was whether *Pennhurst II* "addresses [or] changes prior law on the jurisdiction of

federal courts to order remedies for federal law violations" or "address[es] federal court

jurisdiction to approve an agreed remedy for mixed violations of federal and state law." *Lelsz v.*

*Kavanagh,* 815 F.2d 1034, 1036 (5th Cir. 1987).  Further, in *Ibarra v. Texas Employment*

*Commission,* 823 F.2d 873 (5th Cir. 1987), the Fifth Circuit itself characterized the *Lelsz* panel as

having "applied *Pennhurst* to vacate a portion of a district court order enforcing a consent decree

when the relief provided by that part of the decree was grounded solely in state law." 823 F.2d at

876-77 (citing *Lelsz,* 807 F.2d at 1255).  The *Ibarra* court held:

> Assuming without deciding that *Pennhurst* would extend to a federal court order
> approving a consent decree, we conclude that *Pennhurst* does not apply to the
> present case because the consent decree is not based on state law. . . . The
> concerns about state sovereignty and the lack of any federal interests that were
> critical to *Pennhurst* are not appropriate when, as in this case, the issue is one of
> interpreting federal law.

*Ibarra,* 823 F.2d at 877 (citing *Lelsz,* 815 F.2d at 1036).

Along these same lines, *Ibarra* has since been interpreted by other courts as limiting *Lelsz*

to the enforcement of consent decrees based on state law.  In *Kozlowski v. Coughlin,* 871 F.2d

241 (2nd Cir. 1989), the Second Circuit noted that "the Fifth Circuit has limited [*Lelsz*] to decrees

based solely on state law." 871 F.2d at 244, n. 3 (citing *Lelsz,* 824 F.2d at 373; *Ibarra,* 823 F.2d

at 876-77).  Similarly, in *Duran v. Carruthers,* 678 F.Supp. 839, 850-51 (D.N.M. Feb 11, 1988),

it was held that "any implication that the *Lelsz* holding went beyond an application of *Pennhurst* to a consent decree based solely on state law is eliminated dispositively by *Ibarra*." *See also Wyatt v. Rogers*, 956 F.Supp. 1356, 4132, n. 342 (N.D. Ala. 1997) (rejecting argument based on *Lelsz* that court had limited jurisdiction to enforce consent decree as inapposite in a case not involving a decree based on state law); *United States v. State of Michigan*, 62 F.3d 1418 (6th Cir. 1995).

Despite the pronouncements of these courts, defendants rely on *Saahir v. Estelle*, 47 F.3d 758 (5th Cir. 1995) (per curiam), as evidence of the continuing vitality of *Lelsz* beyond its application to a consent decree based on state law. In *Saahir*, an inmate filed a motion for civil contempt against state prison officials, alleging that the officials had violated a court-approved consent decree by confiscating and not returning his nonreligious tapes. The language of the decree was broad enough to cover all tapes, though Saahir had brought the suit in an effort to vindicate his First Amendment right to practice religion. The Fifth Circuit panel, citing *Lelsz*, held that the enforcement of the provision allowing Saahir to possess nonreligious tapes was not required by any federal or constitutional law, and that the federal court therefore had no jurisdiction to enforce the provision. Said the panel:

> Here, enforcing the provision that allows Saahir the non-religious tapes would not require the federal court to enforce state law against the State, as there is no state law giving prisoners the right to listen to musical tapes. Thus, *Pennhurst's* central concern of having "a federal court instruct [ ] state officials on how to conform their conduct to state law," *Pennhurst*, 465 U.S. at 106, 104 S.Ct. at 911, is not implicated here. Nonetheless, enforcing the provision would not be required by any federal or constitutional law, as we fail to discern any First Amendment protections except as to the religious tapes. Because "the only legitimate basis for federal court intervention, consistent with the Eleventh Amendment is the vindication of federal rights," *Lelsz*, 807 F.2d at 1252, the federal courts have no jurisdiction to enforce the provision as it relates to the non- religious tapes. Although the State of Texas has evidently not legislated on this particular issue,

158

whether a prisoner has a right to listen to musical tapes is an issue that falls in the area of state governance and not that of the federal government. "If a federal court remedy unfounded in federal law intrudes into the governance of matters otherwise presided over by the states, no federal right has been vindicated." *Id.*

*Saahir*, 47 F.3d at 761. Despite defendants' arguments to the contrary, *Saahir* is easily distinguished from the case at hand. First, whether plaintiffs are entitled to specific services under the federal EPSDT statute is not an "issue that falls in the area of state governance and not that of the federal government." Instead, the decree provisions plaintiffs seek to enforce are clearly related to the federal EPSDT program in a way that nonreligious tapes are not linked to the First Amendment right to practice one's religion. Second, in *Saahir*, poor drafting led to the inclusion of a decree provision that, under the court's broad interpretation, bore *no* relation to federal law. There has been no mistaken inclusion of paragraphs unrelated to the health of the plaintiff class and the goals of the federal EPSDT program in this case. Third, the distinction in *Lelsz* between what a court may approve and what may be enforced was not, in the view of this court, central to the *Saahir* court's decision, because the provision at issue would not have passed the *Firefighters* test for approval had it been read at the time of entry to include nonreligious tapes. That is, the court might just have easily held, without reliance on *Lelsz*, that the approval of a provision arguably broad enough to cover non-religious tapes was invalidly entered, for it neither came "within the general scope of the case made by the pleadings" nor "further[ed] the objectives of the law upon which the complaint was based." *Firefighters*, 478 U.S. at 525. These factors suggest that one should read *Saahir* as somewhat of an outlier case (confined to its rather odd set of facts) and caution against viewing the case as an extension or broadening of *Lelsz*. For these reasons, it is held that the restrictive language of *Lelsz*, appropriately narrowed to situations involving the

enforcement of state law provisions by the several above-cited authorities, should not apply here, despite its apparent resurgence in *Saahir*.[199]

### *An Untenable Distinction?*

Finally, it is noted that, while the distinction between a federal court's jurisdiction to approve of terms in a decree and its jurisdiction to enforce those provisions persists in the Fifth Circuit (albeit in rare instances and in narrow form), more than one judicial mind has found the distinction utterly indefensible. For example, the Second Circuit held in *Kozlowski, supra*, that "the *Firefighters* opinion is consistent with the dictates of the Supreme Court's Eleventh Amendment jurisprudence, and the [*Lelsz*] distinction is untenable. If a federal court can validly enter a consent decree, it can surely enforce that decree." 871 F.2d at 244. The Tenth and Seventh Circuits have likewise adopted this standard. *Duran v. Carruthers*, 885 F.2d 1485 (10th Cir. 1989); *Komyatti v. Bayh*, 96 F.3d 955 (7th Cir. 1996). Similarly, the dissenters from the Fifth Circuit's denial of rehearing of *Lelsz* en banc agreed with the Second, Seventh and Tenth Circuits in this regard:

---

[199]Parenthetically, it is noted that even when both *Lelsz* and *Saahir* are given the broadest of interpretations – their holdings not narrowed to their contexts, as in the above analysis – the rule that a court "must fall back on its inherent jurisdiction" in enforcing a consent decree says very little about which of the many decree provisions in the instant case may be enforced. The *Lelsz* and *Saahir* panels were confronted with decree provisions which were found to be wholly unrelated to federal law. Thus, while these cases make clear that the scope of a consent decree does not enlarge the jurisdiction of a federal court, neither case sets out a standard for how related or linked a provision must be to a federal claim over which a court *does* have subject matter jurisdiction. Certainly the "inherent jurisdiction" on which the court must now "fall back," under *Lelsz*, would permit the enforcement of a decree that includes more than the mere recitation of federal law, as "almost any affirmative decree beyond a directive to obey [federal law] necessarily does that." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 389 (1992). For this reason, *Lelsz* and *Saahir* are uninstructive in a case involving a decree which does not implicate state law and which obviously has its roots in federal law.

> There can be no doubt that a federal court, to remedy federal violations, may require state officers to adopt programs that, absent the federal violations, were not guaranteed to the plaintiffs by the Constitution or federal statute. The remedial program need only be tailored to cure the condition that offends federal law. *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *Gates v. Collier*, 501 F.2d 1291 (5th Cir.1974). If the parties do not choose to proceed to trial, the court may, with their agreement, enter a consent decree that provides relief greater than the court might have awarded after trial. *Local Number 93 v. City of Cleveland*, 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). The panel opinion is inconsistent with that clearly established law.

815 F.2d at 1037 (dissent from denial of rehearing en banc by Reavley, Circuit Judge, with whom Clark, Chief Judge, Rubin, Politz, Randall, Johnson, and Williams joined).[200] In addition, it is noted notes that the principles of comity and federalism are furthered when state defendants draft their own documents setting out the means by which they will come into compliance with federal law. To the extent such documents are later held unenforceable by federal courts, the incentives for plaintiffs to enter into such voluntary agreements with defendants are lessened if not wholly removed.

Indeed, the positive policy implications of limiting this distinction are obvious: "Having entered into the consent decree rather than bringing the dispute . . . to trial, [the defendant] cannot now evade an integral portion of that decree on the ground that it was not directly tied to a federal claim." *Kozlowski*, 871 F.2d at 245 (quoting *Kozlowski*, 711 F.Supp. 83, 87 (S.D.N.Y. 1988)). Such an outcome would detract from the integrity of the court by allowing state

---

[200] *See also* Alan Effron, *Federalism and Federal Consent Decrees Against State Governmental Entities*, 88 Colum.L.Rev. 1796, 1812 ("While there is still much uncertainty about the proper relationship of federal consent decrees to state sovereign immunity, it seems clear that the federalism protections of the eleventh amendment, like those of the article III 'case or controversy' requirement, are considerably less embracing here than in the context of ordinary federal equitable relief." (footnotes omitted)).

defendants to avoid bargained-for obligations while receiving the benefit of escaping litigation and potential liability. The parties' intent would also be ignored in such a scheme, and the finality of parties' voluntary agreements significantly undermined. Obviously, such decree nullification would leave little incentive for future parties to enter into voluntary agreements, which avoid often protracted and time-consuming litigation.[201] The Supreme Court has since reaffirmed this logic in the context of the modification of consent decrees based on constitutional claims:

> To hold that a clarification in the law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in institutional reform litigation. [Such a holding] "would necessarily imply that the only legally enforceable obligation assumed by the state under the consent decree was that of ultimately achieving minimal constitutional prison standards. . . . Substantively, this would do violence to the obvious intention of the parties that the decretal obligations assumed by the state were not confined to meeting minimal constitutional requirements."

*Rufo*, 502 U.S. at 389-90 (quoting *Plyler v. Evatt*, 924 F.2d 1321, 1327 (4th Cir. 1991)).

In sum, the distinction in *Lelsz* between the approval of and enforcement of decree provisions has been confined by several authorities to situations involving consent decrees based on state law. Moreover, the distinction as it was originally drawn had little repercussion for the actual holding or logic in *Lelsz*, and was not necessary to the holding in *Saahir*. Because of the narrowing of the *Lelsz* distinction discussed above, defendants' invitation to extend the distinction to this case, in which the decree provisions at issue bear a clear relationship to federal law is declined. Furthermore, the reasoning of the dissenters from the denial of rehearing en banc in

---

[201]Additionally, if judicial precedent renders the line between what is within the jurisdiction of a federal court and what is not becomes more difficult to discern, parties contemplating entering into consent decrees will be even more unsure about their future ability to enforce decree provisions. This uncertainty will further undermine parties' incentives to bind themselves by such agreements.

*Lelsz*, the subsequent explicit rejection of the *Lelsz* distinction by three Circuit Courts of Appeals, and the strong policy-based arguments briefly outlined above, all caution against the extension of the *Lelsz* distinction to this matter.

## C. Application

In accordance with the above analysis, the *Firefighters* test will be applied to the decree provisions sought to be enforced by plaintiffs.[202]  As was held above in Part Two, Section I, plaintiffs possess rights under the EPSDT statute that are enforceable through § 1983.  These rights include the right to be informed of the program, the right to the provision of or arrangement for the provision of screening services, and the right to the arrangement for corrective treatment. Plaintiffs also possess rights to regular medical and dental checkups, and rights to the full range of healthcare services allowed by the federal Medicaid statute, including but not limited to case management.  After a careful and thorough review of the decree provisions sought to be enforced by plaintiffs, it is found that each provision falls squarely within the parameters outlined in

---

[202] The reasons for this court's decision to apply the *Firefighters* standard have been made abundantly clear. During the course of this hearing, defendants have urged the court to adopt various tests in determining whether or not the various decree provisions, all of which bear some relationship to plaintiffs' federally protected rights, are enforceable.  Defendants' Post-Trial Brief at 13 (provisions must "seek to vindicate federally protected rights"), at 27 (provisions must "seek to protect rights created by the EPSDT legislation"); Defendants' Brief in Response to Plaintiffs' Brief in Support of this Courts Jurisdiction to Enforce Consent Decree at 5 (provisions must "directly vindicate an enforceable federal right"), at 7 (provisions must "be closely related to the federal right"); Defendants' Post-Trial Brief at 28 (provisions must be actual requirements of federal law or, alternatively, must have been violated by defendants so as to have "resulted in class members being deprived of specific entitlements or federally protected rights created by the statute").  Because the *Firefighters* standard will be applied by the court for the reasons listed above, defendants' proposed alternative standards will not be fully discussed or applied. However, it is found that, were it the case that only those decree provisions "closely related to" or "directly vindicating" plaintiffs' federal rights were enforceable by this court, this standard would also permit the enforcement of each of the provisions found to have been violated by defendants.

163

*Firefighters*, and therefore may be enforced against defendants. Because the provisions sought to be enforced are many, *see* Part One, *supra*, the court's application of the *Firefighters* standard will not be spelled out in detail with respect to every provision. Instead, each of defendant's objections to the enforcement of various provisions will be considered individually.[203] Only those objections to paragraphs which defendants were found in Part One to have violated will be given attention below. Paragraphs which defendants are found to have violated in Part One but are not discussed below in relation to defendants' objections are found by the court to be enforceable under the application of this test.

---

[203] Before directing its attention toward defendant's objections to the enforcement of specific provisions of the decree, this court notes its strong agreement with the reasoning in *Komyatti v. Bayh*, 96 F.3d 955, 956 (7th Cir. 1996), regarding the appropriate course for a defendant seeking to avoid the enforcement of a consent decree:

> [W]e believe that the court expressed the usual course in *Kindred* when it wrote that a "continuing respect for the valid decrees of a court commands that they be obeyed until changed." 9 F.3d at 644. Such an approach is certainly compatible with the traditional approach of our law. *See Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 439-40, 96 S.Ct. 2697, 2706-07, 49 L.Ed.2d 599 (1976); *Walker v. City of Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). Such an approach is also, we are pleased to say, most compatible with the traditions of our people and their commitment to a rule of law.

*Id.* at 963 (footnote omitted). It is acknowledged that the Fifth Circuit permitted a party to be excused, without having made a motion to modify, from a decree obligation which bore no resemblance to any requirement of federal law. *Saahir v. Estelle*, 47 F.3d 758 (5th Cir.1995). Nonetheless, in cases like this one, in which the court's jurisdiction to enforce particular provisions of the decree is somewhat difficult to ascertain because of the obvious relationship of each provision to federal law, a motion to modify seems most warranted. Otherwise, state officials may be tempted to ignore decree provisions where plaintiffs' ability to enforce them in the future remains unclear. While the defendants in this case have not shown such utter disregard for the order of a federal district court, it would make sense, generally speaking, to create a legal framework in which a defendant seeking to avoid a decree obligation is required to seek an alteration of the decree from the district court. However, in light of *Saahir*, the requirement of filing a motion to modify will not be imposed on defendants in this case without further direction from the Fifth Circuit.

### *Enforcement of Provisions Guaranteeing Services*

*Outreach*

Defendants challenge, first, this court's ability to enforce the outreach provisions of the decree, discussed at length in Part One, Section I.  Defendants assert that plaintiffs' reliance on the term "effective," as that term appears in the decree, contradicts HCFA's definition of the term, therefore materially altering the requirements of federal law.   Specifically, defendants point to 42 C.F.R. § 441.56(a), which states that a state agency must provide for a combination of written and oral methods "designed to inform effectively."  Defendants argue that this regulation should guide the court in ascertaining the parameters of the duty to conduct outreach under federal law.  "The duty to effectively inform all persons in the state is a much greater burden," defendants note, "than is the duty to provide a method designed to effectively inform."  Defendants' Post-Trial Brief at 24.  The court is in agreement with defendants that, in fact, the duty to inform all eligible participants for the program is a much greater task than is the duty to design a method to do so.  However, the duty under federal law is unequivocally the duty to "inform[] all persons" eligible for EPSDT about their rights to services.  42 U.S.C. § 1396a(a)(43)(A).  However, defendants' argument fails for two reasons.  First, as was explained in Part One, Section I, the isolated use of the word "effective" in a single regulation is not particularly probative of the parties' intended meaning of the term "effective" as used in the decree.  This is made obvious by the parties' repeated use of the word in conjunction with defendants' outreach duties without the use of the modifying phrase "designed to."

Second, the court having interpreted the phrase "effectively inform" within the four corners of the decree in Part One, Section I(C), the only remaining question is, may the court

enforce the provision as it has been interpreted?  To answer that question, the court looks not to

an isolated regulation involving one aspect of the duty to inform, but instead to the federal statute

itself, which unequivocally requires defendants to "inform [] all persons" eligible for EPSDT

about their rights to services.  42 U.S.C. § 1396a(a)(43)(A).  Decree provisions which obligate

defendants to inform "effectively," as this court has interpreted the term, clearly serve to resolve a

dispute within the court's jurisdiction, come within the general scope of the case made by the

pleadings, and further the objectives of this statutory provision.  Put simply, if plaintiffs have an

enforceable right to be informed, decree provisions requiring defendants to inform them

effectively clearly vindicate that right.  Therefore, paragraphs 32[204] and 52 of the decree are held

to be enforceable.

*Services*

Defendants next object to the enforcement of the decree's provisions concerning the

provision of medical and dental[205] checkups and case management.  With respect to these

---

[204]The sufficient staffing requirement in paragraph 32, which facilitate the effective informing of the plaintiff class, is similarly held to vindicate class members' right to be informed, and passes the *Firefighters* test cited above.

[205]With respect to dental checkups, defendants launch an independent objection to the enforcement of paragraph 143, which obligates defendants to provide periodic dental check ups to plaintiffs.  Defendants note that the federal statute entitles plaintiffs to dental "services," and not "checkups."  However, federal law also states that "dental services . . . shall at a minimum include relief of pain and infections, restoration of teeth, and maintenance of dental health." 42 U.S.C. § 1396d(r)(3)(B).  Further, dental services must be provided at "intervals which meet reasonable standards of dental practice . . . and at such other intervals, indicated as medically necessary, to determine the existence of a suspected illness or condition."  42 U.S.C. § 1396d(r)(4)(A).  It is held that paragraph 143's mandate that dental checkups be provided quite obviously meets the first two of the *Firefighters* requirements, and clearly furthers the objectives of the law, which include the "maintenance of dental health" through treatment provided at regular "intervals."  The term "checkup" is mere shorthand for these federal requirements.

provisions, defendants argue that federal law merely requires the provision of these services upon request. This objection is discussed at length in Part One, Section II of this Memorandum Opinion, where it is held that the "request" language appearing in the federal EPSDT statute must be read to require the provision of services only upon requests made by those who have first been informed. It is found that the decree provisions requiring the provision of these services serve to resolve a dispute within the court's jurisdiction, come within the general scope of the case made by the pleadings, and further the objectives of the law upon which the complaint was based. Indeed, these provisions are no more than restatements of the requirements of federal law. 42 U.S.C. § 1396a(a)(43). More specifically, this court's interpretation of those provisions – namely, that defendants may be held in violation of decree requirements regarding the provision of services upon request where they have failed to provide class members with the information necessary to make such requests – may be enforced as entirely consistent with the history, text, and structure of the federal EPSDT statute. *See* Part One, Section II, *supra*. Therefore, paragraphs 2, 3, 212,[206] and 143 are held to be enforceable by this court. Defendants launch a similar objection to the enforcement of the decree's case management provisions. For the reasons given above, paragraphs 248 and 264[207] are also held to be enforceable by the court.

---

[206]Defendants launch an independent objection to the enforcement of paragraph 212, arguing that its focus on abused and neglected class members has no basis in federal law. Because this paragraph does no more than state defendant's general duty under federal law with respect to a subgroup of the class, defendant's objection will be denied.

[207]Paragraph 264 also clearly passes the *Firefighters* test because, under 42 U.S.C. § 1396a(a)(1), each state's plan must provide that the EPSDT program be in effect in all political subdivisions of the state.

*Managed Care*

Defendants object to the enforcement of decree provisions obligating defendants to provide checkups and other services to class members who are enrolled in managed care. Defendants note that 42 U.S.C. § 1396u-2 gives states the option to use managed care and to require an individual who is eligible for medical assistance under a state plan to enroll with a managed care entity as a condition of receiving assistance. That section also requires managed care organizations (MCOs) to provide assurances to the state and to the Secretary that the appropriate range of services and access to preventive and primary care services for the population enrolled in the service area is being offered. The provision also requires that MCOs maintain a sufficient number, mix and geographic distribution of providers of services. Defendants stress that under § 1396u-2, each MCO is required to "offer" services, and is not expressly required to assure the receipt of such services. Defendants appear to argue that this should affect the court's ability to enforce the managed care provisions of the decree, discussed at length, *supra*, at Part One, Section IV.

This argument wholly misses the mark. Section 1396u-2 permits the states to utilize managed care to meet their obligations under the federal EPSDT statute; it does not free them from those obligations, or limit their responsibilities to managed care enrollees. Paragraphs 190 and 192 of the decree merely extend defendants' obligations under the EPSDT statute to class members enrolled in managed care, giving special emphasis to their entitlements in light of the potential problems posed by the implementation of managed care.[208] Moreover, the findings of

---

[208]The portions of paragraphs 190 and 192 relevant to this discussion are those which defendants were found to have violated in Part I, Section IV. Paragraph 190 mandates that class members in managed care are "entitled to timely receipt of the full range of EPSDT services,

fact in relation to this subgroup, *see* Part One, Section IV(B), clearly demonstrate that special

provisions underlining defendants' obligations to managed care enrollees are necessary to ensure

defendant's compliance with 42 U.S.C. 1396a(a)(43). In sum, paragraphs 190 and 192 do not

"go beyond" § 1396u-2, as defendants argue; they merely dictate that defendants must comply

with federal EPSDT law with respect to managed care enrollees. Thus, these paragraphs quite

obviously serve to resolve a dispute within the court's jurisdiction, come within the general scope

of the case made by the pleadings, and further the objectives of the law upon which the complaint

was based. Paragraphs 190 and 192 are therefore held to be enforceable by the court.

Along these same lines, defendants argue that because 42 U.S.C. 1396(c)(1)(A)(i) requires

a state implementing managed care to develop and implement access standards, paragraphs 190

and 192 go beyond the requirements of federal law. However, as stated above, the managed care

paragraphs go no further than to assure defendants' compliance with the EPSDT statute, which

requires them to inform and provide services to all members of the EPSDT population, including

those in managed care. Additional federal provisions relating to the implementation of managed

care do not limit defendants' duties under 42 U.S.C. § 1396a(a)(43). Such provisions further

regulate the implementation of managed care.

Defendants also maintain that an additional provision of paragraph 192, which requires

defendants to assure that managed care organizations have the capacity to accelerate services to

the children of migrant farmworkers to accommodate their special circumstances, has no basis in

---

including but not limited to medical and dental checkups." The pertinent portion of paragraph
192 is its requirement that defendants "assure medical and dental checkups in a timely manner to
all [managed care] recipients." *See also* paragraph 266, which states that "[a]ll EPSDT recipients,
including those in managed care, are entitled to the full range of case management assistance
when medically needed."

federal law.  It is recognized that the words "farmworkers" and "acceleration" do not appear in the federal EPSDT statute or accompanying regulations.  However, as Part One, Section IV(D) aptly demonstrates, this subclass of EPSDT eligible participants do not receive the information or services to which they are entitled without such acceleration.  Defendants have a duty under 42 U.S.C. § 1396 to inform "all" EPSDT eligible participants about the program and to provide services to those who request them after having been informed.  *See* Part One, Section II(C). Paragraph 192 requires acceleration because it is a necessary step in fulfilling the duty to inform and serve a population that migrates quickly and is unreachable for long durations of time.  *See* Part One, Section IV(D).  This requirement, which clearly vindicates the rights of this subset of the class, serves to resolve a dispute within the court's jurisdiction, comes within the general scope of the case made by the pleadings, and furthers the objectives of 42 U.S.C. § 1396a(a)(43). Therefore, the farmworker acceleration requirement in paragraph 192 will be enforced by the court.

### *Enforcement of Provisions Requiring Reporting of Data and Information*

*Reporting*

Defendants make numerous objections to the various decree paragraphs requiring the furnishing of information to plaintiffs.

Defendants first object that the decree's requirement (in paragraphs 284 and 191) that defendants report the number of eligible participants who have received checkups is unenforceable because the Health Care Finance Administration (HCFA) does not so require.  HCFA Form 416, which is used by HCFA to assess the effectiveness of state EPSDT programs, requires states to report only the number of eligible participants receiving any dental service, the number of eligible

participants receiving preventive dental services, and the number of eligible participants receiving dental treatments.  Defendants argue that plaintiffs have "made no showing that their claim regarding the reported percentages of dental checkups as compared to medical checkups is at all related to a federally protected right to the receipt of dental services upon request." Defendants' Post-Trial Brief at 17.  The court is well aware that HCFA does not require the reporting of the receipt of checkups. However, it is held that the decree's reporting requirements quite clearly served to resolve a dispute within the court's jurisdiction and come within the general scope of this case.  It is further held that the collection of data furthers the objectives of the EPSDT statute, which is to improve the health of poor children.  That objective cannot be accomplished without constant and rigorous review of the program's accomplishments and shortcomings. Therefore, paragraph 284 will be enforced by this court.

A similar conclusion must be reached with regard to defendants' challenge to the decree's reporting requirements concerning managed care enrollees.  Although HCFA does not require the data required by the decree about the receipt of care by eligible participants enrolled in managed care, it is unquestionable that the *Firefighters* standard has been met with regard to this reporting provision.  Therefore, paragraph 191 will be enforced by this court.

Defendants next object to the reporting requirements for teens and for abused and neglected class members, asserting that neither federal law nor regulations impose any distinct screening performance standards on the state with respect to any sub-groups in the EPSDT population.  Again, while HCFA may not require such detailed reporting, reporting on defendants' compliance with federal law with respect to these at-risk subgroups clearly served to resolve a dispute within the court's jurisdiction, comes within the general scope of the case made

171

by the pleadings, and furthers the objectives of the law upon which the complaint was based. Therefore, paragraph 212 will be enforced by the court.

Additionally, the decree requires defendants to provide plaintiffs with the number of class members who get medical or dental checkups in each county or cluster of sparsely populated counties. This requirement also clearly passes the *Firefighters* test, as 42 U.S.C. § 1396a(a)(1) requires that each state's plan provide that the EPSDT program be in effect in all political subdivisions of the state. Given this provision, the "statewideness" reporting provisions of the decree in paragraphs 273 through 281 are held to be enforceable.

*Outcome Measures and Corrective Action Plans*

Defendants next object to the decree's requirement that they provide certain outcome measures. *See* Part One, Section VII. The agreed-upon outcome measures, which assess the health of the EPSDT population, include immunization rates among subpopulations of the class, lead poisoning levels among class members, asthma hospitalization rates, and the mental health of the population. Again, these are not explicitly required by federal law. However, these indicators of the health of the plaintiff class were created by the parties to gauge the success of the EPSDT program and the widespread receipt of particular services. Therefore, like the other reporting requirements discussed above, the outcome measures clearly fall within the scope of this case, and further the objective of the EPSDT program by informing both parties as to the recipients' health needs and progress. Paragraphs 289, 293, 295, and 296 are therefore enforceable by the court.

Next, defendants challenge the requirement that they create corrective action plans to address the needs of "lagging" counties. *See* Part One, Section III. Defendants assert that they need not "have every class member with a need serviced," as this would be "impossible."

172

Defendants' Post-Trial Brief at 20.  The court is in agreement with this statement, and has found

defendants in violation not for failing to service every child with a health need, but for failing to

meet the requirements of 42 U.S.C. § 1396a(a)(43), based on the overwhelming evidence cited in

Part One.  The requirement that defendants address the needs of "lagging" counties, however, is

supported not only by 42 U.S.C. § 1396a(a)(43), which requires the informing and subsequent

servicing upon request of "all" eligible participants, but also by § 1396a(a)(1), which imposes a

"statewideness" requirement upon participating states.  It is found that the requirement that

defendants create corrective action plans to address their failures in regions where the

performance of the EPSDT program is particularly dismal is enforceable by plaintiffs.  The

provision clearly vindicates the rights of plaintiffs to receive services to which they are entitled

and passes the *Firefighters* test.  The corrective action requirements in paragraphs 273 through

281 are therefore enforceable by the court.[209]

### Enforcement of Training and Toll-free Line Provisions

The decree's training provisions  – both those relating to the training of managed care

personnel and those covering the training of providers and others outside of the managed care

system –  will also be held enforceable by plaintiffs.  Training, defendants correctly argue, is not a

requirement of federal law.  However, both common sense and plaintiffs' evidence aptly

demonstrate the causal connection between the increased knowledge of providers and other

---

[209]Although defendants do not specifically object to the corrective action requirement for
the medical transportation program, it is found that the requirement that defendants continually
re-assess the means by which they arrange and provide healthcare is also enforceable because it is
one means by which the state may meet its obligations under 42 U.S.C. § 1396(B) and (C).  Thus,
the corrective action plan provision serves to vindicate plaintiffs' rights to such arrangement and
provision of services.  It also clearly passes the *Firefighters* test.  Paragraphs 223 through 229 are
therefore held to be enforceable.

personnel and the access to and receipt of services by the plaintiff class. Training personnel

clearly vindicates the rights of the plaintiffs to information and services. Only those who are

trained can impart correct knowledge, and only with knowledge may plaintiffs make requests.

Moreover, the provisions most certainly served to resolve this dispute, and they come within the

general scope of the case made by the pleadings. Finally, training providers about EPSDT clearly

furthers the objectives of the EPSDT statute. For these reasons, the court may enforce

paragraphs 107, 108, 112, 113, 114, 117-120, 124-130, and 194.

Defendants also object to the toll-free line provisions of the decree, noting correctly that

no such lines are required by federal law or regulation. However, defendants are under a clear

statutory mandate to "provide or arrange for" services upon request. 42 U.S.C. § 1396. For

program eligible participants, who are often without home phones or transportation, the toll-free

lines are crucial to the coordination of and receipt of healthcare. *See* Part One, Section V(A).

The requirement that defendants answer toll-free lines promptly and helpfully directly vindicates

the rights of plaintiffs to information, to receive services "upon requests" (which are most

frequently made by class members who cannot afford to pay a toll), and to have services

"provided" and "arranged for." 42 U.S.C. § 1396a(a)(43). It is further found that the

requirement serves to resolve this dispute, and comes within the general scope of the case made

by the pleadings. Last, it is found that because the toll-free lines function as the defendants'

primary means of fulfilling their duty to provide or arrange services, paragraph 247 unequivocally

furthers the objectives of the EPSDT statute. Paragraph 247 will therefore be enforced by the

court.

174

# Conclusion

The court compliments both parties in their diligent efforts to present abundant evidence to the court regarding the merits of this motion to enforce the decree, and further compliments the efforts of both parties to meet the health needs of disadvantaged children in this state.

Based on the above findings of fact and conclusions of law, defendants are hereby

**FOUND** to have violated certain provisions of this court's decree in this matter, as detailed in Part One of this Memorandum Opinion.  It is further

**FOUND** that the decree is enforceable to the extent outlined above, in Part Two of this Memorandum Opinion.

**SIGNED** this 9th day of August, 2000.

William Wayne Justice
Senior United States District Judge