**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**PARIS DIVISION**

| | | |
|---|---|---|
| **LINDA FREW, et al.,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No.** |
| | § | **3:93-CA-065 WWJ** |
| **ALBERT HAWKINS, et al.,** | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION;**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On July 9, 2007, the Court orally granted the parties' joint motion for entry of an agreed

Corrective Action Order, and found that the parties' proposed Corrective Action Order is fair,

reasonable and adequate. *Ayers v Thompson*, 358 F.3d 356, 368 (5th Cir. 2004), *cert. denied*,

543 U.S. 951 (2004); Fed. R. Civ. P. 23(e)(1)(C); *see also* David Herr, Manual for Complex

Litigation, Fourth § 21.61 (2006).  The parties were then asked to submit proposed orders.  The

Court, having received the parties' proposed findings of fact and conclusions of law, (Docket No.

637, Exs. 1-11) hereby enters this Agreed Corrective Action Order (Order).[1]

**BRIEF PROCEDURAL HISTORY**

The Court's previously published decisions outline the procedural history of this case.

*Frew v Gilbert*, 109 F. Supp. 2d 579, 588-89 (E.D. Tex. 2000)(*Frew 2000*) and *Frew*

*v. Hawkins*, 401 F. Supp. 2d 619, 623-25 (E.D. Tex. 2005)(*Frew 2005*)(subsequent histories

---

[1]One purpose of the Corrective Action Order is to bring Defendants into compliance
with the Consent Decree (Docket No. 135) ("Decree"), which remains in effect. The
Court hopes and expects that by complying with the Order, Defendants will also comply
with the Decree.

omitted). This brief procedural history simply provides an update of events relevant to the Court's approval of the Corrective Action Order.

Defendants unsuccessfully appealed this Court's denial of their motion to dissolve the Decree in *Frew 2005*. *Frazar v Ladd*, 457 F.3d 432 (5th Cir. 2006), *cert. denied*, 127 S.Ct. 1039 (2007). Shortly after the case returned to this Court, Plaintiffs again moved the Court to enter remedial orders; they also filed Revised Proposed Correction Action Plans (Docket No. 607, 609).[2] Further, Plaintiffs urged the Court to rule on two pending motions: 1) Plaintiffs' Motion for Sanctions (Docket No. 428), and 2) Plaintiffs' Motion to Extend the Terms of Decree Paragraphs 284 and 295 (Docket No. 429); *see also* Docket No. 599.[3] The Court permitted discovery and set Plaintiffs' three motions for hearing on April 9, 2007 (Docket No. 601).

Counsel for the parties attended a pre-hearing status conference in Chambers on March 30, 2007. They announced that settlement was possible but not yet achieved. Then, at the April 9, 2007 hearing, counsel announced that the parties had reached a settlement in principle. The Court directed the parties to file a finalized version of a new proposed settlement by April 27, 2007.

On April 16, 2007, the Court ordered notice of the proposed settlement to the class (Docket No. 635). The parties jointly filed their final proposed corrective action order on April 27, 2007 (Docket No. 637). Defendants notified the Court on June 8, 2007, that they had provided notice to the class, as required by the Court's Order (Docket No. 641). On July 9, 2007,

---

[2]Plaintiffs' January, 2007 Motion for Corrective Action Orders updated allegations of Decree violations made as early as 1998 (Docket No. 208).

[3]The Corrective Action Order resolves all of Plaintiffs' Motions, as agreed by the parties. (Docket No. 634).

this Court held a fairness hearing to determine whether to adopt the parties' proposals as the Court's Corrective Action Order.  The Court heard oral testimony from Plaintiffs' witnesses Nicole Carroll, Frank Moore, Ph.D., and Nancy Sue (Suzi) Seale, D.D.S., M.S.D., and Defendants' witnesses Defendant Health and Human Services Commission ("HHSC") Executive Commissioner Albert Hawkins and HHSC Medicaid/CHIP Medical Director, John Hellerstedt, M.D.  The Court also admitted into evidence Plaintiffs' modified depositions on written questions from Anne Dunkelberg, Gary Clark, M.D. and Jane Rider, M.D., as well as from Plaintiff Maria Ayala, former Plaintiff Mary Fisher, and parent/guardians G.B., K.C.-D., J.D., J.P. and K.S.  In addition, the Court admitted into evidence Plaintiffs' 366 exhibits and Defendants' 38 exhibits.  Counsel for both parties urged the Court to adopt the Corrective Action Order.  TR 8:17 – 19 (2007); TR 10:9 – 12; TR 11:19 – 20 (2007).

The parties asked the Court for a ruling at the end of evidence on July 9, 2007.  From the bench, the Court granted the parties' joint motion for entry of an agreed Corrective Action Order and stated that the proposed Corrective Action Order was fair, reasonable and adequate.  TR 181 (2007).  The Court also ordered the parties to submit proposed orders.  *See* ¶ 21, 2003 Notes of the Advisory Committee re Amendments to Fed. R. Civ. P. 23 (e)(1)(C) (hereinafter "Comments").  TR 182 (2007).

## LEGAL STANDARDS FOR APPROVAL OF A SETTLEMENT IN A CLASS ACTION

This Court has a limited role vis a vis a proposed settlement in a class action.  The Court may accept the settlement, reject the settlement and require further negotiations, or reject the settlement and set the case for trial.  *Evans v Jeff D.*, 475 U.S. 717, 727 (1986).  The Court cannot "modify a proposed [settlement order] and order its acceptance over either party's

3

objection." *Id.*

Federal Rule of Civil Procedure 23 governs class actions. Although Rule 23 was amended in 2003, the standards for approval of class action settlements have remained stable for decades. Amended Rule 23(e)(1)(C) states that a class action settlement must be "fair, reasonable, and adequate." The Fifth Circuit's most recent decision on this topic uses the same standard, and that Court has relied on it since at least the 1970s. *Ayers*, 358 F.3d at 368; *Reed v General Motors Corporation*, 703 F.2d 170, 172 (5th Cir. 1983); *Parker v Anderson*, 667 F.2d 1204, 1208-09 (5th Cir. 1982)(and cases cited therein).

In the Fifth Circuit, six factors determine whether a proposed settlement is fair, reasonable and adequate. The factors are:

1. the existence of fraud or collusion behind the settlement;

2. the complexity, expense and likely duration of the litigation;

3. the stage of the proceedings and the amount of discovery completed;

4. the probability of plaintiffs' success on the merits;

5. the range of possible recovery; and

6. opinions of the class counsel, class representatives and absent class members.

*Ayers*, 358 F.3d at 369. These are the same factors that this Court relied on when it approved the Consent Decree in this case in 1996. *Fairness Order* at 20-34.[4]

---

[4]Plaintiffs' counsel argued that the Court should also consider factors established by *In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283, 316-24 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999); *see* Comments ¶ 20; TR 9:13 to 10:3 (2007). Despite the Comments' reliance on *In re Prudential*, the Court relies only on *Ayers* both in its July 9, 2007 oral Order and here because the Fifth Circuit's standards have been consistent over the decades. Further, in the post-2003 *Ayers* decision, the Fifth Circuit used the same pre-2003

## FINDINGS OF FACT

The Court makes the following findings of fact:

1.   THE EXISTENCE OF FRAUD OR COLLUSION BEHIND THE SETTLEMENT.

The proposed Orders are not the product of fraud or collusion. TR 31:24 – 32:1; TR 168

(2007); *see also* Pls.' Ex. 355, ¶¶ 9-10 (2007).  Indeed, the Court need look no further than the

highly contentious history of this case.  This Court has ruled twice in favor of the Plaintiffs.

*Frew 2000*; *Frew 2005*.  Both times, Defendants appealed and lost.  *See Frew 2000, Frazar v.*

*Gilbert*, 300 F.3d 530 (5th Cir. 2002); *Frew v. Hawkins*, 540 U.S. 431 (2004); and *Frazar v.*

*Ladd*, 457 F.3d 432 (2006).

The proposed settlement is the product of difficult negotiations.  Prior to reaching an

agreement in principle on April 9, 2007, Plaintiffs' counsel, Defendants' counsel and

Defendants' staff met several times for lengthy negotiations, and also exchanged numerous drafts

of the proposals.  TR 178 (2007).

Negotiations were at arms' length and honest, as the parties had substantially different

ideas about how to approach some areas under discussion.  Commissioner Hawkins, who was

briefed about the negotiations on a regular basis, testified that the intense negotiations addressed

a complex subject, and observed that at the beginning, there was a "pretty good distance between

the approaches that were laid on the table." TR 132: 3 – 4(2007).  He averred that Defendants

wanted a proposal that was "workable or feasible . . . complied with federal . . . [and] state laws

related to procurements . . . that provided good, sound, useful information that could be acted

---

factors, which indicates that the Court of Appeals saw no reason for change even after the Rule
23 amendments.

upon." TR 132:7 – 11 (2007).

Substantial give and take from both sides was required in order to arrive at the proposed

Order currently before the Court.  Indeed, when the parties announced settlement to this Court on

April 9, 2007, they asked for more time to ensure that the proposed Order was properly drafted.

In the ensuing weeks, they exchanged many drafts of the eleven proposals. TR 131:17 – 22; 178

(2007).

Overall, the proposed Corrective Action Order, while not perfect, "is practical in nature

. . . [and] . . . reflects a good faith effort on the part of the parties to arrive at a meaningful and

constructive plan of action that will benefit Texas' neediest children and youth."  Dunkelberg

Dep., ¶¶ 36-37.  As Dr. Moore testified, the Corrective Action Orders strike a balance "shaped by

reality, by reasonableness and feasibility . . . [I]f . . . the parties . . . actually are able to fulfill their

responsibilities, the outcome should be adequate to achieve the remedies that we all seek." TR

33:15 – 21 (2007).

2.       THE COMPLEXITY, EXPENSE AND LIKELY DURATION OF THE LITIGATION.

The parties agree that this case is complex. TR 131:11 (2007).  Indeed, as early as the

1996 Fairness Order ("Fairness Order"), the Court recognized that "the problems that prevent

class members from receiving needed health care are complex and interrelated . . . [and] . . .

'multifactorial.'" Fairness Order at 14.  These sentiments were echoed by Dr. Seale and Dr.

Moore. TR 33:22 – 24 (2007)("on a scale of 1 to 10, real close to 10."); TR 66:13 – 14 (2007).

Moreover, this Court's lengthy findings of fact in *Frew 2000* and *Frew 2005* amply demonstrate

factual complexity.  These prior findings of Defendants' Decree violations relate directly to the

current proceedings because one purpose of the proposed Order is to bring Defendants into

6

compliance with the Decree.

The over 360 exhibits presented by Plaintiffs at the July, 2007 hearing further demonstrate factual complexity. Class counsel explained that Plaintiffs would have presented Exhibits 1-330 at the April, 2007 hearing if the case had not settled. In addition, Plaintiffs were prepared to present the live testimony of two fact witnesses and five experts, Gary Clark, M.D., Chief of Neurology and Developmental Neuroscience, Department of Pediatrics, Baylor College of Medicine in Houston, P. Ex. 25 (2007);[5] Anne Dunkelberg, Associate Director of the Center for Public Policy Priorities in Austin, Pls.' Ex. 26 (2007);[6] Jose Luna, Jr. M.D., M.B.A., D.A.B.F.P., Chief Medical Office, Centro San Vicente in El Paso, Pls.' Ex. 27 (2007); Frank Moore, Ph.D., Associate Professor, U.T.H.S.C. School of Public Health in San Antonio, Pls.' Ex. 28 (2007);[7] Nancy Sue (Suzi) Seale, D.D.S., M.S.D., Chair of the Pediatric Dentistry Department at Baylor College of Dentistry in Dallas, Pls.' Ex. 29 (2007).[8]

---

[5]Dr. Clark testified by deposition in the July, 2007 hearing. Pls.' Ex. 354. Based on his qualifications stated in Pls.' Ex. 25 and his deposition, the Court determines that Dr. Clark is an expert in pediatrics and pediatric specialty care as they apply to class members, including issues raised in this case relating to class members' access to health care that they need.

[6]Ms. Dunkelberg testified by deposition in the July, 2007 hearing. Pls.' Ex. 355. In 2005, the Court qualified Ms. Dunkelberg as an expert in "Medicaid policy in Texas as it relates to this case, and the characteristics of the Texas Medicaid population." 6 TR 149 (2005). She remains in that capacity.

[7]Dr. Moore testified in person at the July, 2007 hearing. In 1995 and 2005, the Court qualified him as an expert in "the field of public health as it pertains to the issues in this lawsuit." 4 TR 34:21 – 15 (2005) He remains in that capacity.

[8]Dr. Seale testified in person at the July, 2007 hearing. She is an expert in "pediatric dentistry, oral health conditions, and problems of children, including members of the class, and barriers that prevent class members from obtaining dental care." 6 TR 59:16 – 23 (2005); *Frew 2000*, 109 F. Supp. 2d at 589 n.5. She remains in that capacity.

Finally, Plaintiffs would have presented the deposition testimony of one expert witness, Dr. Jane C. Rider, a pediatrician in private practice in San Angelo,[9] and four fact witnesses, who are mothers/grandmothers of class members.[10] Defendants had planned to present more than 70 exhibits and a number of witnesses, including seven experts.[11] The large number of class members involved is further evidence of factual complexity. The class includes more than 2.8 million indigent children in federal fiscal year 2006. Pls.' Ex. 30 (2007).[12]

The case involves many aspects of the health care and support services that this large group of children requires. *See* TR 33:25 – 34:20 (2007). The complexity of this topic is demonstrated by the fact that the parties propose an eleven-part Corrective Action Order, with subparts for each of those eleven parts.

---

[9]Dr. Rider's March, 2007 deposition and cross-questions are Pls. Ex. 357. Her supplemental deposition discusses the proposed Corrective Action Order. Pls. Ex. 358.

[10]The March, 2007 deposition and cross-questions of G.B. are Pls.' Ex. 360 (sealed). In Pls.' Ex. 361 (sealed), G.B. discusses the proposed remedies currently before this Court; the March, 2007 deposition of J.D. of Nacogdoches is Pls.' Ex. 363 (sealed). Her supplemental deposition discusses the proposed Corrective Action Order. Pls.' Ex. 364 (sealed)); J.P. of Abilene and her son have had many, ongoing problems with the Medical Transportation Program (MTP). Pls.' Ex. 365 (sealed)); and K.S. of Argyle (K.S. testified in person before this Court in 2005 and via deposition in 2007), whose two adopted children have serious disabilities, have had trouble obtaining access to mental health care including counselors and psychiatrist, problems with inaccurate referral lists for specialty care, and delays in receipt of medications. Pls.' Ex. 366 (sealed)).

[11]Defendants' witness list included Dr. Elizabeth Shenkman, Ph.D., Chair of the Department of Epidemiology and Health Policy Research at the University of Florida College of Medicine, and John O'Brien, Director of the Texas Legislative Budget Board, as well DHHS policy officials.

[12]Plaintiffs' Exhibit 30 is the "CMS-416" Report for 2006. Defendants report, *inter alia*, medical checkup and dental service statistics annually to the Centers for Medicare and Medicaid Services ("CMS"), the federal agency responsible for oversight of the Medicaid program, in this report.

This case is also legally complex, as demonstrated by the two prior appeals. For example, in the first appeal, the Supreme Court had to determine a significant question of Eleventh Amendment immunity. *Frew*, 540 U.S. 431 (2004). Moreover, had the parties not proposed a settlement, this Court would have confronted the difficult legal task of determining how to remedy decree violations that have existed since at least 2000. At the same time, the Court would have been required to defer when possible to Defendants' reasonable exercise of discretion and their judgment about what approach to take. *See, e.g., Milliken v Bradley*, 433 U.S. 267, 280-81 (1977). Achieving this balance would have been time consuming and difficult.

With respect to the likely duration of the case, this case began in 1993. It has been in active litigation since the Court found violations of the Decree in 2000. Membership in the class, however, depends on age; Medicaid recipients who reach the age of 21 are no longer class members. Over the years of appeals, many former class members have "aged out" of the class. Many never got the benefits of the Decree or health care that they should have received. Other current class members have gone without needed services during the years of appeals. Pls.' Ex. 355 (2007); Dunkelberg Dep., ¶ 36. If the Court were to reject the proposed settlement, litigation would continue, including a likely appeal. Many young Texans vulnerable to health problems because of their poverty would reach the age of 21 during the appeal, never having obtained the benefits that this litigation is intended to provide for them.
Others still young enough to remain in the class would not receive needed health care, causing suffering or even death. TR 87:21 – 25 (2007).

The lengthy duration of this case favors approval of the Corrective Action Order. The Corrective Action Order requires Defendants to begin to provide relief now, instead of after the

9

conclusion of another lengthy appeal.

3.    THE STAGE OF THE PROCEEDINGS AND THE AMOUNT OF DISCOVERY
      COMPLETED

This case began in 1993. As stated above, this Court found that Defendants were violating the Decree in 2000 and again in 2005. Discovery was already "extensive" when the Court approved the Decree in 1996. *Fairness Order* at 23. There was extensive discovery in conjunction with the 2000 and 2005 evidentiary hearings, as well as in preparation for the April 2007 hearing. TR 169 (2007).

In addition, Defendants file quarterly reports related to their Decree activities, as required by ¶¶ 306-07 of the Decree. They filed their first report in July, 1996 and, apart from a hiatus during the first appeal, have continued to file reports since that time (Docket No. 161). TR 169 – 170 (2007). Moreover, Plaintiffs' counsel have engaged in ongoing, informal discovery, which helped them to stay current on issues related to this case. For example, they have attended Defendants' regularly scheduled public meetings.

The extent of discovery is important because it tells the Court whether or not counsel were properly informed before they negotiated a settlement. *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 211 (5th Cir. 1981). As early as 1996, the Court had no doubt that Plaintiff's attorney, Susan Zinn, was "well informed about problems with EPSDT [Early and Periodic Screening, Diagnosis, and Treatment ]in Texas and possible solutions." *Fairness Order* at 24. Dr. Moore and Dr. Seale likewise testified that Plaintiffs' counsel were well-prepared for the 2007 negotiations in this case. According to Dr. Seale, both Plaintiffs' counsel are "very knowledgeable about the needs and issues . . . and have put together. . . a very good plan that

10

shows a lot of expertise and . . . preparedness." TR 65:5 – 8 (2007); *see also* TR 32:2 – 10 (2007)(Dr. Moore). Indeed, throughout their prosecution of this case, Ms. Zinn and Ms. Swanson have demonstrated their mastery of this case and their knowledge of the class, the barriers that prevent class members from securing proper access to health care through the Medicaid program, possible remedies

for those problems, and their likely success in Texas.

4.   THE PROBABILITY OF PLAINTIFFS' SUCCESS ON THE MERITS

Plaintiffs' were likely to succeed on the merits. The Court has twice found Defendants in violation of the Decree. *Frew 2000; Frew 2005*, 401 F. Supp. 2d at 684-85. Moreover, on March 30, 2007, Defendants' lead trial counsel informed the Court that Defendants accepted that they had lost. *See also* Docket No. 618 at 1-2. However, had this litigation continued, the Court would not only have had to address Defendants' Decree violations, but it would also have had to craft its own remedial orders. In this regard, the success of Plaintiffs' proposed remedial orders was unclear, as the Court would have been required to give deference to Defendants' reasonable judgement if they had presented adequate remedial proposals. *Milliken*, 433 U.S. at 280-81.[13] Moreover, as part of the proposed settlement, the parties agreed to relief concerning Decree sections not discussed in *Frew 2000* or *Frew 2005*. For example, in 2005 this Court did not make any findings about Decree violations related to class members' access to medications or durable medical equipment that class members need. Nonetheless, an entire section of the parties' proposed Order addresses

---

[13]The proposed Order, of course, already incorporates Defendants' reasoning and judgment since they agreed to it.

these issues.

Commissioner Hawkins testified that Defendants will be able to hold up their end of the bargain presented in the Corrective Action Order. TR 133:3-7 (2007). He believes that the Order is "sound . . . [and] . . . focused on some of the critical needs and issues." TR 133:10 – 11 (2007).

Defendants' lead trial counsel pointed out that Defendants can comply with the Order because they had input into its development. It requires Defendants to do things that are possible and that make sense. They support the proposed research/corrective action plan process because they want to develop programs that work. TR 178 (2007). They hope that the research will help them to develop efforts that are effective and have demonstrable results. This approach is "something that works and is efficient. That's what underlies all 11 of these corrective action plans . . . We know we can implement them. We believe they will be effective and work. We believe they will bring significant relief to the class." TR 179 (2007).

5.    THE RANGE OF POSSIBLE RECOVERY

**Overarching Issues**

Parties give and take to achieve settlements. *United States v Armour*, 402 U.S. 673, 681 (1971). Typically neither Plaintiffs nor Defendants end up with exactly the remedy they would have asked the Court to enter absent the settlement. *Id.* The question here is whether the proposed Corrective Action Order is fair, reasonable and adequate. This calculus is much more difficult than it would be in a case where damages are at issue. In a damages case, the Court would compare the settlement dollar amount to the maximum dollar amount that could have been achieved at trial. Here, the question is whether the entirety of the eleven-part settlement meets the legal standard.

12

The Court begins by reviewing overarching issues concerning the possible range of recovery and the proposed settlement. A discussion of the eleven proposals follows. As previously noted, the problems before the Court are complex. The Corrective Action Order appropriately addresses this complexity because it requires Defendants to make improvements regarding a broad range of problems so that class members can obtain the health care that they need. *See* TR 66:14 – 16 (2007); *see also* TR 34:21 – 35:1 (2007). Indeed, each of the eleven sub-proposals addresses important topics that require improvement so class members can receive health care that they need and are entitled to receive.

The settlement significantly increases the resources available to Defendants to comply with the Decree and provide services that class members need. Defendants will receive an increase of about 14% in spending for class members in fiscal years 2008-2009. Dunkelberg Dep., ¶ 11. Specifically, the legislature has appropriated $706.7 million in general revenue, estimated to be worth over $1 billion if federal matching funds are secured, to implement the proposed corrective action plans for fiscal years 2008-2009.

The proposal also requires studies to determine the extent and likely causes of various problems with Defendants' decree compliance. Defendants will contract with competent, independent researchers to conduct studies about outreach, transportation, medical check-ups and managed care proposals, and, potentially, about case management. Further, the parties must consult about study protocols and researchers, which should encourage ongoing cooperation between them. At the same time, the proposed settlement accommodates Defendants' procurement obligations under federal and state law.

Defendants will not, however, be forced to conduct studies for abstract purposes. Instead,

once the results are known, Defendants will, if necessary, develop corrective action plans to resolve problems that are identified.  This approach of investigation followed by corrective action "is a sound approach in which the involved state agencies essentially can self-regulate to achieve the goals for improvement set out in the consent decree." Dunkelberg Dep., Pls.' Ex. 355; ¶ 16. Moreover, Defendants will confer with Plaintiffs' counsel as they develop the plans, which will likely reduce the need for the Court's involvement in these issues.

Dr. Seale commented in favor of the evaluation/corrective process:

> [One] of the most powerful parts of this whole corrective action plan . . . [is the] pieces that deal with outcome assessment . . . [to look] . . . at whether we're making a difference. And there's a large component devoted to assessing effectiveness of the programs, looking at the programs and making changes if they need to be made along the way and in tracking change over time and tracking outcomes so we know we're making a difference.

TR 67:5 – 13 (2007).  Per Dr. Seale, this approach is "the most effective way to develop and create . . . corrective action plans around a data set that reflects the status of that population you're going to treat." TR 87:9 – 12 (2007). *See also* TR 132:10 – 12 (2007)(Hawkins)(stating that the evaluation/correction process will produce "good, sound, useful information that can be acted upon.").

In addition, the settlement is a "combination of program changes and funding [that] can be expected to result in substantial improvement in compliance with the consent decree and service to the class members." Dunkelberg Dep., ¶ 10.  While the proposed Corrective Action Order increases payments to health care professionals, it "does not rely exclusively, or too heavily, on increased fees to achieve its goals.  The less-cost-intensive components of the corrective action plans . . . are thoughtful, detailed, and targeted at correcting complex systemic

14

shortcomings . . . which . . . are extremely important to the overall impact of the corrective action plans." *Id.* ¶ 16; *see also* TR 35:10 – 13; TR 66:18 – 67:1 (2007).

Each of the eleven proposals requires an "assessment conference." After Defendants complete proposed tasks, counsel will "confer to determine what further action, if any, is required." If they agree, they will report to the Court; if not, the Court will resolve the dispute. Once Defendants comply with that part of the Decree and the related section of the Corrective Action Order, then the Court may terminate that part of the Consent Decree and the Corrective Action Order. Thus, the "assessment conference" process provides a clear potential end point for Defendants' obligations under the Consent Decree. Further, the "assessment conference" encourages cooperation among the parties. Dr. Rider Supplemental Dep., Pls.' Ex. 358, ¶ 7 (2007).

The Court hopes that the parties' progress toward compliance with the Decree and the Corrective Action Order will be swift, smooth and complete. The Court further hopes that the parties' cooperative efforts will continue to strengthen over the remaining course of this litigation.[14]

Nonetheless, "it is essential that the Court monitor . . . Texas' Medicaid problems carefully. . . . " Dr. Rider Supplemental Dep., Pls.' Ex. 358, ¶ 7. The "assessment conference" gives the Court one avenue to monitor compliance with these Orders. Since the Decree remains in effect, Defendants will continue to file quarterly reports to keep the Court apprised of their progress. Decree, ¶¶ 306-07. Also, various sections of the proposed Corrective Action Order

---

[14]Dr. Moore and Dr. Seale both commented on the high level of cooperation among the parties at this stage in the case. *See also* Pls.' Ex. 336 (2007).

specifically permit judicial involvement if disputes arise. Finally, while the Court hopes that no further judicial review will be necessary until the "assessment conferences," the Decree also still permits the parties to return to Court if needed. Decree, ¶ 303.

One final overarching issue: the Order must be fair, reasonable and adequate for the entire class. *Parker*, 667 F.2d at 1211. This class includes more than 2.8 million children. Pls.' Ex. 30 (2007). In a class as large as this where complex equitable relief is at issue, it is possible that different groups within the class will have slightly different concerns. Indeed, the Court would have been surprised if this were not true in this case because children of different ages and different states of health all belong to the class.

The proposals address specific needs of particular subgroups of the class. For example, the outreach proposal addresses "racial and ethnic disparities relating to each form of [proposed] outreach, and may also assess other relevant issues relating to cultural appropriateness." Docket No. 637, Ex.6 at 4. This approach is appropriate in light of disparities in utilization of care based on race and ethnicity. Pls.' Ex. 187 (2007). For example, African-American and Hispanic class members are more likely to lack medical check-ups than are Caucasian class members.

Minority class members are also much more likely than Caucasians to require hospital care for ambulatory care sensitive conditions. *Id.* Ambulatory care sensitive conditions are those that should properly be treated in an outpatient setting like a doctor's office, instead of in the hospital or emergency room; receipt of hospital or emergency room care for ACSCs may indicate inadequate access to outpatient care. *Frew 2005*, 401 F. Supp. 2d at 679-80.

It is appropriate to address these disparities in the outreach proposal, because outreach helps families to overcome common barriers that prevent class members from obtaining check-

ups and other services that they need.  Decree ¶¶ 50-51.  In addition, the outreach proposal

addresses "the causes of missed medical and dental check-ups, and possible ways to improve the

effectiveness of outreach efforts." Docket No. 637; Ex. 6 at 6. To be "effective," of course,

outreach must be appropriate to the needs of various racial and ethnic groups.[15]

Other proposals also address the needs of subgroups.  For example, the provider training

proposal requires training of general dentists to enable them to care for class members aged 1-3

years.  The managed care proposal addresses acceleration of health care services for children

whose parents are migrant farmworkers.

## CORRECTIVE ACTION PLANS

The eleven individual corrective action plans that make up the Corrective Action Order

are all reasonable in light of the best possible equitable recovery.

### A. Adequate Supply of Health Care Providers Proposal

Ensuring an adequate supply of health care providers is "the most difficult problem"

raised in this case. *Fairness Order* at 17.  The number of class members has increased over the

course of this case, from about 1.5 million children in 1993 to more than 2.8 million in 2006.

*Compare Frew* 2000, 109 F. Supp. 2d at 587, *and* Pls.' Ex. 30 (2007)(2006 CMS-416).

Despite this increase in the size of the class, Defendants have not succeeded in increasing

– or even maintaining – the number of health care providers who take care of class members.

For example, the percent of medical doctors in Texas who opened their practices to Medicaid

---

[15]Moreover, according to Dr. Moore, it is possible to overcome these racial and ethnic
disparities. A large study showed "almost no" disparity on the basis of race/ethnicity in
Medicaid children's receipt of check-ups in California, Georgia and Michigan. Pls.' Ex. 344
at 93 (2007).

patients dropped from 67% in 2000 to 36% in 2006. Pls.' Ex. 142 (2007). This decrease causes

hardship to class members. Parent K.C.-D. is "currently driving over 60 miles to see a

pediatrician, because there is no qualified pediatrician in . . . [the Floresville] area who

participates in Medicaid." Pls.' Ex. 362, ¶ 9 (2007); *see also* Pls.' Ex. 356, ¶ 9 (2007).

The problem remains severe in the area of mental health. *See Frew 2000*, 109 F. Supp.

2d at 627, 629; *Frew 2005*, 401 F. Supp. 2d at 679 and n. 105. Regarding Defendants' 2007

training module assessment, one reviewer noted that the

> mental health module's [i]nstruction on referral relationships is unrealistic. The
> module . . . make[s] an assumption that it is actually possible to identify
> behavioral health referrals in all communities. Even where there are providers,
> there is a high probability that these providers will not be accepting referrals of
> . . . [class members] . . . to be identified through this process. This module
> puts     forth an impossible requirement therefore.

Pls.' Ex. 225 at 1 (2007); *see also* Pls.' Ex. 226-236 (2007).

It is undeniable that there are shortages of many kinds of health care providers, such as

doctors, dentists, and mental health professionals for class members. Specialists, in particular

tend to locate in urban areas. 1 TR 7:1 – 8 (2005); 3 TR 196:14 – 17 (2005); 8 TR 84:7 – 11;

84:21 to 85:7 (2005). Further, some class members live in rural areas or poor neighborhoods

where many health care providers do not want to practice, or do not want to live. 3 TR 187:2 to

201:14 (2005). Even when there is an adequate supply of health care providers for the total

population, not enough health care providers take care of class members.

Defendants recognize that low reimbursements also deter professionals from serving class

members, even in urban areas. In January, 2007, Defendants noted that Medicaid reimbursement

rates have not increased for years, which raises a "general concern . . . [about] the state's ability

to maintain a quality provider base . . . [absent] meaningful rate increases . . . ." Pls.' Ex. 148

at 1-2 (2007). Over the course of time, the cost of health care has increased dramatically but

Texas Medicaid payments have not kept pace. TR 39:18 – 21 (2007). Indeed, in 2001,

Defendants noted that "a fee increase may help retain current providers and recruit new

providers, allowing more eligible children to receive services." Pls.' Ex. 243 at 4, 22

(2007)(dental).[16]

The Provider Supply proposal significantly increases reimbursement rates for health care

providers who take care of class members. This should help attract more professionals to take

care of children with Medicaid, which, in turn, should give families more choice among health

care providers to take care of class members. If families can choose among professionals, they

will choose to take their children to the best ones. Other professionals will either have to

improve the quality of their services or go out of business. TR 23:4 – 18 (2007). As Ms.

Dunkelberg noted in her deposition:

> [T]here are a number of historical examples in which . . . bringing
> Medicaid rates closer to market rates with a goal of improved access to
> care . . . [have] made significant gains as a result. On the other hand, the
> rate increases proposed for medical and professional services to Texas
> Medicaid beneficiaries under age 21 will still leave rates well below what

---

[16]G.B.'s grandson is a class member. He is diagnosed with several psychiatric disorders.
They live in Eastland. Pls.' Ex. 350, ¶¶ 2, 4 (2007). G.B. hopes that the reimbursement
increases will mean that "more doctors will join the program" particularly so that her grandson
can see his physicians and counselors more often. His "behavior and symptoms have gotten
worse since he has been seeing a psychiatrist less often." Pls.' Ex. 361, ¶ 7 (2007). Similarly,
J.D. is the mother of two class members from Nacogdoches. Her son has back and foot
problems and her daughter, despite two nasal surgeries, is unable to breathe through her nose and
consequently has chronic sores in her mouth. Pls.' Ex. 363, ¶¶ 2-7 (2007). J.D. notes a "big
shortage of both general and specialist doctors who take Medicaid.." Pls.' Ex. 364, ¶¶ 6-8
(2007).

> private insurers and (in most cases) Medicare pay for the same care. The
> proposed increases are not at all extravagant or excessive. It is my
> opinion that the proposed investment is large enough that we can
> reasonably expect a measurable improvement in access to care and system
> performance . . . .

Pls.' Ex. 355, ¶¶ 14-15 (2007); *see also* TR 40:3 – 7 (2007); Pls.' Ex. 356, ¶ 9 (2007)(more

doctors and dentists will take care of class members if reimbursement increases)(Mary Fisher).

Dr. Moore agreed, noting that if "more providers will accept Medicaid . . . that will have a

beneficial effect . . . in the way of increasing access to the members of the class . . . [A]s we

begin to achieve establishing more medical homes and more continuity over time from these

providers, . . . that will have a very beneficial effect on population health as well." TR 42:19 –

43:2 (2007).

    The Court commends Defendants' prompt efforts to implement the new reimbursement

increases. *See* TR 36:13 – 18; 42:11-15 (2007). By the time of the July 9, 2007 hearing,

Defendants were already well along the road toward implementation of increases for

reimbursements to physicians/other professionals and dentists. They had made initial proposals,

met with Plaintiffs' counsel and considered their views, Pls.' Ex. 340; 348; 350 (2007), proposed

new reimbursement levels, Pls.' Ex. 341; 349 (2007), and scheduled an administrative hearing to

take public comments on July 10, 2007. Pls.' Ex. 342; 351 (2007). Defendants plan to

implement the new reimbursement rates on September 1, 2007. TR 42:11 – 16 (2007).

    Dr. Hellerstedt, the Medical Director for the Texas Health and Human Services

Commission, also testified about the proposed reimbursement increases. Defendants' Physician

Payment Advisory Committee (PPAC) is composed of about 15 members, who are all health care

professionals. TR 148 – 149 (2007). PPAC met twice to consider the proposed rate changes. At

the end of its first meeting, PPAC suggested reimbursement changes and asked Defendants' staff to research the impact that the proposals would have.  At the second meeting, PPAC approved proposals for reimbursement increases for 1) physicians/other professionals and 2) dentists.  TR 148 – 150; 153 (2007); Pls.' Ex. 342, 51 (2007).

### (a) Physicians and Other Professionals

Dr. Hellerstedt described the six step proposal for physicians and other professionals, as follows:

1.    Targeted increases for Texas Health Steps:

      A.    Texas Health Steps medical check-ups: for new patients, the fee will be 100% of the 2007 Medicare fee; for established patients, the fee will be 92% of the 2007 Medicare fee.  In addition to differentiating between payment for new and established patients, this system also differentiates payments based on class members' ages.

      B.    The current administrative fee for Texas Health Steps immunizations will be increased by 60%.

2.    Targeted increases for Evaluation and Management Codes: All other evaluation and management codes will be increased by 27.5%.

3.    Targeted increases for anesthesia codes: Anesthesiology reimbursement is based on a structure that includes a base rate ("for starting the procedure") and a time factor to account for the different length of time that the same surgery may take for different patients.  The base units for anesthesia will be updated to current Medicare units.  Also, the two conversion factors specific to anesthesia will be increased by 27.5%.

21

Anesthesiologists have "expressed satisfaction with the outcomes" of these increases.

4.   Non-Texas Health Steps immunizations: The Texas Health Steps immunizations are
standard immunizations that are universally recommended for children.  Some class
members also need other immunizations based on specific needs, for example, malaria
vaccine for a child traveling to some foreign countries, rabies immunizations and
immunoglobulin.  The administrative fees for these "non-Texas Health Steps" shots will
be increased in the same manner outlined above in Step 2 (60% increase).

5.   Targeted increases for specific mental health codes: Defendants used access-based
fees for several mental health codes.  Access-based fees give special consideration to
increase reimbursement when the RVU-based increase is not sufficient.  The proposal
give access-based increases for psychiatric diagnostic interviews, comprehensive
psychological assessments (which are often used to assess the mental health of foster care
children) and psychotherapy/psychological counseling.

6.   Remaining procedure codes:  Several thousand codes are not addressed by Steps one
through five.  These remaining procedure codes will be updated to 2007 Medicare
Relative Value Units and receive a 5% increase to the conversion factor from $27,276 to
$28,640.  If this change does not result in an increase of at least 5% over the current
reimbursement for a specific service, then the fee will be increased by 5% anyway.  No
fee will increase to more than 150% of current Medicare fees.

*See* Pls.' Ex. 342 at 7-8 (2007); TR 155 – 162 (2007).

The Relative Value Units (RVU) system is a standard approach used by many insurers,
including Medicare and commercial insurers.  TR 151 – 52 (2007).  It addresses "a very, very

broad range of medical services." TR 152 (2007).[17] Each medical service/procedure is assigned a "relative value" based on the effort involved. TR 152 (2007).[18] Then each RVU is multiplied by a standard conversion factor to determine the reimbursement to be provided. TR 41:16 – 24 (2007).

According to Dr. Hellerstedt, updating the RVU system was the "cornerstone" of PPAC's approach to reimbursement increases for physicians and other professionals. TR 150 (2007). Defendants had implemented RVUs in 1992 but had not updated them since then. "[B]y updating the RVUs in the system, we . . . brought those relative values of the various services up to date." TR 151 (2007).

The RVU system is "a nationally accepted method for calculating reimbursement." TR 40:17-18 (2007); *see also* TR 152 – 53 (2007). Physicians are familiar with it and view it as fair.[19] Research demonstrates that physicians are more likely to accept reimbursement structures that they understand and perceive as fair. TR 42:1 – 10 (2007).

Dr. Gary Clark testified by Dep. that the "proposals fairly improve reimbursement for providers." Pls.' Ex. 354, ¶ 8 (2007). They are "adequate to encourage more physicians to participate in the Medicaid system in the State of Texas. Further, these proposals should improve access to care for the children of Texas who have Medicaid." *Id.* ¶ 7. Dr. Rider stated

---

[17]The RVU system does not address anesthesia. Defendants properly plan to institute a separate approach for anesthesia reimbursements. TR 157 – 158 (2007).

[18]"Effort" is determined by three factors: time, support staff/office expense, and insurance costs. TR 40:23 – 41:7 (2007); TR 152 – 53 (2007).

[19]Notably, the Texas Medical Association endorses the use of the RVU structure for Defendants' reimbursement changes. Defs.' Ex. 38; Pls.' Ex. 343; TR 163 – 164 (2007).

that the reimbursement increases "will prevent further decreases in the supply of doctors available to Medicaid-eligible children.  Stabilizing the provider base is essential to making the Medicaid program work, so this is a big step in the right direction." Pls.' Ex. 358, ¶ 8 (2007).[20]

Moreover, the Texas Medical Association (TMA) "strongly endorses" Defendants' approach to the reimbursement increases. Defs.' Ex. 38; Pls.' Ex. 343 (2007).  It "will enable physicians who currently limit their Medicaid participation to open their doors to more patients. For those who have quit Medicaid entirely, we are hopeful that some will reconsider taking at least a few patients each month." *Id.*  Although Defendants and TMA considered other options, the proposal, per TMA, "is the only one that achieves organized medicine's goal of a measurable, fair, transparent methodology benefiting both primary and specialty care physicians." *Id.*  The TMA also opines that the proposed fee schedule for medical check-ups "will entice more primary care physicians to participate in the program and thus promote the TMA goal of creating a 'medical home' for all children."  Finally, the proposed methodology is the only one that "can be implemented by September 1, 2007" both in fee for service and managed care programs. Defs.' Ex. 38; Pls.' Ex. 343; *see also* TR 144:19 – 21 (2007).

### (b) Dental Reimbursement

"Dental decay is the most common disease of childhood." TR 87:15 (2007).  Research shows that it causes missed school days and loss of sleep.  In addition, "it can have long-term health implications.  Untreated decay can actually cause severe health problems." TR 87:18 – 20

---

[20]She is concerned, however, "that the increase will not be enough to draw nonparticipating doctors into the Medicaid program." Nonetheless, she urges approval of the proposed settlement because "it represents such a big improvement over our current situation." Dr. Rider Supplemental Dep., Pls.' Ex. 358, ¶ 8 (2007).

(2007) (Dr. Seale). Evidence shows that "disease of the mouth and gums, can cause disease in other parts of the body. So a healthy mouth is . . . important to a healthy body." TR 88:9 – 11 (2007). As Dr. Seale observed, "we should have effective plans . . . to take advantage of the fact that ... [dental disease] can be prevented." TR 88:4 – 5 (2007). Class members suffer dental disease "in spite of the fact that they . . . should have access to a very broadly based plan of services that should prevent and treat that disease, but it's not happening." TR 62:17 – 19 (2007).

Part of the problem is the longstanding, severe shortage of dentists who take care of class members. *Frew 2000*, 109 F. Supp.2 d at 604; *Frew 2005*, 401 F. Supp. 2d at 656-57. This problem has worsened over the years. In FY 1998, 1,783 dentists were taking care of at least one class member. By the fourth quarter of 2007, however, only 1,622 dentists took care of at least one class member. Pls.' Ex. 248 (2007). As Dr. Seale stated, the "number of [class] members is increasing, and the numbers of dentists are dwindling." TR 67:21 – 22 (2007).

As Plaintiff Mary Fisher observed in her deposition:

> Over the years it has gotten harder and harder to find a dentist who takes Medicaid anywhere close to where I live [in Paris]. Lots of people tell me they have to take their children to Mt. Pleasant, about 50 miles away, to see a dentist. Some have to go even farther.
>
> There are dentists in Paris, but they don't take any new Medicaid patients. There used to be a good dentist that people in my neighborhood could walk to, but he doesn't take Medicaid anymore. So now people have to go far away and some of them just can't get there.

Pls.' Ex. 356, ¶¶ 7-8 (2007).

Nicole Carroll, who testified in person during the July 9 hearing, lives in Denton. TR 12:9 – 28:1 (2007) Ms. Carroll is the mother of four class members, all of whom have significant

health problems.  TR 14:7–16:6 (2007).[21]  She has encountered problems obtaining medications,

finding doctors who accept Medicaid, and, especially, finding the specialists that they need.  She

has also experienced problems with the Medical Transportation Program.  TR 16:7 – 16:24

(2007).

Ms.  Carroll also works as a Family Partner at the Denton County Federation of Families,

a non-profit organization that works with families whose children have severe mental health

problems.  Nearly all of Carroll's clients are on Medicaid, and she assists them with problems

obtaining health care.  TR 12:23 – 14:16; 16:25 – 17:4 (2007).  She testified that in Denton, only

one dentist accepts Medicaid.  The dentist will not schedule appointments until the children's

Medicaid card indicates that a check-up is due.  Then there is a delay to get in for an

appointment.  As a result, Ms.  Carroll's children only get dental check-ups every nine or ten

months instead of every six months, as they should.  TR 19:10 – 17 (2007).

One reason for the shortage of dentists, according to Dr.  Seale, is low dental

reimbursements.  At the time of the July hearing, 99% of Texas dentists normally billed more

than Texas Medicaid pays, and often considerably more.  TR 68:6 – 12 (2007).  Indeed, "many

dentists would tell you that . . . the reimbursement rate is less than it costs them to provide the

service.  So in fact, when they treat Medicaid patients, they're losing money, and that's a huge

disincentive for them to participate in the program."  TR 68:14 – 19 (2007).

According to Dr.  Seale, if reimbursement rates are increased to a "reasonable level,"

---

[21]The health problems confronting Ms.  Carroll's children include serious mental health
issues (depression, bipolar disease, ADHD, anxiety, and learning disorders) as well as chronic
physical conditions (asthma and recurring , chronic ear infections in one case
necessitating multiple ear surgeries and, in the other, resulting in a speech delay).  TR
14:7 (2007).

dentists will stay in Medicaid and others will join. TR 68:20; 78:20 (2007). The number of dental appointments available to class members will increase, which hopefully will result in an increase in the number of class members who get dental services, including check-ups. TR 78: 18 – 79:1 (2007).

The initial proposal was an across-the-board 50% increase to all dental codes, however, over the course of subsequent negotiations, the parties decided to modify this strategy. TR 74:1 – 5 (2007); Pls.' Ex. 348 (2007).[22] Specifically, Defendants agreed to investigate what would happen if the sum of money that represented the estimated cost of a 50% across-the-board increase in dental rates was instead used to double rates for a set of 35 dental codes and services identified by Plaintiffs, with all other rates remaining unchanged.

Dr. Seale testified that the 35 services in question represent the care that is the most important for children. Indeed, at Baylor College of Dentistry in Dallas, the 35 codes represent the full pediatric curriculum for future general dentists. TR 71:6 –72:10 (2007). Dr. Seale testified that doubling the reimbursement rates for the 35 services would be sufficient to "reasonably expect increased participation" by dentists. TR 73:9 – 11 (2007). The initial list of 35 dental services is very comprehensive. It encompasses "100 percent of the . . . dental needs

---

[22]Plaintiffs were advised by a capable group of dentists, including Dr. Seale, two past Presidents of the American Academy of Pediatric Dentistry (both from Texas, Dr. Hunke and Dr. Kennedy), another Texas pediatric dentist with expertise in the Texas Medicaid dental program (Dr. Steinhauer), and Dr. Jim Crall of the University of California at Los Angeles. TR 69:2 – 70:14 (2007). Dr. Crall is a "highly qualified" expert on Medicaid dental programs. TR 69:14 – 70:3; 73:4 – 7 (2007). The American Dental Association and American Academy of Pediatric Dentistry were also consulted. TR 76:22 –77:3 (2007). Plaintiffs were "incredibly fortunate to have ... some of the finest minds in the country to advise us." TR 69:2 – 6 (2007).

for about 80 percent of the class members. And for the other 20 percent . . . it would cover about 80 percent of their needs." TR 72:15 – 19 (2007). Of course, reimbursement for the remaining needed services remains at current levels. TR 72:20 – 24 (2007).

The 35 codes, however, are not the end of the story. After HHSC rate setting staff estimated the cost of doubling the 35 codes, they discovered that there would still be funds left over. TR 74:7 – 8 (2007). After further consultation with dental organizations, Defendants proposed to provide increases of varying amounts to 13 additional dental codes. Pls.' Ex. 350, 351 (2007). This addition makes the scope of dental services even more comprehensive and also improves its acceptability to the Texas Dental Association. TR 74:7 – 75:2 (2007).[23]

According to Dr. Seale, targeting reimbursement increases to a limited number of dental services is a more effective approach than smaller across the board increases.

> [W]e're so far behind with the dental reimbursement rates. They were very, very low. And to spread . . . [the reimbursements] . . . over all the codes, . . . dilute[s] it so much that the . . . most important codes were only going to come up a small amount. And that wasn't really going to be enough . . . incentive to bring in new providers. And by targeting . . . the codes that are the most important, most frequently used, we're able to get the reimbursement rates up to a point that we believe we can attract new providers and keep existing providers.

TR 76:5 – 15 (2007).

Indeed, the Texas Dental Association ("TDA") and the Texas Academy of Pediatric Dentistry ("TAPD") both support the current proposal. Defs.' Ex. 27; Pls.' Ex. 352. According to the TAPD, the "fee increases for the selected codes will improve access to care for many Texas Medicaid recipients under the age of 21 and encourage increased provider participation.

---

[23]Dr. Seale notes that Defendants have been "very cooperative" concerning the structure for increases to reimbursements for dentists. TR 75:17 – 24 (2007). "[T]hey've moved quickly. It's been very encouraging." TR 75:24 – 25.

With increased participation from providers, a greater number of children with get the dental care they need." *Id.* The Texas Dental Association agrees: "these changes in reimbursement are likely to substantially increase the number of dentists who will be willing to participate in Texas Medicaid." *Id*; *see also* TR 81:17 – 25 (2007)(dental community "view that these changes will make an improvement"). TDA and TAPD involvement and endorsement is important Their support may facilitate increased participation in Medicaid by dentists. TR 77:6 – 9 (2007) (Dr. Seale). The parties and the Court hope that the planned increases in reimbursement to dentists will make more appointments available, so class members can get preventative care and treatment. TR 80:10 – 13 (2007). The goal is "a decrease in occurrence and severity [of dental disease] so that . . . [fewer] . . . children . . . are in pain, . . ." TR 80:16–7 (2007) (Dr. Seale).

The increases to physician/other professionals and dentists described above are funded for the 2008-2009 biennium. As Commissioner Hawkins explained,

> What I can answer with most certainty is that we have the authority to make the expenditures . . . one of the characteristics of the [Medicaid] program is that you develop estimates of the number of persons who might be eligible for the program. And regardless of whether you've included them in your estimates, it is an entitlement program, so we'll provide the services . . . If there is a shortfall in the actual appropriation amount, the legislature is obligated to provide that funding.

TP 144:22 – 145:13 (2007).

The settlement, however, specifically "does not address what reimbursement rates will be needed for future years after the 2008-2009 biennium." Docket No. 637;Ex. 8 at 4 n. 1. This permits adjustment of reimbursement rates if further increases are necessary to improve

class members' access to necessary health care.[24] *See* TR 43:24 – 44:7 (Dr. Moore); TR 82:1 – 7 (Dr. Seale)(2007).

Moreover, Defendants will also conduct strategic initiatives to increase class members' access to services. The parties and counsel have already met to discuss initial plans concerning these initiatives.[25] Although there is still much work to do, they hope that the strategic initiatives will help to overcome any shortcomings in reimbursement increases. Defendants will include information about the strategic initiatives including an approximation of the number of class members served in their regular quarterly reports to the Court.

### (c) Other Aspects of Adequate Supply of Providers Remedies

In addition to the improvements to reimbursements, the Provider Supply proposal includes other provisions to improve class members' access to care that they need. For example, many class members receive their medical care through managed care, including HMOs. Ensuring that the new higher reimbursement rates actually reach the providers is therefore a consideration. Pls.' Ex. 164 (2007). The Adequate Supply of Providers proposal addresses this issue as well:

Because under Medicaid Managed Care the health plan, or HMO, not the

---

[24]The Court appreciates the legislature's decision to increase funding in the 2008-2009 biennium and hopes that the legislature's positive involvement will extend into the future. Nonetheless, the Court notes that the Consent Decree and Corrective Action Order are directed toward the Defendants. It is they who must comply.

[25]Dr. Moore attended the parties' meeting to discuss the strategic initiatives. He testified that the parties are "eager to discover the best ways to improve" class members' access to health care that they need. TR 44:22 – 23 (2007). Dr. Seale also attended the meeting. She was skeptical at first, and was pleased and surprised by the cooperation at the meeting. TR 63:7 – 64:3 (2007).

> Medicaid program, makes payments to doctors, special efforts must be made to
> ensure that the HMOs' practices reflect the intent of the corrective action plan.  In
> other words, to improve participation by professionals, the HMOs need to pass on
> the reimbursement increases to the professionals who take care of the children,
> and not use the increased funding for other purposes.  The proposal should
> achieve this important goal.

Dunkelberg Dep., Pls.' Ex. 355 ¶ 18 (2007).

Moreover, the Adequate Supply of Health Care Providers Proposal is not limited to

reimbursement issues.  For example, Defendants have already established timeliness and distance

standards for their managed care programs.  The proposal allows Defendants to revise their

guidelines "only if new standards are more favorable to class members." Docket No.  637;  Ex. 8

at 2.  Thus, Defendants will not change their standards to require class members to travel farther

or wait longer for health care appointments than is true today.[26]  J.D.  testified that distance

standards are very important:

> The distance standards ... are better than what we have now in the area my
> children and I live .  .  .  Most of the doctors around [Nacogdoches] do not accept
> [Medicaid.] Because of that I have had to take my children as far away as
> Houston, Dallas and Galveston to see doctors and dentists.  Sometimes it has just
> been to far and too hard, so I was not able to make sure they got all the care they
> needed.

Pls.' Ex. 364; ¶ 6 (2007).

The proposal also contains standards to require Defendants to ensure that class members

have a choice among managed care organizations and among health care providers of the

appropriate type.  As J.D. further stated,

---

[26]Defendants' current standards are based on the Texas Department of Insurance
standards for commercial managed care programs.  Dunkelberg Dep., Pls.' Ex. 355, ¶ 21 (2007).
They require access to an age-appropriate primary care provider with an open panel within 30
miles of a class member's residence, and access to "common" specialists and mental health
providers within 75 miles.

> When we do not have any choice of doctors, things do not work well at all for my
> children. Most of the time I feel that I have no choice but to take them to the
> emergency room when they are sick . . . Having a choice of doctors is very
> important for my children . . . I have not gotten checkups for my children
> because I could not find a doctor that I trusted to do them.

Pls.' Ex. 364, ¶¶ 7-8 (2007); *see also* Pls.' Ex. 362; ¶ 9 (2007)(testimony of K.C.-D.); *see also*

testimony of Nicole Carroll, *supra.*

Dr. Moore concurs. "[T]he research evidence is clear that choice plays a big role in

participation . . .[in health care] . . . [I]t's very important that the requirements for choice be . . .

here." TR 46:21 – 24 (2007).

Further, the proposed Order addresses serious problems with Defendants' lists of health

care providers who are willing to take care of class members. *Frew 2000,* 109 F. Supp. 2d at

626; *see also* Pls.' Ex. 152. (2007) (class members less than 5 years old referred to OB/GYNs);

Pls.' Ex. 154 (2007)(referrals to doctor who left town two months before). Because of the lists'

inaccuracies, class members have trouble finding appropriate health care providers to take care of

them. For example, K.C.-D. testified that Defendants could not "advise [her] regarding

available doctors" near her home county. Pls.' Ex. 362, ¶ 10 (2007).

The problem is not limited to information about doctors. "[O]ne of the major concerns

that class members have is finding dentists who are accepting new patients. For that to happen,

we have to have current, accurate, up-to-date lists, not just of people who are on the provider list

but who are accepting new patients." TR 82:12 – 17 (2007) (Dr. Seale).

Moreover, inaccurate lists mean that health care providers are discouraged because they

cannot find appropriate specialists to accept referrals of class members. This problem

discourages some health care providers from taking care of class members, because they feel that

they cannot properly discharge their responsibility to their patients for want of timely availability of specialists when they are required.  Dunkelberg Dep., Pls.' Ex. 355, ¶ 20 (2007); TR 45:9 – 18 (2007); TR 82: 8 – 20 (2007).

The Adequate Supply of Health Care Providers proposal requires Defendants to improve their referral information.  Dr. Moore testified that this improvement is "absolutely critical." TR 45:10 (2007).  J.D. thinks that this "will make it easier for my children to get care that they need." Pls.' Ex. 364, ¶ 9 (2007).[27]

By the fall of 2007, Defendants will also start their new web-based Provider Look Up system.  Provider Look Up will provide round-the-clock referral information.  It will also increase the accuracy of Defendants' information about health care providers who take care of class members, because to sign in to use the system, providers will have to update important information on a regular basis.

Also, Defendants will conduct new analyses of the Medicaid Provider Base, which will assist the parties and the Court to assess this important area.  "This type of analysis has seldom before been performed in Texas Medicaid and will provide a much needed benchmark for measuring progress and determining where problems remain." Dunkelberg Dep., Pls.' Ex. 35,5 ¶ 21 (2007); *see also* Dr. Rider Supplemental Dep., Pls.' Ex. 358, ¶ 9 (2007).  In addition to showing how many professionals are actually taking new class member-patients, the studies "should show the impact of the reimbursement increases." TR 43:10 – 11 (2007).  Following the studies, Defendants will develop plans to remedy shortages of each type of provider in any

---

[27]As J.D. observed, "It is hard to get care that my children need when [Defendants] cannot tell me which doctors are taking Medicaid and which are not." Pls.' Ex. 364, ¶ 9 (2007)

geographic area, if any are found.

**B. Health Care Provider Training Proposal:**

The Health Care Provider Training Proposal contains two key provisions. First, in August 2007, Defendants will implement an on-line continuing professional education program for Medicaid-enrolled health care providers, and especially those who take care of class members. The program will include sixteen training modules. This approach is "practical" and makes "consistent information easily and widely available." Dunkelberg Dep., Pls.' Ex. 355, ¶ 26 (2007).

Second, Defendants will begin a training program for licensed general dentists statewide to provide dental checkups for children 1 to 3 years of age. The Court hopes that this new program will improve access to dental care for this underserved group of young class members. As Dr. Seale testified, Texas has too few pediatric dentists to take care of all very young class members. General dentists, however, are often reluctant to see them because dental schools do not train them to do so. Young children "become frightened very easily and then become very uncooperative . . . [T]hat's very off-putting to a general dentist who doesn't have experience." TR 83:18 – 21 (2007).

According to Dr. Seale, "with a concerted effort," it will be possible to train general dentists to take care of very young class members. TR 84:11 – 14 (2007). The procedures that general dentists would perform for very young children are "straightforward [and] fairly simple." TR 85:25 (2007).

While there is significant need for increased access to dental care for all class members, the need is quite acute for very young class members. In FY 2006, only 119,343 out of 470,217

34

class members received preventive dental care during the 12th to 24th month of life. Pls.' Ex. 30

(2007). The result is costly in terms of money and poor dental health. In both FY 2005 and

2006, more than 38,000 class members received dental care under general anesthesia, at a cost of

almost $33 million in FY 2005 and more than $36 million in FY 2006. Pls.' Ex. 9,

Interrogatories 41-42 (2007). This is not only expensive but subjects young children to the risks

inherent to the administration of general anesthesia. TR 81:9 – 11 (2007).

## C. Case Management Proposal

Case management "plays a vital role in facilitating recipients' access to needed medical,

social, and educational services." *Frew 2005*, 401 F. Supp. 2d at 667. It is "necessary in order

for some Medicaid-covered children to get all the care that they need." Pls.' Ex. 358, ¶ 11 (Dr.

Rider). Plaintiff Ayala, of Edinburg, explained:

> [A] lot of people really don't know what to do with Medicaid and how to get
> what their children need, and a Case Manager would be a lot of help . . .
> Because of this lawsuit, a case manager . . . helped us. She helped me to learn
> about the transportation program and how to follow up with my children's health
> care.

Pls.' Ex. 353, ¶¶ 7-8 (2007); *see also* Pls.' Ex.361, ¶ 6 (2007)(testimony of G.B.). K.C.-D.

agreed:

> [S]pecial "out of the box" situations ... need this type of support. I am
> responsible for a foster child who needs a nebulizer. He has been placed [with
> me] but he no longer has his nebulizer, which he lost the last time he was with his
> mother. But the Medicaid rules limit how frequently his nebulizer can be
> replaced. I am hopeful that improved case management will address problems
> like this, that do not fit the typical pattern.

Pls.' Ex. 362, ¶ 8 (2007).

Indeed, according to Defendants' survey, families who had case management "reported

high satisfaction rates with [Children and Pregnant Women's] case management." Pls.' Ex. 281 at 1.[28] Almost 70% reported that they "wouldn't know what to do" without it. *Id.; see also* TR 55:9 – 15 (2007).

Despite its effectiveness, case management is underutilized. *Frew 2000*, 109 F. Supp. 2d at 649; *Frew 2005*, 401 F. Supp. 2d at 667; *see also* Pls.'Ex.  9 (Interrogatory 123), 283-287, 291-293, 295, 299 (2007); *see also* TR 55:20 – 56:2 (2007).  Further, the number of enrolled and active case managers is very low. Pls.' Ex.  289, 290, 294 (2007).  The proposed case management remedy addresses this problem in several ways.  First, Defendants will either contract with and/or hire a sufficient number of case managers to meet class members' needs. Second, Defendants will seek to increase case management utilization by increasing referrals to this important service by other health care providers, in part by educating them about the nature of the service and how to make referrals. *See* TR 56:3 – 10 (2007).[29]  The proposal includes mechanisms to track the success of Defendants' efforts, including tracking of the increases in referrals, and increases in utilization by class members in Texas and in each county.

Finally, the Court hopes that a process of assessment and corrective action will eliminate problems with Defendants' case management efforts.  Since case management is "viewed as beneficial and useful by these families; but at the same time, not all the families who might

---

[28]CPW case management is the form of case management developed in response to the Decree in this case.

[29]Defendants' current system only referred 2,571 class members for case management in FY 2006. Pls.' Ex. 68 (2007) (Case Management Referrals).  Another impediment to class members' utilization of CPW case management is the lack of information about this helpful program and the significant confusion that surrounds it. *Frew 2000*, 109 F. Supp. 2d at 653; *Frew 2005*, 401 F. Supp. 2d at 667.

benefit from it are receiving it, . . . [t]his . . . begs for an evaluation of why that might be." TR 55:23 – 56:2 (2007).

## D. Check-up Proposal

The issue whether class members receive "complete" checkups has been a bone of contention between the parties. This corrective action proposal requires a combination of independent studies on the completeness of check-ups coupled with corrective action plans to remedy problems identified by the study. The corrective action plans are properly targeted, for example, to focus on specific managed care programs if incomplete check-ups occur. *See Frew 2005*, 401 F. Supp. 2d at 683. The research/corrective action plan approach is "critical" because it will help to ensure that as much as possible is achieved in each check-up encounter. It is "important to try to discover what is the completeness of the ... screens during each visit." TR 47:10 – 12; 15 – 16 (2007). See also Pls.' Ex. 353, ¶ 5 (2007).

## E. Outreach Proposal

The outreach program informs families about services and how to access them. It also provides information about the Medical Transportation Program and assistance with scheduling appointments. Despite ongoing outreach efforts, however, many class members still do not receive check-ups. *Frew 2000*, 109 F. Supp. 2d at 601-603, 605; *Frew 2005*, 401 F. Supp. 2d at 648-49. As Dr. Moore testified, check-up utilization "certainly has lots of room for improvement," with only half of the class served. TR  48:21 – 49:4 (2007).  In FY 2006, more than 1.5 million class members did not receive medical check-ups and more than 1.5 million did not receive a dental check-up. Pls.' Ex. 30 (2007)(Class Members Who Lack Medical Check-ups or Preventive Dental Services); Pls.' Ex. 9 (Interrogatory 118 and Attachment 2; Interrogatory

119 and Attachment 3; Interrogatory 120 and Attachment 4 (2007). Among class members who had Medicaid for at least seven months of the year, only one in seven obtained two dental check-ups. TR 79:1 – 80:4 (2007).

Moreover, the percent of class members who received check-ups varied considerably from county to county. TR 49:7-8 (2007). For example, in 2005, the medical checkup participation rate was only .29 (on a scale of zero to one) in Culberson County, but .87 in Titus County. Pls.' Ex. 33 (Appendix B at 24, 30 (2007)( 2005 Medical and Dental Statewide Report)). These disparities continued into 2006. For example, in 2006, the medical check-up participation rate was only 0.23 in Jeff Davis County, but it was 0.80 in Hidalgo County. Pls.' Ex. 337 at 16, 20 (2007). There is similarly significant variation concerning dental check-ups from county to county. Pls.' Ex. 33 (dental check-up report).

Underutilization of check-ups is well addressed in the outreach and informing proposal. The proposal begins with a requirement for research to identify the nature of the problem. Defendants will contract for an independent evaluation of "outreach and the reasons that class members miss check-ups." Docket No. 637, Ex. 6 at 2. The study will evaluate a full array of outreach forms, including the use of media, intensive schoolbased programs, intensive community based programs, telephone calls following missed check-ups, and written correspondence following missed check-ups. TR 50:21 – 51:9 (2007). It is intended to address basic questions about the impact of Defendants' outreach program, TR 51:12 – 18 (2007), such as:

- whether information provided orally is accurate, appropriate, understood and whether the recipient of the information can act on it to obtain completed check-

38

ups;

- the relationship between the type of outreach and subsequent receipt of check-ups;

- whether outreach identifies barriers that prevent class members from getting check-ups and/or follow up care, and whether outreach helps families to overcome barriers;

- what causes class members to miss check-ups;

- what can be done to make outreach more effective.

According to Dr. Moore, "there is a national consensus . . . that these are the very questions that we need to be studying" to improve outreach. TR 50:17 –19 (2007). If the study is done properly, the results will be useful to Defendants and the class, as well as nationally. TR 51:21 – 52:10 (2007). Furthermore, the outreach study will "address racial and ethnic disparities relating to each form of outreach, and may also assess other relevant issues relating to cultural appropriateness." Docket No. 687, Ex. 8 at 4.

After the first study is complete, counsel will confer to determine if corrective action is needed and, if so, what form it should take. Eighteen months later, Defendants will begin the process to initiate a second study to assess the effectiveness of the corrective action taken.

The outreach and informing proposal also includes other important tasks, such as improvements in outreach letters, improvements to the Medicaid ID card, 5 TR 171:11 to 172:12 (2005); improvements to informing about the underutilized "extra effort" referral program by Medicaid eligibility workers, which are "not widely used by the State staff," 1 TR 151:17 – 152:2 (2005), and coordination of outreach messages to avoid conflicting, divergent or unnecessarily duplicative information. Defendants will also reinstate outreach reports required by Decree ¶¶

39

60-61.

**F. Check-up Reports and Plans for Lagging Counties:**

Since check-ups are an important part of the Decree, *Fairness Order* at 6; *Frew 2005*,

401 F. Supp. 2d at 641, it is important to have accurate information about class members'

utilization of them. This proposal improves Defendants' check-up reports by requiring reports

based on age. Defendants' compliance with this proposal will constitute full compliance with

Decree ¶¶ 171 and 284 during the time that this Order is in effect. As standards for these studies

have been the subject of contention in the past, *Frew*, 109 F. Supp. 2d at 612-13, the Court hopes

that the new revised definition of required data will eliminate future disagreements.[30]

Defendants will also improve their dental check-up reports to help to track Defendants'

"effectiveness in getting the children back in" for periodic dental check-ups. TR 86:12 –13

(2007).[31] Annual corrective action plans will be devised for each county or

---

[30]For class members over the age of two years, Defendants will report annually the number of class members of each age who receive a medical check-up. They will also report the unadjusted percent of class members of each age who were enrolled for at least 90 days and received a medical check-up in the immediately preceding year.

For class members under the age of two years, because they are entitled to more than one medical check-up in twelve months, Defendants will draw statistically valid samples of class members from birth to six months, six to twelve months, and twelve to twenty-four months. Defendants will determine a) how many medical check-ups the class member should have received based on age and number of months of Medicaid eligibility, (b) whether the class member received each medical check-up due, and c) if not, the number of check-ups that were missed. Defendants will report for each age group the number and percent of class members who a) got all medical check-ups that were due, b) the number and percent who missed one check-up that was due, two check-ups that were due, etc. They will also report patterns or trends in missed medical check-ups, if any exist.

[31]They will report a) the number and percent of class members of each age who received one dental check up, and b) the number of class members of each age who are eligible for Medicaid for seven or more consecutive months, as well as the number and percent of this group who received two dental check-ups.

cluster of counties that lags behind the state average for medical and/or dental check-ups

"to encourage improved participation in each lagging county or cluster of counties."

Docket No. 637, Ex. 2 at 4. This will help enable class members throughout the state to receive

these important, basic services. *See* TR 18:21 to 19:9 (2007).

### G.. Managed Care Proposal

Defendants now implement managed care in all of Texas' 254 counties. Pls.' Ex. 162,

163, 165 (2007). They require many class members to receive their medical care through either

HMOs or a primary care case management program (PCCM). Pls.' Ex. 164 (2007); *see Frew*

*2005*, 401 F. Supp. 2d at 669-71 for descriptions of these managed care programs.

The managed care proposal includes important standards to protect class members who

receive care through Defendants' managed care programs. As an initial matter, Defendants will

include most of the proposed improvements in their next round of managed care contracts in

2007. This permits Defendants to make changes in a businesslike manner when they would

normally be negotiating changes to managed care requirements. Dunkelberg Dep., Pls.' Ex. 355,

¶ 24 (2007). Moreover, since Defendants must implement the changes in 2007, changes will be

made reasonably soon.

In three areas described below, Defendants will implement a new system of rewards and

sanctions for their managed care programs. For each of the three areas, financial rewards will be

available up to the amount of $15 million (All Funds) per year ($45 million total).

Ms. Dunkelberg hopes that the rewards and sanctions will have a positive impact, and

particularly that they "will be sufficiently vigorous that [they] cause . . . the HMOs to improve

in these areas." Pls.' Ex. 335, ¶ 25 (2007); *see also* TR 22:23 – 23:3 (2007)(Ms. Carroll).

41

The first area subject to rewards and sanctions is medical check-ups. Some class members have had significant problems obtaining medical check-ups within Defendants' managed care programs. *Frew 2000*, 109 F. Supp. 2d at 622-26; *Frew 2005*, 401 F. Supp. 2d at 678-79. Missed check-ups are a serious problem that can lead to other significant problems. For example, as noted in a 2006 report prepared for Defendants by Dr. Betsy Shenkman of the Institute for Child Health Policy, University of Florida, "[p]reventive care visits that meet the American Academy of Pediatrics (AAP) periodicity schedule are associated with a decrease in avoidable inpatient admissions for infants across various racial and ethnic groups, income levels and health status." Pls.' Ex. 185 at 23 (2007); *see also* Pls.' Ex 344 at 94 (2007); Dunkelberg Dep., Pls.' Ex. 355;,¶ 23 (2007).

To address managed care barriers to check-ups, Defendants will require their managed care organizations and PCCM to provide various annual reports about class members' receipt of check-ups. The reports will be provided by service delivery area (HMOs) and by HHSC region (PCCM). Based on these reports and the check-up completeness reports mentioned above, Defendants will develop and implement rewards and sanctions for "high or low rates of check-ups and especially complete check-ups." Docket 637, Ex. 5 at 3.

Moreover, some class members get no services at all even though they are enrolled in a managed care program. To find out why this occurs Defendants will contract for an independent, external study of "class members who do not receive any form of health care covered by Defendants' contracts with their managed care organizations." Corrective actions will be taken if warranted, and plans to resolve the "no care" problem may include financial rewards and sanctions. A second "no care" study will be conducted after implementation of any corrective

action plans with emphasis on the effectiveness of the "no care" corrective action plan.

Children of migrant farmworkers ("FWCs") have particular difficulties obtaining health care because of the confluence of their families' often extreme poverty, their lack of education (including about health care) and related factors. Further, their mobility makes it hard to locate health care providers when needed and can prevent continuity of care. *Frew 2000*, 109 F. Supp. 2d at 631-32; *see also* Pls.' Ex. 219 (2007).

Defendants' managed care organizations have been unable to identify many migrant farmworker class members and have thus failed to accelerate delivery of services to this vulnerable population. *Frew 2000*, 109 F. Supp. 2d at 632-34. This problem continues until today. Pls.' Ex. 9 (Interrogatory 89); Pls.' Ex. 220, 222 (2007).

The proposal will rectify this problem by several means. First, in 2007, Defendants will make "acceleration of services" to FWC enrollees a contract requirement. Docket 637, Ex. 5 at 7. Each Managed Care Organization ("MCO") will be required to report annually about its identification and delivery of services to this group. With these reports, Defendants will learn if each MCO is accelerating services to these class members, including by identifying and cooperating with groups that work with FWC; making appropriate, aggressive efforts to reach each identified FWC to provide timely check-ups and follow up care; maintaining accurate, current lists of FWC enrollees and maintaining confidentiality of information about FWCs. *Frew 2000*, 109 F. Supp. 2d at 634 n. 113.

Based on the reports, Defendants will develop and implement rewards and sanctions based on performance. Reports about each HMO in each region will facilitate recognition of good performance and identification of HMOs that perform poorly, so problems can be rectified

43

in the geographic areas where they occur . *See Frew 2005*, 401 F. Supp. 2d at 683.

Furthermore, Defendants will enhance the impact of the rewards and sanctions by posting

timely information about them on their website.  Hopefully, this will "encourage the HMOs to

improve even more than would occur through the use of the rewards/sanctions alone," and

making the information public "will also help families to choose the best HMO for their

children." Dunkelberg Dep., Pls.' Ex. 355, ¶ 25 (2007).

Finally, Defendants' MCOs will not be permitted to pass financial sanctions to their

contracted health care providers "except on an individual basis . . . on the basis of inadequate

individual performance," and only after efforts to collaborate with providers to improve

performance.  Docket 637, Ex. 5 at 9.  This requirement should be fair to providers while also

improving services to class members by facilitating improvement in services.  Dunkleberg Dep.,

Pls.' Ex. 355, ¶ 25 (2007).

## H.  Prescription and Non-Prescription Medications; Medical Equipment and Supplies Proposal

Modern medicine relies increasingly on medication as a major part of treatment.  TR

54:21 – 22 (2007).  Federal Medicaid law allows State officials to implement a Preferred Drug

List (PDL) program.  42 U.S.C.  §1396r-8.  Through a PDL, State officials may place drugs on a

preferred list if they receive cost rebates from manufacturers.  *See* description of PDL in

Dunkelberg Dep., Pls.' Ex. 355; ¶¶ 27-28 (2007).

In 2005, Defendants initiated a PDL.  Under the PDL system, class members may receive

non-preferred drugs that are prescribed, but only with Defendants' prior approval.  However, if

prior authorization is delayed, federal law requires Defendants to provide a 72-hour emergency

allotment of non-preferred drugs so that class members are not deprived of needed medicines. When pharmacies fail to follow this rule, class members go without emergency medications.[32]

Unfortunately, the PDL system remains "confusing to parents and not well understood by many health care providers, including the pharmacies that are supposed to implement it." Dunkelberg Dep., Pls.' Ex. 355, ¶ 29 (2007). To rectify this problem, the proposal makes several improvements to the pharmaceutical program, which will be practical and should improve class members' access to medicines prescribed for them. First, Defendants will assist pharmacists to provide the 72-hour emergency allotments. Typically, when class members present prescriptions to be filled, pharmacy staff forward them by computer for Medicaid approval. Pharmacies receive electronic approval or denial within a matter of seconds.

Under the proposal, Defendants will improve their electronic message to pharmacies. When a medication is denied only for lack of prior authorization, the pharmacist will automatically be directed to submit a 72-hour emergency request if the prescribing doctor is not available to request prior approval. "[I]f pharmacists hear about the need to provide a 72-hour supply at the same time they hear about prescription disapprovals it will get their attention. It works in an educational type of framework, which . . . is beneficial." Dr. Rider supplemental

---

[32]For example, Ms. Carroll testified that one of her children is allergic to a generic form of a medicine but is not allergic to the name brand. She had difficulties getting prior authorization for a medicine that her child could use. TR 25:8 – 11 (2007). Plaintiff Ayala also testified about problems getting medicines for her three sons, even right after surgery. "Sometimes I wouldn't be able to get the medicine right away, and they needed it right away. The pharmacy would call me, sometimes after a couple of days, and I would have to go back to get the medicine.... Sometimes I had to buy the medicines with my own money." Pls.' Ex. 353; ¶ 6 (2007); *see also* Pls.' Ex. 364, ¶10 (2007)(testimony of J.D.: "my children just suffered without the medicine they needed for infections and other illness."); Pls.' Ex. 362, ¶ 6 (2007) (testimony of K.C.-D.)

Dep., Pls.' Ex. 358; ¶ 16 (2007).  This practical approach "takes advantage of existing

technology resources to improve access to drugs." Dunkelberg Dep., Pls.' Ex. 355; ¶ 30 (2007).

Hopefully, this succinct and timely information will cue pharmacists to provide the 72-hour

medication.

In addition, Defendants will mail written information to each Medicaid-contracted

pharmacy to clearly explain the 72-hour prescription policy, particularly as it applies to class

members.  Defendants will also work with the Texas Pharmacy Association (TPA) to explain the

72-hour policy to TPA members.  As K.C.-D.  testified:

> [I]t's important . . .  to educate the pharmacists about the system, so that they
> realize that they are going to be reimbursed . . .  [I]n the past, the pharmacist did
> not know very much about the Medicaid system, and they weren't willing to stick
> their neck out.  Because of this, children had to go without their medications at
> times.

Pls.' Ex. 362, ¶ 7 (2007).

Second, Defendants will twice analyze their contracted pharmacies' claims history for 72-

hour emergency prescriptions.  Defendants will begin by identifying pharmacies that, despite

high volumes of Medicaid prescriptions in classes that require prior approval, process a) no 72-

hour emergency prescriptions and b) a lower than expected percent of 72-hour emergency

prescriptions.  Based on the review, Defendants will provide intensive, targeted education efforts

to pharmacies that appear to lack knowledge of the 72-hour emergency prescription policy."

Many doctors and other prescribers do not understand which medicines require

prior approval.  Pls.' Ex. 355, ¶29 (2007)(Dunkelberg Dep.).  As a result, they do not know when

---

[33] J.D.  commented that it is important to monitor pharmacies.  "[T]he Medicaid program
is paying these pharmacies to follow the rules., The Medicaid people should make sure the
pharmacies really do this.  Kids suffer if they do not." Pls.' Ex. 364, ¶ 12(2007).

they need to request prior approval before a class member can receive a medicine. To lessen confusion and thereby improve access to medications, Defendants will make available at no charge a Medicaid PDL prescription service to inform prescribers about medicines that require prior approval. The service will be suitable for use by internet or for download to handheld devices that prescribers use.

Barriers also prevent class members from obtaining necessary durable medical equipment. For example, some class members with diabetes have problems obtaining supplies that they need every day, such as lancets and blood testing strips. Pls.' Ex. 65-67 (2007). Similarly, in 2006, despite following all instructions from Defendants, a foster mother could not obtain prescribed nutritional supplements for a class member who, in essence, was starving to death because of a condition known as failure to thrive. Pls.' Ex. 62; 271 (2007). Class members have also reported problems obtaining diapers, incontinence pads and the like. Often the problem arises because the pharmacy that fills the class member's drug prescriptions is not separately contracted with Medicaid as a provider of durable medical equipment and supplies Pls.' Ex. 361, ¶ 8 (2007).

To minimize this problem, in early 2008, Defendants will encourage all Medicaid-enrolled pharmacies to also enroll to provide durable medical equipment providers. This initiative is intended to facilitate class members' access to durable medical equipment commonly found in pharmacies. Dunkelberg Dep., Pls.' Ex. 355, ¶ 32 (2007).[34]

---

[34]In the past, however, class members have had problems with other forms of durable medical equipment, such as obtaining wheelchairs and repairs to wheelchairs. *Frew 2000*, 109 F. Supp. 2d at 630; Pls.' Ex. 63, 64 (2007). The proposal does not directly address this type of problem. The proposed strengthening of case management, however, should help; case managers should be able to help class members to obtain durable medical equipment not normally found in

47

Other initiatives set forth in the proposal include training the HHSC ombudsman's office about the 72-hour medication policy and durable medical equipment issues and encouraging MCOs to train their 24-hour nurse hotlines about the 72-hour medication policy and durable medical equipment issues.

## I. Medical Transportation Program Proposal

Many class members simply cannot use health care services at all without transportation assistance. *Frew 2000*, 109 F. Supp. 2d at 592. However, the Medical Transportation Program (MTP) has not worked well. For example, Ms. Carroll testified that she personally has had problems with mileage reimbursement and never was reimbursed for all of her travel when her son was hospitalized in the fall of 2006. TR 26:1 – 11 (2007). In her work at the Denton Federation of Families, Ms. Carroll has also observed that approximately half of the families whose children are on Medicaid have no transportation or limited transportation (for example, the family has one car which is used for work so the rest of the family lacks transportation during working hours). They must rely on the MTP to get to and from class members' health care appointments. TR 26:17 – 23 (2007).[35]

In response to these problems, the transportation proposal further defines the Decree's

---

pharmacies. Dunkelberg Dep., Pls.' Ex. 355, ¶ 33 (2007).

[35]Similarly, G.B. testified about her grandson, who has frequent emergencies related to his psychiatric problems. Often Defendants' transportation program cannot meet their needs when appointments are closely spaced in time. Pls.' Ex. 361, ¶¶ 4, 5 (2007).

J.D. agreed. "If I cannot get help with medical transportation my children will just not be able to get all the health care they need. And, I know that my family is not the only one." Pls.' Ex. 364, ¶ 13 (2007). Indeed, "lots of people ... have to go far away to take their kids to doctors or dentists that take Medicaid. So, the medical transportation program really has to work right if kids are ever going to get any care. Only rich people can pay for lots of gas for their cars right now." Pls.' Ex. 356, ¶ 11 (2007)(Mary Fisher).

requirements for independent evaluations to determine whether the MTP transportation program

is "effective." ¶ 223.  Research will be followed by corrective action plans developed by

Defendants with input from Plaintiffs.  Also, the MTP will be transferring from the Texas

Department of Transportation to the HHSC at the start of the new fiscal year.  The Court hopes

that this transfer will improve transportation assistance, which "appears to have suffered under

the oversight of TX DOT." Dunkelberg Dep., Pls.' Ex. 355, ¶ 34 (2007).

**J.  Toll Free Number Proposal**

Defendants rely on toll free numbers to inform class members, to assist them to locate

health care providers/schedule appointments, and to arrange for transportation to appointments.

To achieve these purposes, calls must be answered promptly.  Decree ¶ 247.  The proposal

addresses four of Defendants' toll free numbers: Texas Health Steps, Managed Care Enrollment

Broker, Statewide Medicaid Helpline,[36] and Transportation (MTP).

Improvement is certainly required.  Some class members have had to endure unacceptably

long waits on one or more of these toll free lines, and sometimes are "never connected to a

representative." Pls.' Ex. 358, ¶ 18 (2007)(testimony of Dr. Rider).  *See also* Pls.' Ex. 362, ¶ 10

(2007)(testimony of K.C.-D., "I had to wait 45 minutes to an hour on hold, and I was

disconnected sometimes.").  Callers sometimes hang up because the wait is too long, or try to call

on lunch breaks and cannot get through before they have to go back to work.  TR 24:3 – 17

(2007).  Still others, lacking a telephone, must call from neighbors' phones or from "cheap cell

phones that only have so many minutes on them." Pls.' Ex. 356, ¶10 (2007) (Mary Fisher).

When staff do not answer the toll-free lines, parents finally give up, and their children do not get

---

[36]Defendants will implement a new toll free state wide Medicaid Helpline.

care. Pls.' Ex. 364, ¶ 14 (2007)(testimony of J.D.).  "The proposed standards set out in this corrective action plan are badly needed to ensure that callers can reach a live human being within a reasonable amount of time." Dunkelberg Dep., Pls.' Ex. 355, ¶ 35 (2007).

In the past, the MTP number has been the source of the most serious violations of the Decree's toll free number standards. *Frew 2000*, 109 F. Supp. 2d at 639-41.  The MTP number continues to have significant problems, with statewide monthly abandonment rates that exceeded 30% in the first three months of 2007, and lengthy average monthly waits in queue that hovered around 7 minutes during that same time frame. Pls.' Ex. 274, 277-80 (2007).  Defendants will have nine months to remedy these problems, which is six months longer than is permitted to remedy problems with the other three toll free numbers.  Given the longstanding malfunctions of the MTP toll free numbers and the expected transfer of MTP from TX DOT to Defendants, this extra time is reasonable.

Problems are not, however, limited to the MTP toll free numbers.  In 2007 there was a significant decline in performance by the Texas Health Steps and Enrollment Broker toll free numbers, with abandonment rates ranging from 15-41% and average speed to answer ranging from 184–1299 seconds. Pls.' Ex. 108 (2007).

The proposal requires: a) adequate equipment that fails only because of circumstances beyond Defendants' control, such as bad weather; b) a monthly maximum average time of 300 seconds for each call to be answered by a live person; c) an average monthly wait to speak with a live person of no more than 60 seconds (after recorded messages and completion of a user selection menu); d) a maximum monthly abandonment rate not to exceed 10%; e) no more than 2% of calls to receive busy signals, disconnections or other problems that prevent the caller from

50

reaching staff; and f) no calls may be answered by "clearing the queue," which means callers are asked to call back later or told that staff will return the call.[37] Pls.' Ex. 364, ¶ 14 (2007); *see also* TR 24:18 – 23 (Nicole Carroll)(2007); Pls.' Ex. 364, ¶ 14 (2007).

## K.  Health Outcomes Measures and Dental Assessment Proposal

Health outcomes measures serve at least two purposes.  They measure "important aspects of the population's health."  Docket 637, Ex. 4 at 1.  They are also a proxy to indicate "whether [class members] receive the full range of services that they need and are entitled to receive."  *Id.* In Dr. Moore's opinion, outcomes measures assessment is important.  It should show if Defendants' efforts are making a difference in class members' health, instead of just counting the number of services provided.  TR 56:11 – 20 (2007).

The outcomes measures proposal requires Defendants to present approximately 12 proposed outcome measures for Plaintiffs' approval and comment, and thereafter report the proposed measures and study methodologies in their quarterly report if the parties agree.  Within four months of completion of the first outcome measure study, Defendants are to propose corrective action plans and outcome goals, and Plaintiffs are to respond with comments.  The corrective action plans will address methods to achieve the targeted goals for each indicator. "[S]electing and keeping track of health outcomes  measures . . . will be challenging, but, it needs to be done.  It will be worth the time and effort if the methodology for doing it is valid."  Pls.' Ex. 358, ¶ 14 (2007)(Dr.  Rider).

---

[37]If Defendants contract for toll free number service, their new, amended and/or renewed contracts will include these standards.  In addition to regular quarterly reports, if any toll free number violates the standards for three months in a row, Defendants will provide daily reports about that toll free number.

The proposal also requires the parties to cooperate to develop plans for a professional and valid assessment of class members' dental health.  The dental study will evaluate the number and percent of class members who "1) have no history of cavities, 2) have untreated cavities, 3) require urgent dental care for pain, infection or bleeding, and 4) require dental care that may potentially include either inpatient hospitalization or outpatient treatment under general anesthesia." Docket No. 637, Ex. 4 at 4.

After completion of the dental study, the parties will cooperatively develop a dental corrective action plan.  A second study will follow, as well as a second corrective action plan.  According to Dr.  Seale, this is an "excellent" approach that assesses "the status of that population you're going to treat." TR 87:9; 87:11 – 12 (2007).

## 6. THE OPINIONS OF THE CLASS COUNSEL, CLASS REPRESENTATIVES AND ABSENT CLASS MEMBERS.

Plaintiffs' lead counsel asked the Court to enter the Corrective Action Order and urged that it is fair, reasonable and adequate.  TR 8:17 – 19; 8:24 – 25, 167, 175 (2007).  She stated that the "relief proposed will provide significant advantages to the class and will help them to receive the care that they need." TR 170 (2007).

Nicole Carroll, the mother of four class members, testified that the proposed Order is fair, reasonable and adequate.  TR 27:21 – 24 (2007).[38]

K.C.-D.  testified in person before this Court in 2005 and by deposition in 2007.  5 TR

---

[38]In particular, she testified in favor of the proposals concerning case management, check up reports/lagging counties, medical check-up completeness, outreach, managed care, reimbursement increases to improve the supply of professionals to take care of class members, toll free number standards, medications and transportation.

173:23 *et seq.* (2005); Pls.' Ex. 362, ¶ 2 (2007).  She is a foster mother who frequently cares for

class members, and had two class members in her care as foster children at the time of the

hearing.  Her two sons also have Medicaid and are class members.  *Id.*, ¶ 1.  She testified that

"the proposals as a whole are fair, reasonable and adequate.  Several of the specific corrective

actions will directly address some of the problems I have experienced.  I'm very impressed with

all of the proposed changes." *Id.*,  ¶¶ 4, 5.[39]

Present Plaintiff Mary Ayala and former Plaintiff Mary Fisher likewise testified via

deposition that they believe the proposed settlement is fair, reasonable, and adequate.  Pls.' Exs.

353, ¶ 3 and 356, ¶¶ 6, 13 (2007).  Current class member parent/guardians G.B. and J.D.  agreed.

See P.Exs. 361 ¶ 3; 364, ¶ 5 (2007).  Each commented on particular proposals they believed

would benefit their children/grandchildren.

Finally, mother J.D.  observed that "the agreement is fair, reasonable and adequate.  It

may not solve all the problems, but I think it will help a lot." Pls.' Ex. 364, ¶5 (2007).[40]

NOTICE TO CLASS AND COMMENTS OF ABSENT CLASS MEMBERS

The Court received 67 written comments from class members as a result of the Notice

that the Court ordered.  Docket No. 635; *see also* Pls.' Ex. 335 (2007)(Summary Chart of Class

---

[39]K.C.-D. specifically commented in favor of the proposals concerning medication and medical equipment, case management, increased reimbursement to increase the supply of doctors, outreach, toll free numbers and check-ups. *Id.* (throughout).

[40]As described above, various non-class member witnesses agreed that the proposed settlement is "fair, reasonable and adequate." Dr. Clark; Pls.' Ex. 354, ¶7 (2007);  Dunkelberg, Pls.' Ex. 355, ¶4 (2007); Fisher, Pls.' Ex. 356, ¶ 6 (2007); Dr. Moore, TR 33:9 – 11 (2007); Dr. Rider, Pls.' Ex. 358, ¶ 7 (2007); Dr. Seale, TR 66:8 – 10 (2007).

Members Written Comments (2007)) and Pls.' Ex. 359 (2007)(sealed copies of comments).[41]

These comments followed Notice that the Court ordered on April 16, 2007.

Docket No. 635. Defendants assured the Court that notice was provided as the Court

required. Pls.' Ex. 331 (2007); *see also* Pls.' Ex. 332, 333, 334 (2007)(copies of the notice).

Defendants mailed written notice to each class member with the June, 2007 Medicaid ID

cards, using notice language approved by the Court. The notice informed class members that

they could submit written comments to the Court, to be postmarked no later than July 2, 2007.

The notice also explained that class members could view the proposed Corrective Action Orders

in English or Spanish. The proposal was posted on the Court's website, Defendants' website and

in each of Defendants' eligibility offices. Docket No. 641; Pls.' Ex. 331 (2007).

As directed by the Court-approved notice, class members sent written comments to Ms.

Zinn. Every day, her office date stamped and logged them into Pls.' Ex. 335; 359 (2007). Ms.

Zinn mailed written responses to class members who requested further information after they

received the notice. The date and nature of responses are noted in Pls.' Ex. 335 (2007). Further,

if a class member required assistance, Ms. Zinn forwarded the written request to Defendants'

counsel for Defendants' attention and action. Class members did not file any written opposition

to the proposed Order. Indeed, the comments reflected curiosity about the case; most of the

comments simply requested further information.. Several reported problems or issues related to

this case, such as:

---

[41]Comments 66 and 67 were not postmarked by the July 2, 2007 deadline. Docket No. 635, referring to Notice proposed in Joint Brief Concerning Notice. Docket No. 634. The Court considers them because they were received by Plaintiffs' counsel before the July 9, 2007 hearing date. Also, since there are only two tardy comments, and they are both short, it is not a burden for the Court to consider them.

- Transportation problems (# 2, 66)

- High medical bills (# 13)

- Lack of knowledge about EPSDT (# 12, 30)

- Children's illnesses (# 32, 44, 66)

- Check-ups (# 7, 26, 38, 41)

- Dental care (delays, access problems) (# 7, 50, 66)

- Medication access (# 60)

- Class members' receipt of care (# 20, 31, 61)[42]

Ms. Zinn informed the Court that she received several phone calls about the case from class members or their parents. Only one opposed the proposed Order because of the length of time until there could be relief. TR 4:3 – 16; 174 (2007).

Admittedly, it will take some time for class members to see the benefits of some parts of the Order, in particular, the parts that require research prior to corrective action plans. Nonetheless, the proposed Order is fair, reasonable and adequate despite the delays resulting from the studies. First, Defendants will implement important aspects of relief in the very near future. For example, they are already well underway toward implementing reimbursement increases to encourage more professionals to take care of class members. They will soon implement their new computerized information system to advise physicians about which medications require prior approval. Moreover, Defendants' on-line professional education program will be in place by August, 2007.

---

[42]Two comments are about problems with qualifying for Medicaid. Numbers 36, 47/62 (same person). This case does not address problems with Medicaid eligibility. It addresses problems with services for children who have already qualified for Medicaid.

Furthermore, as Dr. Moore and Dr. Seale testified, the research-evaluation/corrective action plan process is impressive. Ultimately it will benefit class members, if properly implemented, by strengthening Defendants' programs for the class.

Finally, Nicole Carroll testified that although she was initially worried about the length of time required to see improvement, "the sooner we get started implementing this and starting the studies, the sooner we'll get to some actual, real good changes . . . And there are parts of it that are going to be implemented fairly soon as well. So . . . overall it's a very good, solid plan that's going to have some real changes to it." TR 27:10 – 20 (2007).

## CONCLUSIONS OF LAW

By definition, settlements are the product of give and take. In the process, parties make concessions and in doing so, give up relief that they may have sought in exchange for other relief that is agreeable to both sides. *Reed*, 703 F.2d at 174. As a result, courts do not look for perfection when deciding whether to approve settlements in class actions.

Instead, this Court must decide whether the proposed Corrective Action Order is fair, reasonable and adequate. Fed .R. Civ. P 23(e)(1)(C). Despite the shortcomings mentioned above, this Court has no hesitation in reaching the decision that the proposed Corrective Action Order surely meets this standard.

Above, the Court has already addressed the factors the favor this determination. To reiterate, however, as a matter of law, *Ayers'* six factors all weigh in favor of this Court's entry of the Corrective Action Order:

1.     There was no fraud or collusion behind the settlement;

2.     Absent settlement, the litigation would have continued to be complex, expensive,

and likely of long duration before the class received relief;

3.    The Decree has been in effect for more than ten years. This Court found Defendants in violation of the Decree in 2000 and again in 2005. *Frew 2000, Frew 2005*, 401 F. Supp. 2d at 684-85. This proposed settlement represents the first significant cessation of hostilities between the parties since they jointly urged entry of the Decree in 1995.

Also, the stage of proceedings, combined with the amount of discovery, helps to convince the Court to approve the settlement. "The several [hearings] and appeals that have already occurred in this case have largely resolved the controlling legal issues. Thus, the parties and the district court possess ample information with which to evaluate the merits of the competing positions." *Ayers*, 358 F.3d at 369.

Further, the amount of discovery completed certainly supports approval of the Order. The Court is confident that class counsel are very familiar with the circumstances and facts of this case, and that they were skilled in their negotiations in these proceedings. The Court believes that Plaintiffs' counsel knew enough to make good decisions concerning the needs of absent class members and whether or not the proposed Order would meet those needs properly.

4.    Plaintiffs and the class were quite likely to prevail on the merits of Defendants' decree violations, given Defendants' concession that they had lost and the affirmance of the Court's decisions in 2000 and 2005. Nonetheless, Plaintiffs'

success was less certain on remedial issues, particularly since the Court is required to defer to Defendants' reasoned judgment. *Milliken*, 433 U.S. at 280-81.

5.  Regarding the range of possible recovery, had the Court taken evidence in a disputed hearing in April, 2007, it is unlikely the Court could have devised a better, more practical remedy than the proposed Order currently at issue. This process certainly would have taken more time, contrary to the interests of the class.

6.  The opinions of the class counsel, class representatives and absent class members favor the adoption of the proposed Order. *Ayers*, 358 F.3d at 369.

After so many years of contention, the Court is impressed by the Parties' cooperative efforts, which are embodied in the Corrective Action Order. The Court concludes that the proposed settlement is fair, reasonable and adequate.

SIGNED this 5th day of September, 2007.

William Wayne Justice
Senior United States District Judge

58