IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| CARLA FREW, et al. | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:93cv65 |
| | § | JUDGE RICHARD A. SCHELL |
| KYLE L. JANEK, M.D., et al. | § | |
| *Defendants.* | § | |

**DEFENDANTS' RULE 60(B)(5) MOTION TO VACATE THE DENTAL ASSESSMENT
PORTION OF THE HEALTH OUTCOMES MEASURES AND DENTAL ASSESSMENT
CORRECTIVE ACTION ORDER, AND RELATED CONSENT DECREE PROVISIONS**

Pursuant to Federal Rule of Civil Procedure 60(b)(5), Defendants file their motion to vacate the dental assessment portion of the Corrective Action Order: Health Outcomes Measures and Dental Assessment [Dkt. 637-5] ("CAO")[1] and Paragraphs 143-174 of the Consent Decree [Dkt. 135] ("Decree"), and would respectfully show the Court as follows:

**I.   INTRODUCTION**

Eighteen years ago, Defendants agreed in the 1996 Consent Decree to undertake discrete obligations regarding Texas EPSDT[2] dental services, including, inter alia, outreach efforts to Medicaid recipients under age 21 and dental providers, quarterly and annual reports to the Court, and a study to assess the dental health of the EPSDT population in Texas.[3]   Seven years ago, Defendants agreed in the 2007 CAO to conduct two studies to assess the dental health of the THSteps population in Texas and implement a corrective action plan ("CAP") in between those

---

[1] Ex. 1, Corrective Action Order: Health Outcomes Measures and Dental Assessment [Dkt. 637-5].  The first five bullet points ("BPs") of the Corrective Action Order: Health Outcomes Measures and Dental Assessment relate to health outcomes measures and not the dental assessments, and are not at issue in the present motion.

[2] The Early and Periodic Screening, Diagnosis, and Treatment ("EPSDT") service is known as the Texas Health Steps (or "THSteps") program in Texas.  Texas Health Steps is Texas's Medicaid comprehensive preventive health services program (medical, dental, and case management) for individuals from birth through 20 years of age.

[3] Dkt. 135 at ¶¶ 143-174.

studies.[4]   As shown below, Defendants have satisfied all of the mandatory, enforceable obligations under the Decree and CAO,[5] and thus the dental assessment portion of the CAO and related Decree paragraphs (143-174) should be vacated under Prong 1 of Rule 60(b)(5) ("the judgment has been satisfied, released, or discharged").

## II.  BACKGROUND INFORMATION REGARDING TEXAS MEDICAID DENTAL SERVICES FOR CHILDREN AND THE FREW LAWSUIT

The Texas Medicaid program provides dental services at no cost to eligible Medicaid recipients under age 21.   When this lawsuit was filed 21 years ago in 1993, the number of Medicaid recipients under age 21 eligible for EPSDT was 1,160,343, with a dental participation ratio of 14 percent.[6]  At the time, all dental services for Medicaid recipients under age 21 were provided through a fee-for-service delivery model, meaning that a recipient sought services from a Medicaid-enrolled dental provider of his/her choice and that provider billed the Medicaid program directly for services rendered.   As of 1999 (three years after the 1996 Frew Consent Decree was entered), 1,548,192 Medicaid recipients under age 21 were eligible for EPSDT, with 41% of those Medicaid recipients receiving any dental service through Medicaid, and 35% receiving any preventive dental treatment service through Medicaid.[7]  By contrast, by 2013 the number of Texas Medicaid recipients under age 21 receiving any dental service through Medicaid had increased to 62%, and the number receiving any preventive dental treatment service through Medicaid had increased to 50%.[8]

In 2000, Defendants were held in violation of certain portions of the Consent Decree, including an unenforceable recital paragraph in the Dental section of the Decree, Paragraph 143

---

[4] Ex. 1, CAO [Dkt. 637-5] at BPs 6-11.
[5] Dkt. 135, at ¶ 302 ("The term 'will' creates a mandatory, enforceable obligation.").
[6] Ex. 2, Declaration of Michelle Long, at Att. F.
[7] Ex. 2, Long Decl., at Att. F.
[8] *Id.*

("Defendants must provide periodic dental check ups and needed dental services to relieve pain, restore teeth and maintain dental health for EPSDT recipients. 42 U.S.C. § 1396d(r)(3). The Texas EPSDT periodicity schedule provides that dental check ups begin at age 1 and continue every 6 months thereafter.").[9]   In 2007, Defendants entered into eleven Corrective Action Orders, each intended to bring Defendants into compliance with the Consent Decree.  *See* Dkt. 663, p. 15 ("Once Defendants comply with that part of the Decree and the related section of the CAO, then the Court may terminate that part of the Consent Decree and CAO.").  As noted above, the CAO at issue in the present motion required Defendants to perform an assessment of dental health, implement a CAP, and then perform a second assessment of dental health.[10]

From 2008 to 2009, as required by the 2007 CAO, Defendants conducted a First Dental Assessment.  The First Dental Assessment findings demonstrated that children enrolled in Medicaid experienced dental outcomes that were equal to or better than the outcomes for children not enrolled in Medicaid, on all outcome measures tested.[11]  Defendants argued in their 2010 Rule 60(b)(5) motion to modify [Dkt. 766] that, due to the very positive findings in the First Dental Assessment, the CAO should be modified to not require Defendants to undertake "corrective" action and an additional dental assessment.  The Court denied Defendants' motion to

---

[9] Despite the fact that this paragraph is an unenforceable recital paragraph which merely paraphrases federal Medicaid law (42 U.S.C. § 1396d(r)(3)) and states what the then-current (and no longer accurate) Texas EPSDT periodicity schedule was in 1996, the 2000 opinion found, "based on the evidence relayed in Section II(B)(2) regarding defendants' provision of dental checkups to the plaintiff class, that defendants ha[d] violated paragraph 143." *Frew v. Gilbert*, 109 F. Supp. 2d 579, 611 (E.D. Tex. 2000).  However, Paragraph 302 of the Decree states that Decree paragraphs must contain a "will" to create an enforceable obligation, which Paragraph 143 does not contain.  *See* Dkt. 135 at ¶ 302 ("The term 'will' creates a mandatory, enforceable obligation.").  Further, the paragraphs containing mandatory, enforceable obligations in the Dental section of the Decree do not begin until <u>after</u> Paragraph 146. *Id.* at ¶ 146 ("The parties agree to and the Court orders the following improvements to the EPSDT dental program:").

[10] Ex. 1, CAO [Dkt. 637-5].

[11] Ex. 3, Declaration of Linda Altenhoff, D.D.S., at Att. E (First Amended Dental Assessment).  The one exception to this was in the category of "dental caries experience" (which measured whether a child had ever had a cavity) for third grade school children.  *Id.* at pp. 3, 6.  77% of third-graders enrolled in Medicaid had ever had a cavity, compared to a 72% rate for third-graders not enrolled in Medicaid.  *Id* at p. 6.  However, for the subgroup of third-graders who were not enrolled in Medicaid and who received free school lunch, a greater percentage – 79% – had ever had a cavity.  *Id.* at p. 7.

modify in 2011 [Dkt. 822].  In February 2012, in accordance with the CAO, Defendants began to implement a CAP which required Defendants to undertake (or continue, if already undertaken) actions designed to improve the dental health of Medicaid recipients under age 21.[12]

In March 2012, the Texas Medicaid program transitioned the delivery model for dental services for most Medicaid recipients under age 21 from a fee-for-service model to a capitated managed care model.[13]  A capitated fee structure pays managed care organizations ("MCOs") a negotiated flat rate per member, per month for providing covered Medicaid services that members require.  The current dental managed care organizations ("DMOs") are MCNA and DentaQuest.[14]  Medicaid managed care recipients under age 21 are allowed to choose their DMO and "main dentist,"[15] which is similar to a primary care provider for medical services.[16]

The DMOs are overseen and monitored in multiple ways by HHSC, HHSC's External Quality Review Organization ("EQRO") vendor, and HHSC's federal partner in the Medicaid program, the Centers for Medicare & Medicaid Services ("CMS").[17]  In connection with the state's Section 1115 waiver for medical and dental managed care,[18] HHSC sends an annual Summary of Activities report to CMS which includes a dental data validation summary and

---

[12] Ex. 2, Long Decl., at ¶ 11; Ex. 4, Declaration of Vy Nguyen, D.D.S., M.P.H., at ¶¶ 16-21; Ex. 5, Declaration of Rudy Villarreal, at ¶¶ 5, 12.

[13] Ex. 5, Villarreal Decl., at ¶ 3.  All Medicaid recipients under age 21 receive Medicaid dental services through the managed care model, except for Medicaid recipients under age 21 who are in residential facilities or intermediate care facilities for individuals with developmental disabilities.  *Id.* at ¶ 4.

[14] *Id.* at ¶ 4.  A third DMO, Delta Dental, operated from March 2012 until its contract with HHSC was terminated in November 2012.  *Id.* at ¶ 3.

[15] *Id.* at ¶ 4.  If the recipient does not select a DMO and main dentist within 45 days of receipt of their enrollment packet, then assignment defaults to a designated DMO and main dentist.  *Id.*

[16] Defendants' Main Dental Home program pairs members with a main dentist, which allows the main dentist to become familiar with a patient's mouth, resulting in better diagnosis and treatment of the patient and avoidance of overtreatment and unnecessary services.  Ex. 3, Altenhoff Decl., at ¶ 41.  Maintenance of a Main Dental Home is associated with higher quality dental care.  *Id.*

[17] CMS is an agency of the U.S. Department of Health and Human Services.

[18] Section 1115 of the Social Security Act gives the Secretary of Health and Human Services authority to approve experimental, pilot, or demonstration projects that promote the objectives of the Medicaid program and the Children's Health Insurance Program (CHIP).  In general, Section 1115 demonstrations are approved for a five-year period and can be renewed, typically for an additional three years.  *See* http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/Section-1115-Demonstrations.html.

HEDIS metrics collected for dental managed care.[19]  HHSC also submits a quarterly report to CMS which provides summary information on the performance of the DMOs on several metrics including enrollment, provider counts, and complaints.[20]  In addition to CMS oversight, HHSC's Health Plan Management ("HPM") division monitors the detailed DMO contracts (which spell out deliverables and other obligations)[21] in a variety of ways,[22] and in the event that a dental plan does not comply with contract standards, HPM staff works to ensure that the plan comes into compliance with the contract.[23]  Finally, HPM's Quality Department—through HHSC's EQRO

---

[19] Ex. 6, Declaration of Kathleen Cordova, at ¶¶ 3-4.  The Healthcare Effectiveness Data and Information Set (HEDIS) is a tool used by health plans to measure performance on dimensions of care and service.  *Id.* at n.1.

[20] Ex. 6, Cordova Decl., at ¶ 5.  The quarterly report information is based on Quarterly Performance Reports compiled by health plan specialists for each plan in each service area.  *Id.*  The 1115 Quarterly Reports also include summaries of the quarterly dental stakeholder meetings.  *Id.*  In conjunction with the 1115 Quarterly Report, CMS and HHSC hold monthly conference calls to discuss any questions or issues regarding Medicaid programs, including 1115 report findings.  *Id.*

[21] The full "HHSC Dental Contract Terms & Conditions" (which is HHSC's contract with MCNA and DentaQuest) is located online at http://www.hhsc.state.tx.us/medicaid/managed-care/contracts/dental-services-contract.pdf and includes a detailed deliverables matrix.  Ex. 5, Villarreal Dec., at ¶ 8 & Atts. A-B.  As established by contract and monitored by HHSC, both MCNA and DentaQuest comply with the following contract requirements, among others: all dental benefits available to Medicaid recipients under age 21 under the fee-for-service model have the same dental benefits under the capitated managed care model; MCNA and DentaQuest assign a main dentist to each Medicaid recipient under age 21, providing that recipient with a dental home; main dentists are required to facilitate appropriate referrals to specialists; MCNA and DentaQuest both have adequate networks of available, open network providers who treat Medicaid recipients under age 21; MCNA and DentaQuest allow Medicaid recipients under age 21 to see out-of-network providers where access within the plan's network is insufficient; case management is available, if necessary, to MCNA and DentaQuest members, and both dental plans refer members to Case Management for Children and Pregnant Women services if such services are needed; MCNA and DentaQuest have credentialing and re-credentialing processes for their network providers; MCNA and DentaQuest both provide member-specific education; MCNA's and DentaQuest's performance is tracked, in part, through the use of performance indicator dashboards; MCNA and DentaQuest conduct annual performance improvement projects ("PIPs") to improve processes, and thereby outcomes, of care (each DMO has four PIPs, and each PIP addresses timeliness of oral evaluation, as well as preventive services such as fluoride and sealants); MCNA's and DentaQuest's provider manuals explain how to refer Medicaid recipients under age 21 for dental care, and also explain the concept and purpose of the main dental home; and MCNA and DentaQuest educate their members on the benefits of preventive dental care and available dental services, including sealants.  *Id.* at ¶ 12.

[22] Ex. 5, Villarreal Decl., at ¶ 10.  On a quarterly basis, HPM staff analyzes various administrative measures to gauge the performance of the MCO.  *Id.*  These measures include: the MCO's membership; the provider network; MCO member and provider hotline performance; MCO member and provider complaints; MCO member appeals; complaints received by HHSC; claims processing timeliness; encounters as compared to financial data; and out-of-network utilization.  *Id.*  Other departments within the Medicaid/CHIP Division also monitor the MCOs for compliance.  *Id.*  Finance staff analyzes financial information from the MCOs, and also manages HPM's contracts with HPM's external auditors, who conduct financial and program audits with guidance from HPM.  *Id.*

[23] Ex. 5, Villarreal Decl., at ¶ 11.  HPM has several sanctions at its disposal, including assessing liquidated damages, putting the DMO on a corrective action plan which is monitored by HHSC staff, and suspending/terminating the contract or a portion of the contract.  *Id.*  Sanctions taken against the DMOs are posted on a quarterly basis at http://www.hhsc.state.tx.us/medicaid/managed-care/sanctions.shtml.  *Id.*

vendor—also monitors the DMOs for compliance in several ways including monitoring healthcare outcomes, managing the DMO Performance Improvement Projects, administering member and provider satisfaction surveys, and conducting encounter validation for rate-setting purposes.[24]

THSteps dental policies recommend that Medicaid recipients under age 21 have their first dental checkup at six months of age, and that dental checkups be repeated every three months while the recipient is under 36 months of age, after which checkups are recommended every six months.[25] As explained more fully below, Medicaid recipients under age 21 receive extensive outreach and informing from Defendants and their contractors through a variety of means intended to explain the importance of good oral healthcare and of regular dental checkups.[26] Medicaid providers are also educated in a multitude of ways about preventive (and other) dental services.[27]

In accordance with the CAO, from 2013 to 2014 Defendants conducted the Second Dental Assessment. As explained more fully below, the findings of the Second Dental Assessment showed that, in several domains, Medicaid-enrolled children fare better than their non-Medicaid enrolled peers and have significantly higher rates of access and utilization of dental services.[28] Further, despite the overwhelmingly positive results for Medicaid-enrolled students already seen in the First Dental Assessment, the numbers in the Second Dental Assessment still showed significant improvement from the First Dental Assessment in several

---

[24] Ex. 5, Villarreal Decl., at ¶ 10.
[25] Ex. 3, Altenhoff Decl., at ¶¶ 22, 26, 38.
[26] *See, e.g.*, Ex. 7, Declaration of Melinda Metteauer, at ¶¶ 6-11, 13-16; Ex. 8, Declaration of Lori Howley, at ¶¶ 3, 7, 9-11; Ex. 9, Declaration of Carlos A. Lacasa, at ¶¶ 6-9; Ex. 10, Declaration of Margaret Bruch, at ¶¶ 16, 18-19; Ex. 4, Nguyen Decl., at ¶¶ 7-9, 12; Ex. 5, Villarreal Decl., at ¶ 9.
[27] *See, e.g.*, Ex. 10, Bruch Decl., at ¶¶ 3-17; Ex. 8, Howley Decl., at ¶ 6; Ex. 9, Lacasa Decl., at ¶¶ 3, 10; Ex. 4, Nguyen Decl., at ¶¶ 16-21.
[28] Ex. 11, Declaration of Dorothy Mandell, at Att. B, p. 20.

key areas.[29]   The Second Dental Assessment established that there has been sustained improvement in the dental health outcomes, access to care, and utilization for Medicaid recipients under age 21.

In the most recent (FFY 2013) state-by-state comparison, Texas ranked first in the nation (61.9%, or 15 percentage points higher than the national average of 46.9%) for percent of EPSDT eligibles receiving any dental service, and sixth in the nation for percent of EPSDT eligibles receiving preventive dental services (49.8%, or 8 percentage points higher than the national average of 41.8%).[30]   Perhaps most impressive about Texas's number one ranking for receipt of any dental service is that Texas provided dental services to over 2 million EPSDT patients.[31]   By contrast, Vermont, Washington, Idaho, Massachusetts, Hawaii, and Illinois—combined, served roughly the same number of clients, but all ranked lower than Texas for percent receiving any dental service.[32]   Finally, states with numbers of EPSDT-eligible children that are comparable to Texas's 3,295,672 EPSDT-eligible children had much lower rates of clients receiving any dental services in 2013 than Texas's 61.9% rate.[33]   For example, California had a rate of 43.2%, and New York had a rate of 40.3%.[34]

Additionally, the Texas Medicaid program's utilization rates for dental services have dramatically improved in the 18 years that the Consent Decree has been in effect.  The number of Texas Medicaid recipients under age 21 receiving any dental service through Medicaid increased from 41% in 1999 to 62% in 2013, and the number receiving any preventive dental treatment

---

[29] *Id*. at Att. B, pp. 12, 19-20.
[30] Ex. 12, FFY 2013 CMS-416 State Summary, at pp. 1-2.
[31] *Id.* at p. 1.
[32] *Id.*
[33] *Id.*
[34] *Id.*

services through Medicaid increased from 35% in 1999 to 50% in 2013.[35]  These improvements

are all the more impressive given that the number of Medicaid recipients under age 21 eligible

for EPSDT dental services has almost tripled in the 21 years since the Frew lawsuit was filed

(from 1,160,343 in 1993 to 3,295,672 in 2013) and more than doubled since 1999, the year of

comparison (1,548,192 in 1999).[36]

## III. THE CAO AND RELATED CONSENT DECREE PROVISIONS

The dental assessment portion of the CAO requires Defendants to take specific, concrete

actions in order to achieve compliance with the Decree.  The CAO sets out a series of tasks

which includes:

- Proposing plans for a first dental study that assesses dental health (with input from Plaintiffs).
- Conducting a study to assess the dental health of the EPSDT population.
- Drafting a dental CAP (with input from Plaintiffs) and implementing it.
- Proposing plans for a second dental study that assesses dental health (with input from Plaintiffs).
- Conducting a second dental study to assess the dental health of the EPSDT population.
- Conferring with Plaintiffs to determine what further action under the CAO is required, if any.

In addition, the related Decree provisions set out a series of tasks—some of which were

satisfied before the Decree was entered in 1996—which includes:

- Outreach to families of EPSDT-recipient infants beginning in January 1996 about Baby Bottle Tooth Decay (now known as "Early Childhood Caries").

---

[35] Ex. 2, Long Decl., at Att. F.  It should be noted that First Dental Home ("FDH") and Oral Evaluation and Fluoride Varnish in the Medical Home ("OEFV") services, while preventive in nature, are not included in the preventive dental treatment services reported to CMS and included in the table at Attachment F.  FDH allows for the first dental checkup to occur at six months of age, covers preventive dental checkups every 3 months thereafter (until the Medicaid recipient reaches 36 months of age), and is aimed at providing preventive dental care early in a child's life. Ex. 3, Altenhoff Decl., at ¶ 22.  OEFV is also available to Medicaid recipients from 6 months through 35 months of age and is provided in the medical home as opposed to the dental home.  *Id*. at ¶ 24.  As part of OEFV, primary care providers are trained about and reimbursed for providing a dental evaluation to Medicaid recipients, providing anticipatory guidance to parents of Medicaid recipients about the importance of dental healthcare, and applying fluoride varnish to Medicaid recipients' teeth.  *Id*.

[36] Ex. 2, Long Decl., at Att. F.

- Outreach on dental services (including prevention of Early Childhood Caries) for teen mothers and pregnant teens.
- The Texas Department of State Health Services ("DSHS") Oral Health Program was to include a process to inform children who received dental scans at schools if they needed care immediately or soon, if DSHS opted to perform dental scans in schools.
- Cover all necessary sealants regardless of the recipient's age by September 30, 1995.
- Identify all dentists who provided no or few sealants, and send a letter to all dentists whose practices could reasonably include the application of sealants by April 30, 1996.
- By May 31, 1996, review billing records to see if there was an increase in the number of dentists providing sealants.  Provide further targeted outreach information about sealants to dentists who did not provide sealants unless their specialty indicated that they would not provide this service.
- Quarterly reports on the number and percent of participating dentists who see 0-29, 30-99, and 100+ EPSDT recipients.
- By September 30, 1995, develop policies and rules for conducting audits of dentists that provide services to EPSDT recipients.
- Develop professional dental standards in the EPSDT program, based upon consultation with appropriate experts.
- Prepare an annual report of the number and percent of recipients who receive 1 dental checkup per year and 2 dental checkups per year, beginning by September 30, 1996.
- Report on dental health outcomes in the EPSDT population.  Develop a study methodology and conduct a study to assess the dental health of the EPSDT population.

Because all of these CAO and Decree obligations have been completed,[37] this aspect of the Medicaid program should be returned to the state and federal agencies that are intended to administer it.

## IV. RULE 60(B)(5) STANDARD

Federal Rule of Civil Procedure 60(b)(5) allows a court, on motion and just terms, to relieve a party from a final order for a variety of reasons, including where:

- the judgment has been satisfied, released, or discharged;
- it is based on an earlier judgment that has been reversed or vacated; or
- applying it prospectively is no longer equitable.

---

[37]   Attached is a table setting out each CAO and Decree requirement and identifying the particular exhibits supporting satisfaction of them.  *See* Ex. 13 (CAO and Consent Decree Requirements and Evidence Table).

This portion of Rule 60 allows three independent grounds for relief, any one of which can be sufficient to vacate a judgment.  *Horne v. Flores*, 557 U.S. 433, 454 (2009).  Having satisfied the terms of the CAO and related portions of the Consent Decree, Defendants seek relief under Prong 1 of Rule 60(b)(5).  Defendants have reported their actions taken in compliance with the orders in their quarterly monitoring reports ("QMRs") to the Court.  Defendants' compliance with the orders is further supported by testimony and other evidence presented with this motion. Defendants move the Court to find that they have satisfied all of the obligations contained within the dental assessment portion of the CAO and all of the relevant, enforceable Consent Decree provisions, and to vacate the dental assessment portion of the CAO and the relevant portions of the Consent Decree (Paragraphs 143-174).

## V.  DEFENDANTS HAVE SATISFIED ALL CAO AND RELATED DECREE OBLIGATIONS.

### A.  Defendants Have Complied with the Requirements of the CAO.

#### 1.  Study Methodology for the First Dental Assessment.

Bullet Points 6 and 7 provide:

*Dental Assessment: Within four months of entry of the corrective action plan Order, Defendants will propose plans for a professional and valid dental study that assesses class members' dental health. It will include at least the evaluation of the number and percent of recipients who: 1) have no history of cavities; 2) have untreated cavities; 3) require urgent dental care for pain, infection or bleeding; and 4) require dental care that may potentially include either inpatient hospitalization or outpatient treatment under general anesthesia. At Defendants' option, Defendants may decide that the Texas Department of State Health Services ("DSHS"), the State Dental Director and DSHS's regional dentists will conduct the study, as long as it is professionally and validly designed and conducted. The evaluation will determine reasons why inpatient hospitalization or outpatient treatment under general anesthesia may be necessary, including such factors as disability or compromising medical condition. The dental study will differentiate between class members who have been enrolled in Medicaid in Texas for less than 12 continuous months and those who have been enrolled in Medicaid in Texas for more than 12 continuous months.*

10

> *Plaintiffs will respond to Defendants' dental study proposal within two months of receiving it. Plaintiffs will indicate whether they agree that the proposed methodology is professional and valid, and whether it complies with Decree paragraphs 173 and 174. They may also offer suggestions, which Defendants may accept or reject. Defendants will report on the study methodology in the next quarterly report issued after the methodology has been determined.*

In compliance with the CAO, HHSC and DSHS proposed plans for a professional and valid dental study to assess the dental health of Medicaid recipients under age 21 in January 2008, which was within four months of the entry of the CAO in September 2007.[38]   Plaintiffs initially responded to Defendants' dental study proposal within a month of receiving the proposal.[39]   Defendants sent Plaintiffs a revised proposal for the dental assessment on July 1, 2008, and the next day Plaintiffs accepted "the proposed protocols for the dental assessment."[40]  Defendants reported on the agreement in the July 2008 QMR [Dkt. 689-2] and attached the agreed methodology as Exhibit 14 to the QMR [Dkt. 692], the next quarterly report issued after the study methodology had been determined.[41]   The parties' agreement on the protocol was

---

[38]  Ex. 2, Long Decl., at ¶ 8.  Although the CAO required an assessment of "class members' dental health," Defendants' assessment was designed to assess the dental health of a broader group—Texas Medicaid recipients under age 21.  The *Frew* class, certified on June 16, 1994, consists of:

> [A]ll present and future Texas Medicaid recipients who are under the age of 21, and therefore eligible for EPSDT services, but who have not received the entire range of EPSDT services to which they are entitled, except anyone who has knowingly and voluntarily refused EPSDT services.

Dkt. Nos. 71, 80.  As noted in the certification order, the *Frew* class is very narrowly limited to Texas Medicaid recipients under age 21 who: 1) have not received the entire range of EPSDT services to which they are entitled, and 2) have not knowingly and voluntarily refused EPSDT services.  *Id*.  Given the enormous changes that have occurred in the Texas Medicaid program in the intervening twenty years, it is unclear how many (if any) of today's approximately 3.5 million Texas Medicaid recipients under age 21 satisfy the criteria for membership in the *Frew* class.

[39]  Ex. 2, Long Decl., at ¶ 8.  For several months, the parties exchanged correspondence and had discussions on the topic.  *Id*.  During this period, Plaintiffs offered suggestions, and Defendants accepted some of those suggestions and rejected others.  *Id*.

[40]  *Id*. at ¶ 8 & Att. B.

[41]  *Id*. at ¶ 8 & Att. C.

recognized by the Court in its 2011 ruling on Defendants' Rule 60(b)(5) motion regarding this CAO, in which the Court determined that:

In July 2008, the parties agreed upon protocols for the first dental study. After completion of the study the Defendants filed the results with the court on December 31, 2009 (Dkt. 747). The study was entitled "Assessment of Child Dental Health Status" (Dental Assessment).[42]

Plaintiffs agree that the requirements under Bullet Point 7 have been completed.[43]

Per the CAO, Defendants decided that DSHS would arrange for the data collection for the study and that the DSHS Division of Family and Community Health, Office of Program Decision Support would conduct analysis of the data.[44]  The study included the evaluation of the number and percent of recipients who: 1) had no history of cavities; 2) had untreated cavities; 3) required urgent dental care for pain, infection, or bleeding; and 4) required dental care that may have potentially included either inpatient hospitalization or outpatient treatment under general anesthesia.[45]  The study determined reasons why inpatient hospitalization or outpatient treatment under general anesthesia may be necessary, including such factors as a disability or a compromising medical condition.[46]  The study did not differentiate between Medicaid recipients under age 21 who had been enrolled in Medicaid in Texas for less than 12 continuous months and those who had been enrolled in Medicaid in Texas for more than 12 continuous months, because Medicaid enrollment status was not collected for the entire sample; third grade data were collected prior to reaching final agreement on the protocols and the parties agreed to use the data that were collected during the 2007-08 school year.[47]

---

[42] *Frew v. Suehs*, 775 F. Supp. 2d 930, 933 (E.D. Tex. 2011).
[43] Ex. 14, Plaintiffs' May 22, 2014 Responses to Defendants' Chart Showing CAO and Decree Provisions, at p. 1.
[44] Ex. 2, Long Decl., at ¶ 9.
[45] *Id.*
[46] *Id.*
[47] *Id.*; Ex. 3, Altenhoff Decl., at ¶ 51 & Att. F.  Although the study methodology could have been revised to collect Medicaid numbers for participating recipients, the study would have lost the benefit of using 2007 baseline

The First Dental Assessment's study methodology (including design, implementation, and analysis) was professional and valid, and its results were accurate, valid, and reliable.[48]  DSHS' Oral Health Program (OHP) staff administered a Basic Screening Survey (BSS)[49] among two separate age populations: preschool age children, 3 through 5 years of age, enrolled in Head Start, and elementary school children in the third grade who were approximately 8 through 10 years of age.[50]  In order to ensure high inter-rater reliability, the DSHS dental teams were trained and calibrated so that each dentist and dental hygienist recorded accurate and consistent scores when examining the same child.[51]

---

information (a period before changes were implemented as a result of the *Frew* lawsuit) to determine relative changes. Ex. 3, Altenhoff Decl., at ¶ 51. Specifically, data from the First Dental Assessment were comparable to data collected prior to increases in dental reimbursement rates and the implementation of programs to promote dental programs. *Id.* As Defendants explained to Plaintiffs in a March 24, 2008 letter:

> The impact of these two major policy changes on THSteps class members' oral health status is the primary issue that the study must address as these initiatives represent the main thrust of the state's efforts to improve class members' access to dental care. If new data collection were to be initiated, the baseline would be contaminated by the previously implemented changes and could not effectively measure the impact of these recent policy changes. By using the existing data and replicating methods in 2010-2011, a true measure of change among class members will be achieved.

*Id.*

[48] Ex. 15, Declaration of Gita Mirchandani, Ph.D., M.P.H., at p. 20. Dr. Mirchandani's declaration was filed by Defendants as Exhibit 2 to their reply in support of their Rule 60(b)(5) motion to modify the CAO in 2010. Dkt. 787-2. Dr. Mirchandani is no longer employed at DSHS, but because she has already provided sworn testimony regarding the validity of the First Dental Assessment's methodology and results, Defendants attach her 2010 declaration to the present motion as evidence of the same. To the extent that Dr. Mirchandani's declaration provides testimony regarding the testimony of Plaintiffs' witnesses for the 2010 briefing, portions irrelevant to the present briefing should be disregarded. The attachments cited in Dr. Mirchandani's declaration (Exhibits 3, 4, and 10 to the 2010 reply brief) have been re-labeled as Attachments A-C to avoid confusion with the numbering of the exhibits for the present motion.

[49] The BSS was developed by the Association of State and Territorial Dental Directors (ASTDD) in collaboration with the Centers for Disease Control and Prevention's Division of Oral Health. Ex. 3, Altenhoff Decl., at Att. E, at p. 2 of the attachment. Through the use of calibrated examiners, the BSS used direct visual observation of the mouth, which provided individualized screening results. *Id.*

[50] Ex. 3, Altenhoff Decl., at Att. E, at p. 3 of the attachment.

[51] Ex. 15, Mirchandani Decl., at p. 11.

## 2.  Reporting the Results of the First Dental Assessment.

Bullet Point 8 provides:

*Defendants will conduct a study to evaluate the dental health of the EPSDT population. Defendants will present the results of their first dental study to the Court and to Plaintiffs no later than eighteen months after the parties agree to a study methodology.*

In compliance with the CAO, Defendants conducted a study to evaluate the dental health of the EPSDT population, and presented the results of the First Dental Assessment to the Court and to Plaintiffs on December 31, 2009 [Dkt. 747].[52]  The First Dental Assessment results show that children enrolled in Medicaid experienced dental outcomes that were equal to or better than the outcomes of children not enrolled in Medicaid[53] on all outcome measures tested.[54]  For example, among children in third grade, those enrolled in Medicaid experienced lower rates of untreated dental decay and lower rates of decay requiring urgent care.  Specifically, third-grade school children enrolled in Medicaid experienced only a 35% rate of untreated dental decay, compared to a 45% rate of untreated dental decay for children not enrolled in Medicaid and a 52% rate of untreated dental decay for the subgroup of children who were not enrolled in Medicaid and who received free school lunch.[55]  Further, third-graders enrolled in Medicaid experienced only a 6% rate of decay requiring urgent care, compared to a 10% rate of decay requiring urgent care for children not enrolled in Medicaid, and a 13% rate of decay requiring

---

[52] Ex. 2, Long Decl., at ¶ 10.  Defendants later presented an amended dental assessment to address a number of requests by Plaintiffs.  *Id.*  This amended First Dental Assessment was filed as Exhibit F to Dkt. 766.  *Id.* References to the "First Dental Assessment" in the present motion refer to the amended version of the First Dental Assessment.

[53] "Children not enrolled in Medicaid" would include children who were privately insured, children covered by CHIP, and children without insurance.

[54] Ex. 3, Altenhoff Decl., at Att. E.  As noted above, the one exception to this was in the category of "dental caries experience" (which measures whether a child has ever had a cavity) for third grade school children.  *See id.* at pp. 3, 6.

[55] *Id.* at pp. 6-7, Tables 4-5.

urgent care for the subgroup of children who were not enrolled in Medicaid and who received free school lunch.[56]

Additionally, the First Dental Assessment established that, among the three- to five-year-old children in Texas Head Start programs in both rural and urban areas, those enrolled in Medicaid experienced significantly lower rates of untreated dental decay, decay requiring urgent care, and decay potentially requiring treatment under general anesthesia.  Specifically, three- to five-year-old children enrolled in Medicaid experienced only a 14% rate of untreated dental decay in urban areas and a 26% rate in rural areas, while children not enrolled in Medicaid experienced a 27% rate of untreated dental decay in urban areas and a 39% rate in rural areas.[57] Further, three- to five-year-old children enrolled in Medicaid experienced only a 2% rate of decay requiring urgent care in urban areas and a 5% rate in rural areas, while three- to five-year-old children not enrolled in Medicaid experienced a 6% rate of decay requiring urgent care in both urban and rural areas.[58]  Additionally, three- to five-year-old children enrolled in Medicaid experienced only a 0.6% rate of decay potentially requiring treatment under general anesthesia in urban areas and a 2% rate in rural areas, while three- to five-year-old children not enrolled in Medicaid experienced a 2% rate of decay potentially requiring treatment under general anesthesia in urban areas and a 3% rate in rural areas.[59]

Finally, the First Dental Assessment established that the three- to five-year-old children in Head Start programs who were enrolled in Medicaid experienced significantly higher rates of access and utilization of dental care.  Specifically, the percentages of three- to five-year-old children enrolled in Medicaid who had ever visited a dentist were 95% in urban areas and 87% in

---

[56] *Id.*
[57] Ex. 3, Altenhoff Decl., at Att. E, pp. 8-9, Tables 8-9.
[58] *Id.*
[59] *Id.*

rural areas, while the percentages of children not enrolled in Medicaid who had ever visited a dentist were only 74% in both urban and rural areas.[60]  Further, the percentages of children enrolled in Medicaid who had visited a dentist within the past year were 91% in urban areas and 82% in rural areas, while the percentages of children not enrolled in Medicaid who had visited a dentist within the past year were only 68% in urban areas and 65% in rural areas.[61]  Finally, the percentages of children enrolled in Medicaid who had a family dentist were 67% in urban areas and 60% in rural areas, while the percentages of children not enrolled in Medicaid who had a family dentist were only 25% in urban areas and 47% in rural areas.[62]

### 3. Drafting and Implementing a Corrective Action Plan.

Bullet Point 9 provides:

*Within four months of completion of the first dental study, Defendants will present a dental corrective action plan to Plaintiffs. Plaintiffs' counsel will have two months to respond and offer suggestions to the proposed dental corrective action plan. Defendants may not unreasonably reject Plaintiffs' suggestions. Once the terms of the corrective action plan are determined, Defendants will implement them as expeditiously as possible while complying with all state and federal laws concerning any actions the corrective action plans require.*

Defendants presented a dental CAP to Plaintiffs in June 2011, which was within 120 days of the Court's March 2011 opinion ordering Defendants to draft and implement a CAP.[63]  In July 2011, Plaintiffs' counsel responded to the CAP and offered suggestions to the proposed dental CAP, and Defendants considered Plaintiffs' suggestions and did not unreasonably reject them.[64]  After more than six months of negotiations on the plan, in February 2012 the parties reached

---

[60] Ex. 3, Altenhoff Decl., at Att. E, pp. 8-9, Tables 8-9.
[61] *Id.*
[62] *Id.*
[63] Ex. 2, Long Decl., at ¶ 11.  Bullet Point 9 of the CAO was modified by the Court's March 30, 2011 opinion, which ordered Defendants to present a dental corrective action plan to Plaintiffs within 120 days of the order.  *Frew v. Suehs*, 775 F. Supp. 2d at 938.
[64] Ex. 2, Long Decl., at ¶ 11.

agreement on the terms of the dental CAP.[65]  Defendants implemented the CAP as expeditiously as possible while complying with all state and federal laws concerning actions the CAP required.[66]  Plaintiffs concede that the parties agreed on the plan.[67]

Pursuant to the dental CAP, Defendants undertook (or continued to undertake) a series of actions designed to improve the dental health of Medicaid recipients under age 21, including:

- Continue the First Dental Home ("FDH") program.[68]
- Continue the Oral Evaluation and Fluoride Varnish in the Medical Home ("OEFV") program.[69]
- Send letters to families on the availability of preventive dental services beginning at 6 months of age.[70]
- Distribute "Take Time for Teeth" (now renamed "Brush Up on Healthy Habits") materials to professional organizations and entities having contact with Medicaid recipients under age 21.[71]
- THSteps to continue to distribute a teen-specific brochure on oral health to medical and dental providers, Head Start Programs, school nurses, and the Texas Women, Infants, and Children ("WIC") Program.[72]
- Send an introduction letter and FAQ sheet to class members 5 months before dental managed care is implemented, and send an enrollment packet to candidates 3 months in advance of implementation.[73]
- Dental due and reminder letters for ages 5-12 to be amended to include language on dental sealants.[74]
- THSteps to continue consulting with professional associations in an attempt to effect provider recruitment and retention.[75]
- State Dental Director to continue to have meetings with the Texas Dental Association (TDA), Texas Academy of Pediatric Dentistry, and Texas Academy of General Dentistry to establish open communications about the Medicaid dental program.[76]
- DSHS to provide information to the Texas Nurses Association and the Texas nursing schools about OEFV.[77]
- Continue to organize quarterly dental stakeholder meetings.[78]

---

[65] *Id.* at ¶ 11 & Att. D.

[66] *Id.* at ¶ 11.

[67] Ex. 14, Plaintiffs' May 22, 2014 Responses to Defendants' Chart Showing CAO and Decree Provisions, at p. 2.

[68] Ex. 3, Altenhoff Decl., at ¶¶ 22-23, 46; Ex. 4, Nguyen Decl., at ¶¶ 19-21; Ex.5, Villarreal Decl., at ¶ 5.

[69] Ex. 3, Altenhoff Decl., at ¶¶ 24, 47; Ex. 4, Nguyen Decl., at ¶¶ 16-19, 21; Ex. 5, Villarreal Decl., at ¶ 5.

[70] Ex. 7, Metteauer Decl., at ¶ 16; Ex. 3, Altenhoff Decl., at ¶ 24.

[71] Ex. 7, Metteauer Decl., at ¶¶ 10, 12, & n.4; Ex. 3, Altenhoff Decl., at ¶ 26; Ex. 10, Bruch Decl., at ¶ 4.

[72] Ex. 10, Bruch Decl., at ¶ 4; Ex. 7, Metteauer Decl., at ¶¶ 9-10, 16; Ex. 3, Altenhoff Decl., at ¶ 28.

[73] Ex. 7, Metteauer Decl., at ¶¶ 6-7, 13.

[74] Ex. 7, Metteauer Decl., at ¶ 16.

[75] Ex. 10, Bruch Decl., at ¶¶ 5, 9; Ex. 3, Altenhoff Decl., at ¶¶ 13, 25; Ex. 16, Katy Walter Decl., at ¶¶ 3-5.

[76] Ex. 16, Walter Decl., at ¶¶ 3-5; Ex. 3, Altenhoff Decl., at ¶¶ 12, 14, 25, 27, 39; Ex. 4, Nguyen Decl., at ¶ 20.

[77] Ex. 10, Bruch Decl., at ¶¶ 3, 9-10.

- State Dental Director to continue providing live FDH training to dental students and residents.  FDH training also to be online.[79]
- State Dental Director to continue providing live OEFV training to medical residents and faculty.  OEFV training also to be online.[80]
- State Dental Director to continue annual training ("Taking the Mystery Out of Texas Medicaid") for TDA members and their employees.[81]
- Enter managed care contracts for statewide dental managed care delivery system with contractors that meet the obligations of Request for Proposals (RFP) #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.[82]
- Inform THSteps providers about how to refer managed care members for dental care and about the Main Dental Home.[83]
- Require DMOs to educate their members on the benefits of preventive dental care and available dental services.[84]
- Update online educational modules and in-person training materials for primary care providers and dentists to include information regarding dental managed care.[85]

Defendants regularly reported their progress on the CAP implementation to the Court in

their QMRs.[86]

### 4.  Conducting the Second Dental Assessment.

Bullet Point 10 provides:

*Defendants will conduct a second dental study, beginning within 36 months of the date on which the parties agree to the terms of the dental corrective action plan. The second study will look at selected dental measures, to be determined by counsel for both parties, with emphasis on examining the effectiveness of the new dental corrective action plan and changes in class members' dental health since the first study. Defendants will present the results of their second dental study to the Court and to Plaintiffs no later than eighteen months after the parties agree to a study methodology for the second dental study. The second study will be prepared according to the procedures stated above, unless the parties agree otherwise.*

---

[78] Ex. 3, Altenhoff Decl., at ¶¶ 14-16, 39; Ex.16, Walter Decl., at ¶¶ 3-5.  In addition, 11 regional dental stakeholder meetings were held around the state in December 2012 and January 2013 in a town-hall format with more than 300 participants, for the purpose of allowing stakeholders a specific opportunity to share feedback on successes and challenges associated with the transition to dental managed care in March 2012. Dkt. 1031-1 at p. 52.
[79] Ex. 10, Bruch Decl., at ¶¶ 3, 7, 14; Ex. 4, Nguyen Decl., at ¶¶ 19-21; Ex. 3, Altenhoff Decl., at ¶¶ 22-23, 46.
[80] Ex. 10, Bruch Decl., at ¶¶ 3, 8-10, 14; Ex. 4, Nguyen Decl., at ¶¶ 16-19, 21; Ex. 3, Altenhoff Decl., at ¶¶ 24, 47.
[81] Ex. 3, Altenhoff Decl., at ¶ 27; Ex. 10, Bruch Decl., at ¶ 9; Ex. 4, Nguyen Decl., at ¶ 20.
[82] Ex. 5, Villarreal Decl., at ¶ 12.
[83] Ex. 5, Villarreal Decl., at ¶ 12; Ex. 10, Bruch Decl., at ¶¶ 16-17; Ex. 3, Altenhoff Decl., at ¶¶ 41, 47.
[84] Ex. 5, Villarreal Decl., at ¶ 12.
[85] Ex. 10, Bruch Decl., at ¶ 17.
[86] Dkt. 919-1 at p. 49; Dkt. 961-1 at p. 54; Dkt. 1001-1 at p. 45; Dkt. 1031-1 at pp. 50-53; Dkt. 1049-1 at pp. 52-54; Dkt. 1094-1 at pp. 51-53; Dkt. 1124-1 at pp. 46-48; Dkt. 1162-1 at pp. 41-42.

In compliance with the CAO, Defendants proposed plans for the second professional and valid dental study to assess the dental health of Medicaid recipients under age 21 in August 2012, which was within 36 months of the date on which the parties agreed to the terms of the dental CAP.[87]  Plaintiffs responded within the same month with questions and concerns about the proposed methods.[88]   In response, Defendants adjusted the proposal and provided clarifications to Plaintiffs to answer their questions.[89]   On November 15, 2012, after considering Defendants' adjustments to the proposal and clarifications on questions, Plaintiffs expressed some additional concerns, but stated that they believed Defendants should proceed with the assessment.[90] Defendants replied in December 2012 to address Plaintiffs' concerns, and asked Plaintiffs to respond with any additional questions and/or concerns so that the parties could reach full agreement before conducting analysis.[91]  Defendants received no additional correspondence from Plaintiffs' counsel regarding the proposal for the assessment.[92]

The Second Dental Assessment looked at selected dental measures, determined by counsel for both parties, and examined changes in the dental health of Medicaid recipients under age 21 since the first study.[93]  As with the first study, DSHS staff performed the Second Dental Assessment, which measured the prevalence of five dental health outcomes for Head Start (ages 3 to 5 years, newly enrolled in federally-funded Head Start centers in Texas) and third grade students: 1) No history of dental caries; 2) Dental caries experience (treated and untreated dental

---

[87] Ex. 2, Long Decl., at ¶ 13.
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] *Id.*   Defendants also reported in several QMRs that they had never received any additional comments on the Second Dental Assessment methodology from Plaintiffs, and therefore reasonably assumed that Plaintiffs had no remaining concerns with the Second Dental Assessment.  Dkt. 1031-1 at p. 51; Dkt. 1049-1 at p. 52; Dkt. 1094-1 at p. 51; Dkt. 1124-1 at p. 48.
[93] Ex. 2, Long Decl., at ¶ 14.

caries); 3) Urgent dental care required for pain, infection, or bleeding;[94] 4) Dental sealants on permanent molars (only for third grade students); and 5) Dental care required that may potentially include either inpatient hospitalization or outpatient treatment under general anesthesia (only for Head Start students).[95]  In order to ensure the consistency and reliability of the oral health data collected by the dentists for the Second Dental Assessment, all DSHS dentists were calibrated and trained to use set diagnostic criteria.[96]  The methodology, design, implementation, and analysis of the Second Dental Assessment were professional and valid, and the results of the Second Dental Assessment are accurate and valid.[97]

Defendants presented the results of the Second Dental Assessment to the Court and to Plaintiffs in the April 2014 QMR [Dkt. 1162-18], which was no later than 18 months after the parties agreed to a study methodology for the Second Dental Assessment.[98]  The Second Dental Assessment findings show that in several domains, <u>Medicaid-enrolled children are doing better than their non-Medicaid enrolled peers and have significantly higher rates of access and utilization of dental services</u>.[99]  For the dental utilization measures, children enrolled in Medicaid for more than 12 months had a significantly higher prevalence than non-Medicaid children of having a family dentist, having ever seen a dentist, and having seen a dentist in the past year.[100]

---

[94] DSHS substituted the term "swelling" for "bleeding" in their evaluation of urgent need for dental care.  Ex. 4, Nguyen Decl., at ¶ 23.  The urgent phase of dental care is indicated by the clinical presentation of the four signs and symptoms of pain, infection, swelling, and/or bleeding.  *Id*.  Any of the mentioned signs or symptoms, or a combination of them, would classify a child within the urgent-care-needed indicator and require urgent dental care within 24-48 hours.  *Id*.

[95] Ex. 4, Nguyen Decl., at ¶ 22.

[96] Ex. 4, Nguyen Decl., at ¶ 24.

[97] Ex. 11, Mandell Decl., at ¶ 24.

[98] Ex. 2, Long Decl., at ¶ 15.  Defendants later presented an amended second dental assessment to Plaintiffs attached to correspondence on June 30, 2014, and to the Court in the July 2014 QMR as Exhibit 9 [Dkt. 1195-12].  *Id*.  References in the present motion to the Second Dental Assessment refer to the amended version of the Second Dental Assessment.  Because the results did not change between the original and amended versions, any comparisons that refer to the original version and not the amended version are still valid comparisons.

[99] Ex. 3, Altenhoff Decl., at Att. G, p. 20.

[100] *Id*. at pp. 11, 20.

This higher reported utilization suggests that these children have a higher chance of having tooth decay (if any) diagnosed and treated by a dentist.[101]

Positive results for Medicaid-enrolled students were seen in both the Head Start and third grade portions of the Second Dental Assessment. For the Head Start portion of the Second Dental Assessment, Head Start students enrolled in Medicaid had a significantly higher prevalence of ever having seen a dentist than the non-Medicaid Head Start students.[102] Newly-enrolled Head Start students whose parents indicated that they were enrolled in Medicaid had a significantly higher prevalence of having evidence of past treatment for caries than non-Medicaid recipients.[103]

The third grade assessment revealed that for most of the dental outcome measures, students enrolled in Medicaid fared better than non-Medicaid enrolled students.[104] Over half of the children enrolled in Medicaid for more than 12 months had sealants, and this prevalence was significantly higher than children who were not enrolled in Medicaid.[105] Further, Medicaid-enrolled third graders had a significantly higher prevalence for having evidence of past treatment for caries and a significantly lower prevalence of untreated dental caries than third graders not enrolled in Medicaid.[106] Parents of third graders reported to be on Medicaid had a significantly higher prevalence of reporting having a family dentist and also a significantly higher prevalence of their child having seen a dentist within the past year than the parents of non-Medicaid enrolled third graders.[107]

---

[101] *Id*. at p. 20.
[102] Ex. 3, Altenhoff Decl., at Att. G, pp. 16, 18-19.
[103] *Id*. at p. 15.
[104] Ex. 3, Altenhoff Decl., at Att. G, p. 19.
[105] *Id*.
[106] *Id.* at p. 8.
[107] *Id*. at p. 9.

Despite the overwhelmingly positive results for Medicaid-enrolled students already seen in the First Dental Assessment, the numbers in the Second Dental Assessment still showed significant improvement from the first assessment in several areas in both the third grade and Head Start assessments.  For the third graders, in comparison to the First Dental Assessment, in the Second Dental Assessment the state as a whole (Medicaid and non-Medicaid) showed a significant increase in the prevalence of sealants.[108]  Complementing the sealant results were significant decreases in untreated dental caries[109] and in the need for urgent dental care for both groups (Medicaid and non-Medicaid) from the First to Second Dental Assessment.[110]  For the Head Start assessment, while almost all of the measures did not significantly change from the First Dental Assessment to the Second Dental Assessment, there was a significant decrease from the First Dental Assessment to the Second Dental Assessment in the prevalence of Medicaid-enrolled students needing urgent dental care, and this lower prevalence was seen in both the parent report of Medicaid status and the matched Medicaid data.[111]

In addition, Texas is today meeting or close to meeting national goals for the year 2020 set by the federal government's Healthy People 2020 (HP2020) initiative for the U.S. population (not just the Medicaid population), including the goal to "[r]educe the proportion of children aged 6 to 9 years with untreated dental decay in their primary and permanent teeth."[112]  The

---

[108] Ex. 3, Altenhoff Decl., at Att. G, p. 19.

[109] Third graders enrolled in Medicaid in 2009 experienced a 35% rate of untreated dental caries, compared to a 45% rate of untreated dental caries for third graders not enrolled in Medicaid.  *Id.* at Att E, p. 6.  In 2013, the findings were even better, in that third graders enrolled in Medicaid experienced only a 20.1% rate of untreated dental caries, while 28.8% of non-Medicaid third graders had untreated dental caries.  *Id.* at Att. G, p. 12.

[110] Ex. 3, Altenhoff Decl., at Att. G, pp. 12, 19.  In 2009, third graders enrolled in Medicaid experienced only a 6% rate of caries requiring urgent care, compared to a 10% rate of caries requiring urgent care for third graders not enrolled in Medicaid, and in 2013 again similar improved findings occurred, with only 2.7% of third graders with Medicaid requiring urgent dental care, whereas 5.5% of non-Medicaid third graders required urgent dental care.  *Id.* at Att E, p. 6 & Att. G, p. 12.

[111] Ex. 3, Altenhoff Decl., at Att. G, p. 19.

[112] Ex. 17, HP2020 Documents, at p. 1 ("The U.S. Department of Health and Human Services today unveiled Healthy People 2020, the nation's new 10-year goals and objectives for health promotion and disease prevention, and 'myHealthyPeople,' a new challenge for technology application developers . . . .  Healthy People 2020 is the

22

Second Dental Assessment estimated the prevalence of untreated dental caries in the third grade Medicaid population at 20.1%, which is even better than the HP2020 goal of 25.9% for children aged 6 to 9 years.[113]  Further, the Texas Head Start Medicaid group is within a standard error of meeting the HP2020 goal of 21.4% for children 3-5 years with untreated dental decay, with a prevalence rate of 22.2% in the Second Dental Assessment.[114]

Both the First and Second Dental Assessments show that there has been sustained improvement in the dental health outcomes, access to care, and utilization of Medicaid-enrolled clients under age 21.  In fact, as noted above and as seen in both dental assessments, in the vast majority of cases Medicaid-enrolled students had dental health outcomes and utilization equal to or better than students who were not enrolled in Medicaid.

### 5.  Conference Period.

Bullet Point 11 provides:

*When the two dental studies are complete, counsel will confer to determine what further action, if any, is required. Counsel will begin to confer no later than 30 days following completion of the second study. If the parties agree, they will so report to the Court within 120 days of completion of the second study. If the parties cannot agree within 90 days of completion of the study, the dispute will be resolved by the Court upon motion to be filed by either party. If the parties cannot agree, either party will file their motion within 30 days of completion of discussions among counsel.*

When the two dental studies were complete, counsel for both parties conferred to determine what further action, if any, was required.[115]  A copy of the Second Dental Assessment was provided to Plaintiffs' counsel on April 25, 2014.[116]  Counsel began to confer on April 28,

---

product of an extensive stakeholder feedback process that is unparalleled in government and health. It integrates input from public health and prevention experts, a wide range of federal, state and local government officials, a consortium of more than 2,000 organizations, and perhaps most importantly, the public."), p. 5.

[113] Ex. 3, Altenhoff Decl., at Att. G, p. 12; Ex. 17, HP2020 Documents, at p. 5.

[114] Ex. 17, HP2020 Documents, at p. 4; Ex. 3, Altenhoff Decl., at Att. G, p. 19.

[115] Ex. 2, Long Decl., at ¶ 16.

[116] *Id.*

2014 to determine what further action, if any, was required, which was no later than 30 days following the completion of the second study on April 8, 2014.[117]  The 90-day conference period ended on July 24, 2014, without agreement.[118]  The present motion is being filed within 30 days of completion of discussions among counsel.

**B.  Defendants Have Complied with the Related, Enforceable Provisions of the Consent Decree.**

Portions of a consent decree should be vacated once a party has complied with its terms.[119]  The enforceable provisions of the Consent Decree related to this CAO are Paragraphs 148, 152-154, 158, 160-161, 165, 167, 169, and 171-174.[120]  The CAO was designed to bring Defendants into compliance with the dental-related Decree provisions.  As shown below, and in the table attached as Exhibit 13, Defendants have satisfied all of the mandatory, enforceable obligations in Paragraphs 143-174 of the Decree, and accordingly those paragraphs should be vacated under Prong 1 of Federal Rule of Civil Procedure 60(b)(5).

**1.  Decree Paragraph 148 provides:[121]**

> *BABY BOTTLE TOOTH DECAY To help prevent Baby Bottle Tooth Decay (BBTD), Defendants will conduct outreach to families with EPSDT recipient infants, beginning in January, 1996.  BBTD is a preventable dental disease of young children.  It causes rampant decay of teeth, sometimes to the extent that the young child's upper front teeth are completely gone.  Exhibit 5.  BBTD is associated with increased decay in baby and adult teeth.  It is also associated with fever, infection, eating problems and in some instances failure to thrive.*

---

[117] *Id.*

[118] *Id.*

[119] *See Collins v. Thompson*, 8 F.3d 657, 659 (9th Cir. 1993), *cert. denied*, 511 U.S. 1127 (1994) (affirming lower court's decision to vacate the consent decree where the state met the terms of the consent decree).  Further, justification for continued Court oversight over Paragraphs 143-174 is lacking, particularly in the absence of any ongoing violation of Medicaid law.  *See id.* (citing *Toussaint v. McCarthy*, 926 F.2d 800, 802 (9th Cir. 1990), *cert. denied*, 502 U.S. 874 (1991)).

[120] While Defendants seek to have Decree ¶¶ 143-174 vacated, only ¶¶ 148, 152-154, 158, 160-161, 165, 167, 169, 171-174 create mandatory, enforceable obligations on the part of Defendants.  *See* Dkt. 135, at ¶ 302 ("The term 'will' creates a mandatory, enforceable obligation.").  The other Decree paragraphs consist of mere recitations and do not contain mandatory, enforceable obligations.

[121] This paragraph was not among the Decree paragraphs that Defendants were held to have violated in 2000.

Defendants have complied with Decree Paragraph 148. From 1996 to the present, Defendants have engaged in outreach efforts for families of THSteps-recipient infants about Baby Bottle Tooth Decay (now known as Early Childhood Caries, or "ECC"), and have reported their compliance in QMRs.[122] HHSC's administrative services contractor, MAXIMUS, conducts outreach and informing for all Medicaid recipients under age 21 and their families on dental-related issues, including ECC.[123] MAXIMUS sends a letter to every Medicaid recipient at four months of age explaining that the infant should see a dentist for a Texas Health Steps dental checkup beginning at six months of age and that good dental care helps keep infants safe from the pain of tooth decay.[124] Included with this letter is the "Brush Up on Healthy Habits" brochure, which explains that infants can start getting germs in their mouths that can lead to tooth decay when teeth start coming in, and provides tips on preventing ECC.[125] MAXIMUS also sends a multitude of letters and brochures to Medicaid recipients of all ages (including

---

[122] *See, e.g.*, Dkt. 147-2, p. 4; Dkt. 161-2, p. 1; Dkt. 169, p. 4; Dkt. 171, p. 8, July 1997 QMR; Dkt. 178, May 1997 QMR, p. 7; Dkt. 189, Nov. 1997 QMR, p. 4; Dkt. 191, Jan. 1998 QMR, p. 6; Dkt. 195, Apr. 1998 QMR, p. 19; Dkt. 198, July 1998 QMR, p. 18; Dkt. 212, Oct. 1998 QMR, p. 23; Dkt. 218, Jan. 1999 QMR, p. 25; Dkt. 228, Apr. 1999 QMR, pp. 28-29; Dkt. 234, July 1999 QMR, pp. 27-28; Dkt. 254, Oct. 1999 QMR, p. 20; Dkt. 301, Jan. 2000 QMR, p. 20; Dkt. 302, Apr. 2000 QMR, p. 19; Dkt. 314-2, July 2000 QMR, p. 20; Dkt. 339-2, Oct. 2000 QMR, pp. 29-30; Dkt. 349, Jan. 2001 QMR, p. 30; & Ex. B; Dkt. 363, Apr. 2001 QMR, p. 31; Dkt. 365, July 2001 QMR, p. 30, & Ex. B; Dkt. 367, Oct. 2001 QMR, pp. 33-34; Dkt. 374, Jan. 2002 QMR pp. 39-40 & Ex. N; Dkt. 372, Apr. 2002 QMR pp. 41-42 & Ex. C; Dkt. 404, Oct. 2004 QMR, p. 28 & Ex. B; Dkt. 453, Jan. 2005 QMR, p. 28; Dkt. 501, Apr. 2005 QMR p. 27; Dkt. 551, July 2005 QMR, p. 26; Dkt. 571, Oct. 2005 QMR p. 28; Dkt. 574, Jan. 2006 QMR, p. 41; Dkt. 586 Apr. 2006 QMR, p. 44; Dkt. 589, July 2006 QMR, p. 40; Dkt. 596, Oct. 2006 QMR, p. 38; Dkt. 608, Jan. 2007 QMR, p. 38 & Ex. B; Dkt. 638, Apr. 2007 QMR, p. 42; Dkt. 651, July 2007 QMR, pp. 39-40 & Ex. B; Dkt. 670-2, Oct. 2007 QMR, pp. 7-9 & Ex. C; Dkt. 676-2, Jan. 2008 QMR, pp. 6-7 & Ex. A; Dkt. 681-2, Apr. 2008 QMR, pp. 8-9 & Ex. B; Dkt. 689-2, July 2008 QMR, pp. 7-9 & Ex. 3; Dkt. 701-2, Oct. 2008 QMR, pp. 10-11 & Ex. 2; Dkt. 710-1, Jan. 2009 QMR, pp. 6-8 & Ex. 3; Dkt. 719-2, Apr. 2009 QMR, pp. 10-11 & Ex. 3; Dkt. 726-2, July 2009 QMR, pp. 10-11 & Ex. 4; Dkt. 751-2, Jan. 2010 QMR, pp. 8-9 & Ex. 3; Dkt. 758-1, Apr. 2010 QMR, pp. 8-10 & Ex. 4; Dkt. 775-1, July 2010 QMR, pp. 9-10 & Ex. 3; Dkt. 800-1, Oct. 2010 QMR, pp. 7-9 & Ex. 5; Dkt. 813-1, Jan. 2011 QMR, pp. 8-10 & Ex. 4; Dkt. 825-1, Apr. 2011 QMR, pp. 9-11 & Ex. 5; Dkt. 857-1, July 2011 QMR, pp. 9-11 & Ex. 4; Dkt. 836-1, Oct. 2011 QMR, pp. 9-12 & Ex. 3; Dkt. 868-1, Jan. 2012 QMR, pp. 9-12 & Ex. 2; Dkt. 903-1, Apr. 2012 QMR, pp. 11-14 & Ex. 4.
[123] Ex. 7, Metteauer Decl., at ¶¶ 2-3.
[124] *Id.* at ¶ 16 & Att. Q.
[125] *Id.* at ¶ 16 & Att. Q.

infants and toddlers) encouraging the establishment of a dental home at six months of age and emphasizing the importance of regular dental checkups and the prevention of tooth decay.[126]

In addition to mailing written materials about ECC to families of THSteps-recipient infants, MAXIMUS staff conducts dental education events at various locations and orally informs Medicaid recipients under age 21 and their families about dental anticipatory guidance, including information about the prevention of ECC.[127]   By July 2014, MAXIMUS had made over 160 presentations at dental education events in State Fiscal Year ("SFY") 2014 alone.[128]   At these events, MAXIMUS staff uses in its presentations the "Brush Up on Healthy Habits" brochure (discussed above) and the "Brush Up on Healthy Habits" flip chart, which provides pictures of teeth with ECC, explains the causes of ECC, and provides detailed guidance on how to prevent ECC.[129]

The two DMOs also conduct outreach for their members about ECC.   At community events, health fairs, and presentations, DentaQuest staff informs parents about the dangers and the prevention of ECC and provides materials with tips on preventing ECC.[130]   As of July 2014, DentaQuest had attended 669 community events and conducted 290 presentations at schools and Head Start programs in SFY 2014, and approximately 140,000 people were present at these events and presentations.[131]   MCNA shares health tips on dental issues such as preventing ECC

---

[126] *Id.* at ¶¶ 15-16 & Atts. L-CC.
[127] Ex. 7, Metteauer Decl., at ¶¶ 8-9.   These dental education events are conducted at/for Head Start centers; elementary schools; Career Day events; centers that accommodate WIC, after-school programs, refugee programs, and detention (jail) programs; day care centers; homeless service providers; health departments; and other community- and faith-based organizations.  *Id.* at ¶ 8.
[128] *Id.* at ¶ 8.
[129] Ex. 7, Metteauer Decl., at ¶ 10 & Atts. C, H.
[130] Ex. 8, Howley Decl., at ¶ 11 and Att. F ("Oral Health Matters: Did You Know that Good Oral Health Begins at Birth?" flyer).
[131] Ex. 8, Howley Decl., at ¶ 11.

with members via Facebook and Twitter, and also distributes a "How to Avoid Baby Bottle Tooth Decay" flyer to members and their families/caregivers at health fairs around the state.[132]

Although not required to under the Decree, Defendants also inform healthcare providers about ECC and its prevention.  Online provider education modules and DSHS regional provider relations staff members train providers about preventing ECC.[133]  DSHS staff informs providers about ECC with the "Brush Up on Healthy Habits" brochure and flip chart (discussed above), gives providers a "Keep Your Child Smiling" brochure that discusses prevention of ECC and a "Stages of Tooth Decay" poster with pictures of tooth decay, and allows providers to order these materials for free online on the THSteps website.[134]  Additionally, DSHS Oral Health Program staff provides First Dental Home training to dental students and providers, which includes information on prevention of ECC.[135]

### 2.  Decree Paragraph 152 provides:[136]

*Since they are EPSDT recipients, Medicaid recipients who are teenage mothers are themselves eligible for dental services.[137]  One purpose of this phase of outreach will be to encourage teenaged mothers to get dental check ups and treatment, if needed, for themselves promptly after the birth of their infants.  Mothers' treatment should be finished, if possible, before infants' teeth begin to erupt at about 6-8 months.  This dental care will benefit the mother.  It was also benefit her infant.  If the mother's decay is treated, she may avoid passing on bacteria to her infant and so avoid BBTD.*

Defendants have complied with Decree Paragraph 152, and from 1996 to the present, have reported their compliance in QMRs.[138]  In addition to the outreach about ECC discussed

---

[132] Ex. 9, Lacasa Decl., at ¶¶ 7-8 & Atts. D, F.

[133] Ex. 10, Bruch Decl., at ¶¶ 3, 11.

[134] Ex. 10, Bruch Decl., at ¶¶ 4, 12 & Atts. B-C, H.

[135] *Id*. at ¶ 7.

[136] This paragraph was not among the Decree paragraphs that Defendants were held to have violated in 2000.

[137] [FN in Decree] The Texas Medicaid program does not cover most dental services for recipients who are not eligible for EPSDT, i.e., adults.

[138] *See, e.g.*, Dkt.147-2, p. 4; Dkt. 453, Jan. 2005 QMR, p. 28; Dkt. 501-1, Apr. 2005 QMR p. 27; Dkt. 551, July 2005 QMR, p. 27;  Dkt. 571-2, Oct. 2005 QMR p. 29; Dkt. 574, Jan. 2006 QMR, p. 42; Dkt. 586, Apr. 2006 QMR,

above in connection with Decree Paragraph 148, Defendants and their contractors specifically inform teenage mothers and pregnant teens about the importance of getting dental checkups and treatment and about the prevention of ECC in a variety of ways.  MAXIMUS sends all pregnant Medicaid recipients under age 21 a letter which provides tips for maintaining the health of pregnant women and their babies; emphasizes the importance to pregnant women of receiving dental checkups during pregnancy every 6 months; informs of the need to schedule checkups for babies; and recommends and encourages the scheduling of checkups when the baby is born.[139] Additionally, MAXIMUS sends pregnant Medicaid recipients under age 21 who were not successfully reached by telephone a letter which emphasizes the importance of dental checkups for babies and asks them to contact THSteps for more information on case management services.[140]   MAXIMUS also mails teenaged Medicaid recipients various outreach letters (including a letter for parenting teens which emphasizes the importance of dental care for themselves and their babies) and teen-specific brochures to emphasize the importance of regular dental checkups.[141]  At dental education events, MAXIMUS staff uses the "Brush Up on Healthy Habits" brochure and flip chart to inform about the importance of dental care and checkups and healthy eating habits during pregnancy; educates about the importance of pregnant women receiving dental checkups during pregnancy and the importance of attention to parental oral hygiene; and provides high school parenting education for pregnant and parenting teens related

---

p. 45;  Dkt 589, July 2006 QMR, p. 41; Dkt. 596-2, Oct. 2006 QMR, p. 39; Dkt. 608, Jan. 2007 QMR, p. 39; Dkt. 638, Apr. 2007 QMR, p. 43 & Ex. F; Dkt. 651, July 2007 QMR, p. 40; Dkt. 670-2, Oct. 2007 QMR, pp. 7-9 & Ex. C; Dkt. 676-2, Jan. 2008 QMR, pp. 6-7 & Ex. A; Dkt. 681-2, Apr. 2008 QMR, pp. 8-9 & Ex. B; Dkt. 689-2, July 2008 QMR, pp. 7-9 & Ex. 3; Dkt. 701-2, Oct. 2008 QMR, pp. 10-11 & Ex. 2; Dkt. 710-1, Jan. 2009 QMR, pp. 6-8 & Ex. 3; Dkt. 719-2, Apr. 2009 QMR, pp. 9 & Ex. 3; Dkt. 726-2, July 2009 QMR, pp. 10-11 & Ex. 4; Dkt. 751-2, Jan. 2010 QMR, pp. 8-9 & Ex. 3; Dkt. 758-1, Apr. 2010 QMR, pp. 8-10 & Ex. 4; Dkt. 775-1, July 2010 QMR, pp. 9-10 & Ex. 3; Dkt. 800-2, Oct. 2010 QMR, pp. 7-9 & Ex. 5; Dkt. 813-1, Jan. 2011 QMR, pp. 8-10 & Ex. 4; Dkt. 825-1, Apr. 2011 QMR, pp. 9-11 & Ex. 5; Dkt. 857-1, July 2011 QMR, pp. 9-11 & Ex. 4; Dkt. 836-1, Oct. 2011 QMR, pp. 9-12 & Ex. 3; Dkt. 868-1, Jan. 2012 QMR, pp. 9-12 & Ex. 2; Dkt. 903-1, Apr. 2012 QMR, pp. 11-14 & Ex. 4.
[139] Ex. 7, Metteauer Decl., at ¶ 16 & Att. O.
[140] *Id*. at ¶ 16 & Att. AA.
[141] *Id*. at ¶ 16 & Atts. U, Y, BB.

to dental care and preventive services for pregnant and parenting teens and their children, including encouragement to teenaged mothers to get dental checkups and treatment for themselves promptly after the birth of their infants.[142]

The two DMOs also provide outreach to teenage mothers and pregnant teens about the importance of getting dental checkups and treatment and about the prevention of ECC. DentaQuest members who are teenage mothers or are pregnant receive outreach to inform them about the importance of oral health during pregnancy and to encourage them to get dental checkups and treatment, if needed, for themselves during pregnancy.[143] DentaQuest staff attends health fairs and events that target teens and pregnant teens and works with several high schools and teen parenting programs to promote oral health for both the mother and the children.[144] Presentations are conducted at high schools across the state aimed at educating teens and teen parents regarding oral health topics.[145] From September 2013 to July 2014, DentaQuest attended 19 events that specifically targeted teens, and approximately 2,300 teens attended those 19 events.[146] DentaQuest also works with the WIC Program in all eleven Health and Human Services regions across the state, and at WIC health fairs and baby shower events, DentaQuest provides members with brochures and flyers regarding oral health for pregnant women, infant and adult toothbrushes, and other oral health items.[147] The brochures encourage pregnant DentaQuest members to get dental checkups regularly, and teen parents often attend these events and receive this information and these oral health items.[148] Finally, at community events, health fairs, and presentations, DentaQuest staff has spoken to and provided parents (including teen

---

[142] *Id.* at ¶¶ 9-10 & Atts. C, H.
[143] Ex. 8, Howley Decl., at ¶ 9 & Atts. C ("Oral Health Matters" brochure), D ("Oral Health Matters: Pregnant Women" flyer).
[144] *Id.* at ¶ 10.
[145] *Id.*
[146] *Id.*
[147] *Id.* at ¶ 10 & Att. E ("Oral Health Matters: Baby Teeth Are Important" flyer).
[148] *Id.* at ¶ 10.

parents) with brochures and other handouts about, inter alia, the importance of good oral health and a healthy diet during pregnancy and the causes and effects of ECC.[149]

MCNA also engages in outreach efforts for pregnant and parenting teens.  MCNA call center staff is trained to ask questions during member calls to identify pregnant members, and, once identified, all pregnant members receive a Bright Beginnings dental care kit which includes a toothbrush, floss, toothpaste, and oral hygiene information in the "Healthy Smiles for Mom and Baby" flyer.[150]  The flyer is also distributed at health fairs around the state of Texas to educate members.[151]  The full-color flyer encourages pregnant members to get dental checkups regularly; informs them about preventing ECC, reducing cavities, gum disease, and pregnancy gingivitis, and maintaining good oral health and a healthy diet during pregnancy; and directs pregnant members to visit MCNA's website at www.mcna.net for more oral hygiene tips.[152]  MCNA has also developed a series of health tips that are distributed via Facebook and Twitter, and these health tips include information on the importance of good oral health and cavity treatment for pregnant women in order to prevent bacteria transfer to their infants, and other tips include information on preventing ECC and the importance of early dental care.[153]

### 3.  Decree Paragraph 153 provides:[154]

> *Age appropriate outreach will also address the prevention of BBTD.  See pages 10-11, 13, 19.*

Defendants have complied with Decree Paragraph 153, and have reported their compliance over the years in QMRs.[155]  Please see the discussions for Decree Paragraphs 148

---

[149] *Id.* at ¶ 11.

[150] Ex. 9, Lacasa Decl., at ¶ 7 & Att. C ("Healthy Smiles for Mom and Baby" flyer).

[151] *Id.*

[152] *Id.*  MCNA's website has, among other informational features, a "Kids Zone" which contains interactive dental games, quizzes, downloads, videos, and more.  *Id.* at ¶ 7.

[153] *Id.* at ¶ 7 & Att. D.

[154] This paragraph was not among the Decree paragraphs that Defendants were held to have violated in 2000.

and 152 above (discussing Defendants' age-appropriate outreach and informing efforts aimed at prevention of ECC).

### 4. Decree Paragraph 154 provides:[156]

*Dental Scans   TDH may at its option perform dental scans for recipients who are in 2nd or 3rd and 6th or 7th grades.  Dental scans are brief examinations of the mouth by a dentist.  They will be performed by TDH public health dentists or by dentists who contract with TDH.  Dental scans will*

*\*   inform recipients about their apparent dental health and need for dental care;*

*\*   help to arrange dental care for recipients*

*\*   encourage the placement of sealants when recipients by informing recipients about them in a timely manner; and*

*\*   place sealants when recipients do not have access to another dentist who makes sealants available.*

Plaintiffs have agreed that Paragraph 154 is optional,[157] and it is indeed optional by its own language ("TDH may at its option perform dental scans…."). Dkt. 135, ¶ 154 (emphasis added). DSHS (previously referred to as TDH), at its own election, performs dental scans for Medicaid recipients in second or third and sixth or seventh grades as described in Decree

---

[155] *See, e.g.*, Dkt.147-2, p. 4; Dkt. 301, Jan. 2000, QMR, p. 23; Dkt. 302, Apr. 2000 QMR, p. 20; Dkt. 314-2, July 2000 QMR, p. 20; Dkt. 339-2, Oct. 2000 QMR, p. 30; Dkt. 349, Jan. 2001 QMR, p. 31; Dkt. 363, Apr. 2001 QMR, p. 32; Dkt. 365, July 2001 QMR, p. 31, & Ex. B; Dkt. 367, Oct. 2001 QMR, p. 34 & Ex. C; Dkt. 374, Jan. 2002 QMR p. 40 & Ex. N; Dkt. 379, Apr. 2002 QMR p. 42 & Ex. C; Dkt. 404, Oct. 2004 QMR, p. 29; Dkt. 453, Jan. 2005 QMR, p. 29; Dkt. 501-1, Apr. 2005 QMR p. 28; Dkt. 551, July 2005 QMR, p. 27; Dkt. 571-2, Oct. 2005 QMR p. 29; Dkt. 574, Jan. 2006 QMR, p. 42; Dkt. 586,  Apr. 2006 QMR, p. 45; Dkt. 589, July 2006 QMR, p. 41; Dkt. 596-2, Oct. 2006 QMR, p. 39; Dkt. 608, Jan. 2007 QMR, p. 39; Dkt. 670-2, Apr. 2007 QMR, p. 43; Dkt. 651, July 2007 QMR, p. 40-41; Dkt. 670-2, Oct. 2007 QMR, pp. 7-9 & Ex. C; Dkt. 676-2, Jan. 2008 QMR, pp. 6-7 & Ex. A; Dkt. 681-2, Apr. 2008 QMR, pp. 8-9 & Ex. B; Dkt. 689-2, July 2008 QMR, pp. 7-9 & Ex. 3; Dkt. 701-2, Oct. 2008 QMR, pp. 10-11 & Ex. 2; Dkt. 710-1, Jan. 2009 QMR, pp. 6-8 & Ex. 3; Dkt. 719-2, Apr. 2009 QMR, pp. 9-10 & Ex. 3; Dkt. 726-2, July 2009 QMR, pp. 10-11 & Ex. 4; Dkt. 740-2, Oct. 2009 QMR, pp. 8-9; Dkt. 751-2, Jan. 2010 QMR, pp. 8-9 & Ex. 3; Dkt. 758-1, Apr. 2010 QMR, pp. 8-10 & Ex. 4; Dkt. 775-1, July 2010 QMR, pp. 9-10 & Ex. 3; Dkt. 800-2, Oct. 2010 QMR, pp. 7-9 & Ex. 5; Dkt. 813-1, Jan. 2011 QMR, pp. 8-10 & Ex. 4; Dkt. 825-1, Apr. 2011 QMR, pp. 9-11 & Ex. 5; Dkt. 857-1, July 2011 QMR, pp. 9-11 & Ex. 4; Dkt. 836-1, Oct. 2011 QMR, pp. 9-12 & Ex. 3; Dkt. 868-1, Jan. 2012 QMR, pp. 9-12 & Ex. 2; Dkt. 903-1, Apr. 2012 QMR, pp. 11-14 & Ex. 4.

[156] This paragraph was not among the Decree paragraphs that Defendants were held to have violated in 2000.

[157] Ex. 14, Plaintiffs' May 22, 2014 Responses to Defendants' Chart Showing CAO and Decree Provisions, at p. 6.

Paragraph 154.[158]   Reports on dental scans for second, third, sixth, and seventh graders have regularly been included in Defendants' QMRs.[159]   Defendants are in full compliance with Decree Paragraph 154.

The DSHS Oral Health Program ("OHP") has five regional dentists and five dental hygienists who are located in the Lubbock, Tyler, Midland, San Antonio, and Houston DSHS regional offices.[160]   These regional offices provide limited oral evaluations (LOEs) (also referred to as brief examinations, limited dental evaluations, or dental screenings/scans) and preventive dental services to Texas school-aged Medicaid clients.[161]   These evaluations consist of viewing a client's mouth to check for tooth decay and other dental problems during school-based and Head Start preventive dental services projects.[162]   The teams provide evaluations for all clients at selected schools, contingent upon parental permission.[163]   Accordingly, Medicaid recipients for whom written parental/guardian permission has been obtained are included within the populations evaluated and treated.[164]   Depending upon the grades offered at the selected schools,

---

[158] Ex. 4, Nguyen Decl., at ¶ 5.
[159] *See, e.g.*, Dkt. 404, Oct. 2004 QMR, p. 29; Dkt. 453-1, Jan. 2005 QMR, p. 29; Dkt. 501, Apr. 2005 QMR, p. 28; Dkt. 551, July 2005 QMR, p. 27; Dkt. 571-2, Oct. 2005 QMR, p. 29; Dkt. 574, Jan. 2006 QMR, p. 42; Dkt. 586, Apr. 2006, QMR p. 45; Dkt. 589, July 2006 QMR, p. 42; Dkt. 596-2, Oct. 2006 QMR, p. 40; Dkt. 608, Jan. 2007 QMR, p. 39; Dkt. 638, Apr. 2007 QMR, p. 43; Dkt. 651, July 2007 QMR. p. 41; Dkt. 670-2, Oct. 2007 QMR, pp. 36-37; Dkt. 676-2, Jan. 2008 QMR, p. 34; Dkt. 689-2, July 2008 QMR, p. 47; Dkt. 701-2, Oct. 2008 QMR, p. 44; Dkt. 710-1, Jan. 2009 QMR, p. 34; Dkt. 719-3, Apr. 2009 QMR, p. 45; Dkt. 726-2, July 2009 QMR, pp. 54-55; Dkt. 740-2, Oct. 2009 QMR, p. 52; Dkt. 751-2, Jan. 2010 QMR, pp. 61-62; Dkt. 758-1, Apr. 2010 QMR, p. 66; Dkt. 775-1, July 2010 QMR, pp. 66-67; Dkt. 800-1, Oct. 2010 QMR, p. 66; Dkt. 813-1, Jan. 2011 QMR, p. 54; Dkt. 825-1, Apr. 2011 QMR, p. 54; Dkt. 857-1, July 2011 QMR, p. 55-56; Dkt. 836-1, Oct. 2011 QMR, pp. 62-63; Dkt. 868-1, Jan. 2012 QMR. pp. 61-62; Dkt. 903-1, Apr. 2012, QMR p. 66; Dkt. 919-1, July 2012 QMR, p. 50; Dkt. 961-1, Oct. 2012 QMR, pp. 54-55; Dkt. 1001-1, Jan. 2013 QMR, p. 46; Dkt. 1031-1, Apr. 2013 QMR, p. 53; Dkt. 1049-1, July 2013 QMR, pp. 54-55; Dkt. 1094-1, Oct. 2013 QMR, pp. 53-54; Dkt. 1124-1, Jan. 2014 QMR, pp. 48-49; Dkt. 1162-1, Apr. 2014 QMR p. 43; Dkt. 1195-1, July 2014 QMR, p. 43.
[160] Ex. 4, Nguyen Decl., at ¶ 6.
[161] *Id.*
[162] *Id.*
[163] *Id.* at ¶ 6 & Atts. A-B.
[164] *Id.*

LOEs may be performed on clients in second, third, sixth, seventh, and additional grade levels.[165]

---

[165] *Id.* at ¶ 6.

### a. Informing Recipients About Their Apparent Dental Health and Need for Dental Care.

The DSHS OHP regional dentists perform LOEs as part of: 1) school-based preventive dental services provided to recipients in preschool up to sixth grade in Head Start centers and elementary schools; 2) the BSS for Third Grade Students, which is conducted by DSHS OHP Regional Dental Teams; and 3) collaborative preventive dental service projects and events provided to clients up to 21 years of age in collaboration with external and internal partners of DSHS OHP.[166]   The school-based preventive dental services, the BSS, and the collaborative preventive dental service projects/events act to inform clients about their dental health and their need for dental care through the Results of Limited Oral Evaluation Form ("LOE Form").[167]   The LOE Form provides the recipients and their parents/caregivers with the results of the client's LOE, and denotes within which of three categories the recipient falls, contingent upon his or her oral health care needs, as follows: (0) connoting no obvious dental problems; (1) connoting that dental treatment is needed as soon as possible; and (2) connoting that a dental problem requires immediate attention.[168]   Additional observations and/or instructions are also included under each category to provide further detailed information to the recipient's parents/caregivers about the recipient's oral health status.[169]   The appropriate regional dentist's phone number is provided at the bottom of the form so that the parent of the client can contact the DSHS OHP Regional Dental Team with any additional questions or concerns about the results of the LOE.[170]

---

[166] Ex. 4, Nguyen Decl., at ¶ 7.
[167] *Id.* at ¶ 7 & Att. C.
[168] *Id.*
[169] *Id.*
[170] *Id.*

### b.  Helping to Arrange Dental Care for Recipients.

DSHS OHP Regional Dental Teams work with school nurses and Head Start health coordinators to provide referrals for additional dental evaluations and treatment for all the clients that are identified as needing dental care through the LOE.[171]  In addition, the "Help your child have a healthy smile" postcards, developed in 2013 and provided to parents/caregivers after their child's LOE, offer three means of obtaining more information and resources regarding dental services and health insurance coverage: calling 2-1-1, visiting 211.org, or visiting www.dshs.state.tx.us/low-cost-dental-services.[172]  The postcards are sent home with the child, either stapled to the LOE Form or included in a "goodie bag" for the child.[173]

### c.  Encouraging the Placement of Sealants by Informing Recipients About Them in a Timely Manner.

The DSHS OHP encourages the placement of sealants by informing recipients about the sealants in a timely manner through the following means:

- The Parent Information Letter for preventive dental services, which is sent to the parents of recipients at selected schools and provides a description of dental sealants and their oral health benefits ("Sealants are thin, plastic coatings a dentist puts on the chewing surfaces of teeth. They fill in the deep pits and grooves where food and germs get trapped. They can prevent tooth decay. The dentist does not use needles or drugs when putting sealants on a child's teeth. Fluoride varnish is a protective coating that is placed on the teeth to help prevent new cavities and to help stop very small

---

[171] Ex. 4, Nguyen Decl., at ¶ 8.
[172] *Id*. at ¶ 8 & Att. D.
[173] *Id*.

cavities that have already started. Together, fluoride varnish and dental sealants work to prevent most tooth decay.");[174]

- The Parent Permission Form, also sent to parents of recipients at selected schools, which allows their child to participate in preventive dental services and provides a description of dental sealants and their oral health benefits ("Dental sealants are thin, plastic coatings that may be applied to the chewing surfaces of teeth. They fill in the deep pits and grooves where food and germs get trapped. They can prevent tooth decay (cavities). The dentist does not use needles or drugs when putting sealants on a child's teeth. Fluoride varnish is a protective coating that is placed on the teeth to help prevent new cavities and to help stop very small cavities that have already started. Together, fluoride and dental sealants work to prevent most tooth decay.");[175]

- The development of a "Sealants and Fluoride Varnish" poster in collaboration with THSteps.  The poster can be ordered for free through a link on the DSHS OHP website and displayed in healthcare and school settings to inform recipients about the benefits of dental sealants and fluoride varnish.[176]

### d.  Placing Sealants When Recipients Do Not Have Access to Another Dentist Who Makes Sealants Available.

The DSHS OHP Regional Dental Teams provide dental sealants for eligible recipients as part of the school-based preventive dental services and collaborative preventive dental service projects/events.[177]  Often, recipients whose parents indicated on the Parent Permission Form that their child has not seen a dentist within the past 12 months and/or have not indicated a family

---

[174] Ex. 4, Nguyen Decl., at ¶ 9 & Att. A.
[175] *Id.* at ¶ 9 & Att. B.
[176] *Id.* at ¶ 9 & Att. E.
[177] Ex. 4, Nguyen Decl., at ¶ 10.

dentist may be eligible to receive dental sealants by DSHS OHP regional dental teams.[178]  DSHS

OHP regional dental teams place dental sealants on recipients that are determined to be eligible,

indicate a need for dental sealants, and have provided a signed parent permission form to receive

dental sealants.[179]

### 5. Decree Paragraph 158 provides:[180]

> *Dental scans are not a substitute for full dental check ups.  The scan program will be carefully designed and implemented to encourage recipients to receive full dental exams every 6 months.  Recipients will be informed if they need dental care immediately, soon or within 6 months.  The program will further assist recipients to schedule dental check ups after scans are completed.*

Because the dental scans in Decree Paragraph 154 are optional, Decree Paragraph 158's

descriptions of the dental scan program must also be considered optional.  Defendants, however,

are in full compliance with Paragraph 158, and updates on Decree Paragraph 158 have regularly

been reported in Defendants' QMRs.[181]

### a.   The Scan Program Will Be Carefully Designed and Implemented to Encourage Recipients to Receive Full Dental Exams Every 6 Months.

The school-based preventive dental services, the BSS, and the collaborative preventive

dental service projects/events encourage all recipients to receive full dental exams every six

months through the following:

- The Parent Information Letter provided to clients, which explains the preventive

  dental services offered or the BSS conducted, states: **"This limited dental evaluation**

  **does not take the place of regular dental checkups.  You should keep taking your**

---

[178] *Id.*

[179] *Id.*

[180] This paragraph was not among the Decree paragraphs that Defendants were held to have violated in 2000.

[181] *See, e.g.,* Dkt. 919-1, July 2012 QMR, p. 50; Dkt. 961-1, Oct. 2012 QMR, p. 54; Dkt. 1001-1, Jan 2013 QMR, p. 46; Dkt. 1031-1, Apr. 2013 QMR, p. 53; Dkt. 1049-1, July 2013 QMR, pp. 54-55; Dkt. 1094-1, Oct. 2013 QMR, pp. 53-54; Dkt. 1124-1, Jan. 2014 QMR, pp. 48-49; Dkt. 1162-1, Apr. 2014 QMR, p. 43; Dkt. 1195-1, July 2014 QMR, p. 43.

**child to the dentist for twice-a-year dental checkups and treatment."**  The letter is written in English and Spanish;[182]

- The Preventive Dental Services Parent Permission Form states: **"The limited dental evaluation does not take the place of regular dental checkups. You should keep taking your child to the dentist for twice-a-year dental checkups and treatment."**  The form is written in English and Spanish;[183]

- The LOE form, which provides parents/caregivers with the results of their child's LOE, reminds parents: "Keep in mind that a limited evaluation does not replace the need for regular dental checkups every 6 months."  This form is written in English and Spanish;[184]

- The "Help your child have a healthy smile" postcard is provided to parents/caregivers of recipients who participate in the preventive dental services.  The postcard reminds parents that: "This evaluation does not take the place of regular dental checkups. Keep taking your child to the dentist for twice-a-year checkups and treatment."  This postcard is written in English and Spanish.[185]

    **b.  Recipients Will Be Informed if They Need Dental Care Immediately, Soon, or Within 6 Months.**

*See* the discussion above for Paragraph 154, section (a) ("Informing Recipients About Their Apparent Dental Health and Need for Dental Care.").

---

[182] Ex. 4, Nguyen Decl., at ¶ 12 & Att. A.
[183] *Id.* at ¶ 12 & Att. B.
[184] *Id.* at ¶ 12 & Att. C.
[185] *Id.* at ¶ 12 & Att. D.  As mentioned above, the postcards also provide three means of obtaining more information and resources regarding dental services and health insurance coverage: calling 2-1-1, visiting 211.org, or visiting www.dshs.state.tx.us/low-cost-dental-services.  *Id.* at ¶ 12 n.1 & Att. D.

### c.   The Program Will Further Assist Recipients to Schedule Dental Check Ups After Scans Are Completed.

*See* the discussion above for Paragraph 154, section (b) ("Helping to Arrange Dental Care for Recipients.").

### 6.   Decree Paragraph 160 provides:[186]

> *Elimination of Age Limit* Current EPSDT regulations allow the placements of sealants for recipients younger than 14 years. Although most recipients who require sealants are in this age group, some recipients require sealants at other ages. The limitation based on age is therefore inconsistent with the EPSDT requirement that services be available whenever necessary. 42 U.S.C. § 1396d(r)(5). By September 30, 1995, Defendants will cover all necessary sealants regardless of the recipient's age.

In compliance with Decree Paragraph 160, the age restriction on medically necessary sealants (which allowed sealants only for recipients younger than 14 years of age) was removed on September 30, 1995 (prior to the Decree being entered in 1996).[187] Currently, all medically necessary sealants are covered for Medicaid recipients under age 21 without any age limitation, for dental managed care recipients as well as fee-for-service recipients.[188] Plaintiffs agree with Defendants that the requirements of Decree Paragraph 160 have been completed.[189]

### 7.   Decree Paragraph 161 provides:[190]

> *Training for Providers:* By April 30, 1995, Defendants will identify all dentists who provide services to EPSDT recipients but provide no or few sealants. By May 31, 1995, the TDH Dental Director will write to dentists whose practices could reasonably include sealants about sealants. The Dental Director will provide current information about a) the benefits sealants, b) how to use sealants and c) EPSDT reimbursement for sealants. Letters will be sent to dentists who regularly provide sealants and dentists who do not. By May 31, 1996, Defendants will review billing records to determine if the number of dentists who regularly provide sealants has increased. Dentists who do not

---

[186] This paragraph was not among the Decree paragraphs that Defendants were held to have violated in 2000.
[187] Ex. 18, 1996 and 1997 QMR Excerpts, at p. 2 (Dkt. 147-2 (Apr. 1996 QMR), p. 2).
[188] Ex. 3, Altenhoff Decl., at ¶ 32; Ex. 8, Howley Decl., at ¶ 12; Ex. 9, Lacasa Decl., at ¶ 12.
[189] Ex. 14, Plaintiffs' May 22, 2014 Responses to Defendants' Chart Showing CAO and Decree Provisions, at p. 7.
[190] This paragraph was not among the Decree paragraphs that Defendants were held to have violated in 2000.

*provide sealants will receive further targeted outreach information about sealants unless their specialty indicates that they would not provide this service.*

As required by the Consent Decree, by April 30, 1995 Defendants generated a list of all dentists who provided services to EPSDT recipients but provided no or few sealants.[191]  By May 31, 1995, the TDH Dental Director wrote to all dentists on that list and provided the information about sealants required by Paragraph 161.[192]  In June 1996, Defendants reviewed dental claims payment information to determine if the number of dentists who regularly provided sealants had increased.[193]  Defendants determined that between SFY 1994 and SFY 1995, there was a 14.1% increase in the total number of dentists applying sealants and a 17.0% increase in the number of sealants applied per provider.[194]  There was also an 8.6% decrease in the relative proportion of dentists who did not apply sealants.[195]  In December 1996, dentists that were not providing sealants were identified and sent an educational letter on sealants, along with an article on guidelines for sealant use.[196]

Defendants and Plaintiffs agree that the terms of Decree Paragraph 161 have been met.[197] The sole exception to that agreement is that it is Defendants' position that the December 1996 letter satisfied the final obligation of Paragraph 161 (targeted outreach information about sealants to dentists who did not provide sealants) and that Paragraph 161 does not contain ongoing obligations.  Plaintiffs, on the other hand, take the unsupported position that Defendants must

---

[191] Ex. 18, 1996 and 1997 QMR Excerpts, at p. 1 (Dkt. 147-2 (Apr. 1996 QMR), p. 1).
[192] Ex. 18, 1996 and 1997 QMR Excerpts, at p. 3 (Dkt. 161-2 (July 1996 QMR), p. 3).
[193] Ex. 18, 1996 and 1997 QMR Excerpts, at p. 6 (Dkt. 169 (Oct. 1996 QMR), p. 7).
[194] Ex. 18, 1996 and 1997 QMR Excerpts, at p. 6 (Dkt. 169 (Oct. 1996 QMR), p. 7).
[195] *Id.*
[196] Ex. 18, 1996 and 1997 QMR Excerpts, at p. 8 (Dkt. 171 (Jan. 1997 QMR), p. 8).
[197] Ex. 14, Plaintiffs' May 22, 2014 Responses to Defendants' Chart Showing CAO and Decree Provisions, at p. 8.

continue targeted outreach to dentists who do not provide sealants, despite the absence of language in Paragraph 161 indicating any ongoing obligation.[198]

Even assuming *arguendo* that Plaintiffs are correct and that Paragraph 161 contains some sort of unwritten continuing "obligation" to inform dentists about sealants, Defendants have more than met this unwritten "obligation."  Defendants and their contractors provide information about sealants in various ways to <u>all</u> Medicaid dental providers, not just those who do not provide sealants to their patients.  The THSteps online provider education modules contain information about sealants, and are available at no cost to all providers and provide continuing education credit.[199]   HHSC and DSHS THSteps staff members conduct training and presentations on Texas Medicaid and THSteps program services—including dental services such as sealant application—at professional schools and with professional organizations.[200]  DSHS staff regularly trains providers about sealants; gives providers brochures, posters, and other materials which emphasize the importance of sealants in helping to prevent tooth decay; and also allows providers to order those materials for free online.[201]  The DSHS OHP State Public Health Dental Director meets with TDA during its Committee on Access, Medicaid and CHIP meetings, and the Director's presentations always focus on, *inter alia*, the importance of sealants.[202] During presentations and training, DSHS OHP staff provides dental students and providers with materials regarding sealants.[203]

The DMOs also inform dental providers about the importance of sealants.  DentaQuest informs its providers about available Medicaid dental services—including encouraging the use of

---

[198] Ex. 14, Plaintiffs' May 22, 2014 Responses to Defendants' Chart Showing CAO and Decree Provisions, at p. 8.
[199] Ex. 10, Bruch Decl., at ¶ 3.
[200] Ex. 10, Bruch Decl., at ¶ 15.
[201] Ex. 10, Bruch Decl., at ¶¶ 4, 11-12, 14 & Atts. B, G, H, I, K.
[202] Ex. 10, Bruch Decl., at ¶ 5.
[203] Ex. 10, Bruch Decl., at ¶ 7.

sealants—via provider manuals, mailings, portal postings, newsletters, office visits, phone outreach, and provider trainings.[204]   Since 2013, DentaQuest has had an incentive program to motivate providers to improve performance on profiled measures such as the percentage of children (ages 6-9 and 10-14) during the prior six months who received a sealant and fluoride.[205] From March 1, 2012 through June 26, 2014, 3,391,215 sealants were provided to DentaQuest's members under age 21 with Medicaid.[206]

MCNA's provider manuals and training educate network providers about sealant application as part of preventive treatment for members in order to prevent tooth decay.[207] MCNA also includes dental sealant application on permanent molars as part of its preferred provider program, known as the Stellar Treatment and Recognition Reward (STARR) program.[208]   The STARR brochure explains that the American Academy of Pediatric Dentistry recommends the use of sealants after the eruption of the first and second permanent molars; that sealants are 100 percent effective if they are fully retained on the tooth; that according to the Surgeon General's 2000 report on oral health, sealants have been shown to reduce decay by more than 70 percent; and that the combination of sealants and fluoride has the potential to nearly eliminate tooth decay in school-age children.[209]   From March 2012 to July 2014, MCNA members under age 21 received over 1,829,920 sealants.[210]

---

[204] Ex. 8, Howley Decl. at ¶ 6 & Att. B.

[205] Id. at ¶ 6.

[206] Id. at ¶ 12.

[207] Ex. 9, Lacasa Decl., at ¶¶ 3, 10 & Att. A.

[208] Id. at ¶ 10 & Att. I (MCNA's 2012-13 STARR brochure that went to all general and pediatric dentists in MCNA's network).   The STARR program rewards and incentivizes providers who excel in the provision of preventive care services such as annual exams and six-month checkups, prophylaxis, fluoride application, and sealant application on permanent molars.   Id. at ¶ 17.   Providers are ranked against their peers, with the top performers receiving financial recognition for providing high quality dental care.   Id.   The first STARR program recognition reward payments totaled $10 million to over 1,600 qualifying providers.   Id.

[209] Id. at ¶ 10 & Att. I.

[210] Id. at ¶ 11.

Finally, Defendants and their contractors do not just inform providers about sealants, but also engage in various efforts to inform Medicaid recipients under age 21 about sealants. MAXIMUS mails a brochure to all Medicaid recipients when they are four months old that explains that parents should ask the child's dentist at the age-appropriate time about sealant application and that sealants help prevent tooth decay.[211]   MAXIMUS also mails a letter to Medicaid recipients between ages five and twelve that informs about dental sealants and their purpose, and mails a similar letter with information about sealants to Medicaid recipients between ages six and twelve who have not received a dental checkup in the last six months.[212] At dental education events, MAXIMUS staff educates Medicaid recipients under age 21 about dental sealants and their purpose and provides materials discussing the role of sealants in preventing tooth decay.[213]   DentaQuest's member handbook explains to members that they will receive a free dental care kit (which includes a backpack, mouth guard, toothbrush, toothpaste, brushing chart, and stickers for the brushing chart) if they receive proper dental treatment— which specifically includes sealants—from their main dentist.[214]   MCNA provides all members with member handbooks that discuss sealants, and also provides members with information about sealants at health fairs across the state in order to encourage members to obtain sealants.[215]

Accordingly, Defendants have fully satisfied the terms of Decree Paragraph 161.

## 8.  Decree Paragraph 165 provides:[216]

> *Beginning no later than October 31, 1995, Defendants will maintain reports of the number and percent of participating dentists who see 0-29, 30-99, and 100+ EPSDT recipients every 3 months.  The format of these reports will be similar to those already prepared for medical doctors.*

---

[211] Ex. 7, Metteauer Decl., ¶ 16 & Att. Q.
[212] Ex. 7, Metteauer Decl., ¶ 16 & Atts. T, X.
[213] Ex. 7, Metteauer Decl., ¶¶ 9-10 & Att. H.
[214] Ex. 8, Howley Decl., at ¶ 3 & Att. A at p. 33.
[215] Ex. 9 , Lacasa Decl., ¶¶ 6, 9 & Atts. B, G-H.
[216] This paragraph was not among the Decree paragraphs that Defendants were held to have violated in 2000.

In compliance with Decree Paragraph 165, Defendants have reported in each QMR the number and percent of participating dentists who see 1-29, 30-99, and 100+ EPSDT recipients, starting with the first quarter of SFY 1996.[217]

### 9. Decree Paragraph 167 provides:[218]

> The professional conduct of audits is important to EPSDT recipients. Plaintiffs contend that unprofessional conduct of audits may cause dentists to stop serving EPSDT recipients. Accordingly, Defendants will finalize policies or rules for the audits by September 30, 1995. Further, they began a 3 month moratorium on audits on April 1, 1995.

In compliance with Decree Paragraph 167, Defendants established and implemented final policies and protocols for dental audits by September 30, 1995 (prior to the Decree being entered).[219] Plaintiffs agree with Defendants that the requirements of Decree Paragraph 167 have been met.[220]

### 10. Decree Paragraph 169 provides:[221]

> Defendants are committed to use the appropriate professional standards in the EPSDT program. They will develop standards that comport with professional judgment, based upon consultation with appropriate experts, including the chairs of the Department of Pediatric Dentistry in Texas.

In compliance with Decree Paragraph 169, the THSteps dental periodicity schedule, policies, and standards for approval of dental services comport with professional standards of care.[222] The THSteps dental policies and standards—including the concept and definition of a

---

[217] Ex. 19, THSteps Active and Enrolled Dental Provider Participation Report, 1996-Current (Dkt. 1195-13 (July 2014 QMR at Ex. 10)).

[218] This paragraph was not among the Decree paragraphs that Defendants were held to have violated in 2000.

[219] Ex. 18, 1996 and 1997 QMR Excerpts, at p. 2 (Dkt. 147-2 (Apr. 1996 QMR), p. 2), p. 4 (Dkt. 161-2 (July 1996 QMR), p. 4).

[220] Ex. 14, Plaintiffs' May 22, 2014 Responses to Defendants' Chart Showing CAO and Decree Provisions, at p. 9.

[221] This paragraph was not among the Decree paragraphs that Defendants were held to have violated in 2000.

[222] Ex. 3, Altenhoff Decl., at ¶¶ 38-39; Ex. 4, Nguyen Decl., at ¶ 15.

Main Dental Home—are determined based upon American Academy of Pediatric Dentistry (AAPD), Texas Academy of Pediatric Dentistry (TAPD), and other appropriate guidelines and upon consultation with appropriate experts such as representatives of the three Texas dental schools,[223] which each have a Department of Pediatric Dentistry.[224]

Plaintiffs agree that Defendants' dental standards comply with Paragraph 169 and are based upon AAPD standards, but state that they do not know whether the DMOs align with AAPD standards.[225]   By contract, the DMOs' dental policies and standards must align with AAPD guidelines.[226]   The DMO contract adopts the AAPD definition of Main Dental Home, and requires DMOs to enlist Main Dental Home providers to provide Medicaid recipients under age 21 with diagnostic and preventive services in accordance with AAPD recommendations.[227]   The DMO contract also requires the DMOs' utilization management programs to be consistent with national guidelines from the AAPD and the American Dental Association, the Texas Dental Practice Act's requirements, and Texas State Board of Dental Examiners rules.[228]

Accordingly, Defendants have complied with Decree Paragraph 169.

**11. Decree Paragraph 171 provides:[229]**

> *Defendants do not maintain records of the number of the recipients who receive 1 or 2 dental check ups each year.   The parties agree that by September 30, 1996, Defendants will prepare a report of the number and percent of the recipients who receive 1 dental check up/year and 2 dental check ups/year.   They will prepare similar reports every year.*

---

[223]  Baylor College of Dentistry, the University of Texas Dental Branch in Houston, and the University of Texas Health Science Center-San Antonio Dental School.

[224] Ex. 3, Altenhoff Decl., at ¶¶ 38-39; Ex. 4, Nguyen Decl., at ¶ 15.

[225] Ex. 14, Plaintiffs' May 22, 2014 Responses to Defendants' Chart Showing CAO and Decree Provisions, at p. 9.

[226] The full HHSC Dental Contract Terms & Conditions is posted on HHSC's website at http://www.hhsc.state.tx.us/Medicaid/managed-care/forms.shtml.

[227] Ex. 20, Excerpts from HHSC Dental Contract Terms & Conditions, at p. 2 (Section 8.1.4.1).

[228] Ex. 20, Excerpts from HHSC Dental Contract Terms & Conditions, at p. 4 (Section 8.1.9).

[229] This paragraph was not among the Decree paragraphs that Defendants were held to have violated in 2000.

In compliance with Paragraph 171 of the Decree, Defendants have reported annually in QMRs on the number and percent of Medicaid recipients age one through age 20 who receive one dental checkup and more than one dental checkup during the reporting year.[230]

**12. Decree Paragraph 172 provides:[231]**

> By December 1, 1996, the parties will agree on expected increases in the number and percent of recipients who receive 1 and 2 dental check ups/year.

Plaintiffs and Defendants were not able to agree on the Decree's aspirational goal ("expected increases") by December of 1996.   Further, despite several attempts in the intervening years to reach agreement on expected increases in the number and percent of Medicaid recipients under age 21 who receive one and two dental checkups per year, Plaintiffs and Defendants have not been able to reach an agreement in this regard.   In December 2007, Plaintiffs' counsel proposed an "expectation" of an annual 25% increase and an annual 100% increase for Medicaid recipients under age 21 who receive one and two dental checkups, respectively.[232]   Defense counsel responded in May 2008, stating that Plaintiffs' proposed percentage increases were not supported by any empirical basis and that Defendants were not prepared to project future utilization trends for dental services until at least one full year's worth of benchmark data post-implementation of the SFY 2008-09 dental reimbursement rate increases

---

[230] Ex. 21, Texas Health Steps Dental Checkups 1997-2013 (Ex. 11 [Dkt. 1195-14] to July 2014 QMR).  Although dental checkups are now available beginning at six months of age instead of one year of age, the report provides ages one through 20 to allow for comparison across years.  Additionally, data regarding number and percent of Medicaid recipients receiving one or more than one dental checkup were included in the dental utilization reports prepared for the CAO: Check Up Reports and Plans for Lagging Counties.  *See* Dkt. 691-10 (A Report On Service Utilization of Texas Health Steps Dental Checkup, SFY 2007); 728-6 (A Report on Service Utilization of Texas Health Steps Dental Check up, SFY 2008); 776-6 (A Report on Service Utilization of Texas Health Steps Dental Check up, SFY 2009); 858-11 (A Report on Service Utilization of Texas Health Steps Dental Check up, SFY 2010).

[231] This paragraph was not among the Decree paragraphs that Defendants were held to have violated in 2000.

[232] Ex. 22, Paragraph 172 Correspondence, at p 2 (Excerpts of Plaintiffs' Dec. 10, 2007 letter to Defendants, p. 4.)

could be obtained—which would allow HHSC to have an empirical basis for setting an appropriate increase.[233]

However, Plaintiffs did not respond with any empirical data to support their proposed percentage dental checkup increases.  Instead, in February 2009, Plaintiffs averred that one "Dr. Crall" (who has yet to be designated by Plaintiffs as an expert witness in this case) "suggests that at least an annual 10% increase in utilization is more than reasonable," but instead proposed an annual 10 percentage point (not percent) increase.[234]  In April 2009, Defendants informed Plaintiffs that Defendants attempted to contact Dr. Crall to determine the source of his proposed "annual 10% increase in utilization," but were unable to successfully reach him, and that Defendants could find no published reports or articles which would support either an annual 10 percentage point increase or an annual 10% increase in utilization.[235]  Defendants also proposed a 2% (not percentage point) increase in participation for Medicaid recipients under age 21 receiving one checkup each year, and a 3% (not percentage point) increase for two checkups each year.[236]  In September 2009, Defendants again sent correspondence to Plaintiffs requesting that Plaintiffs propose an alternative increase in utilization based upon empirical data for Defendants' consideration.[237]  In March 2010, Plaintiffs responded by alleging that Dr. Crall was a "well-qualified pediatric dental expert," and accordingly, his "expert opinion" was that a "10% annual dental utilization increase" was appropriate.[238]  Plaintiffs also stated that "other States have achieved a 10% rate of improvement," and accordingly, Texas should increase dental

[233] Ex. 22, Paragraph 172 Correspondence, at pp. 4-5 (Excerpts of Defendants' May 21, 2008 letter to Plaintiffs, pp. 10-11).

[234] Ex. 22, Paragraph 172 Correspondence, at p. 7 (Excerpts of Plaintiffs' Feb. 27, 2009 letter to Defendants, p. 3).

[235] Ex. 22, Paragraph 172 Correspondence, at p. 9 (Excerpts of Defendants' Apr. 30, 2009 letter to Plaintiffs, p. 5).

[236] Ex. 22, Paragraph 172 Correspondence, at p. 9 (Excerpts of Defendants' Apr. 30, 2009 letter to Plaintiffs, p. 5).

[237] Ex. 22, Paragraph 172 Correspondence, at pp. 19-20 (Excerpts of Defendants' Sep. 4, 2009 letter to Plaintiffs, pp. 8-9).

[238] Ex. 22, Paragraph 172 Correspondence, at p. 22 (Excerpts of Plaintiffs' Mar. 29, 2010 letter to Defendants, p. 4).

checkup utilization in kind.[239]   However, Plaintiffs again failed to cite to or provide any empirical data demonstrating that an annual 10 percentage point or percent increase in dental checkup utilization was appropriate for Texas based upon Texas's then-current dental checkup utilization rates.[240] In September 2010, Plaintiffs again contended that "an annual 10 percentage point increase" in utilization was appropriate "based on previously provided information."[241] To date, Plaintiffs have failed to cite to or provide any empirical data demonstrating that their proposed dental checkup utilization percentage or percentage point increase is appropriate. Due to Plaintiffs' failure to supply any empirical data establishing that an annual 10 percentage point or percent dental utilization increase was a reasonable expected increase, the parties did not reach agreement on the Decree's aspirational goal of "expected increases."

As noted with regard to Paragraph 171 above, Defendants have reported annually the number and percent of Medicaid recipients age one through age 20 who receive one dental checkup and more than one dental checkup during the reporting year.[242] These reports show that the percentage of Medicaid recipients age one through age 20 who received at least one dental checkup during the reporting year increased from 34.2% in 1997 to 59.4% in 2013—a 73% increase.[243] Further, the percentage of Medicaid recipients age one through age 20 who received one dental checkup increased from 27.3% in 1997 to 34.9% in 2013 (a 27% increase), and the percentage who received more than one dental checkup increased from 6.8% in 1997 to 24.4% in 2013 (a 258% increase).[244] The average percentage increase from the prior year for recipients receiving at least one dental checkup is 3.65% since 1998, while the average percentage

---

[239] Ex. 22, Paragraph 172 Correspondence, at p. 22 (Excerpts of Plaintiffs' Mar. 29, 2010 letter to Defendants, p. 4).
[240] Ex. 22, Paragraph 172 Correspondence, at p. 22 (Excerpts of Plaintiffs' Mar. 29, 2010 letter to Defendants, p. 4).
[241] Ex. 22, Paragraph 172 Correspondence, at p. 24 (Excerpts of Plaintiffs' Sep. 4, 2010 letter to Defendants, p. 2).
[242] Ex. 21, Texas Health Steps Dental Checkups 1997-2013 (Ex. 11 [Dkt. 1195-14] to July 2014 QMR).
[243] *Id.*
[244] *Id.*

increases from the prior year for recipients receiving one dental checkup and more than one dental checkup are 1.64% and 9.34% since 1998, respectively.[245]   Accordingly, Defendants were very close to their proposed goal of a 2% increase for one checkup each year and far exceeded their proposed 3% increase for two checkups each year.

### 13. Decree Paragraphs 173 and 174 provide:[246]

> 173.   <u>Recipients' Health</u>   A reporting system to determine whether recipients receive all needed follow up diagnosis and treatment would be so cumbersome that it would collapse under its own weight.   Accordingly, Defendants will report on dental health outcomes in the EPSDT population. If the EPSDT dental program works, the incidence of dental disease in the EPSDT population should decrease over time, because most dental disease can be prevented.   But, in the interim, dental disease may appear to increase because many recipients who previously had no care will begin to receive care as a result of increased outreach.   It is likely that they will have significant dental disease because they have not received treatment in the past.

> 174.   By March 1, 1996, Defendants will arrange for a study to assess the dental health of the EPSDT population.   The study will assess changes over time.   At a minimum, the study will evaluate the improvements in the number and percent of recipients who 1) have no cavities, 2) have no untreated cavities and 3) require hospital treatment for dental problems.   The method will be subject to Plaintiff's approval.   Plaintiff's approval will be limited to whether the method for the study is professional and valid. Plaintiffs will not unreasonably withhold approval.   If they approve of the method, Plaintiffs may still offer suggestions about the proposed method. Defendants may accept or reject Plaintiffs' suggestions.

Defendants have fully complied with the requirements of Decree Paragraphs 173 and 174.

In 1997, Defendants awarded a contract to the University of Texas Health Science Center at San Antonio for a study to assess the dental health of the THSteps/EPSDT population.[247]   The study report ("Make Your Smile Count") was completed in September 1999 and sent to Plaintiffs

---

[245] *Id.*

[246] This paragraph was not among the Decree paragraphs that Defendants were held to have violated in 2000.

[247] Dkt. 302 (Apr. 2000 QMR) at p. 22.

in January 2000.[248]   The "Make Your Smile Count" study assessed dental health of second graders and eighth graders in 16 elementary schools and 16 adjacent middle schools via a questionnaire and a clinical oral examination by a dentist.[249]   The study also included a survey of the parents/guardians of preschool children (2-3 years of age) and an at-home dental inspection of those children by a dental examiner.[250]

As noted above, the First and Second CAO-required Dental Assessments studied dental health outcomes for Head Start (ages 3 to 5 years, newly-enrolled in federally-funded Head Start centers in Texas) and third grade students.[251]   Because the "Make Your Smile Count" and CAO-required studies assessed the dental health of different age groups in different ways, they are not comparable studies.

As noted above with regard to Bullet Points 6-8 and 10 of the CAO, the parties negotiated about and agreed to methodologies for the First and Second Dental Assessments, and those Assessments studied selected dental health outcomes in the THSteps population in accordance with the CAO and Decree Paragraph 174.[252]   The First and Second Dental Assessments' results were reported in December 2009 and April 2014, and assess changes over time in accordance with Decree Paragraph 174.  Further, as noted in great detail above in the discussion regarding Bullet Point 10 of the CAO, despite the overwhelmingly positive results for Medicaid-enrolled students already seen in the First Dental Assessment, the numbers in the

---

[248] *Id.*; Ex. 23, "Make Your Smile Count" Study Report.
[249] Ex. 23, "Make Your Smile Count" Study Report, at p. 3 of the Exhibit (p. ii of the Report).
[250] *Id.*
[251] See discussion above with regard to Bullet Points 6-8 and 10 of the CAO.
[252] For the First Dental Assessment, these dental health outcomes included: 1) no history of dental caries; 2) had untreated caries; 3) urgent dental care required for pain, infection, or bleeding; and 4) dental care required that may have potentially included either inpatient hospitalization or outpatient treatment under general anesthesia (only for Head Start students).  Ex. 2, Long Decl., at ¶ 9.  For the Second Dental Assessment, these dental health outcomes included: 1) no history of dental caries; 2) dental caries experience (treated and untreated dental caries); 3) urgent dental care required for pain, infection, or bleeding; 4) dental sealants on permanent molars (only for third grade students); 5) dental care required that may potentially include either inpatient hospitalization or outpatient treatment under general anesthesia (only for Head Start students).  Ex. 4, Nguyen Decl., at ¶ 22.

Second Dental Assessment still showed significant improvement from the First Dental Assessment in several areas in both the third grade and Head Start assessments.  Accordingly, the First and Second Dental Assessments have shown that the incidence of dental disease in the THSteps population has decreased over time, in accordance with Decree Paragraph 173.

## VI. CONCLUSION

For all of the reasons stated above, Defendants respectfully request that the Court enter an order vacating the dental assessment portion of the CAO and related Consent Decree provisions (Paragraphs 143-174) under Prong 1 of Rule 60(b)(5) because Defendants have fully satisfied their mandatory, enforceable obligations under those orders.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DAVID C. MATTAX
Director for Defense Litigation

*/s/      James "Beau" Eccles*
**JAMES "BEAU" ECCLES**
Assistant Attorney General
Chief – General Litigation Division
Texas State Bar No. 00793668
LINDA HALPERN
Manager of Complex Litigation
Texas Bar No. 24030166
beau.eccles@texasattorneygeneral.gov
linda.halpern@texasattorneygeneral.gov
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2120 Phone
(512) 320-0667 Fax

***ATTORNEYS FOR DEFENDANTS,***
***KYLE L. JANEK, M.D., ET AL***.

## CERTIFICATE OF CONFERENCE

I, the undersigned counsel for Defendants, certify that Local Rule CV-7(h) has been complied with by way of ongoing discussions between counsel on this Corrective Action Order. Discussions between the parties regarding the relief sought in this Motion have conclusively ended in an impasse, leaving an open issue for the Court to resolve.

*/s/ James "Beau" Eccles*
JAMES "BEAU" ECCLES
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent via Electronic Filing Notification System on August 25, 2014 to:

Jane K. Swanson
Attorney at Law
P.O. Box 8302
The Woodlands, Texas 77387-8302
jks@sbcglobal.net

Timothy Garrigan
*Stuckey, Garrigan & Castetter*
P.O. Box 631902
Nacogdoches, Texas 75963-1902
tim@sgclaw.org
tim2@sgclaw.org

*/s/ James "Beau" Eccles*
JAMES "BEAU" ECCLES
Assistant Attorney General